FILED

AUG 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

CV Case No. **08    3751**

CW

E-filing

DANIEL PARTIDA,

        Petitioner,

  v.

BEN CURRY, Warden,
California Training Facility-Central,

        Respondent

Supreme Court: **S160641**
**Second Appellate District**
Division 2: B204834
LASC No.: BH004210
Criminal Trial: BA043905

## PETITION FOR WRIT OF

## HABEAS CORPUS BY A STATE PRISONER

-----------------------------------------------

Daniel Partida, H-48181
CTF-North
P O Box 705
Soledad, CA 93960-0705

Petitioner In Pro Se

# ORIGINAL

# TABLE OF CONTENTS

Page

**PETITION FOR WRIT OF HABEAS CORPUS BY A STATE PRISONER**

Table of Contents ................................................................. i

I.    Introduction ................................................................ 1

II.   Grounds for Relief ........................................................ 5

### *Ground 1*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board had no relevant or reliable evidence to support the reasons given to deny him parole.

### *Ground 2*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board failed to apply a standard of proof to the substantial evidence favoring parole, as admitted by the Board commissioners. *People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013

### *Ground 3*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board has a policy against granting parole to life prisoners until they have exceeded the terms set forth in its sentencing guidelines considered appropriate to a particular offense, thus depriving such prisoners of any benefit that postconviction credits might have on a parole date, once set. Petitioner asserts that according to the guidelines, and in consideration of his postconviction credits he has earned, he has been imprisoned beyond the term that would apply to his offense and culpability, and that his earned post-conviction credits are rendered meaningless. Additionally, this general administrative increase in actual time served from the date of his offense to the present time, constitutes a violation of Ex Post Facto prohibitions.

III.  Statement of the Case ..................................................... 7

    A.   The Parole Hearing ............................................... 7

    B.   Lower Court Proceedings ......................................... 9

    C.   The Commitment Offense ......................................... 10

D.    Postconviction History ................................................ 12
    1)    CYA Commitment .......................................... 12
    2)    The CDC Commitment ..................................... 14
    3)    Life Prisoner Evaluations ................................ 17
    4)    Mental Health Evaluations ................................ 17
IV.    Jurisdiction of the United States District Court ........................... 20
V.    Summary of Argument ....................................................... 21
VI.    Relief Requested ............................................................. 22
VII.    Conclusion ................................................................ 24
Verification .......................................................................... 25
Certificate of Related Cases ......................................................... i
Certificate of Timeliness of Petition ................................................ ii

APPENDIX:
    Appendix 1: California Supreme Court denial of petition.
    Appendix 2: California Court of Appeals denial of petition.
    Appendix 3: California Superior Court denial of petition.
    Appendix 4: California Supreme Court Petition for Review
    Appendix 5 : Statement of Jose Claro

Declaration of Service by Mail

1  Daniel Partida, H-48181
   CTF-North
2  P O Box 705
   Soledad, CA 93960-0705
3
4  Petitioner In Pro Se

5

6              UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8

9

10 DANIEL PARTIDA,                    Case No._____

11          Petitioner,              Supreme Court: S160641
                                     Second Appellate District
12     v.                            Division 2: B204834
                                     LASC No.: BH004210
13                                   Criminal Trial: BA043905

14 BEN CURRY, Warden,                **PETITION FOR WRIT OF**
                                     **HABEAS CORPUS;**
15 California Training Facility-Central,  **MEMORANDUM OF POINTS &**
                                     **AUTHORITIES;**
16          Respondent               **VERIFICATION; EXHIBITS**

17

18                      **I.**

19                 **INTRODUCTION**

20      COMES NOW Daniel Partida, Petitioner, to submit a Petition for Writ of

21 Habeas Corpus. Petitioner is presently in custody of the Respondent and is unlawfully

22 restrained of his liberty by the California Board of Parole Hearings. Petitioner alleges

23 that the State courts' decisions denying his petition were an unreasonable application of

24 and contrary to federal constitutional law as defined by United States Supreme Court

25 precedent, as set forth in his separate Memorandum of Points & Authorities.

26      Petitioner includes the Court's standard form petition required-information

27 structure into this Petition, pointing out that the standard form is confusing since it is

28 structure for collateral attack to a conviction, which is not the case here.  Further,

Petitioner asserts that the form unfairly limits his ability to set forth his claims. This Petition format accurately follows the standard informational form as previously submitted.

**A.    Information about your conviction and sentence ( See Exhibit A.)**

    1.    What sentence are you challenging in this petition?

        (a)    Name and location of court that imposed sentence.

               Los Angeles Superior Court,  Los Angeles, California
                    *Court Location*

        (b)    Case number, if known ____ BA043905/BH004834 ____

        (c)    Date and terms of sentence  May 5, 1993, 15 years to Life W/Possibility of Parole

        (d)    Are you now in custody serving this term? ____ Yes ____

               Where?    California Training Facility - North,
                         *(Name of Institution)*

                         P.O. Box 705, Soledad, CA   93960-0705
                         *(Address)*

    2.    For what crime were you given this sentence?

        Penal Code § 187 (Murder 2nd);

    3.    Did you have any of the following?

        Arraignment: Yes __ X ____    Preliminary Hearing: Yes _X_

        Motion to Suppress:  Don't Know _____ X ____

    4.    How did you plead?  Not Guilty _X____

    5.    If you went to trial, what kind of trial did you have?    Jury _Yes_

    6.    Did you testify at your trial?  Yes _____

    7.    Did you have an attorney at the following proceedings:

    (a)    Arraignment:                 Yes_ X _No_____

    (b)    Preliminary hearing         Yes_ X _No_____

| | | |
|---|---|---|
| (c) | Time of Plea | No plea _____ |
| (d) | Trial | Yes __X__ No _____ |
| (e) | Sentencing | Yes __X__ No _____ |
| (f) | Appeal | Yes __X__ No ___ |
| (g) | Other post-conviction proceeding | Yes _____ No __X__ |

8.    Did you appeal your conviction?  Yes

        (a)    If you did, to what court(s) did you appeal?

              **Court of Appeal, Second Appellate District, B071301**

              Any other court:    **No**

        (b)    If you appealed, were the grounds the same as those that you are raising in this petition?  **No**

        (c)    Was there an opinion?  **Yes  (unpublished)**

        (d)    Did you seek permission to file a late appeal under Rule 31(a)?

              ***Not applicable to this petition***.

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?

        Yes _____ No __X_____

 

    ***Petitioner's Note***:  This petition concerns a challenge to a decision by the Board of Prison Terms, not to his original conviction. The following answers to the remainder of question 9 are relative to the State exhaustion of the claims raised in this petition.

    **(a)    Lower Court Proceedings:**

**1)** Na me of Court:  <u>Superior Court, County of Los Angeles, Dept. 100</u>

    Type of Proceeding:   <u>Petition for Writ of Habeas Corpus, #BH004210</u>

    Filed:          <u>            05/22/07            </u>

Grounds Raised: (Be brief but specific)

**Same as raised in appellate court.**

Result: _____ Denied. **Appendix 1** _____

Date of Result: _____ 10/29/07 _____


**2)** Na me of Court: <u>Court of Appeal, State of California,</u>

<u>Second Appellate District</u>

Type of Proceeding: _____ <u>Petition for Writ of Habeas Corpus</u> _____

Filed: January 10, 2008, No. B2040834

Grounds Raised (Be brief but specific):

**_Ground 1_**:

> Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board had no relevant or reliable evidence to support the reasons given to deny him parole.

**_Ground 2_**:

> Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board failed to apply a standard of proof to the substantial evidence favoring parole, as admitted by the Board commissioners. *People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013

**_Ground 3_**:

> Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board has a policy against granting parole to life prisoners until they have exceeded the terms set forth in its sentencing guidelines considered appropriate to a particular offense, thus depriving such prisoners of any benefit that postconviction credits might have on a parole date, once set. Petitioner asserts that according to the guidelines, and in consideration of his postconviction credits he has earned, he has been imprisoned beyond the term that would apply to his offense and culpability, and that his earned post-

conviction credits are rendered meaningless. Additionally, this general administrative increase in actual time served from the date of his offense to the present time, constitutes a violation of Ex Post Facto prohibitions.

Result: _____ Denied  (see **Appendix 2**) _____

Date of Result: January 29, 2008

**3)** Na me of Court  California Supreme Court

Type of Proceeding _____ Petition for Review  No.: S160641

Grounds Raised (Be brief but specific):

    a)    Review of lower court proceedings and grounds.

Result: Denied (see **Appendix 3**)

Date of Result: _ April 9, 2008 _

    b)    Is there any petition, appeal or other post-conviction proceeding now pending in any court?    Yes __ No. _ X _

## II.

## <u>GROUNDS FOR RELIEF</u>

Petitioner has made the following factual allegations regarding his primary claim of unlawful restraint of his liberty:

**Petitioner is unlawfully restrained of his rightful liberty under the Fifth and Fourteenth Amendments to the United States Constitution (due process) where he was denied parole for the second time by the Board of Parole Hearings, a) where the parole hearing was a pro forma sham following a predetermined policy;  b) the decision denying him parole was without any evidence having any relevant or reliable evidence to support the Board's conclusion that he posed an unreasonable risk of danger to public safety if released to parole.**

    *//*

Page 5

**Supporting Facts**:

Daniel Partida entered the Board room for the second time to apply for a parole release date.  From the record of that hearing, it seems clear that the Board was predisposed and disinclined to entertain any notion of setting a parole release date. While this may be deemed "conclusory", one fact is NOT conclusory: the Board grants parole in less than 1 or 2 percent of all applications it hears each year.  The statute, Section 3041, creates the presumption that a parole release date "shall normally" be set, with the exception to that presumption based on the convicted offense or offenses, or past convicted offense or offenses.  The specific words used in subd.(b)'s exception is "timing" and "gravity."  If the Board is not granting parole in a manner consistent with the explicit presumptions in the enabling statute, then under any rule of statutory construction the Board has unlawfully "enlarged" the statute, and any decision based upon that enlargement cannot stand up to constitutional scrutiny.  Notwithstanding, Partida's offense was driving the car from which a third party fired the shots. Partida and his family has submitted credible information that Partida never belonged to a gang, that he didn't know the shooter (it was an associate of his girlfriend's brother, who was a gang member), he was only giving them a ride home (or so he thought), and the shooting was a total surprise to him.  Partida was only 17 years old at the time. Nothing about his culpability in this offense, or his his juvenile record, and certainly not in his postconviction record, constituted any reliable or relevant evidence sufficient to find him to be an "unreasonable risk" of danger to society if the Board set his parole release date.  To the contrary, the substantial record strongly suggested otherwise.

The State courts abused their discretion with decisions that were contrary to, and an unreasonable application of clearly established federal law as set forth by the United States Supreme Court, and which were an unreasonable application of the law to the facts of this case.

Partida is asking this Court to GRANT the Writ of Habeas Corpus, and ordering his release from custody, or for such other relief as would be appropriate.

Page 6

# III.

# STATEMENT OF THE CASE

Mr. Partida entered the Department of Corrections on August 20, 1996, for the crime of Second Degree Murder, Case No. BA043903, committed January 21, 1991. He had been sentenced to 15-years-to-Life. (**Exhibit A, Abstract and Sentencing Transcript.**) His term started May 5, 1993, when he was placed in the California Youth Authority at SACCO/YA on May 5, 1993. He was transferred to the adult California Dept of Corrections August 20, 1995. His Minimum Eligible Parole Date was July 22, 2001, which parole hearing was held October 17, 2001, at which he was denied parole for three years. (**Exhibit B**) At the time of his crime he was 17 years old. He has now been incarcerated for 13 years not including jail time. (**Exhibit C**)

A.    **The Parole Hearing**

    ***The June 14, 2005 Parole Hearing***       (**Exhibit D.**)

His subsequent parole hearing was held June 2005. It is the hearing at issue in this case. He was denied parole. The Panel found that his release would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The primary reason for denial was the commitment offense, which the Board characterized as carried out in a callous manner, and the motive for the crime was inexplicable truly in relation to the offense. The Panel found that he had an escalating pattern of criminal conduct in that he had been arrested for vandalism, tampering with ID markers on firearms, as well as possession of live ammunition, and an arrest for robbery. The Panel found he had an "unstable history with others prior to his crime which has brought him to the – position in prison." [sic] The Panel noted 6 128 chronos (for unauthorized telephone usage, absence from assignment twice, unauthorized shower, emergency alarm procedures, with the 6th one in CYA 1999 for leaving class without authority), and a 115 in CYA in 1995 for possession of contraband. The Panel noted opposition to parole by the Los Angeles County District Attorney's Office (who appears to oppose <u>all</u> lifer paroles), as well as opposition by the

1  Los Angeles Police Department.  The Panel noted "other information bearing upon the
2  suitability, the inmate admits driving during the crime, but denies involvement in the
3  actual murder of the victim. And his participation – and, in addition, his participation in
4  of LA local crimes which is however documented in the file." [sic]  "We also have
5  taken confidential information into consideration in making our decision."

6        The panel, however, did find that Mr. Partida has remained disciplinary-free, his
7  psychological evaluation of 2004 was supportive in that there is no indication of any
8  mental or emotional problems in this case that would interfere with granting of parole
9  date, and there are "many factors which are listed above that would indicate that Inmate
10  Partida would make a good adjustment to the community, [with] the prognosis for
11  successful adjustment in society is excellent in this case."  The Panel found Petitioner
12  had adequate parole plans and strong family support.

13        The Panel stated the Mr. Partida should be commended for acquiring his GED,
14  completing a course in professional career development in the area of accounting,
15  participation in lifer groups, impact programs, Path-to-Peace program, Family
16  Effectiveness Training program, Self-Esteem Lifers Group, being an Instructor for an
17  inmate peer educational program,  Twelve-Step program, Laubach Literacy Tutor, and
18  completion of three vocational trade courses.

19        The Panel recommended Mr. Partida "remain disciplinary free."  And, "if
20  available, participate in self-help programs. Most of the programs he has already
21  accomplished. Has done an excellent job in getting ready for eventual parole."

22        In summary, **PRESIDING COMMISSIONER INGLEE** stated:

23        "Mr. Partida, your – no one can fault anything you've done
         for preparing for your eventual parole – you'll put yourself in
24       a position where eventually getting out and becoming a
         worthwhile citizen and add to society. [sic] ¶ I personally
25       think you have to take a very hard look at inside of our
         concern over your potential gang involvement and possibly
26       the concern of others in the future.  I think you have to think
         about that.  ¶ Your family support is undeniable. I think it's
27       meritorious what they – your family has done and the fact that
         you have an opportunity to eventually go and work into the
28       family business.  ¶ But I think you have a little more time to

Page 8

give some consideration [sic], and , therefore, we are -- we're giving you a two-year denial on this."

In his closing, **DEPUTY COMMISSIONER McBEAN** stated:

> "Mr. Partida, we know you're disappointed today, but we really took into consideration a lot of the good things that you've done, and you have come – you had a three-year denial last time. This time we gave you a two-year denial. ¶ That tells you that you're going in the right direction. ¶ We are pleased with how much you have done. You've gotten very active since your last appearance, in self-help, and that is exactly what we want you to continue to do. It's very important for you to continue doing all the away – [sic] positive things that you have been doing. Staying disciplinary free. ¶ You've got three vocs now. You've upgraded education [sic] as much as you're required to. And, of course, you stay working towards your AA, and that's great. the more you can get, the better off it will be for you. ¶ Keep up the good work in terms of your self-help. That should help you with insight. That should help us understand the extent to which you've been able to come to terms of your crime. ¶ So even though we know you're going to be disappointed today, I want to leave you – we want to leave you with a positive – on a positive note to just really keep up that good work and don't let yourself slide back. ...."

Petitioner challenges this hearing on the basis that there was no relevant evidence that he poses an unreasonable risk to society if released to parole after some 15 years confinement.  The record shows the Board cited to not a single piece of evidence that supported its conclusion. This petition seeks to reverse the Board's decision and to obtain a parole release date.  It is supported by the following facts, arguments, and points and authorities.  This is a clear prima facie case requiring a formal Order to Show Cause.

### B. Lower Court Proceedings

On May 22, 2006, Petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court for the County of Los Angeles, No. BA043905/BH004210.  This Petition was denied October 29, 2007.

On January 10, 2008, Petitioner filed a Petition for Writ of Habeas Corpus in the Court of Appeal for the State of California, Second Appellate District.  The court did

Page 9

1  not request briefing from the Respondent nor was a formal Order to Show Cause

2  issued.  On January 29, 2008, the Petition was denied by the Court of Appeal.

3        A Petition for Review to the California Supreme Court, filed February 5, 2008,

4  resulted in a summary denial on April 9, 2008.  (**Appendix 3.**) The Petition is attached

5  as **Exhibit D.**

6           Petitioner alleges that the State courts' decisions were an unreasonable

7  application of and contrary to federal constitutional law, and that the Board's denial

8  violated his Fifth and Fourteenth Amendment rights to due process of law.

9

10  ## C. The Commitment Offense

11        The following is taken from the decision affirming the conviction, *People v.*

12  *Partida*, No. B071301, Court of Appeal, Second Appellate District, Div. 2, dated

13  09/08/1994:

14              "[T]here was abundant proof that appellant, a member of the
                Street Saints gang, was driving his uncle's distinctive red
15              Hyundai in territory claimed by the rival 38th Street gang,
                with whom the Street Saints were feuding. He slowed the
16              vehicle, first to permit its passengers to issue verbal
                challenges, and then to use a 9-millimeter Uzi to gun down a
17              youth who apparently was not a gang member, but who at
                that moment had the misfortune to be with a person who was
18              and into whose car bullets had been fired a few days earlier.
                ¶ Following his arrest, after advisement and waiver of his
19              constitutional rights, appellant [Partida] admitted he was
                driving the car at the time of the murder. He stated a fellow
20              gang member, Jose Claro, had been with him, but he claimed
                it was a man he did not know who fired the fatal shots. [FN1:
21              One of the recanting witnesses had told the police and the
                district attorney that Claro was the shooter.]  In fact, he
22              asserted, he had not even been aware that this person was
                armed. When the officer then inquired how it was possible his
23              passenger could have been carrying so large a weapon
                without it being apparent, appellant stated he did not wish to
24              discuss the matter further without an attorney. The officer
                honored this declaration and immediately halted the
25              interrogation.  ¶ Evidence was also introduced to establish
                that only a month earlier, appellant had been stopped while
26              driving the same red Hyundai with a semiautomatic handgun
                beneath the driver's seat. Jose Claro had been a passenger at
27              that time as well."

28  **(Exhibit E.)**

Page 10

The jury in the case specifically found:

> "We, the Jury in the above-entitled action, find the Defendant, DANIEL PARTIDA, guilty of the crime of SECOND DEGREE MURDER, in violation of Penal Code section 187, a felony, a lesser and necessarily included offense than that charged in Count 1 of the Information. ¶ We, further find that the allegation that in the commission and attempted commission of the above offense a principal was armed with a firearm, to wit, a handgun, within the meaning of Penal Code Section 12022(a)(1) to be NOT TRUE."

**(Exhibit F.)**

At his sentencing hearing, the court rejected a CYA commitment pursuant to Section 1731.5, Welfare and Institutions Code, because this was a "drive by shooting" by a gang member. The court stated the sentence:

> "Although the CYA report says that CYA commitment is highly recommend [sic], I, nevertheless, think in a case like this it is not appropriate. ¶ Accordingly, the defendant is sentenced to the term prescribed by law to 15 years to Life in the State Penitentiary. ¶ However, pursuant to Welfare and Institutions Code, Section 1731 point 5, it is ordered that the defendant be transferred to the Youth Authority for the purpose of housing and participation in programs available there. ¶ But that defendant shall be deemed to be committed to the Department of Corrections and shall remain subject to the jurisdiction of the Department of Corrections and Board of Prison Terms."

At the sentencing hearing, his attorney, in arguing for CYA commitment, said:

> "The Court heard the evidence in this case. There is no doubt that he [Partida] was not the shooter in this case. Had he been in [sic] the shooter in the case or had the jury found that he used a weapon, I think that there would be no question as to the seriousness of the offense being particular endangerment to the community. ¶ Because the jury did not find the weapon allegation to be true, found second degree, and because it was never alleged that he was the shooter, in fact, there was a lot of evidence to indicate that he was the driver, and that is, of course, what he admitted to the police upon his arrest. ¶ So he took responsibility at that time."

**(Exhibit A)**

Page 11

**D.    Postconviction History**

    **1)    *CYA Commitment***

       The CYA report dated 05/07/96 began at the H.G. Stark Y.T.S. institution in October 1992. He had been placed with the M/N Treatment Team and assigned the treatment and training objectives of addressing the commitment offense and cultural factors, and increase his education/employability skills. He was afford the opportunity to participate in small group discussions and individual counseling sessions, as well as complete written casework assignments. Based on the fact that his case was under appeal, Partida would not discuss the details of his commitment offense. During his first year on M/N Treatment Team, areas of concern included his level of involvement in the gang subculture. Although Partida's offense was viewed as being gang related, he denied being a member of any particular gang. In the area of behavior, Partida received disciplinary documentation for failing to follow instructions. In the area of academics, he studied Government-US, Science of Living, and Algebra. His TABE (Testing Adult in Basic Education) score reached the 12.9 grade level in reading, mathematics and language. Up to 12/31/93 he had earned 54.5 high school credits. From 12-31-93 to 12-31-94, he enrolled in Vocational Upholstery, accruing 63 hours of instruction. It was noted that he was making good use of time in the trade. He was assigned treatment objectives to address the dynamics surrounding his commitment offense and victim's issues, but he would not discuss the specifics of the offense. With respect to victim's issues, he expressed empathy for the victim and the victim's family, but did not feel responsible for his death. He received disciplinary documentation for failing to follow instructions, but overall, he was not considered a management problem. In academics, he studied GED Prep, Science of Living, Physical Education, Algebra, Science-Earth, and English. During the time from 12-31-94 to 12-31-95, he continued to work towards completing the requirements for a High School Diploma, accumulating 79 credits. He passed the GED exam on 08-12-94. His plan was to enroll in college courses if accepted into the program. He continued in Upholstery with a total

of 171 hours of instruction and attained Helper Trade Skills. He also received 99 hours

instruction in Vocational Electronics. Both instructors felt that Partida was taking

advantage of available training.   In treatment, he began to discuss specifics regarding

the crime, but it was noted he lacked remorse when discussing his criminal behavior.

However, it was believed that he could continue to benefit from reformatory

opportunities. The report claims Partida admitted he was a member of the Street Saints

gang, but had severed all ties to the gang subculture, but avers now that this report

misconstrues what he said.[1] He received a disciplinary for possessing contraband, but

was not viewed as a management problem. He continued his studies in English,

Economics, History-US, Science of Living, and Mathematics. From 12-31-95 to 05-

01-96, he had earned his GED, and continued towards completing the credits for a High

School Diploma, accumulating 114 credits. He continued in Vocational Electronics

with a total of 135 hours of instruction. He also accrued 81 hours of instruction in

---

[1]    In CYA, Partida admitted he had been *affiliated* with a member of the Street Saints gang, (**Exhibit G**, 01-01-95 entry) which was his girlfriend's (Yecel Claro) brother, Jose Claro, and, but for this offense, who may have become his brother-in-law. He never joined any gang. (*See* **Exhibit H**, 08-25-04 letter from Petitioner's older brother Pedro Partida.) At his 2001 parole hearing, when asked about this conflicting information, Partida explained that he did NOT admit gang membership, but that his counselor misinterpreted what he said to her. (**Exhibit B**, at page 21-22; also pp. 35-36.) Petitioner could NOT have belonged to the Street Saints gang. In the neighborhood where he lived, on the same block, was the "Ghetto Boys," who were a neighborhood gang. The Ghetto Boys played sports against other gangs they were friendly with. Daniel Partida, and other non-gang neighbors, often played sports with them. The one feature that is important here is that the Ghetto Boys would not have tolerated a member of the Streets Saints living in their neighborhood. The Ghetto Boys, like many of the street gangs, began as a group of kids in the early 1980's who played sports together, but who later turned into more sinister associations, as did the other gangs. (*See* **Exhibit I**, Declarations of Peter Partida, Modesta Salas, and Jacinto Alarcon, Social Worker, Los Angeles.) Partida explained that his moniker "Loverboy" was not a name he chose, but what Jose Claro began calling him after he began dating Claro's sister; it was like a joke, referring to him as "loverboy." Because Partida was a non-gang member, he could date Jose Claro's sister; he could not have done so if he belonged to another gang like the Ghetto Boys. (**Exhibit B**, 2001 BPT transcript, p. 46.)

Business Education and attained Helper Trade Skills. In treatment, he continued to address the commitment offense and victim's issues. Although he denied firing the weapon that killed the victim, he has accepted responsibility for causing the death of another individual by saying, "I drove the car." Staff were encouraged by his willingness to finally accept responsibility for the death of an innocent victim. He continued his studies in Math A, Physical Education, and English, and accumulated 122 credits. By May of 1996, he accrued a total of 108 hours of instruction in Business Education. (**Exhibit G**, CYA Life Prisoner Progress Report.)

### 2)    *The CDC Commitment*

Partida was received in the CDC 08/20/96 and initially housed at CCI-RC. On 10/07/96, he was endorsed to Corcoran COR-III with a classification score (CS) of 48 points. He was placed on a vocational and ABE-III waiting list. On 10/25/96 he enrolled in Vocational Machine Shop and terminated 12/17/96 due to reduction in custody level. His performance level was rated Satisfactory. On 06/04/97 he appeared before the Unit Classification Committee (UCC) for annual review and referred for transfer with the recommendation of RJD-III at San Diego. He received a Certificate of Completion for Volunteer Tutor Workshop by Laubauch Lit Action on 04/30/97. On 02/04/97 he was assigned as a Teacher's Clerk where he received below average, unsatisfactory, satisfactory, above average, and exceptional work reports. He received no disciplinaries. On 01/04/97 he received a chrono for successful completion of Literacy Thinking Lifeskills Self-Help program, volunteer classroom format 40 hours. During this period until 03/22/97, he received chronos for successfully completing Literacy Thinking-Organization, and Interaction of Life Skills, How Best to Tutor/Instruct Fellow Inmates (8) hours, Literacy Thinking Lifeskills Self-Help as a Tutor, and 80 hours of instruction in Thinking Skills and 20 hours in learning Interactive Thinking. On 06/26/97, he was assigned to Vocational Machine Shop at Corcoran-III, and received satisfactory performance in this assignment. On 06/19/97, he

Page 14

received a chrono for 17 hours on how best to tutor/instruct inmates in Literacy instruction. On 06/30/97, he received a chrono for providing 52 hours of instruction as a certified Laubach Tutor. On 08/01/97, he received a chrono for 40 hours of instruction to inmates in Literacy Thinking.

On 12/03/97 Partida was transferred to RJDonovanCF prison at San Diego. On 06/02/98, his custody was reduced from Close Custody to Medium-A, and his Classification Score reduced to 36 points from 48. As of 06/03/98, he had completed 120 hours of Life Plan for Recovery program. He obtained a minor custodial counseling chrono CDC-128-A, dated 05/21/98, for "Emergency Alarm Procedure." He received a chrono dated 08/26/98 for attendance in Rapha 12-Step program. He received a CDC-128-B General Chrono dated 08/18/98 for completion of 22 hours Advance Hands of Peace/Friends Outside Creative Conflict Resolution Workshop. On 11/25/98 he received a custodial counseling chrono CDC-128-A for an unauthorized shower. On 01/30/99 he received a custodial  counseling chrono CDC-128-A for Unauthorized Leaving Work. On 06/19/99 he received a custodial counseling chrono CDC-128-A for being absent from work. He participated in the "Walk-A-Thon" fundraiser for which he received a chrono dated 05/05/99. Remained assigned to Vocational Machine Shop until re-assigned on 08/13/99 to Laboratory Porter on 08/14/99. Work reports dated 08/14/99 to 12/15/99 reflect satisfactory grades. He was reassigned to Medical Supply Clerk on 05/18/2000. Work Supervisor's report dated 08/22/00 reflect good grades and positive commentary. In self-help he completed the basic, 22 hour workshop in "Hands of Peace"/Friends Outside Creative Conflict Resolution workshop with laudatory chrono dated 05/07/00. He received a custodial counseling chrono dated 07/23/00 for unauthorized telephone call. His classification score was reduced to 20 points.

Partida was transferred to CTF-II Soledad on 08/25/00. Remained assigned to Vocational Off-Set Printing on 09/16/00. Partida enrolled in a correspondence course in the School of Bookkeeping and Accounting through the Professional Career

Page 15

Development Institute. He successfully completed a course in the cause, prevention, treatment and management of tuberculosis, HIV/AIDS, hepatitis, and sexually transmitted disease and received 128-B chronos dated 10/05/00, 10/06/00, and 10/10/00. He was assigned as a Clerk in Medical Central Supply at RJD and received satisfactory grades, per Work Supervisor Report dated 08/22/00. As of 01/27/01 he was assigned to Vocational Print Shop. As of 06/06/01 he had remained disciplinary free. As of 08/26/04 he remained assigned as a student in the Vocational Off-Set Print/Graphic Arts program with satisfactory ratings and positive comments per chrono dated 06/30/01, 12/30/01 and 03/31/02. He received a 128-B laudatory chrono dated 07/24/01 which documented his skills and positive attitudes in the printshop program. He completed the 13-week IMPACT self-help program by 04/29/02. Remained disciplinary free during that period.

On 09/25/02 he was dropped from the Vocational Off-Set Print/Graphic Arts program for having completed it. He was assigned as a dining hall worker on 09/27/02 and then to a food cart/porter relief position in the Infirmary on 09/28/02. In self-help he completed the 12-week Millati Islami (The Path to Peace) Addiction Recovery Program by 09/04/02. He remained disciplinary free.

His request to participate in the "Cage Your Rage" Anger Management Group was denied on 01/07/04 due to ineligibility, since Partida is not a participant in the Mental Health Services Delivery System (i.e., he has no diagnosed psychiatric disorder). He participate in a weekly Lifer's Group from 10/31/03 through May 2004. He remained disciplinary-free.

This postconviction record is documented in the Progress Reports, at **Exhibit J.** It is clear from this postconviction record that Daniel Partida has sought out and participated in as many available programs as he could, enhancing his education, his vocational skills (3 trades), learning about himself in self-help programs, helping others, and generally meeting all expectations of the Board of Parole Hearings and more.

Page 16

**3)**    ***Life Prisoner Evaluations:***

Life Prisoner Evaluations ("LPE") are the forensic reports documenting an inmate's progress through the Department of Corrections.  They also contain summary information about the commitment offense, preconviction factors, future plans, and, prior to 2004, a risk assessment.[2]

Mr. Partida's June 2000 LPE gave a risk assessment as follows:

    1.    Considering the commitment offense, prior record and prison adjustment, I believe that Partida would pose a moderate degree of threat to the public if released at this time

    2.    Prior to release, Partida would benefit from remaining disciplinary free, continuing to upgrade vocationally and participation in self-help and therapy when available, maintaining full time assignments.

**(Exhibit K,** 2000 LPE)

No risk assessment was made in the October 2004 LPE, and the counselor just advised that Partida could benefit from remaining disciplinary free. **(Exhibit C,** 2004 LPE.)

**4)**    ***Mental Health Evaluations:***

Mental Health Evaluations are performed on life prisoners at the behest of the Board of Parole Hearings. They are performed by prison staff psychologists through the Department of Mental Health Services for the Department of Corrections, or by contract psychologists.

**<u>Partida's 01/06/2001 Psychological Evaluation</u>: (Exhibit L)**

---

[2] Following Superior Court decisions in *In re Cortez* Superior Court of Los Angeles County, No. BH001953, and *In re Aremu*, Superior Court of Los Angeles County, No. BH002661, Order issued August 31, 2004, the Department of Corrections was prohibited from allowing correctional counselors to make future predictions of inmate behavior on the basis they were unqualified to engage in psychological evaluations. Petitioner asks the Court to take judicial of its prior decisions in these two cases.

*PETITION FOR WRIT OF HABEAS CORPUS*

The report noted that Partida has throughout his incarceration participated in 12-Step program and continuous Alcoholics Anonymous meetings although he denied having any history of either drug or alcohol abuse. When the psychologist asked why he participated in these programs, Partida responded with "It helps me to learn more about myself, and I know the Board will recommend that I participate." (*Id.,* at page 3.) In the Clinical Assessment, under Current Diagnostic Impressions, he rates as follows:

1. AXIS I:    No Contributory Clinical Disorder.
2. AXIS II:   No Contributory Personality Disorder.
3. AXIS III:  No Contributory Physical Disorder.
4. AXIS IV:   Incarceration.
5. AXIS V:    GAF – 85.

Under Assessment of Dangerousness, the psychologist concluded:

> If released to the community, his violence potential is estimated to be no more than the average citizen in the community. Although he has a juvenile record prior to the commitment offense, the charges were either dropped or he was counseled and released to his grandmother's custody.

Under Clinician Observations/Comments/Recommendations:

1. This inmate is competent and responsible for his behavior. He has the capacity to abide by institutional standards and has generally done so during his incarceration period.

2. This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole.

3. The only risk factor which could be a precursor for this individual would be his return to gang affiliation, and therefore should be monitored closely for negative associations.

> Report by: R.S. Coate, Psy.D.
> Senior Supervising Clinical Psychologist
> Correctional Training Facility, Soledad

### Partida's 11/27/04 Psychological Evaluation: (Exhibit M.)

This very detailed report by Licensed Psychologist Melvin Macomber, Ph.D., and approved by Senior Supervising Psychologist B. Zika, Ph.D., resulting in the same conclusions of all five Axis as the previous report. The report noted that "Partida has

Page 18

made a very good adjustment to his prison experience. He has actively involved himself
in activities designed for self-improvement." (Those activities were listed but since they
are also listed elsewhere in this petition under Postconviction Progress reports they won't
be repeated here.) Dr. Macomber found that "There is no history of mental disorder in
this case. In the interviews, it is evidence that there are no mental or emotional problems.
Inmate Partida does not have a personality disorder of any type. He is not an individual
that is antisocial or sociopathic in his thinking or values. He has a great deal of warmth
and empathy towards other people. He continues to have a friendly and cheerful attitude
in spite of his years of incarceration. He has a positive outlook on the future. There is no
evidence of psychopathology in this case." (*Id.*, at p.2.) When asked about the
commitment offense, Dr. Macomber related Partida's explanation:

> When questioned about the commitment offense, he stated
> that he had absolutely no intent to commit this offense. He
> stated the problem was that he had accidentally associated
> with a negative person who was the assailant in this offense.
> He had no idea who this person was, or what his intent was.
> He stated that, after work, he was driving over to see his
> girlfriend, and he saw his girlfriend's brother. He stopped and
> asked the brother if he wanted a ride. The brother, Jose, age
> 15, was walking with an older associate that was unknown to
> inmate Partida. He stated he was about 19. He asked for a ride
> also, and so they both got into the car. ¶ As they were driving
> towards his girlfriend's home, the other individual asked to be
> taken to a nearby apartment building. Inmate Partida stated
> that he assumed that was where the individual lived.  He
> pulled up to the curb in order to let him out. He immediately
> heard a shot and thought that someone was shooting at him.
> He stated he ducked down and put his foot on the throttle in
> an effort to get out of the area. He heard two more shots, and
> then realized that the person sitting in the passenger seat next
> to him was shooting the gun at bystanders on the sidewalk. ¶
> Inmate Partida stated that he felt panicked, and he drove away
> quickly. He went to Trinity Park, where the assailant was
> dropped off. He stated that Jose was arrested for this offense,
> but then released. He was told that Jose had protected his
> friend, and accused inmate Partida of this offense. The actual
> assailant was not arrested, and be believes he must have left
> the area.  He suspected that he was from South America. He
> stated that he had no idea how to defend himself, and how to
> obtain legal counsel. He stated that his public defender never
> questioned Jose, who could have explained the truth of what
> really happened."

Page 19

*Id.*, at page 3.)  Under Assessment of Dangerousness, Dr. Macomber concluded:

> "If released to the community, his potential for dangerousness is no greater than that of the average citizen in the community. This was stated by the previous psychologist, and I agree with that assessment. His juvenile record is minor. He has consistently denied being involved in street gangs, although the opportunity was certainly available to him when he was living in the community. In addition, there are other factors that would indicate that he has a low potential for dangerous behavior."

Dr. Macomber lists 8 factors to support his assessment. *Id., pp. 4-5.*

Under Clinician Observations/Comments/Recommendations:

> "There is no indication of any mental or emotional problems in this case that would interfere with granting a parole date. There are many factors which were listed above that would indicate that inmate Partida would make a good adjustment to the community. The prognosis for successful adjustment in society is excellent in this case. ¶ As a former parole agent who has had numerous lifers on my caseload in the Los Angeles area, I would not hesitate to have inmate Partida on my caseload."

Clearly, there was no evidence that Daniel Partida posed an unreasonable risk of danger to society if released to parole, and that is the bottom line under criteria for parole.

## IV.

## Jurisdiction of the United States District Court

This Court has jurisdiction pursuant to 28 United States Code § 2254 to entertain a federal petition for writ of habeas corpus by a state prisoner alleging that he is currently imprisoned and that his continued restraint is unlawful.

This court has federal-subject matter jurisdiction over any claim "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. 1331. A proper petition for habeas corpus gives rise to federal subject-matter jurisdiction. 28 U.S.C. 2254(a) (petition must claim that the prisoner is held "in custody in violation of the

Page 20

Constitution or laws or treaties of the United States"). The Fifth and Fourteenth amendments prohibit the government from depriving a prisoner of life, liberty, or property without due process of law. A prisoner claiming a due-process violation must allege deprivation of a constitutionally protected liberty or property interest, which can be created by a state statute, and a denial of adequate procedural protections. *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir.2003). A federal, constitutional claim confers subject-matter jurisdiction on district courts unless the claim's "unsoundness so clearly results from the previous decisions of [the Supreme C]ourt as to foreclose the subject and leave no room for ... controversy." *Hagans v. Lavine,* 415 U.S. 528, 536-38, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).

## V.

## SUMMARY OF ARGUMENT

Petitioner possesses a federally protected "expectancy of release" which is a liberty interest established by mandatory and presumptive language in the California Penal Code section 3041 and Board regulations 15 Cal.Code of Regulations, Div.2, BPH Rules, sections 2400 et seq.

Petitioner has been deprived of those liberty by an arbitrary, capricious, and standardless process applied to his parole decision at issue here.

Petitioner's crime occurred when he was a juvenile, age 17. He spent his early years in the California Youth Authority before being transferred to the adult prison system. The substantial record shows he has matured as an adult, has reformed his thinking, and he has made significant achievements in self-help and educational programs. While there are unresolved differences in the official version and his version (a version supported by other credible information), there is not a shred of evidence that supports the Board's conclusion that Daniel Partida currently poses an unreasonable risk of danger to society if a parole release date is set. Because there is none, it does appear that the Board simply referenced historic facts and issued a rote recitation of

Page 21

1  unsupported reasons referencing the standard <u>PAROLE DENIED</u> worksheet to deny
2  him parole for the second time. This is hardly individualized consideration.

3      Petitioner incorporates by reference his separately submitted Memorandum of
4  Points & Authorities, which sets forth the law to the facts in similar instances, and
5  which support the granting of the Writ of habeas corpus by this federal court.

**VI**

**THE EVIDENCE OF LIMITED CULPABILITY**

8      Finally, it is noteworthy to briefly review the question of Daniel Partida's actual
9  culpability and foreknowledge in this crime. He went to jury trial. Co-defendant Claro,
10 who was 14 years old at the time, was never called to testify at Partida's trial. On March
11 16, 1991, Jose Claro, his sister Yecel, Partida's girlfriend at the time of the offense,
12 encouraged Claro to come clean about the crime. He created and signed a notarized
13 statement clearing Daniel Partida of any foreknowledge of the offense. While he did not
14 identify "Mongo" the shooter, he explained what happened the day of the crime, and
15 alleges this was the truth. Whether Claro had foreknowledge, which he denies, is not the
16 concern here, because one can both lie about one thing and tell the truth about another.
17 This Statement is submitted as **Appendix 5.** If this statement is true, and the
18 Declarations of Pedro Partida and Jacinto Alarcon give credibility to Claro's statement,
19 then a most egregious injustice has been committed against Daniel Partida. Without
20 foreknowledge a crime is to be committed, it appears Daniel was indeed a patsy, a fall
21 guy. Claro states:

23      Back in January 1991 when this offense was committed Danny was
24      unaware that we would be involved in this drive by shooting. I was on my
        way home with a companion from my gang when Danny drove up asked
25      me where was I going. When I said to my grandma's, Danny asked me to
26      get in. I didn't want to just leave my companion there so I asked Danny to
        give him a ride to 24th st. Danny agreed we both got in his car. There was
27      nobody hanging out on 24th st. This guy asked Danny to drive him
28      somewhere, I couldn't hear because of the music soon I realized we were in

39th st. territory. Danny stopped the car in the front of some apartments the shooting took place. Danny drove away shocked so was I. We never planned on doing a shooting, I was going home. When Danny dropped us off at the part he quickly drove away without giving me a chance to talk to him. The next day when I was hanging out with my friends there was talk about what to say if anything happened. Someone said to blame it on Danny since he was not a member of the street saints. ¶ When I was arrested I was 14, yrs old never been in trouble with the law. I was scared intimidated by the detectives my parents were not there during questioning. I was told about "mongo's" statement how he was blaming Danny. I was told that if I wanted to help myself I needed to cooperate give a statement blaming someone since Danny was in Mexico I soon began agreeing with mongo's statement the detectives filled in the rest. I just said yeah to what they wanted to hear. This is how my statement came about. ¶ There is no truth to what I said I only made those statements because of fear intimidation.

     1. Danny never was a member of the street saints.

     2. Neither Danny or myself knew a shooting was going to happen. I didn't even know this guy had a gun.

     3. My only relationship to Danny was because he was dating my sister Yecel.

     4. The weapon used was a black hand gun not an Uzi. The detectives said it was an Uzi I said yeah.

     This is the truth about what happened on the night of January 1991. I was never called to court.

Jose Claro was 30 years old when he gave this statement, 16 years beyond the 14 year old at the time of the crime. The statement is retyped exactly as written, including the numerous errors in grammar and syntax. Daniel Partida has said from the beginning he was never a gang member. His brother Pedro and Jacinto Alarcon explain why he could NOT have been a Street Saints member living in Ghetto Boy's territory. The dynamics of gang infestation of neighborhoods is surely recognized by experts in street gangs, and it only takes a bit of common sense to understand enough of how they work to recognize the allegation he was a Street Saint's member is likely untrue.

# VII.

## RELIEF REQUESTED

WHEREFORE, on good cause shown, Petitioner prays for the following relief:

1.     That the Court issue a formal Order to Show Cause and order the Respondent to file a response as to why the relief prayed for should not be granted;

2.     That the Court find that the Board failed to meet its burden of "some evidence" that Petitioner Partida current poses an unreasonable risk to society if released to parole;

3.     That the Court find that the Board did not allege nor show that the crime was more than the minimum necessary to sustain conviction for the underlying offense, under the standards set forth by *In re Rosenkrantz*, 29 Cal.4[th] 616 (2002);

4.     That the Court find that the Board failed to show "some evidence" that the offense showed an "exceptionally callous disregard for human suffering" pursuant to 15 CCR §2402(c)(1)(D), according to the standards set forth by *In re Rosenkrantz*, 29 Cal.4[th] 616; *In re Scott (Scott I)* 119 Cal.App.4[th] 871 (2004), and other case law cited herein;

5.     That the Court find that the Board did not support its allegation of "inexplicable motive" as relates to Partida in this offense in its denial of parole, pursuant to the standards set forth by *In re Scott I, supra,* 119 Cal.App.4[th] 871 (2004), and other caselaw cited herein;

6.     That the Court find that the Board's allegation that Partida has a "pattern of escalated pattern of criminal conduct" [sic] in his youth is not a legitimate reasons insofar as it does not appear in Board regulations, and further, that it is not supported as a sufficient basis for parole denial when his offenses were minor, not violent,  and did not result in any criminal dispositions;

Page 24

7.  That the Court find, as the superior court did, that the opposition by the District Attorney and law enforcement does not rise to the level of "some evidence" of unsuitability under *In re Rosenkrantz, supra*, 29 Cal.4th 616, 658 [there must be "some evidence in the record before the Board [that] supports the decision to deny parole, *based upon the factors specified by statute and regulation*" (italics added)];

8.  That the Court find that the Board's decision was arbitrary and capricious insofar as it did not apply a standard of proof to the substantial evidence before it, and instead denied parole based upon the subjective viewpoint of the Commissioner that Partida needed to do more time;

9.  That the court find that the increase in duration of confinement from 1991, at the time of Partida's offense, to the current time, violates due process and the ex post facto clause.

SO PRAYED, this 28th day of July, 2008.

DANIEL PARTIDA, in pro se

Page 25

## VII.

## CONCLUSION

WHEREFORE, on good cause shown, Petitioner Daniel Partida prays that this Court will GRANT the Writ of Habeas Corpus, and order the Board of Parole Hearings to set his parole release date.

Respectfully submitted,

Dated: July  28, 2008.

_Danny Partida_
Daniel Partida
Petitioner In Pro Se

## VERIFICATION

I, Daniel Partida, declare that I am the petitioner in the foregoing petition for writ of habeas corpus, that I have read and know the petition to be true and correct to the best of my knowledge, information, and belief, and that I submit this petition and its supporting documents in good faith as to the merits hereof.

Sworn to under penalty of perjury, this  28th day of July, 2008, at Soledad, California.

_Danny Partida_
Daniel Partida, declarant
Petitioner in pro se

*PETITION FOR WRIT OF HABEAS CORPUS*

## CERTIFICATE OF RELATED CASES

I, Daniel Partida, declare that I am not aware of any specific related cases, and that I do not have any other related cases pending in this or other federal courts.

Sworn to under penalty of perjury, this 28th day of July, 2008, at Soledad, California.

*Daniel Partida*

Daniel Partida, declarant
Petitioner in pro se

## CERTIFICATE OF TIMELINESS OF PETITION
## FOR WRIT OF HABEAS CORPUS BY A STATE PRISONER
## SEEKING RELIEF UNDER 28 U.S.C. § 2254

I, Daniel Partida, certify that the following timelines are correct for jurisdiction of the Court, and that this petition is timely filed within 365 days of the appropriate date which begins AEDPA untolled time:

| | | |
|---|---|---|
| Parole Hearing Date: | 6/15/2005 | |
| Decision Effective Date: | 10/12/2005 | |
| Governor's 30 Days for Review: | 11/11/2005 | AEDPA untolled time begins. |
| **Superior Court Petition Filed**: | 5/22/2006 | 192 days untolled time. |
| Superior Court Denial of Petition: | 10/29/2007 | |
| Appellate Court Petition Filed: | 1/10/2008 | 102 days Interim (3.4 months) |
| Appellate Denial of Petition: | 1/29/2008 | |
| Cal Supreme Court Petition Filed: | 2/05/2008 | (Petition for Review) |
| Petition for Review Denied: | 4/09/2008 | AEDPA untolled time begins. |
| **Federal Habeas Petition Mailed**: | 7/31/2008 | 112 days Untolled time. |

Total Days Untolled Time: 192 + 112 = 304 days.
Remaining AEDPA days: 61 days.

Sworn to under penalty of perjury, this 28th day of July, 2008, at Soledad, California.

*Daniel Partida*
Daniel Partida, in pro se

Page ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **APPENDIX 1**

California Supreme Court denial of Petition for Review

Court of Appeal, Second Appellate District, Div. 2 - No. B204834
**S160641**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re DANIEL PARTIDA on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

APR - 9 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

# **APPENDIX 2**

19
20

California Appellate Court denial of Petition for Writ of Habeas Corpus

21
22
23
24
25
26
27
28

# CALIFORNIA APPELLATE COURTS
### Case Information

| | |
|---|---|
| Welcome | **2nd Appellate District** |

Change court ▾

**Attention: 2nd District Court of Appeal database and email registration will be offline from 8:00PM Friday, February 1 to 7:00AM Monday, February 4 for server maintenance. Your patience is appreciated.**

Search

E-mail

Court data last updated: 01/31/2008 05:05 AM

Calendar

Help

Options

**Case Summary    Docket    Scheduled Actions    Briefs    Disposition    Parties and Attorneys    Trial Court**

C|C

home

## Docket (Register of Actions)

**Partida v. The People**
**Division 2**
**Case Number B204834**

| Date | Description | Notes |
|---|---|---|
| 01/10/2008 | Petition for a writ of habeas corpus filed. | 1 volume of exhibits |
| 01/29/2008 | Order denying petition filed. | |
| 01/29/2008 | Case complete. | |

**Click here to request automatic e-mail notifications about this case.**

©2007 Judicial Council of California

# CALIFORNIA APPELLATE COURTS

### Case Information

| | |
|---|---|
| Welcome | ## 2nd Appellate District     `Change court ▾` |
| Search | **Attention: 2nd District Court of Appeal database and email** |
| E-mail | **registration will be offline from 8:00PM Friday, February 1 to** |
| Calendar | **7:00AM Monday, February 4 for server maintenance. Your** |
| Help | **patience is appreciated.** |
| Opinions | Court data last updated: 01/31/2008 05:05 AM |

**Case Summary   Docket   Scheduled Actions   Briefs   Disposition   Parties and Attorneys   Trial Court**

C|C
home

## Trial Court

**Partida v. The People**
**Division 2**
**Case Number B204834**

| | |
|---|---|
| **Trial Court Name:** | Los Angeles County Superior Court |
| **County:** | Los Angeles |
| **Trial Court Case Number:** | BA043905 |
| **Trial Court Judge:** | Van Sicklen, Steven |
| **Trial Court Judgment Date:** | |

**Click here** to request automatic e-mail notifications about this case.

© 2007 Judicial Council of California

# **APPENDIX 3**

Superior Court denial of Petition for Writ of Habeas Corpus

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | October 29, 2007 | | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. Newton | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004210
In re,
DANIEL PARTIDA,
    Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on May 22, 2006 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that the Petitioner presents an unreasonable risk of danger to society and is unsuitable for parole. Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 667.

The Petitioner was received in the Department of Corrections on August 20, 1996, after a conviction for second degree murder. He had previously been placed in the California Youth Authority on May 5, 1993, on this committing offense. The term was fifteen years to life in prison. His minimum parole eligibility date was July 22, 2001.

The record reflects that on January 9, 1991, the Petitioner was driving his uncle's red Hyundai when he saw an acquaintance, Jose Claro, and another person on the street. He agreed to drive both persons to another location where certain individuals were congregated on the street. At some point, a passenger fired a 9-millimeter Uzi weapon at the individuals. Gabriel Sotelo was struck in the back of the head and was killed. The Petitioner maintains that he was not a member of any gang and did not know that one or both passengers in the vehicle were armed.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on June 14, 2005. The Petitioner was denied parole for two years. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he is released.

1

Minutes Entered
10-29-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | October 29, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. Newton | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004210
In re,
DANIEL PARTIDA,
Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

The Board based its decision primarily on the commitment offense.

The Court finds that there is some evidence to support the Board's finding that the commitment offense was carried out in a dispassionate and calculated manner. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B). The vehicle was driven by the Petitioner to a specific location where the shooting occurred, which was a gang-related attack on a group on individuals. In addition, the motive for the crime was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E). The killing appeared to be a gang-related, drive-by shooting.

Although the Petitioner has maintained that he was not in a gang and did not know that the passengers were armed, the record indicates that his assertions are incorrect. The Petitioner was found guilty of the crime following a jury trial. Furthermore, the decision of the Second Appellate District, which affirmed the conviction, contradicts the Petitioner's version of the events. (Decision of *People v. Partida*, BA043905, filed September 8, 1994.) It states, in pertinent part:

". . . there was abundant proof that appellant, a member of the Street Saints gang, was driving his uncle's distinctive red Hyundai in territory claimed by the rival 39th Street gang, with whom the Street Saints were feuding. He slowed the vehicle, first to permit its passengers to issue verbal challenges, and then to use a 9-millimeter Uzi to gun down a youth who apparently was not a gang member, but who at that moment had the misfortune to be with a person who was and into whose car bullets had been fired a few days earlier.

2

Minutes Entered
10-29-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | October 29, 2007 | | |
|-------|------------------|--|--|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. Newton | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004210
In re,
DANIEL PARTIDA,
          Petitioner,
    On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

Following his arrest. . . . he stated a fellow gang member, Jose Claro, had been with him, but he claimed it was a man he did not know who fired the fatal shots. In fact, he asserted, he had not even been aware that this person was armed. When the officer then inquired how it was possible his passenger could have been carrying so large a weapon without it being apparent, appellant stated he did not wish to discuss the matter further without an attorney.

Evidence was also introduced to establish that only a month earlier, appellant had been stopped while driving the same red Hyundai with a semiautomatic handgun beneath the driver's seat. Jose Claro had been a passenger at that time as well." (September 4, 1994 Appellate decision, pages 2-3.)

In addition, the Court finds that the Petitioner had previously been arrested for vandalism as well as tampering with ID markers on a firearm. He also admitted possessing live ammunition and a pistol he had purchased on the street. These arrests do not provide a basis upon which the Petitioner could have been denied parole, and they did not involve acts of violence. However, the Board properly considered the Petitioner's criminal history as part of its determination. Cal. Code Regs., tit. 15, §2402, subd. (b).

In addition, the Board noted that the District Attorney's Office had opposed the Petitioner's release. While this is also not a factor on which the Board may rely to deny parole, such opposition may be properly considered. Penal Code §3402.

3

Minutes Entered
10-29-07
County Clerk

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | October 29, 2007 | | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. Newton | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH 004210
In re,
DANIEL PARTIDA,
        Petitioner,
  On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

The Board also noted several positive gains that the Petitioner has achieved while incarcerated. However, it concluded that despite these gains, the Petitioner posed an unreasonable threat to public safety at the time of its hearing. Penal Code §3041(b).

The Court also finds that the Board did not err in denying the Petitioner parole for a period of two years. The reasons were specified in the Board's decision, and essentially repeated the rationale for denying parole. The reasons need not be completely different from those justifying the denial of parole, and a sufficient basis for the two-year denial did appear in the record as a whole. See *In re Jackson* (1985) 39 Cal.3d 464, 479.

Finally, the Court has received, read and considered the contents of the Petitioner's confidential file. The Court finds that it does not appear that the Petitioner was found unsuitable for parole due to the information contained therein.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Joseph V. Camarata, Esq.
Law Offices of Joseph V. Camarata
1410 Georgia Street
Vallejo, California 94590
Attorney for Petitioner Daniel Partida

Department of Justice
Office of the Attorney General – State of California
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, California 92101

4

Minutes Entered
10-29-07
County Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|

COURTHOUSE ADDRESS:
Clara Shortridge Foltz Criminal Justice Center
210 West Temple Street
Los Angeles, CA 90012

PLAINTIFF/PETITIONER:

DANIEL PARTIDA

| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(e)(1) | CASE NUMBER:<br>BH004013 |
|---|---|

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time          ☑ Order re: Writ of Habeas Corpus
☐ Order to Show Cause           ☐ Order          Petition
☐ Order for Informal Response   ☐ Order re:
☐ Order for Supplemental Pleading  ☐ Copy of

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

December 3, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
    J. Newton

Joseph V. Camarata, Esq.
Law Offices of Joseph V. Camarata
1410 Georgia Street
Vallejio, California 94590

State of California-Department of Justice
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 110
San Diego, California 92101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **APPENDIX 4**

Petition for Review submitted to the

California Supreme Court

# In The Supreme Court of the State of California

## No. $S160641$

In re:

**DANIEL PARTIDA**
**CDC# H-48181,**

          **Petitioner,**

**On Habeas Corpus**

)
)  Second Appellate District
)  Division 2: #B204834
)  LASC No.: BH004210
)  Criminal Trial #BA043905
)
)  ***PETITION FOR REVIEW***
)
)
)

---

### TO THE HONORABLE RONALD GEORGE, CHIEF JUSTICE, AND THE ASSOCIATE JUSTICES OF THE CALIFORNIA SUPREME COURT

---

#### AFTER DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS BY SECOND APPELLATE DISTRICT, DIV. 2, NO. B204834 ON JANUARY 29, 2008

---

Daniel Partida, H-48181
CTF-North
P O Box 705
Soledad, CA 93960-0705

Petitioner in pro se

1

# TABLE OF CONTENTS

**PAGES**

PETITION FOR REVIEW (COVER)

Table of Contents ................................................................. i

Table of Authorities ............................................................. iii

CONSTITUTIONAL QUESTIONS PRESENTED ..................... <>

**PETITION FOR REVIEW** ............................................... 1

I.    JURISDICTION ..................................................... 1

II.   ALLEGATIONS MADE BY PETITIONER PARTIDA ...... 2

### *Ground 1*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board had no relevant or reliable evidence to support the reasons given to deny him parole.

### *Ground 2*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board failed to apply a standard of proof to the substantial evidence favoring parole, as admitted by the Board commissioners. *People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.

### *Ground 3*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board has a policy against granting parole to life prisoners until they have exceeded the terms set forth in its sentencing guidelines considered appropriate to a particular offense, thus depriving such prisoners of any benefit that postconviction credits might have on a parole date, once set. Petitioner asserts that according to the guidelines,

i

and in consideration of his postconviction credits he has earned, he has been imprisoned beyond the term that would apply to his offense and culpability, and that his earned post-conviction credits are rendered meaningless. Additionally, this general administrative increase in actual time served from the date of his offense to the present time, constitutes a violation of Ex Post Facto prohibitions.

| III. | INTRODUCTION ..................................................... | 4 |
| IV. | REASONS FOR REVIEW .......................................... | 6 |
| V. | LOWER COURT PROCEEDINGS ............................. | 8 |
| VI. | ARGUMENT ........................................................... | 8 |
| VI. | ARGUMENT ........................................................... | 22 |
| VII. | SUMMARY ............................................................. | 22 |
| VIII. | CONCLUSION ....................................................... | 24 |
| | CERTIFICATE OF COMPLIANCE ........................... | 25 |
| | VERIFICATION .................................................... | 26 |

APPENDIX:

Appendix 1: Appellate Court denial of petition.

Appendix 2: Superior Court denial of petition.


DECLARATION OF SERVICE BY MAIL

# TABLE OF AUTHORITIES

PAGE

### STATUTES

California Gov. Code, §§ 11342.1, 11342.2 ------------------------------------------- 7

California Penal Code §3052 ------------------------------------------------------- 15

California Penal Code Section 3041 --------------------------------------- passim

West's Ann. Cal. C.C.P. §1858 ---------------------------------------------- 13

### OTHER AUTHORITIES

California Code of Judicial Ethics, Preamble, Canons 2 and 3 ---------------- 17

### REGULATIONS

15 Cal.Code Regulations, §2269 ------------------------------------------- 19, 20

15 Cal.Code Regulations, §2403(c) ------------------------------------------ 19

15 Cal.Code Regulations, §2402(c) ------------------------------------------ 15

### CONSTITUTIONAL PROVISIONS

Cal. Const., Art. I, sec. 9 ----------------------------------------------------- 4

Cal.Const., Art. I, sec. 7 & sec. 15 ------------------------------------------ 3, 4

Cal.Const., Article III, §1 ------------------------------------------------------ 14

U.S. Const., Amend. 14 ---------------------------------------------------- 3, 4

U.S. Const., Art. I, sec. 9 c.3 -------------------------------------------------- 4

### STATE CASES

*In re Rosenkrantz,* 80 Cal.App.4[th] 409, 428 (2000) --------------------------------- 7

*Agricultural Labor Relations Bd. v. Superior Court* (1976)
   16 Cal.3d 392, 419, 128 Cal.Rptr. 183 --------------------------------------- 13

*Arnett v. Del Cielo,* (1996) 14 Cal.4[th] 4, 56 Cal.Rptr.2d 706 -------------------- 14

*ASP Properties Group v. Fard, Inc.,* 133 Cal.App.4th 1257,
   35 Cal.Rptr.3d 343 (Cal.App. 4 Dist., 2005) ----------------------------------- 16

*Auto Equity Sales,Inc. v. Superior Court,* 57 Cal.2d 450, 455 (1962) ----------- 16

*In re Cooper* (2007) 153 Cal.App.4[th] 1043 ------------------------------------- 4

*In re Dannenberg,* 34 Cal.4[th] 1061 (2005) --------------------------------- passim

iii

*In re Huynh,* 2006 WL 280900 at *9 (Cal.App. 6 Dist.,2006) ------------------- 21

*In re Jacobson* (2007) 154 Cal.App.4th 849------------------------------------------4

*In re Lawrence* (2007) 150 Cal.App.4th 1511----------------------------------------4

*In re Lee,* 143 Cal.App.4th 1400, 1408 (2006)---------------------------------- 8, 19

*In re Morrall,* (2001) 102 Cal.App.4th 280, 305-----------------------------3, 7, 12

*In re Murillo,* 176 B.R. 524 (9th Cir. BAP (Cal.) 1995)----------------------------- 13

*In re Powell,* (1988) 45 Cal.3d 894---------------------------------------------------6

*In re Ramirez* case, 94 Cal.App.4th 549 (2001) ----------------------------------- 18

*In re Reyes,* 2005 WL 3540806 (Cal.App. 6 Dist.,2005) -------------------------- 22

*In re Rodriguez,* 14 Cal.3d 639 (1975)------------------------------------14, 20, 21

*In re Rosenkrantz,* 29 Cal.4th 616 (2002) --------------------------------------3, 10

*In re Shaputis,* 2007 WL 2372405 (2007)--------------------------------------------4

*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309,

    58 Cal.Rptr.2d 855 -------------------------------------------------------------- 12

*People v. Butler,* 43 Cal.4th 1224, 51 Cal.Rptr.2d 150---------------------------- 14

*People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827 ------ 2, 3

*People v. Wingo,* 14 Cal.3d 169 (1975) --------------------------------------------- 14

*Smith v. Cushing*------------------------------------------------------------------------ 16

*Terhune v. Superior Court,* 65 Cal.App.4th 864, 872-873 (1998)-12, 13, 15, 22

*Wirin v. Horall,* 85 Cal.App.2d 497, at 505-506 (1948) -------------------------- 23

*Woods v. Superior Court* (1981) 28 Cal.3d 668, 680, 170 Cal.Rptr. 484 -------7

## FEDERAL CASES

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756,

    95 S.Ct. 1917, 1934, 44 L.Ed.2d 539 (1975) ------------------------------------ 13

*Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194,

    61 L.Ed. 442 (1917) ------------------------------------------------------------- 13

*Hayward v. Marshall,* 2007 WL 43716 (9th Cir. (Cal.) 01-03-2008)--------------3

*McQuillion v. Duncan,* 306 F.3d 895 (2002) ----------------------------------7, 19

*McQuillion v. Rushen,* 639 F.Supp. 420 (N.D.Cal.,1986-------------------------- 20

*Patterson v. Shumate,* 504 U.S. 753, ---- - ----, 112 S.Ct. 2242, 2246-47,

    119 L.Ed.2d 519 (1992)---------------------------------------------------------- 13

*Rake v. Wade,* 508 U.S. 464, ----, 113 S.Ct. 2187, 2191,

    124 L.Ed.2d 424 (1993)---------------------------------------------------------- 13

iv

*Saunders v. Carey,* Slip Copy, 2007 WL 1988923 (E.D.Cal.,2007), at *3 ----- 21

*Superintendent v. Hill,* 472 U.S. 445, 455 (1985) -------------------------------- 11

*United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241,
   109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989)--------------------------------- 13

*Watt v. Alaska*, 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678,
   68 L.Ed.2d 80 (1981)------------------------------------------------------------- 13

//////////

## CONSTITUTIONAL QUESTIONS PRESENTED

1.    Was it a violation of State and Federal due process when the lower courts denied habeas relief on the basis that "some evidence" supported the reasons given by the Board to deny parole, where the same evidence did not support the conclusion that Daniel Partida posed an unreasonable risk of danger to society after thirteen years imprisonment, which began when he was still a juvenile, and where he consistently and adamantly maintains 1) he was not the shooter, which the evidence shows, and 2) he did not know the shooter was armed or was going to shoot someone.

2.    Was it a violation of State and Federal due process when the lower courts denied habeas relief without address Partida's substantive claim that the Board's decision denying him parole did not appear to be based on a discernible standard of proof as would be required of any administrative agency?

3.    Was Partida's State and Federal due process violated by a policy against granting parole to life prisoners until they have exceeded the terms set forth in its sentencing guidelines considered appropriate to a particular offense, thus depriving such prisoners of any benefit that postconviction credits might have on a parole date, once set. Petitioner asserts that according to the guidelines, and in consideration of his postconviction credits he has earned, he has been imprisoned beyond the term that would apply to his offense and culpability, and that his earned post-conviction credits are rendered meaningless.    Additionally, assuming the allegation of a general administrative increase in actual time served from the date of his offense to the present time, would such administrative increase constitute a violation of Ex Post Facto prohibitions?

Daniel Partida, H-48181
CTF-North
P O Box 705
Soledad, CA 93960-0705

Petitioner in pro se

# In The Supreme Court of the State of California

## No._____

| | |
|---|---|
| *In re:* | Second Appellate District, |
| | Division 2: # B204834 |
| Daniel Partida, | LASC No. BH004210 |
| | Crim.Trial No.: BA043905 |
| Petitioner, | |
| | |
| On Habeas Corpus. | ***PETITION FOR REVIEW*** |

# I
## JURISDICTION

Comes now Petitioner Daniel Partida, a state prisoner, in pro se, who seeks the Writ of Habeas Corpus against unlawful restraint of his liberty by the Board of Parole Hearings, which has denied him parole based primarily on his commitment offense. Pursuant to Rules 28 and 29 of the Rules of Court, Petitioner seeks Review in this Court of the lower court decisions denying the Writ. The petition for writ of habeas corpus filed in the Second Appellate District, Division 2, on January

1

10, 2008, was summarily denied without opinion on January 29, 2008. (**Appendix 1**.) Petitioner did not petition for rehearing in the appellate court because the summary denial of a habeas petition is final upon filing. (Rule 24(2)(A).) The only 'reasoned' decision is by the superior court for the county of Los Angeles, before the Honorable Steven R. Van Sicklen, filed May 22, 2006, and denied October 29, 2007, on the sole basis that "there is some evidence to support the Board's finding that the commitment offense was carried out in a dispassionate and calculated manner" (although the murder was NOT committed by Partida), and that the "Board properly considered the Petitioner's criminal history as part of its determination" (although the criminal history was minor), and that the Board could consider opposition to parole by the District Attorney's Office. In the superior court, the court ordered confidential information produced, but concluded that "it does not appear that the Petitioner was found unsuitable for parole due to the information contained therein." (**Appendix 2**.)

Thus, the instant Petition for Review is timely and properly before this Court. This Court reviews a decision by an appellate court "where it appears necessary to secure uniformity of decision or the settlement of important questions of law." (Cal. Rules of Ct., rule 29.)

## II
## ALLEGATIONS MADE BY PETITIONER PARTIDA

This petition for review presents important questions of law that require resolution by this Court. The Petitioner has alleged in the lower courts:

***Ground 1***:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board had no relevant or reliable evidence to support the reasons given to deny him parole. (*In re Rosenkrantz*, 29 Cal.4th 616 (2002); Cal.Const., Art. I, sec. 7 & sec. 15; *Hayward v. Marshall*, 2007 WL 43716 (9th Cir. (Cal.) 01-03-2008); U.S. Const., Amend. 14.)

***Ground 2***:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board failed to apply a standard of proof to the substantial evidence favoring parole, as admitted by the Board commissioners. *People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827; *In re Morrall*, (2001) 102 Cal.App.4th 280, 305, 125 Cal.Rptr.2d 391; Cal.Const., Art. I, sec. 7 & sec. 15; U.S. Const., Amend. 14.)

***Ground 3***:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board has a policy against granting parole to life prisoners until they have exceeded the terms set forth in its sentencing guidelines considered appropriate to a particular offense, thus depriving such prisoners of any benefit that postconviction credits might have on a parole date, once set. Petitioner asserts that according to the guidelines, and in consideration of his postconviction credits he has earned, he has been imprisoned beyond the term that would apply to his offense and culpability, and that his earned post-conviction credits are rendered meaningless.       Additionally,      this      general

3

administrative increase in actual time served from the date of his offense to the present time, constitutes a violation of Ex Post Facto prohibitions. (Cal.Const., Art. I, sec. 7 & sec. 15 (due process); U.S. Const., Amend. 14 (due process); Cal. Const., Art. I, sec. 9 (ex post facto); U.S. Const., Art. I, sec. 9 c.3 (ex post facto).

These matters, set forth *infra,* are compelling and the Court should grant review to resolve these matters, as detailed herein. Petitioner notes that the Court has granted review in similar cases alleging repeated reliance on the commitment offense and other static, unchanging factors, as well as with regards to the standard of judicial review. (*In re Lawrence* (2007) 150 Cal.App.4[th] 1511 (*Lawrence*)(S154018); *In re Cooper* (2007) 153 Cal.App.4[th] 1043 (*Cooper*) (S155130); *In re Shaputis,* 2007 WL 2372405 (2007) (S155872); *In re Jacobson* (2007) 154 Cal.App.4[th] 849 (*Jacobson*) (S156416), *infra.*) Petitioner submits that were the Board disallowed from reliance on his commitment offense and criminal history, the Board would NOT have reached the same conclusion based solely on the other minor factors, and that under prevailing law the conclusions reached by the lower courts were an abuse of discretion and inconsistent with both State and Federal precedent with regards to the standard of review. All of these matters were presented to the lower courts, and supported by substantial evidence.

## III
## INTRODUCTION

Daniel Partida was a juvenile at the time of the instant offense. In short, he was convicted of a drive-by shooting a third person

4

committed. On the day of the crime he was returning home from work when he spotted Jose Claro, a gang-banger, who was the brother of Partida's girlfriend Yecel Claro. Partida pulled over and asked Jose if he wanted a ride home. Jose accepted, then spoke to his companion, who remained unknown, and asked Partida if the man could ride with them on the way. Partida agreed. On the way, the third person gave Partida directions where to go, and when he told him to stop, Partida assumed the man would get out of the car. Instead, he pulled a machine-pistol from his coat and opened fire on a group of young people standing on a street corner, killing one of them. Partida sped off in his uncle's distinctive red Hyundai vehicle. After his arrest, Partida admitted driving the car, but stated that he did not know the third person with Jose Claro, and did not know he was armed. At jury trial, the jury found him guilty of accomplice in the murder, but expressly found him Not Guilty of being armed. It was never alleged in the Information that Partida was the shooter or was armed.

The superior court in the instant petition said that although Partida "maintains that he was not in a gang and did not know that the passengers were armed, the record indicates that his assertions are incorrect" and states the appellate record "contradicts the Petitioner's version of the events." (**Appendix 2**) However, the appellate court appeal record states that there was "abundant proof" that Partida "was driving his uncle's distinctive red Hyundai in territory claimed by the rival 39th Street gang, with whom the Street Saints were feuding. He slowed the vehicle, first to permit its passengers to issue verbal challenges, and then to use a 9-millimeter Uzi to gun down a youth who

5

apparently was not a gang member, but who at that moment had the misfortune to be with a person who was and into whose car bullets had been fired a few days earlier."   Partida alleges that this wording "abundant proof" expressly refers to proof that he was a gang member because no such proof existed, and his entire affiliation with the Street Saints was via Jose Claro, whom he liked but who was his girlfriend's brother.  Partida admitted he liked Jose and occasionally went places with him, but expressly denied he was ever a Street Saints gang member.  Sworn declarations submitted with the petition were apparently disregarded by the superior and appellate courts. (**Exhibits G, H, I, N, O,** and the motions to supplement to the superior court containing the sworn affidavits of Jose Claro and Yecel Claro clearing Partida of any gang membership at the time.  These latter affidavits were incorporated into **Exhibit N** of the appellate record.)  The lower courts ignored this evidence.  (See **Appellate Petition**.)

## IV.
## REASONS FOR REVIEW

Neither the standard of judicial review or the Board's burden of proof is definitively explained by this Court in terms consistent with the Due Process Clauses of the California or Federal Constitutions. This Court brought the "some evidence" standard into the parole context in *In re Powell,* (1988) 45 Cal.3d 894, without even analyzing the parole statute itself, a flaw that surfaced when the Ninth Circuit, finally, after 26 years of non-articulation, explained the constitutionally-protected liberty interests created by Penal Code

6

Section 3041. (*McQuillion v. Duncan,* 306 F.3d 895 (2002).)  But no court has yet to define the Board's burden of proof, although the appellate court in *In re Morrall,* 102 Cal.App.4[th] 280, at 302 (2001) suggested that the "preponderance of evidence" standard was the appropriate burden of proof when it said that the Governor was bound by the criteria of the Board and "may" use the preponderance of evidence standard.

Nor has any court been willing to address the undisputed and indisputable fact that the Board grants parole in about 2.5% of the thousands of cases it hears each year, notwithstanding that the Board disapproves some of those, and the Governor takes about 2/3rds of the remaining few, for an actual release rate of about 0.34%.  No state court has addressed the fact that the Board, since 2000, only granted parole at an Initial hearing 7 times, disapproved several of those, the Governor reversed the others, and only one actually got released. Partida submitted those statistical facts in his lower court petitions. (**Exhibit T.**)

This Court cannot continue to allow the Board of Parole Hearings to carry out an anti-policy that is clearly established by firm practice in a manner inconsistent with the controlling statute, and unlawful by any standard of statutory construction, (*Woods v. Superior Court* (1981) 28 Cal.3d 668, 680, 170 Cal.Rptr. 484; see Gov. Code, §§ 11342.1, 11342.2), and disguised by a masquerade of pro forma sham hearings. (*Accord, In re Rosenkrantz,* 80 Cal.App.4[th] 409, 428 (2000).)

## V
## LOWER COURT PROCEEDINGS

The Second Appellate District, Div. 2, issued a postcard denial. (**Appendix 1**.) The only 'reasoned' opinion was the superior court decision, which acted inconsistent with *In re Lee,* 143 Cal.App.4th 1400, 1408 (2006), by finding that the recitation of the Board of fact-based reasons were sufficient "some evidence" to defer to the decision denying parole, instead of determining whether such reasons were sufficient, at this juncture, to support a conclusion that Partida posed an unreasonable risk of danger to parole. (**Appendix 2**.) The lower court's fact-finding was cursory at best, insofar as the decision strongly suggests a failure of the judge to review all the facts that were contrary to, and undermined the Board's parole decision. Thus, there was substantial evidence contrary to the judge's findings and conclusions, and his failure to follow the proper standard of review was an abuse of discretion.

## VI
## ARGUMENT

The superior court, Judge Steven R. Van Sicklen, said that the Petitioner "agreed to drive both persons to another location where certain individuals were congregated on the street." (Decision p. 1.) However, "agreed to drive" does not automatically translate into knowingly participating in a drive-by shooting, and could have been, as Partida adamantly maintains, an innocent agreement to give Jose Claro and Claro's friend, a ride to Claro's home and the location Claro's

8

friend wanted to go. Whether Claro knew a drive-by shooting was to take place does not necessarily mean that he transferred this information to Partida. The exhibits Partida submitted with his lower court petitions show credible evidence that he was never a member of any gang. (**Exhibit G, Exhibit H, Exhibit B, Exhibit I, Exhibit N, Exhibit O,** lower court petitions.) Judge Van Sicklen cited too the fact that a month earlier, Partida had been stopped in the same red car with a semiautomatic handgun beneath the driver's seat and Jose Claro had been a passenger at that time. If this is cited to show evidence of gang affiliation, this is only one inference. Another inference regarding the handgun is the one he explained in the lower court petition, i.e., that he lived in a gang-infested area of Los Angeles where gang-violence was commonplace. Carrying a weapon, even an illegal one, was self-protection and may, in actual confrontations, mean the difference between life-and-death. (See appellate petition, at fn. 9, page 25.) As to the fact that Jose Claro had been in the car, Partida admitted they had become friends, due to the fact Partida was dating Claro's sister, and it was not uncommon that they sometimes "hung out" together, but that association does not necessarily translate into Partida being a gang member. (See appellate petition, footnote 9, page 25.) Judge Van Sicklen mentioned none of the sworn declarations stating that Partida was never a gang member. Judge Van Sicklen cursorily stated that "The Board also noted several positive gains that the Petitioner has achieved while incarcerated. ..." Yet the Board hardly "noted" these; nothing so cursory can reasonably be derived from that hearing transcript. The record presented in the lower court petition, including the hearing

9

transcript, show Partida has performed in an exceptional manner in all manner of positive programming. The Panel could not find a single deficiency in his programming, even though it said he needed more insight into his offense; this statement was made because Partida steadfastly maintains he had no foreknowledge of the shooting, nor knew Claro's companion. Partida's failure to admit what the Board apparently wants him to admit does him no service with regards to parole. The benefit of the lie – that he had foreknowledge – is a finding that he now <u>fully</u> accepts responsibility for the offense, which then makes him more suitable for parole; indeed, from the statement of the Panel, it would make him suitable for parole. (See Appellate Petition page 3.) Notwithstanding, the transcript appears to show that the Panel was no longer convinced that Partida had foreknowledge; however, it chose to remain with the appellate record and conviction.

There is no doubt but that the Board of Parole Hearings regularly abuses its discretion by rendering decisions without support in the record that the prisoner presents an unreasonable risk of danger to public safety if paroled. The state and federal cases finding this to be so continue to pile up, even as other courts simply defer to anything the Board gives as a reasons or reasons for denial, yet no definitive standard of judicial review is apparent. Rather, this Court has created the confusion by both *In re Rosenkrantz*, 29 Cal.4[th] 616 (2002) and *In re Dannenberg*, 34 Cal.4[th] 1061 (2005), where the Court has rendered judicial review virtually unworkable, the "some evidence" standard without any value whatsoever, and habeas relief virtually unobtainable by explication of the "some evidence" standard that is contrary to, and

10

an unreasonable application of, the "some evidence" standard as articulated by the United States Supreme Court in *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). Petitioner alleges that some lower courts have felt their hands were tied even though the Board's (or Governor's) decisions were unfair and arbitrary, as he explained in the appellate petition, all due to this Court's unwillingness to force the Board (and Governor) to comport with principles of fundamental fairness and apply a standard of proof to their decision-making that is not arbitrary.

As evident in *Rosenkrantz, supra,* this Court has been unwilling to recognize what is apparent to everyone else, i.e., that the Board exercises a policy against granting paroles that is inconsistent with the enabling statute, Section 3041 Penal Code, and does so by manipulation of regulations and, even, blatant disregard for judicial decisions attempting to correct its arbitrariness and unfairness. Petitioner Partida cited detailed statistics in his lower court petitions that show how the Board has increased the length of actual confinements of second degree murder offenders approximately 200% since Partida's crime was committed, which administrative but unofficial increase raises the specter of Ex Post Facto law. Petitioner has alleged, with evidence, that the Board rarely, if ever, grants parole at the Initial hearing despite the statute's express language that the Board "shall normally" set a release date at that hearing (subd.(a)) unless the gravity of the offense is such that a release date should not be set at that hearing (subd.(b)). This clearly denotes that the offense should be something far greater than that of which Partida had been convicted (i.e., being the driver, not

11

the shooter). The fact that the Board rarely, if ever, sets a release date at the Initial hearing cannot simply be dismissed with a "So what?" response. The express language of the statute must be applied, and in Partida's case there was no evidence that his culpability in the offense or his past minor brushes with the law were such that a release date could not be set at his Initial or especially his subsequent hearing.

Notwithstanding this Court's *Rosenkrantz* decision that only 100% denials of parole would indicate a policy, a practice where only 0.34% of life prisoners are actually released would demonstrate to any *reasonable person or jurist* that such practice is grossly inconsistent with Section 3041. In *In re Morrall, supra,* at 301, the appellate court said, "The law contemplates that persons convicted of murder may eventually become suitable for parole, and it would be contrary to the statutory scheme to deny parole simply because the commitment offense was murder."

The Court cannot sweep under the rug these statistical facts with a blithe dismissive statement that it only shows the Board being "more stringent" when assessing public safety concerns. The Board has no authority, and this Court can give the Board no such authority, to enlarge the statute and nullify its intent and express language. *Terhune v. Superior Court,* 65 Cal.App.4th 864, 872-873 (1998), citing to *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309, 58 Cal.Rptr.2d 855. Yet this is what the Court has done in both *Rosenkrantz* and *Dannenberg, supra.* The Court is obliged to define the statute according to its express language and legislative intent at the time of the enactment, and not judicially enlarge it. To observe the

12

practice of the Board and not to intervene when its actions are
inconsistent with the statute is to enlarge it by judicial inaction.

   "No matter how altruistic its motives, an administrative agency
has no discretion to promulgate a regulation that is inconsistent with
the governing statutes." *Terhune, supra,* citing *Agricultural Labor
Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 419, 128
Cal.Rptr. 183.) Thus, this Court has set the standard in other contexts,
and *Terhune* brought it home to the parole context. The Court cannot
ignore its own defined standards merely because the context forum is
the disfavored group known as "lifers" or "murderers."

   California statutes are interpreted according to their plain
meaning. (West's Ann. Cal. C.C.P. §1858; *In re Murillo*, 176 B.R.
524 (9th Cir. BAP (Cal.) 1995).) [1/] The California Constitution
recognizes the United States Supreme Court as the supreme law of the

_____

[1/] The starting point in every case involving construction of a statute is
the language itself. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S.
723, 756, 95 S.Ct. 1917, 1934, 44 L.Ed.2d 539 (1975). "In determining
the meaning of any statute, the words of the statute are 'the primary,
and ordinarily the most reliable, source of interpreting' its meaning."
*Watt v. Alaska*, 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678, 68
L.Ed.2d 80 (1981). Thus, when the language of the statutes is plain,
"the sole function of the courts is to enforce it according to its terms."
*Rake v. Wade*, 508 U.S. 464, ----, 113 S.Ct. 2187, 2191, 124 L.Ed.2d
424 (1993), citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S.
235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), and citing
*Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61
L.Ed. 442 (1917); *Patterson v. Shumate*, 504 U.S. 753, ---- - ----, 112
S.Ct. 2242, 2246-47, 119 L.Ed.2d 519 (1992).

land. (Cal.Const., Article III, §1.) A court may not adopt a broader construction of a statute, which was allegedly in conformity with legislative intent in adopting the statute, where words of statute had well-established meaning, so that there was no need for construction. *Arnett v. Del Cielo,* (1996) 14 Cal.4th 4, 56 Cal.Rptr.2d 706, *modification denied.* In attempting to determine legislative intent, the court looks first to the words of the statute itself; if these words are clear and unambiguous, court may not modify them to accomplish purpose not apparent on face of statute or from its legislative history. (*People v. Butler,* 43 Cal.4th 1224, 51 Cal.Rptr.2d 150, *rehearing denied, review denied.*)

Whereas Section 3041 of the Penal Code, modified by Chapter 1139 of Stats 1976, in the Uniform Determinate Sentencing Act, was the result, as was the entire UDSA, from the findings of the California Supreme Court in the case of *In re Rodriguez,* 14 Cal.3d 639 (1975) (finding the former Adult Authority applying the Indeterminate Sentencing Law (ISL) in an unconstitutional manner); and citing *People v. Wingo,* 14 Cal.3d 169 (1975), and numerous other cases since 1970. While the UDSA was structured to remove the disparity emanating from a Board of lay commissioners and to fix appropriate terms within a tripartite sentencing range, Section 3041, as it applied to those offenders who did not come under the determinate sentencing provisions of Section 1170, was also intended to provide protection against disparity in sentencing while leaving some discretion with the new parole authority as to excepting those considered too dangerous from having a release date set at the Initial hearing. Board regulations,

14

enabled by Penal Code §3052 to carry out this function, also established tripartite sentencing ranges to determine the appropriate punishment for variations of offense severity, but the Board applies its "suitability" regulations to withhold the setting of a release date in less than 2.5% of all cases, and in every grant the date is not set until the prisoner has exceeded the maximum term appropriate for his or her offense by those regulations. The plain and ordinary words of Section 3041 leaves no room for a construction and interpretation by the parole authority or any court to approve and apply the exception to setting a release date as the rule. The rule is that a release date "shall normally" be set unless the Board makes specific findings under the exception provisions of subd. (b) of Section 3041. There is no possibility that Partida's culpability, as questionable as it has been shown to be, could fall within subd.(b).

Because the history of Section 3041, as predicated on legislative intent to eliminate the disparity that marked the downfall of the former ISL, a practice of shoe-horning all "life" offenders into 15 Cal.Code Regulations, §2402(c), for denial of parole is a gross misapplication of the enabling statute under *Terhune, supra,* 65 Cal.App.4th at 872-873.

In his appellate petition, Partida cited and enclosed the Santa Clara Superior Court case of *In re Criscione,* No. 71614, *review granted,* 6th Appellate District No. H032426, which, after extensive discovery and expert testimony, concluded that the Board was malfunctioning where in 100% of all cases it placed the offender under 15 CCR §2402(c) for denial of parole. These findings will not be

15

disturbed except by substantial evidence that they are incorrect or
unsupported, and there is no evidence of that. (*Smith v. Cushing*
41 Cal. 97, 1871 WL 1332 (Cal. 1871); *ASP Properties Group v. Fard,
Inc.,* 133 Cal.App.4th 1257, 35 Cal.Rptr.3d 343 (Cal.App. 4 Dist.,
2005).)    The *Criscione* ruling stems from the judge's review of
statistical evidence from nearly 2700 board decisions denying parole to
murder offenders, and her finding that the Board used boilerplate
language regarding the heinous nature of the original crime as
justification to deny parole without providing the specific evidence
required by the law of *current* risk to public safety if paroled.  This is
precisely what occurred in Partida's case with the Board itself.  The
lower courts failure to acknowledge these findings, *and* to find a prima
facie showing by Partida, was a clear abuse of discretion and a failure
to respect the doctrine of *stare decisis.* (*Auto Equity Sales,Inc. v.
Superior Court,* 57 Cal.2d 450, 455 (1962).)

The reluctance of this Court to bring the Board within the folds
of lawful conduct is understandable but troubling, as Justice Moreno
has said.  As Justice Moreno noted in *In re Dannenberg, supra,* 34
Cal.4[th] 1061, at 1100 et seq., especially at 1106, that the majority may
be "endorsing the Board's way of conducting parole release because it
seeks to avoid the undesirable result of the mass release of convicted
murderers" (which backlog is the direct result of the unlawful
administration of the parole release process by the Board itself). Rather
than impose consequences upon the Board for its unlawful
administration of the parole scheme, the Court instead imposes even
higher suffering on the class of prisoners affected thereby by endorsing

16

Board practices guaranteed to ensure almost no lifers get paroled, and by emasculating the authority of the state courts to correct abuses in the vast majority of cases.

Nonetheless, the law requires that judges abide by rules governing judicial conduct. Under the rules, judges must "strive to enhance and maintain confidence in our legal system." They must "act in a manner that promotes public confidence in the integrity and impartiality of the judiciary." They must "perform the duties of judicial office impartially" and without bias, and they must be "faithful to the law." (California Code of Judicial Ethics, Preamble, Canons 2 and 3.) Judges, like our society, are governed by the rule of law. If that principle means anything, it must mean that a judge sitting on a case will apply the controlling law. That's the essence of the judge's job. That's the compact the judge makes with the public and with litigants. If a judge won't do that, he or she should not sit on the case. At what point does judicial refusal to enforce such important and controversial laws as California's statutory parole scheme transform into judicial anarchy, as Justice Moreno seemed to suggest? How can a justice authoritatively and credibly perform the judicial function --- passing judgment on the propriety of other judicial conduct --- when he or she has openly or implicitly refused to apply the law in any context? A judge's refusal to follow the law, like the Board's refusal to apply the law correctly, is a form of civil disobedience. Whether or not civil disobedience can be motivated by high and worthy principles does not absolve the person or agency from the consequences of that refusal to obey the law, no more than Partida could be absolved from his offense

17

by his youthful immaturity. Just as the law demanded consequences for
Partida's actions, which consequences he continues to endure, so too
does Partida demand that the law applying those consequences be
correctly, fairly, and lawfully applied so that he does not become a
victim of retributive justice by an agency who seems to have acquired
ascendency over the law by endorsement from this Court. Partida
believes that Justices Moreno, Kennard, and Werdegar in *Dannenberg,*
on dissent, clearly understand what Partida is talking about now, and he
further believes Justice Corrigan also understands this from her
position in the appellate decision in *Dannenberg, supra,* as well as in
the *In re Ramirez* case, 94 Cal.App.4[th] 549 (2001).

Partida has alleged there was no evidence before the Board that
he remained a current unreasonable risk of danger to society, which is
the overarching factor in deciding to grant or deny parole. The
commissioner even seemed to acknowledge this when the
commissioner recognized his outstanding prison performance
throughout his incarceration. It acknowledged that the mental health
prognosis gave him a 'clean bill of health.' (**Exhibit D**, at p.85.) After
making its decision, the commissioners both commented about his
postconviction performance. (*Id.*, at pp. 86-88.) Commissioner Inglee
nonetheless recommended more self-help programs even though there
was no evidence of need. (*Ibid.)* He stated: "Most of the *other*
programs he has already accomplished. Has done an excellent job in
getting ready for *eventual* parole." (emphasis added) Deputy
Commissioner McBean stated: "We are pleased with how much you
have done. You're gotten very active since your last appearance in self-

18

help, and that is exactly what we want you to continue to do. It's very important for you to continue doing all the away – positive things that you have been doing. Staying disciplinary free. ¶ You're got three vocs now. That's, you know, we can't ask you to do more than that. You've upgraded education as much as you're required to. And, of course, you stay working towards you AA, and that's great. The more you can get, the better off it will be for you. Keep up the good work in terms of your self-help. That should help you with insight. That should help us understand the extent to which you've been able to come to terms of your crime." *(Ibid.)*

The very fact that the commissioners acknowledge all of this and yet refused to set his release date is clearly contrary to the enabling statute, and its own regulation. The Board's regulation, at §2269, provides for the setting of a future release date, and provides for regular Progress Hearings until that release date is reached. At those Progress Hearings, the prisoner is reviewed for compliance with rules and expectations, and is also granted §2410-2411 postconviction credits to reduce the tentative release date. (*See McQuillion v. Duncan,* 306 F.3d 895, at 898-899.) When Commissioner Inglee clearly stated that Partida had met the criteria for "eventual" release, there was thus no bar against setting Partida's release date consistent with the sentencing regulations in §2403(c), and then scheduling him for future Progress Hearings under §2269. The fact that the lower courts failed to apply *Lee, supra,* 143 Cal.App.4[th] at 1408 to find that Partida was entitled to a release date because none of the cited factors demonstrated he was a

19

current unreasonable risk at the time of the hearing must constitute an abuse of judicial discretion.

The courts are wrangling with the practice of the Board to repeatedly rely on the commitment offense and prior history as cause for interminable denials of parole. The point at which such reliance violates due process is as yet to be determined due to the variances in severity of offenses and prior history. This point is not at issue in the instant case.

The courts have yet to address the lawfulness of Board practices to never grant, or rarely grant a parole release date at the Initial parole hearing despite the plain language of the statute. The abiding premise for addressing and resolving this issue is not just that the plain language of Section 3041 requires it in most cases, but that the setting of a release date does not necessarily equate to immediate release, as demonstrated by 15 CCR §2269 (Progress Hearings). What §2269 does do is recognize the eventual parolability of the offender, sets his release date early enough to provide time to effectively challenge it. (*In re Rodriguez, supra,* 14 Cal.3d 639, at 654 fn.18; *McQuillion v. Rushen,* 639 F.Supp. 420 (N.D.Cal.,1986.)[challenging, *inter alia,* the imposition of DSA sentencing regulations imposing a 28-year term imposed at Initial parole hearing in 1979 on ex post facto grounds; court finding that since McQuillion was also given a lesser ISL term, no ex post facto violation occurred]), and provide for subsequent monitoring until the actual release of the prisoner. In *McQuillion, supra,* McQuillion was able to challenge, albeit unsuccessfully, the 28-

20

year term and reach a decision <u>before</u> he actually had to serve the full term. This <u>is</u> one of the points that Partida has alleged.

Current practices by the Board do not allow such a challenge because the Board does precisely the same thing *now* that was found unconstitutional under *Rodriguez,* at 646-656, i.e., imposing terms only at the time a parole grant decision was made and beyond the time where a challenge could be effectively mounted against an alleged excessive term.[2] There is not a shred of difference between the ISL

---

[2]   The Court's remark in *Dannenberg, supra,* at 1098, that an aggrieved prisoner may bring a habeas corpus to challenge what he believes to be a constitutionally excessive sentence is smoke without any substance inasmuch as reviewing courts look directly to the life potential and find that a life potential for murder can never be constitutionally excessive; whereas in *Rodriguez,* a child molestation offense, the Court looked directly at the term typically imposed for such sentences by the Adult Authority, and by reviewing other jurisdictions as well. Under *Rodriguez's* reasoning, contemporary review should be whether the prisoner is being excessively confined beyond the sentencing regulations, not measured against the maximum potential of life, yet there is no definitive judicial answer to this issue either. (*Cf., Saunders v. Carey,* Slip Copy, 2007 WL 1988923 (E.D.Cal.,2007), at *3.) As with all other critical issues affecting the duration of an indeterminately-sentenced prisoners confinement, this Court has avoided the question of how to determine excessive confinement in the context of "life" potential sentences, but has stated that this "limitation will rarely apply to those serious offenses and offenders currently subject by statute to life-maximum imprisonment" and, under the current statutory scheme, it does not require the Board to "set fixed release dates for all life prisoners except those whose crimes are most 'egregious' compared to others of the same class." *Dannenberg, supra,* at 1071. (Unpublished cases denying challenges on 8th Amendment excessive confinement grounds are, *In re Huynh,* 2006 WL 280900 at *9 (Cal.App. 6 Dist.,2006); *In re Reyes,* 2005 WL 3540806 (Cal.App. 6

21

practices and current practices by the Board, and by the same rule applied in *Rodriguez*, so too must this Court find current practices equally unconstitutional. The fact that the Legislature combined term-fixing and parole-setting under Section 3041 (Stats 1976 c. 1139) does not absolve the Board from also complying with the uniformity requirements in **most** cases, with **exceptions** to doing so allowed only under the provisions of subd. (b) of Section 3041. A practice of nullifying the uniformity provisions in all cases by repeated denials until the prisoner has served beyond those provisions is an unconstitutional enlargement of the enabling statute, and must be stricken. (*Terhune, supra.*)

# VII
## SUMMARY

In a time when political importance and interests often takes precedent over duty and adherence to the law, it is appropriate to point out that by virtue of the conviction of a prisoner that subjects him to a politically-appointed parole board in order to obtain future release, the board does not automatically acquire ascendency over the law. "In a free government it must constantly be borne in mind that each and every individual, no matter what his state of wealth or official position, is subject to the Constitution adopted by the people and the laws made pursuant thereto, and that where a violation of law necessarily follows, acts of executive and administrative officials are not given validity on

Dist.,2005) [reflecting boilerplate treatment of this issue by the 6th Appellate District].)

22

the theory that 'the end justifies the means.'" *Wirin v. Horall*, 85 Cal.App.2d 497, at 505-506 (1948).

Because the Court's action in this case is one of <u>review</u>, Petitioner Partida expects that the record will be fully reviewed. Therefore, he will not repeat the legal arguments and citations he made in the appellate petition, but incorporates them by reference, and instead will rely on the regular performance of this Court's legal staff to conduct that review. Nonetheless, Partida reminds the Court that he has nothing to gain by maintaining that he was never a gang member or that he had foreknowledge of the drive-by shooting. He has spoken truthfully and consistently since his arrest. Part of the evidence against him was a Street Saint's gang member, "Mongo", who testified and pointed the finger at Partida and away from fellow gang member Claro. Claro and his sister Yecel have since written declarations exonerating Partida from foreknowledge or gang membership, which are contained in the appellate record, as stated heretofore, as are declarations from other persons. Not a single document has been written by prison officials indicating any association by Partida of any gang members or affiliation while incarcerated, within or without the prison system.

Before the parole board was not a single piece of credible, relevant, or reliable evidence that he needs a lengthier period of confinement, or that a release date in the future is necessary for the protection of public safety. The Board's burden of proof was either absent or misapplied. The Board cannot add weight where there is no evidence of unsuitability to place in the balance.

23

Partida is entitled to have the Court resolve the issues alleged in this Petition because they affect the administration of the parole system, and ultimately affect the integrity of the processes of the Board and the judiciary on review. But for the unresolved issues, the lower courts may likely have granted the petition.

The Court must grant review and resolve these issues in Partida's favor. The Court must reverse the lower court decisions and order that the petition for writ of habeas corpus be granted.

## VIII
## CONCLUSION

WHEREFORE, on good cause, and upon review of the record, the Court should GRANT review and the relief requested above.

Dated:  February 3, 2008.              Respectfully submitted,

DANIEL PARTIDA, in pro se

24

# CERTIFICATE OF COMPLIANCE

Petitioner Daniel Partida certifies to the Court that he has complied with the rules limiting the petition for review to 8400 words. In this petition, the word count is 6,566 words, not counting cover, tables, certificate, verification, appendices, or proof of service. The font is 14 points CAMBRIA typeface.

Sworn to under penalty of perjury, this 3rd day of February, 2008, at Soledad, California.

Dated:  February 3, 2008.

_Danny Partida_

Daniel Partida, in pro se

25

## VERIFICATION

I, Daniel Partida, declare I am the petitioner in the foregoing Petition for Review and that I have read and know the contents thereof are true and correct to the best of my knowledge, information, and belief, and that I bring this Petition in good faith as to the merits thereof.

Sworn to under penalty of perjury, this 3rd day of February, 2008, at Soledad, California.

Daniel Partida, in pro se

26

# DECLARATION OF SERVICE BY U.S. MAIL

**Court:**              SUPREME COURT OF CALIFORNIA

**Case Name**:          *In re Daniel Partida, on habeas corpus.*

**Lower Ct #:**         B204834, 2nd App. Dist., Div. 2

**Document Title:** PETITION FOR REVIEW

I, Daniel Partida, declare that I am the petitioner in the foregoing Petition for Review, proceeding in pro se. I am over the age of 18 years and a citizen of the United States. On the below indicated date I have caused to be placed into the delivery system of the United States Postal Service this Petition for Review to this Court, and to the Attorney General of California, as counsel for Respondent, and to the appellate and superior courts, as addressed below, proper postage affixed thereto.

Attorney General of California
Attn: Supervising D.A.G.
300 South Spring Street
Fifth Floor, North Tower
Los Angeles, CA 90013

Clerk, Court of Appeal
State of California
Second Appellate District
Div. 2
300 South Spring St., 2d Floor
Los Angeles, CA 90013

Clerk, Superior Court of California
Attn: Hon. Steven R. Van Sicklen
Los Angeles Superior Court
Department 100 / Appeals Section
210 West Temple Street
Los Angeles, CA 90012

SWORN TO UNDER PENALTY OF PERJURY, this 3rd day of February, 2008, at Soledad, CA.

*Danny Partida*
Daniel Partida, in pro se, declarant

3

# APPENDIX 5

## Statement of Jose Claro

To Who it my concern:

My name is Jose Claro, I am Danny's co-Defendant in this case. I was encouraged by my sister Yecel to write this letter set the straight.

Back in January 1991 when this offense was committed Danny was unaware that we would be involved in this drive by shooting . I was on my way home with a companion from my gang when Danny drove up asked me where was I going. When I said to my grandma's, Danny asked me to get in. I didn't want to just leave my companion there so I asked Danny to give him a ride to 24th st. Danny agreed we both got in his car. There was nobody hanging out on 24th st. This guy asked Danny to drive him somewhere, I couldn't hear because of the music soon I realized we were in 39th st. territory. Danny stopped the car in the front of some apartments the shooting took place. Danny drove away shocked so was I. We never planned on doing a shooting, I was going home. When Danny dropped us off at the park he quickly drove away without giving me a chance to talk to him. The next day when I was hanging out with my friends there was talk about what to say if anything happened. Someone said to blame it on Danny since he was not a member of the street saints.

When I was arrested I was 14, yrs old never been in trouble with the law. I was scared intimidated by the detectives my parents were not there during questioning. I was told about "mongo's" statement how he was blaming Danny. I was told that if I wanted to help myself I needed to cooperate give a statement blaming someone since Danny



JAIME HOYUELA
COMM. # 1461116
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
COMM. EXP. JAN. 6, 2008

was in Mexico I soon began agreeing with mongo's statement
the detectives filled in the rest. I just said yeah to what they
wanted to hear. This is how my statement came about.

There is no truth to what I said I only made those
statements because of fear intimidation.

1. DANNY NEVER WAS A MEMBER OF THE
STREET SAINTS.

2. NEITHER DANNY OR MYSELF KNEW A
A SHOOTING WAS GOING TO HAPPEN. I DIDN'T
EVEN KNOW THIS GUY HAD A GUN.

3. MY ONLY RELATIONSHIP TO DANNY WAS
BECAUSE HE WAS DATING MY SISTER YECEL.

4. THE WEAPON USED WAS A BLACK HAND
GUN NOT AN UZI. THE DETECTIVES SAID IT WAS AN
UZI I SAID YEAH.

This is the truth about what happened on the night of
JANUARY 1991. I was never called to court.



Jose Claro
2393 Wilma Ave
Los Angeles, CA 90040


State of California        }
                           }SS
County Of Los Angeles      }

Subscribed and sworn to (or affirmed) before me on this 16th of March,
2007, by, Jose Claro, personally known to or proved to me on the basis of
satisfactory evidence to be the person who appeared before me.


Jaime Hoyuela
Notary Public

JAIME HOYUELA
COMM. # 1461118
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
COMM. EXP. JAN. 6, 2008

## DECLARATION OF SERVICE BY U.S. MAIL

**Court:**              UNITED STATES DISTRICT COURT, NORTHERN DISTRICT
**Case Name**:          *Partida v. Curry*
**Lower Ct #:**         **S160641, Cal Supreme Court**
                        B204834, 2nd App. Dist., Div. 2
                        BH004210, Los Angeles Superior Court
**Document Title:**     **PETITION FOR WRIT OF HABEAS CORPUS**

I, Daniel Partida, declare that I am the petitioner in the foregoing Petition for Review, proceeding in pro se. I am over the age of 18 years and a citizen of the United States. On the below indicated date I have caused to be placed into the delivery system of the United States Postal Service this Petition for Writ of Habeas Corpus to this Court, and to the Attorney General of California, as counsel for Respondent, as addressed below, proper postage affixed thereto.

Attorney General of California
Attn: Supervising D.A.G.
300 South Spring Street
Fifth Floor, North Tower
Los Angeles, CA 90013

SWORN TO UNDER PENALTY OF PERJURY, this 31st day of July, 2008, at Soledad, CA.

*Daniel Partida*
Daniel Partida, in pro se, declarant



DANIEL PARTIDA, H-48181
CTF-NORTH
P O BOX 705,
SOLEDAD, CA 93960-0705

To:

Clerk, United States District Court
Northern District of California
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102

Via ........

UNITED STATES
POSTAL SERVICE®

PRIORITY MAIL