

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

E-filing

CV Case No. 08          3751

DANIEL PARTIDA,

      Petitioner,

v.

BEN CURRY, Warden, California Training
Facility-Central,

      Respondent

Supreme Court: S160641
Second Appellate District
Division 2: B204834
LASC No.: BH004210
Criminal Trial: BA043905

CW

**MEMORANDUM OF POINTS ND
AUTHORITIES IN SUPPORT OF
ANCILLARY PETITION FOR
WRIT OF HABEAS CORPUS**

Daniel Partida,  H-48181
CTF-North
P O Box 705
Soledad, CA 93960-0705

Petitioner In Pro Se

**ORIGINAL**

# TABLE OF CONTENTS

**Pages**

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF

PETITION FOR WRIT OF HABEAS CORPUS BY STATE PRISONER.

I.    Introduction ..............................................................

II.   Contentions ..............................................................

### *Ground 1*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board had no relevant or reliable evidence to support the reasons given to deny him parole.

### *Ground 2*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board failed to apply a standard of proof to the substantial evidence favoring parole, as admitted by the Board commissioners. *People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.

### *Ground 3*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board has a policy against granting parole to life prisoners until they have exceeded the terms set forth in its sentencing guidelines considered appropriate to a particular offense, thus depriving such prisoners of any benefit that postconviction credits might have on a parole date, once set. Petitioner asserts that according to the guidelines, and in consideration of his postconviction credits he has earned, he has been imprisoned beyond the term that would apply to his offense and culpability, and that his earned post-conviction credits are rendered meaningless. Additionally, this general administrative increase in actual time served from the date of his offense to the present time, constitutes a violation of Ex Post Facto prohibitions.

1  III.    Standard of Review of Petition ……………………………………

2  IV.    Argument ……………………………………………………………..

3  V.    Summary ……………………………………………………………

4  VI.    Conclusion …………………………………………………………

5  Declaration of Service by U.S. Mail

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

### CONSTITUTIONAL PROVISIONS

U.S. Const., art. I, § 9, cl.3; art. I, § 10 cl.1 ------------------------------------------------25

### STATUTES

28 United States Code § 2254(d) -------------------------------------------------------------- 9

California Evidence Code §115------------------------------------------------------------------20

California Penal Code § 3041(b) ---------------------------------------------------------------21

California Penal Code § 1170-------------------------------------------------------------------22

California Penal Code § 2932(c)(5) ------------------------------------------------------------19

California Penal Code § 3041, subd.(b) -------------------------------------------------------10

California Penal Code § 3041.5(a)(5)----------------------------------------------------------19

### CALIFORNIA CODE OF REGULATIONS, TIT. 15, DIV. 2, BPH REGULATIONS

§2000, subd.(b)(51)[Good Cause]---------------------------------------------------------------20

§2402(a) ------------------------------------------------------------------------------------------10

§2402(c)(1)(E)----------------------------------------------------------------------------------15

§2402(c)(2) --------------------------------------------------------------------------------------14

§2402(c)(3) --------------------------------------------------------------------------------- 15, 16

§2402(d)------------------------------------------------------------------------------------- 15, 21

§2402(d)(2) --------------------------------------------------------------------------------- 15, 21

§2402(d)(3) --------------------------------------------------------------------------------------21

§2402(d)(4) --------------------------------------------------------------------------------------21

§2402(d)(5) --------------------------------------------------------------------------------------21

§2402(d)(6) --------------------------------------------------------------------------------------21

§2402(d)(7) --------------------------------------------------------------------------------------21

§2402(d)(8) --------------------------------------------------------------------------------------21

1   §2402, subd. (c)(1)----------------------------------------------------------------------13

2   §2403(c) ------------------------------------------------------------------------------4, 22

3   §2410 ------------------------------------------------------------------------ 4, 23, 24, 25

4   §2450 ----------------------------------------------------------------------------------20

5   15 CCR, Division 3, CDCR Regs., §3000 -----------------------------------------------20

6   15 CCR, Division 3, CDCR Regs., §3320(l) --------------------------------------------19

7

8

9   ## STATE CASES

10  *Board of Prison Terms v. Superior Court (Ngo)*, 130 Cal.App.4th 1212,

11      31 Cal.Rptr.3d 70 (Cal.App. 6 Dist.,2005)------------------------------------------27

12  *In re Alvarade*, Not Reported in Cal.Rptr.3d, 2005 WL 217030, at *9,  (Cal.App. 6 Dist.,2005) ---16

13  *In re Bray* (1979) 97 Cal.App.3d 506, 511-13------------------------------------------26

14  *In re Caswell* (2001) 92 Cal.App.4th 1017, 1027, 112 Cal.Rptr.2d 462)-------------------------19

15  *In re Dalton* (1987) 117 Cal.App.3d 521 ----------------------------------------------25

16  *In re Dannenberg*, 2007 WL 2927359 at 9 (Cal.App. Nov. 16, 2007), *modified*, 2007 WL 4227229

17      (Cal.App. Dec. 3, 2007) -------------------------------------------------------------21

18  *In re Dannenberg*, 34 Cal.4th 1061, 1071, 23 Cal.Rptr.3d 417 (Cal.2005) -----------------------31

19  *In re Duran*,  Not Reported in Cal.Rptr.3d, 2005 WL 3032500 at *6-*7,

20      (Cal.App. 6 Dist., Nov 14, 2005)----------------------------------------------------16

21  *In re Elkins*, 144 Cal.App.4th 475, 499 (Cal.App. 2006)-------------------------------------21

22  *In re Harper* (1979) 96 Cal.App.3d 138, 141 ------------------------------------------26

23  *In re Huynh*, Not Reported in Cal.Rptr.3d, 2006 WL 280900 AT *18-*19,

24      (Cal.App. 6 Dist., Feb 03, 2006) ----------------------------------------------------16

25  *In re Lee*, 143 Cal.App.4th 1400, 1408 (Cal.App. 2006) -----------------------------------21

26  *In re Minnis*, 7 Cal.3d 639 (1972) -----------------------------------------------------26

27  *In re Montgomery*, 156 Cal.App.4th 930, 946-947, 67 Cal.Rptr.3d 721

28      (Cal.App. 2 Dist., 11-07-2007.) ------------------------------------------------- 12, 13

*In re Samble*, Not Reported in Cal.Rptr.3d, 2006 WL 401282

   (Cal.App. 6 Dist., Feb 21, 2006) -------------------------------------------------------------------16

*In re Scott* (2005) 133 Cal.App.4th 573, 591, 34 Cal.Rptr.3d 905 ( *Scott II* ) ---------------- 12, 17, 21

*In re Sheppard*, Not Reported in Cal.Rptr.3d, 2004 WL 943903 at *10,

   (Cal.App. 6 Dist., Apr 29, 2004) -------------------------------------------------------------------16

*In re Smith (Ernest)*, 114 Cal.App.4th 343 (2004)------------------------------------------------ 16, 17

*In re Stanworth* (1982) 33 Cal.3d 176 ---------------------------------------------------------------25

*In re Weider*, 145 Cal.App.4th 570, 588, 52 Cal.Rptr.3d 147 (2006) ----------------------------------31

*In re Weider,* Not Reported in Cal.Rptr.3d, 2005 WL 40042 at *10

   (Cal.App. 6 Dist., Jan 10, 2005) -------------------------------------------------------------------16

*People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013----------------13

*Terhune v. Superior Court,* (1998) 65 Cal.App.4th 864, at 873 ----------------------------------- 20, 25

## FEDERAL CASES

*Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir.2002) ------------------------------------------------- 9

*Bair v. Folsom State Prison,* 2005 WL 2219220 at *9 (E.D.Ca. 2005)-------------------------------28

*Biggs v. Terhune,* 334 F.3d 910, 914 (9th Cir.2003)----------------------------------------------------30

*Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir.2000) ----------------------------------------------- 9

*Devries v. Schwarzenegger,* 2005 WL 2603203 at 4 (E.D.Cal. 2005) ----------------------------------28

*Early v. Packer,* 537 U.S. 3, 7, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002)----------------------------- 9

*Flemming v. Oregon Bd. Of Paroles,* 998 F.2d 721, 724-27 (9th Cir. 1993) --------------------------26

*Hamilton v. United States,* 67 F.3d 761, 764-65 (9th Cir. 1995)-----------------------------------26

*Irons v. Carey,* 505 F.3d 846, 851 (9th Cir.2007)----------------------------------------------- 30, 31

*Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) -----------------------30

*Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003) -------------------- 9

*McQuillion v. Duncan* (9th Cir.2002) 306 F.3d 895, 902------------------------------------------19

*McQuillion v. Schwarzenegger,* 369 F.3d 1091 (9th Cir. 2004) -------------------------------------26

*Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.1985) ---------------------------------------------- 30

*Miller v. Florida* 482 U.S. 423, 430, 107 S.Ct. 2446 (1987) --------------------------------------- 26

*Nulph v. Faatz*, 27 F.3d 451 (9th Cir. 1994) --------------------------------------------------------- 26

*Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942,

110 S.Ct. 344 (1989) --------------------------------------------------------------------------------- 30

*Powell v. Ducharme*, 998 F.2d 710 (9th Cir. (Wash.) 1993) ---------------------------------------- 30

*Roberts v. Corrothers*, 812 F.2d 1173, 1174 (9th Cir. 1987)-------------------------------------- 19

*Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1127-28 (9th Cir.2006)------------------- 30

*United States v. Johns*, 5 F.3d 1267- 1271-72 (9th Cir. 1993) ----------------------------------- 26

*Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)---------------- 9

/////////////////////////////////

Daniel Partida,  H-48181
CTF-North
P O Box 705
Soledad, CA 93960-0705

Petitioner In Pro Se

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

DANIEL PARTIDA,

        Petitioner,

  v.

BEN CURRY, Warden, California Training

Facility-Central,

        Respondent

Case No. _____

Supreme Court: S160641
Second Appellate District
Division 2: B204834
LASC No.: BH004210
Criminal Trial: BA043905

**MEMORANDUM OF POINTS ND AUTHORITIES IN SUPPORT OF ANCILLARY PETITION FOR WRIT OF HABEAS CORPUS**

## I.

## INTRODUCTION

COMES NOW, Petitioner Daniel Partida, who alleges that Petitioner is being unlawfully restrained of his liberty by the Board of Parole Hearings after denial of parole at his June 2005 parole consideration hearing.

Daniel Partida was convicted of being a principal in a drive-by shooting January 21, 1991. He has denied knowing the shooter, stating that his girlfriend's brother Jose Claro, brought him along after Partida picked him up on his way to his girlfriend's house. The Court of Appeals decision, at page 2, noted that initially there were witnesses who had

advised the police they could identify the occupants of the subject car (of the drive-by shooting) but who declined to do so at trial. The shooter got away, never to be identified, and Jose instead blamed Partida to protect his friend the shooter.[1]

Notwithstanding that the jury did not believe Partida to be completely innocent of this crime, or that the police believed Partida was more involved, there is one factor that augers in favor of Partida's averment: his uncle's car (Jose G. Escobar). Partida was driving a distinctive red car with a license plate on it. It is inconceivable that he would deliberately drive such an identifiable car to a place where numerous witnesses observed this car during a drive-by shooting and who could readily identify the car. But there is another factor that stands out, which comes after his conviction and imprisonment: not once in his 13 years of incarceration is there any chrono or disciplinary or investigation report associating or affiliating him with gang members in prison. Instead, Partida has been viewed at the outset as amenable to treatment and he has lived up to that official view by his extensive and continuous involvement in therapy, self-help, educational, vocational and volunteer activities. Except for minor counseling chronos and a single 115 in 1995 for possession of contraband (2 batteries externally attached to his approved Walkman radio). (**Exhibit B**, 2001 transcript, p. 18; **Exhibit D**, 2005 BPH transcript p. 45.) The possession of contraband in 2003, which resulted in a 128 counseling chrono, was for possession of an unauthorized music CD. (*Ibid.*, at 45-46.)

And he explained to the Board that the reason the police gang unit had him listed as a member of the Street Saints (or Sync) gang was because his girlfriend's brother Jose, himself a gang member, told them that, and it was a lie. (*Id.*, at p. 47)

---

[1] The arrest report contained a statement that two detectives on the case had spoken with a gang member named Robert Alex Carlias AKA "Mongo" who alleged that he was told by Jose A. Claro, AKA "Shabby" (co-defendant) that Partida has committed the drive-by shooting.(**Exhibit N**) The arrest report continues with "Mongo" identifying Partida from a photo line-up, and claiming Partida "bragged" to him that he did the shooting. In that same report "Shaggy" was interviewed and he claimed that Partida approached him to do the drive-by shooting and the unknown person who actually did the shooting was already with Partida. At trial, Partida was specifically eliminated as the shooter, rendering "Mongo's" claims incredible. (*Ibid.*) *See also* **Exhibit O**, Reporter's Transcript, p. 37, showing Carlias was a gang member of the Street Saints.

1       The Board did not find any evidence that Daniel Partida actually posed an

2   unreasonable risk to public safety. What it did was state this, and then claim that the offense

3   of murder was carried out in a callous manner, which Partida does not dispute, but he was

4   not the shooter and steadfastly claims lack of any foreknowledge the shooting was going to

5   take place. The Board's claim of an inexplicable motive suffers from the problem, i.e.,

6   Partida was not the shooter and steadfastly claims lack of foreknowledge of the crime. The

7   Board did NOT allege that as a result of these allegations of "callous manner" and

8   "inexplicable motive" that he needs additional therapy and self-help in order "to face,

9   discuss, cope and understand" his offense, as this Court has undoubtedly seen many times in

10  these parole petitions.  If these factors were of such concern to the Board, it certainly would

11  have stated this additional need as it does in most cases.  (*Id.*, p. 85.) It may be that the

12  Board found his statements credible enough to not attack his credulity.

13      Further, and most importantly, the Board did NOT find that this offense was

14  "especially" heinous, atrocious, or cruel, nor did it find that it was "particularly egregious"

15  which are the factors that the Board must allege and support with some evidence of that in

16  the record. It did not do so in this case. What the Board said, in its reason for the two-year

17  deferral, is that the offense was carried in a manner which demonstrates an "exceptional

18  callous disregard for human suffering." [sic].  (*Id.*, p.86.)  Under standards set forth in more

19  recent court decisions, as cited *infra*, the shooting of a victim who died instantly may not be

20  characterized as an "exceptional callous disregard for human suffering" because the victim

21  did not <u>suffer</u>. Since the Board cited to no facts and made no allegations that this offense

22  was "particularly egregious" then it had no evidence to support a finding based on the

23  offense that <u>Partida</u> posed an unreasonable risk to public safety if released. If he was the

24  shooter, that might be a different story.

25      Additionally, in the two-year deferral, the Board cited that Partida had an "unstable

26  social history with others prior to his crime which has brought him to the – position in

27  prison." The Board cited to no facts in the record to support this unfounded claim. There is

28  nothing in the record that remotely indicates that Partida had an unstable social history; to

1  the contrary, everything in his record indicates his relationships were stable with people. His

2  family relationships were satisfactory, he attended school and when he wasn't in school he

3  worked as a car salesman for the family business for approximately two years. (**Exhibit L**,

4  2001 Mental Health Evaluation, p.2.) He had a close relationship with his uncle and

5  grandmother, having been raised by his paternal grandparents. (His mother died when he

6  was young and his father was murdered in 1987.) (*Ibid.*) He didn't belong to a gang, he

7  adamantly states, but made friends with his girlfriend's brother who was a gang member.

8  There is absolutely no evidence in the record that Partida had an "unstable social history."

9  In prison he has maintained good relationships with staff and inmates alike, spending years

10  as a Laubach literacy tutor helping other inmates. Thus, there is no support whatsoever for

11  the Board's conclusion of "unstable social history."

12      In denying Partida parole for another two years, the reason for the denial came down

13  to one thing and one thing only: the commissioner felt that "you have a little more time to

14  give some consideration [sic]..." *Id.*, at p.87. In other words, we want you to serve more

15  time. This subjective view of the Board panel is not sufficient for denial of parole. The

16  statutory requirement is whether the prisoner currently poses an unreasonable of danger to

17  society. The Panel mouthed those words of more time but without any support whatsoever

18  that Partida actually poses an unreasonable risk.

19      The Board's regulations, at 15 CCR §2403(c), the matrix for second degree murder,

20  is an intersecting grid of offense Circumstances and Victim circumstances. Partida's offense

21  falls in Category III (No Prior Relationship) and A (Indirect). He had no prior relationship

22  with the victim and another person actually killed the victim. In that matrix category, the

23  term ranges from 17-18-19 years. Given Partida's steadfast claim of lack of foreknowledge

24  the shooting was going to take place, and that another person did the shooting, he should

25  fall no higher than the middle term of 18 years. He has spent some 13 years imprisoned, and

26  has an exceptional record which the Board acknowledged. Thus, he is entitled to

27  postconviction credits under §2410 of zero to 4 months per each year served, minus the

28  1995 rule infraction. If calculated only from his entry in 1993 to CYA (and not counting his

1   jail time since 7/22/1991), he would be entitled to 48 months off of that 18 years, which

2   calculates to 168 months, or 14 years imprisonment. He has served his time, factoring in jail

3   credits. This 2-year deferral would render meaningless his accumulated goodtime credits.

4       Petitioner submitted to the state courts a letter from his brother Peter Partida, and

5   declarations from Pedro Partida, Modesta Salas (grandmother), Jacinto Alarcon (friend &

6   social worker for county of LA, all explaining Daniel Partida was NEVER a gang member,

7   and that he NEVER assaulted Ruth Jiminez and was, in fact, assaulted by her. These are

8   submitted here as **Exhibit H, Exhibit I**, with letters of support in **Exhibit P**.

9       Interestingly, at the trial court hearing on August 31, 1992, entitled "State Prison

10  Appeal Rights," the court was considering whether a California Youth Authority

11  commitment or an adult commitment was appropriate. Although the court determined that

12  an adult commitment was appropriate, it ordered that Partida be housed at CYA to be later

13  transferred to the custody of the Department of Corrections. This transcript was submitted

14  to the state courts as **Exhibit A**, as it is here. Having been placed in the CYA for evaluation

15  by CYA of amenability to treatment, the report returned saying he was amenable to

16  treatment. (*Id.*, at page 5.) His trial attorney explained Partida's family history and

17  environment. His mother died shortly after his birth, his father had been in state prison and

18  later killed in a shooting in Tijuana when he was very young. An uncle and older brother

19  had raised him, and he was living with his grandmother Modesta Salas at the time of the

20  crime. He lived in a very rough area in Los Angeles where gangs literally controlled the

21  streets, yet he was never an actual gang member, despite the official version. (**Exhibit H,**

22  **Exhibit I**, and **Exhibit P**.) He was 'peripherally' involved because his neighborhood peers

23  were mostly gang members, and his girlfriend's brother was an active gang member who he

24  sometimes associated with. (**Exhibit A**, page 6-7.) The CYA report given the trial court

25  indicated "he is not heavily vested in gang activity, he doesn't necessarily identify himself

26  with any particular gang ...." (*Id.*, at page 7:2.) The trial court rejected the CYA

27  acceptance report, noting the high rate of drive-by shootings going on just in Los Angeles

28  County, and noting the CYA report stated Partida expressed no remorse or sense of

1   responsibility. (*Id.,* at page 10:15 .)  However, this was due to Partida not being the shooter,

2   denying he knowingly participated in the drive-by with foreknowledge, and, in his youth,

3   not understanding why he was being punished so severely for something he did not do.  The

4   trial court sentenced him to the state penitentiary, but committed him to the CYA for the

5   purpose of housing and participating in programs, but stated that Partida "shall be deemed

6   to be committed to the Department of Corrections and shall remain subject to the

7   jurisdiction of the Department of Corrections and Board of Prison Terms." (*Id.,* page 11:5.)

8   Partida's record of treatment was very positive, as indicated by **Exhibit G,** CYA Progress

9   Reports.)  He was transferred to the adult prison system 8/20/1996 after he had turned 22

10  years old. (*Ibid.,* also **Exhibit J,** CDC Progress Reports, PR June 14, 1999, 6-11-96 to 6-10-

11  97.) These reports show Partida was a model inmate and stayed out of serious trouble, with

12  only minor custodial counseling chromos, and no 115s in the adult system.

13      In his Declaration about his brother,  Pedro Partida explained how Daniel was able to

14  avoid direct involvement in the local gangs, although he associated with them. He explained

15  that a number of local boys did not join a gang but stuck together in sports activities,

16  sometimes competing against other boys who were gang members. Pedro explained

17  Daniel's girlfriend Yecel Claro had a brother who was a gang member, Jose "Shaggy"

18  Claro, a Street Saints member.  Pedro explained Daniel could NOT have been a Street

19  Saints member because the local in his neighborhood was the Ghetto Boys and would never

20  have tolerated a Street Saints member living in Ghetto Boys turf.  Pedro explained that the

21  Street Saints used Daniel as a "patsy" in the drive-by, that Daniel had no foreknowledge of

22  the shooting, and that a Street Saints member pointed the finger at Daniel precisely because

23  he was NOT a Street Saints member to take the heat off of Jose Claro and the actual

24  shooter, who Daniel did not even know.

25      As to the alleged assault and robbery of Ruth Jimenez, Daniel's ex-girlfriend, Pedro

26  explained it was Ruth who came to Daniel's house when the family had gathered there,

27  called Daniel outside, began screaming at him, then slapped Daniel a couple of times, at

28  which time Daniel pushed her away but never struck or kicked her.  Pedro explained that at

that time Ruth's gold chain, previously given her by Daniel, must have gotten torn off during the pushing and shoving, which was later found by Jose Pelayo, a neighbor. The original charges were later dismissed. (**Exhibit I.**) Daniel's grandmother Modesta also explained the incident with Ruth Jiminez. (**Exhibit I.**) Jacinto Alarcon, a family friend who is now a Social Worker for the non-profit United States Veteran's Initiative, an affiliate of the Long Beach Veteran's Administration, gave a detailed declaration of the history of life in his neighborhood, the rise of local gangs, why Daniel could NOT have been a Street Saints member, and that Daniel never joined a gang. (**Exhibit I.**) Although these declarations were NOT available at the 2005 hearing, there was no concrete evidence in the record at the 2005 hearing that Daniel Partida was a gang member or that he had ever assaulted Ruth Jiminez. The substantial evidence at the 2005 hearing was that Daniel Partida was rehabilitated and did not pose a risk of threat to public safety if released to parole.

In sum, there was no evidence presented at the hearing in the Board's findings or conclusions that Daniel Partida posed an unreasonable risk to public safety if released from prison. The State courts should have reversed the parole denial decision for lack of any evidence that Daniel Partida posed an unreasonable risk if paroled. Their failure to do so was an unreasonable application of controlling law to the facts in this case, and was contrary to and an unreasonable application of federal constitutional law as set forth by the U.S. Supreme Court and/or as defined by the state and federal courts. The parole denial decision must be reversed.

## II.

## CONTENTIONS

### Ground 1:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board had no relevant or reliable evidence to support the reasons given to deny him parole.

### *Ground 2*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board failed to apply a standard of proof to the substantial evidence favoring parole, as admitted by the Board commissioners. *People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d 827, 926 P.2d 1013.

### *Ground 3*:

Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board has a policy against granting parole to life prisoners until they have exceeded the terms set forth in its sentencing guidelines considered appropriate to a particular offense, thus depriving such prisoners of any benefit that postconviction credits might have on a parole date, once set. Petitioner asserts that according to the guidelines, and in consideration of his postconviction credits he has earned, he has been imprisoned beyond the term that would apply to his offense and culpability, and that his earned post-conviction credits are rendered meaningless. Additionally, this general administrative increase in actual time served from the date of his offense to the present time, constitutes a violation of Ex Post Facto prohibitions.

Petitioner asks the Court to grant habeas relief on his substantive claims and order the Board of Parole Hearings to reverse its decision denying him parole. *(See* Prayer for Relief, *infra*.)

## III.
## STANDARD OF REVIEW OF A PETITION
## FOR WRIT OF HABEAS CORPUS

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

1    (2) resulted in a decision that was based on an unreasonable determination of the

2    facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).

3    Under § 2254(d)(1), a state court decision is "contrary to" clearly established

4    United States Supreme Court precedents if it applies a rule that contradicts the governing

5    law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

6    indistinguishable from a decision of the Supreme Court and nevertheless arrives at

7    different result. *Early v. Packer*, 537 U.S. 3, 7, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002)

8    (citing *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389

9    (2000)).

10   Under the "unreasonable application" clause of section 2254(d) (1), a federal

11   habeas court may grant the writ if the state court identifies the correct governing legal

12   principle from the Supreme Court's decisions, but unreasonably applies that principle to

13   the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court "may not

14   issue the writ simply because that court concludes in its independent judgment that the

15   relevant state-court decision applied clearly established federal law erroneously or

16   incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; see also

17   *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003) (it is "not

18   enough that a federal habeas court, in its independent review of the legal question, is left

19   with a 'firm conviction' that the state court was 'erroneous.' ")

20   The court looks to the last reasoned state court decision as the basis for the state

21   court judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir.2002). Where the state court

22   reaches a decision on the merits but provides no reasoning to support its conclusion, a

23   federal habeas court independently reviews the record to determine whether habeas corpus

24   relief is available under section 2254(d). *Delgado v. Lewis*, 223 F.3d 976, 982 (9th

25   Cir.2000).

26   //

27   //

28

# IV.

# ARGUMENT

As shown here, the law fully supports Petitioner's claims. The Board commissioners commended Partida for doing an outstanding program during his incarceration, and simply wanted more time. "More time" is not a legitimate demand, as shown at Ground #3, *infra*. Notwithstanding, there is no evidence additional time is required to achieve a rehabilitative goal, or to promote the notion of deterrence, and no evidence Partida is a current threat to anyone.

## *Ground 1*:

> Petitioner is unlawfully restrained of his liberty by the Board of Parole Hearings in violation of the State and Federal Due Process Clause by its denial of parole at his June 2005 parole hearing. Petitioner alleges that the Board had no relevant or reliable evidence to support the reasons given to deny him parole.

## *The Commitment Offense*

The statutory and regulatory requirement is that the Board must find that the prisoner currently poses an unreasonable risk of threat to the public *before* it can deny parole. (Penal Code section 3041, subd.(b); 15 Cal.Code Regs., Div.2, §2402(a); *In re Rosenkrantz*, 29 Cal.4th 616, 653 (2002). Quoting from *Rosenkrantz*:

> " The Board's criteria for setting parole dates for individuals convicted of murder committed after 1978, as in the present case, are set forth in title 15, division 2, chapter 3, article 11 of the California Code of Regulations. Pursuant to section 2401 of title 15 of these regulations: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d)." (Italics added.)

> According to the applicable regulation, circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; [FN11] (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

FN11. Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

The regulation further provides that circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).)(3)

In sum, the governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen. Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. (Cal. Code Regs., tit. 15, § 2401.) Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation."

*Id.*, 29 Cal.4th at 653.

1    Accordingly, the overarching consideration in the suitability determination, and the

2 one that is prescribed by statute, is whether the inmate is currently a threat to public safety.

3 (*In re Dannenberg*, (2005) 34 Cal.4th at pp. 1071, 1083, 1085-1086, 23 Cal.Rptr.3d 417; *In*

4 *re Scott* (2005) 133 Cal.App.4th 573, 591, 34 Cal.Rptr.3d 905 ( *Scott II* ).) In *Dannenberg*,

5 the court said that the Board may, in some cases, find that the setting of a fixed release date

6 "may be premature if it concludes, on relevant grounds with support in the evidence, that

7 the grant of a parole date is premature for reasons of public safety."( *Ibid.*) The

8 determination in the particular case "should focus upon the public safety risk posed by 'this

9 individual.' " ( *Id.* at p. 1083, 23 Cal.Rptr.3d 417, 104 P.3d 783.)

10    In exercising its discretion, the Board is constrained by the procedures specified by

11 statute. The precise manner in which the specified factors relevant to parole suitability are

12 considered and balanced is within the Board's discretion, but its decision must reflect an

13 individualized consideration of the specified criteria and it cannot be arbitrary or capricious.

14 ( *Scott II, supra*, 133 Cal.App.4th at pp. 590-591, 34 Cal.Rptr.3d 905; citing *Rosenkrantz*,

15 *supra*, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) " 'Although a prisoner is not

16 entitled to have his term fixed at less than the maximum or to receive parole, he is entitled

17 to have his application for these benefits "duly considered" ' based upon an individualized

18 consideration of all relevant factors. [Citations .]" ( *Rosenkrantz, supra*, 29 Cal.4th at p.

19 655, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added.)

20    In Petitioner Partida's case, at page 84 of the transcript (**Exhibit D**), the Board did

21 not find that the offense was "particularly egregious" but limited its finding to "the offense

22 was carried out in a callous manner" which is an apt description for <u>any</u> murder. As the

23 Board noted, the victim, which was struck by a bullet not intended for him, was hit in the

24 back of the head and died immediately.  The Board then said that the "motive of the crime

25 was inexplicable or trivial in relation to the offense."  But this was not a crime of motive,

26 since this was not the intended victim, and motive cannot be ascribed to Partida who only

27 drove the car and has consistently claimed no foreknowledge of the rang-related shooting

28 (of which he was NOT a member). The panel noted he "in fact, was the driver in the case of

this committed offense," (**Exhibit D,** pp. 15-19),  a fact also acknowledged by the jury

(**Exhibit F**) and the court of appeal. (**Exhibit E.**)  As stated recently in *In re Montgomery,*

> "Here, the Governor viewed the nature of the crime without considering that
> Montgomery was not the shooter. While an accomplice is treated the same as
> the perpetrator of a crime for purposes of determining guilt and  imposing
> sentence (*e.g., People v. Prettyman* (1996) 14 Cal.4th 248, 259, 58 Cal.Rptr.2d
> 827, 926 P.2d 1013), continuing to do so in making a parole suitability
> determination violates the prisoner's due process right to " an individualized
> consideration of all relevant factors.""

*In re Montgomery,* 156 Cal.App.4th 930, 946-947, 67 Cal.Rptr.3d 721 (Cal.App. 2

Dist., 11-07-2007.)  Thus, Partida was denied individualized consideration where the Panel

ascribed to him the same culpability as that of the shooter, and thus the same level of

dangerousness.

  In addition, with respect to Partida's threat to public safety, analysis leads to conclude

that the Board's findings fail to reflect the compelling value of the low risk of violence

assessment that Partida had received from the doctors, as well as his prison behavior and

program. The Board should have considered these factors under section 3041 and applicable

regulations as compelling a finding of "suitability."  Lip service to these factors in this case

tends to show an abuse of discretion because it is arbitrary and capricious.

  Thus, the question is, in order to rely on the commitment offenses as a factor

favoring unsuitability, did the Board properly cite some evidence of aggravating factors

beyond what was minimally necessary to sustain convictions for the life crime?

(*Dannenberg, supra,* 34 Cal.4th at p. 1095, fn. 16; see also p. 1071.)  No, it did not.

  Further, notwithstanding Partida was not the shooter, to cite motive, where the

victim, an innocent bystander, was not the intended target, is not, in and of itself, "trivial in

relation to the offense[s]" such that the offenses can be said to have been committed in an

"especially heinous, atrocious or cruel manner" under the regulation. (Regs., §2402, subd.

(c)(1).)  (This legal fact is not intended to minimize the senselessness of the shooting, but

motive is not a factor in this case against Partida.)

1    Further, the finding that Partida has an "escalated pattern of criminal conduct in his

2    youth" is belied by the fact that there is no disposition on these arrests. And even if they are

3    true, they are misdemeanor offenses at most. The 03-01-90 vandalism, at age 16, was

4    explained as a mistaken identification. Charges were dropped. (*See,* **Exhibit M;** *also*

5    **Exhibit S,** Probation Report, page 7) At age 17 he and a friend walked into Lynwood High

6    School without permission so his friend could see his girlfriend. Partida says he was truant

7    from school that day and was caught by the security guards who called the police. He was

8    arrested but released to his grandmother. (*Ibid.*) (**Exhibit S,** page 7.) At age 17 he was

9    arrested with possession of live ammunition without parental permission (PC 12101(B)),

10    carrying a loaded firearm in a public place (underneath his car seat) (PC 12031(A)), and

11    with tampered ID marks on the firearm (PC 12090). A non-detained petition was filed

12    01/14/91. Charges dismissed. (*See* **Exhibit M.**) He was arrested on 12/06/90 for an alleged

13    robbery (snatching a chain from a girl's neck and assaulting her), which charge was

14    dismissed.[2]

15    It cannot be credibly said that Partida had an "escalating pattern of criminal conduct"

16    as anything relative to this offense or to serious criminality.[3] In fact there is no such

17    regulation. The closest regulation would be §2402(c)(2) **Previous Record of Violence.**

18

19    [2]    Partida's former girlfriend, Ruth Jimenez, came over to his grandmother's house, where he

20    lived, and started an argument. It was Ruth who assaulted him with slaps to his face, resulting in

      him pushing her away. The incident happened in her and his brother's presence in the front yard.

21    (**Exhibit D,** pp. 47-48; *see also* **Exhibit M,** 2004 Mental Health Evaluation, at page 3 [Partida

22    stated he would never disrespect his former girlfriend or his grandmother by being aggressive or

      violent towards his girlfriend.]) *See also* **Exhibit I,** Declaration of Peter Partida and his

23    grandmother Modesta Salas, explaining that Ruth initially slapped Daniel twice before he *pushed*

      her away at which time the chain must have been snagged, at which point she 'stormed' off. A

24    neighbor picked up the chain from the ground. The testimony of the arresting officer reveals he

      observed no bruises on Ruth, (**Exhibit O,** transcript page 7-11), and the charges were later

25    dismissed.

26    [3]    Partida lived in a part of the city infested by gangs. This is a fact noted in the record.

      Nontheless, he managed to avoid being a gang member. The question of why he would buy and

27    carry a pistol may be reasonably answered. He lived in a gang-infested neighborhood. It was often

      dangerous for young men his age. Perhaps he thought a pistol would protect him.

28

[The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated *serious assaultive behavior at an early age.*] (emphasis added) The Board relied exclusively on the vandalism charge, the possession of live ammunition and a pistol (which Partida admitted), and the *arrest* for robbery (the ex-girlfriend incident). As to the 'robbery' incident, it appears that his former girlfriend Ruth lied to the police about the assault, insofar as it is extremely unlikely that Partida would have committed an assault in his grandmother's very presence. (*See* **Exhibit I,** Declaration of Modesta Salas, grandmother and eyewitness.)

In giving Partida the two year denial, the Panel did so on the basis that "the offense was carried out in a manner which demonstrates an exceptional callous disregard for human *suffering*." (emphasis added.) (§2402(c)(1)(D).) Again the Panel found the motive was "inexplicable or trivial in relation to the offense." (§2402(c)(1)(E).)

The Panel alleged an "unstable social history with others" but failed to explain what that even meant. (§2402(c)(3).)

The Board panel said that Partida had an unstable social history with "others." The commissioner did not define "others" but it appears he was talking Partida's relationship with Jose Claro, his friend and girlfriend's brother, who was a gang member. The Regulations provide that an "unstable social history," defined as having "a history of unstable or tumultuous relationships with others," is a factor tending toward unsuitability. (§2402(c)(3).) Similarly, a "stable social history," defined as having "experienced reasonably stable relationships with others," is a factor favoring parole suitability. (Regs., §2402(d)(2).)

Here, the Board cited only Partida's relationship with Claro ("Shaggy"), the co-defendant, to support that Partida did not have a stable social history. This single relationship, which was NOT "tumultuous" hardly establishes a "history" of unstable relationships with "others," i.e., more than one person, as referenced in the applicable Regulation. (Regs., §2402(c)(3).) Aside from his *stable* relationship with Claro, there was not "some evidence" that Partida had unstable or tumultuous relationships with others.

"Because the language of the relevant subdivision permits the Board to consider whether [a prisoner] had 'a history of unstable or tumultuous relationships with others' [citation], the language appears to contemplate that a prisoner can be deemed unsuitable if he was chronically unable to form stable relationships. We therefore question whether this criterion can be satisfied by evidence of a single tumultuous relationship." (*In re Shaputis* (2005) 135 Cal.App.4th 217, ----, fn. 13 [review granted on other grounds].)

In sum, there was not "some evidence" in the record of a "history of unstable or tumultuous relationships with others" such that Partida could be determined unsuitable for parole on this basis. (Regs., §2402(c)(3).)

This case falls well within the analysis of in *In re Scott I, supra,* 119 Cal.App.4th 871 (2004), at 895-896. There is no evidence that his preconviction social history was "unstable." Although his mother died early and his father was murdered when he was young, he was raised in a stable environment by his grandparents with close support by his uncle and brother. He attended school and he worked in the family business. After imprisonment, his entire 13 year record has shown he gets along very well with staff and inmates alike, and his network of community support is excellent. (**Exhibit P**, letters) Under *Scott,* the Board had no evidence to support this assertion.

Courts which have addressed the matter of "exceptional callous disregard for human suffering" have found no evidence to support this characterization where the victim was killed immediately and did not *suffer. See, e.g., In re Scott (Scott I)* 119 Cal.App.4th 871 (2004); *In re Smith (Ernest)*, 114 Cal.App.4th 343 (2004); *In re Shaputis*, 135 Cal.App.4th 217, 228 (12/28/2005).[4]

---

[4] In numerous unpublished cases, cited here pursuant to Rule 977, the courts have found the Board's characterizations in other cases not supported. Petitioner asks the court to take judicial notice of these cases. *In re Alvarade* Not Reported in Cal.Rptr.3d, 2005 WL 217030, at *9, (Cal.App. 6 Dist.,2005); *In re Sheppard*, Not Reported in Cal.Rptr.3d, 2004 WL 943903 at *10, (Cal.App. 6 Dist., Apr 29, 2004); *In re Samble*, Not Reported in Cal.Rptr.3d, 2006 WL 401282 (Cal.App. 6 Dist., Feb 21, 2006); *In re Huynh,* Not Reported in Cal.Rptr.3d, 2006 WL 280900 AT *18-*19, Cal.App. 6 Dist., Feb 03, 2006); *In re Duran,* Not Reported in Cal.Rptr.3d, 2005 WL 3032500 at *6-*7, Cal.App. 6 Dist., Nov 14, 2005); *In re Weider,* Not Reported in Cal.Rptr.3d, 2005 WL 40042 AT *10 (Cal.App. 6 Dist., Jan 10, 2005).

Therefore, an unsuitability determination must be predicated on 'some evidence that the particular circumstances of [the prisoner's] crime – circumstances beyond the minimum elements of his conviction – indicated exceptional callousness and cruelty with trivial provocation, and thus suggests he remains a danger to public safety.' ( *Dannenberg, supra,* 34 Cal.4th at p. 1098, 23 Cal.Rptr.3d 417, 104 P.3d 783.)" ( *In re Scott II, supra,* 133 Cal.App.4th 573, at p. 598 (2005).) The court's analysis and finding in *In re Smith (Ernest),* is instructive:

> Second degree murder requires express or implied malice--i.e., the perpetrator must kill another person with the specific intent to do so; or he or she must cause another person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for life. (§§ 187-189; see CALJIC No. 8.11.) For this reason, it can reasonably be said that all second degree murders by definition involve some callousness-i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others. (*See* Webster's Third New International Dict. (3d ed.1993) p. 319, col. 1.) As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable. Presumably, therefore, in calling defendant's crime callous, the Governor was invoking the suitability factor in *367 section 2042, subdivision (c)(1)(D) and finding that Smith killed Garner in a manner that showed "exceptionally callous disregard for human suffering." (Regs., § 2402, subd. (c)(1)(D).)

> However, the Governor does not specify how Smith manifested exceptionally callous disregard for Garner's suffering. There is no evidence that Smith acted with cold, calculated, dispassion; or that he tormented, terrorized, or injured Garner before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering.

As in Smith's case, the Board in Partida's merely cited the offense as being "callous," not exceptionally callous. (**Exhibit D**, p.84.) Nonetheless, it cited "an exceptional callous disregard for human suffering" as cause for the two year deferral. *Id.,* p.85. The analysis and finding of *Smith* applies here as well. (The main difference, of course, is that Smith killed his wife.)

The Board is, of course, free to reject Partida's version – that he was NOT a gang member, did not have foreknowledge that a shooting was going to occur, and only gave a

ride to his friend/girlfriend's brother Jose and *his* friend – but only on the basis of "some evidence"— that is, the Board's decision must have " 'some basis in fact.' " (*In re Powell*, (1988) 45 Cal.3d 894, at p. 904.) The record before the Board contains little reliable information of any sort showing whether Partida was acting with foreknowledge at the time his passenger shot the victim.[5] But the record contains no evidence <u>Partida</u> committed the offense "in an especially heinous, atrocious or cruel manner," or that the nature of his crime indicates he poses a continuing threat to the public safety if released. Indeed, the record contains abundant uncontradicted evidence to the contrary. And it does not appear that the Panel was steadfast in its position of Partida's foreknowledge; it appears it may have considered that his version has some credibility.

In *Shaputis, supra*, at page 228, the court found "The record is devoid of any evidence of aggravated conduct reflecting an exceptionally callous disregard for human suffering. [.] As in *In re Smith, supra*, 114 Cal.App.4th 343, 7 Cal.Rptr.3d 655, there is no evidence Shaputis "tormented, terrorized, or injured [his victim] before deciding to shoot [her]; or that he gratuitously increased or unnecessarily prolonged her pain and suffering."

By comparison, whereas these cited cases all involved the actual killer, the instant case does not. Insofar as these cited cases all found no evidence to support characterizations of especially heinous or exceptional callous disregard for human suffering" in circumstances more aggravated that the instant crime, the only conclusion is that there is no evidence to support the Board's findings of exceptionally callous disregard for human suffering in this case.

Examined in light of the record, the Board's explanation of why Partida is not suitable for release from prison is revealed as no more than the mouthing of conclusionary

---

[5] As earlier indicated, the only evidence before the Board regarding the issue of whether Partida was a gang member or had foreknowledge, or committed the shooting himself was the statements of gang member "Mongo" who stated co-defendant and Street Saints gang member Jose Claro told him this. (*See fn. 2, this petition.*)

1    words in the attempt to support a subjective viewpoint that Partida needed to do more time.

2    The reliable factual underpinning that is constitutionally required cannot be shown (*see*

3    *McQuillion v. Duncan* (9th Cir.2002) 306 F.3d 895, 902; *In re Caswell* (2001) 92

4    Cal.App.4th 1017, 1027, 112 Cal.Rptr.2d 462), even under the exceptionally deferential

5    "some evidence" standard of review.

6        ***Ground 2***:

7            Petitioner is unlawfully restrained of his liberty by the Board of
         Parole Hearings in violation of the State and Federal Due
8            Process Clause by its denial of parole at his June 2005 parole
         hearing. Petitioner alleges that the Board failed to apply a
9            standard of proof to the substantial evidence favoring parole, as
         admitted by the Board commissioners.
10

11        As a separate and distinct claim, Petitioner asserts that the Board failed to apply a

12    standard of proof to the evidence before it in a manner consistent with law. Notwithstanding

13    the *Rosenkrantz* court's 'gift' of arbitrariness and capriciousness to the Board to have

14    unreviewable discretion to determine what weight to give evidence before them,  a

15    reviewing court is not precluded from determining the legal significance of proffered

16    evidence. *In re Scott I, supra,* 119 Cal.App.4th 871 (2004);  *In re Caswell, supra*, 92

17    Cal.App.4th 1017 (2001);  *McQuillion v. Duncan, supra,* 306 F.3d 895 (9th Cir. 2002).  In

18    these cases the court acted to determine legal significance of proffered evidence.

19        More to the point, however, is that a reviewing court can determine whether the

20    Board applied all applicable legal standards. *Rosenkrantz*, 29 Cal.4th 616, at 677.  Here,

21    there is no evidence that the Board properly applied its standard of proof, i.e., the

22    preponderance of evidence standard, to the evidence before it.  "Preponderance of evidence

23    standard in Parole Commission's regulations is not applied to each item of information

24    before Commission, but to evidence taken as a whole." *Roberts v. Corrothers*, 812 F.2d

25    1173, 1174 (9th Cir. 1987).[6]

26

---

[6]    There is considerable support for the proposition that the Board's standard of proof is the
27    preponderance of evidence standard. The asserted requirement of a discernible and applicable
     standard of proof is not without statutory basis. It is referenced in Penal Code Section 3041.5(a)(5)
28    by citing to Penal Code Section 2932(c)(5) which requires the "preponderance of evidence"

What is puzzling about Partida's case is that the Board recognized his outstanding prisoner performance throughout his incarceration. It acknowledged that the mental health prognoses gave him a 'clean bill of health.' (**Exhibit D**, at p.85.) After making its decision, the commissioners both commented about his postconviction performance. (*Id.*, at pp. 86-88.) Commissioner Inglee nonetheless recommended more self-help programs[7] even though there was no evidence of need. (*Ibid.*) He stated: "Most of the *other* programs he has already accomplished. Has done an excellent job in getting ready for *eventual* parole." (emphasis added) Deputy Commissioner McBean stated: "We are pleased with how much you have done. You're gotten very active since your last appearance in self-help, and that is exactly what we want you to continue to do. It's very important for you to continue doing all the away – positive things that you have been doing. Staying disciplinary free. ¶ You're got three vocs now. That's, you know, we can't ask you to do more than that. You've upgraded education as much as you're required to. And, of course, you stay working towards you AA, and that's great. The more you can get, the better off it will be for you. Keep up the good work in terms of your self-help. That should help you with insight. That

---

standard. It is also cited in the Department of Corrections and Rehabilitation (CDCR) regulations (15 CCR div.3, at §3320(l)) which cites to Penal Code Section 2932. CCR §3320(l) is the requirement of the preponderance of evidence at disciplinary proceedings, especially where loss of goodtime credits are implicated.

Board regulations, at §2450, regarding rescission of parole, requires "good cause" for the substantive decision, and "good cause" is clearly defined in Board regulations at §2000, subd.(b)(51)[Good Cause] as requiring a "preponderance of evidence." The CDCR also defines "good cause" with the exact same language. (15 CCR §3000)

So it is clear that the evidence code, penal code, and administrative regulations of both the CDCR and the Board engage the lowest standard of proof set forth by California law in the California Evidence Code §115 as the standard that guides their actions.

7    What programs? The psychological evaluations do not indicate any need for additional self-help programs, notwithstanding Partida participates in everything he can find. This recommendation is without basis and appears to be self-serving *ipse dixit* causation opinion based on subjective viewpoint that the current administrative sentencing guidelines are an insufficient amount of time to be served for all offenses. Just because a commissioner believes that his opinion of what amount of time is enough because he says so doesn't make it so, as a matter of law. *Terhune v. Superior Court,* (1998) 65 Cal.App.4th 864, at 873.

1  should help us understand the extent to which you've been able to come to terms of your

2  crime." *(Ibid.)*

3       Under §2402(d), the factors of tending to indicate suitability, Partida has no record of

4  assaulting others or committing crimes with a potential of personal harm to victims

5  (§2402(d)(1)), he did NOT have a history of unstable social relationships (§2402(d)(2), he

6  has demonstrated sincere remorse (§2402(d)(3)),  motivation for the crime was not a factor

7  here (§2402(d)(4));  he lacked any history of violent crime[8] (2402(d)(6));  his age is now 33

8  years old and his forensic findings show indisputable maturation (§2403(d)(7));  he has

9  made realistic plans for release <u>and</u> has developed marketable skills that he can put to good

10  use upon release (§2402(d)(8));  and, finally, his institutional behavior, recognized as

11  exceptional, indicates an enhanced ability to function within the law upon release.

12  (§2402(d)(9).)  According to *In re Rosenkrantz, supra,* 29 Cal.4th at 653, "A parole date

13  shall be set if the prisoner is found suitable for parole under §2402(d)." Partida has met

14  ALL of the criteria under this section [excluding the Battered Woman Syndrome, at

15  §2402(d)(5)].

16       There is no evidence Partida poses an unreasonable risk to public safety, and the

17  Panel abused its discretion by so finding.  Petitioner asks the Court to consider the

18  following state cases,  *In re Dannenberg,* 2007 WL 2927359 at 9 (Cal.App. Nov. 16, 2007),

19  *modified,* 2007 WL 4227229 (Cal.App. Dec. 3, 2007);  *In re Lee,* 143 Cal.App.4th 1400,

20  1408 (Cal.App. 2006);  *In re Scott,* 133 Cal.App.4th 573, 595 (Cal.App. 2005); and *In re*

21  *Elkins,* 144 Cal.App.4th 475, 499 (Cal.App. 2006.)  In *Elkins,* the court held that the

22  "governor, in reviewing a suitability determination, must remain focused . . . on facts

23  indicating that release currently poses 'an unreasonable risk of danger to society.'" (citing

24  Cal. Code Regs., tit.15, §2402(a)));  *In re Scott, supra,* 133 Cal.App.4th at 591 ("The factor

25

26  _____

[8]   This includes the alleged assault on his girlfriend, which allegations by her appear to
27  have been falsely made as retaliation for their argument in front of his grandmother and the
28  taking back of the gold chain he had given her.

1  statutorily required to be considered, and the overarching consideration, is 'public safety.'"

2  (citing Cal. Penal Code § 3041(b))).)

3        This Court must conclude that the superior court unreasonably applied the some

4  evidence standard when it concluded that the Board's denial of parole was justified.

5  Viewed fairly and in its context, no evidence in Partida's record supports a determination

6  that his release would unreasonably endanger public safety.

7  ***Ground 3***:

> Petitioner is unlawfully restrained of his liberty by the Board of
> Parole Hearings in violation of the State and Federal Due
> Process Clause by its denial of parole at his June 2005 parole
> hearing. Petitioner alleges that the Board has a policy against
> granting parole to life prisoners until they have exceeded the
> terms set forth in its sentencing guidelines considered
> appropriate to a particular offense, thus depriving such prisoners
> of any benefit that postconviction credits might have on a parole
> date, once set. Petitioner asserts that according to the guidelines,
> and in consideration of his postconviction credits he has earned,
> he has been imprisoned beyond the term that would apply to his
> offense and culpability, and that his earned post-conviction
> credits are rendered meaningless. Additionally, this general
> administrative increase in actual time served from the date of his
> offense to the present time, constitutes a violation of Ex Post
> Facto prohibitions.

17        Under the former Indeterminate Sentence Law, **second degree** murder offenders

18  typically served a median of 8-10 years. (**Exhibit Q**)  When the law changed in July 1977,

19  second degree indeterminate sentences were converted under Penal Code section 1170 to 5,

20  6, 7 years. (Stats 1976, UDSA)  However, by people's Initiative, Proposition 7 brought in a

21  15-years-to-Life indeterminate sentence, indicating a public opinion that 5, 6, 7 years was

22  insufficient. During the 1980's, by contrast, the median time for second degree murder was

23  61.7 months (51. years), and the mean was 70.34 months (5.9 years).  In the 1990's,

24  however, the median was 138.1 months (11.5 years), and the mean was 169.5 (14.1 years).

25  From 2000 to 2003, the median was 193.2 months (16.1 years). In 2004, the median was

26  257.5 months (21.5 years).   As the Court can see, the Board, on its own, has steadily

27  increased the actual periods of confinement for second degree murder offenders from the

28  5, 6, 7 years when the UDSA was enacted, to three times that in the 2000's.  Yet the

sentencing guidelines set forth in §2403(c), which range from 15-21 years, have not changed. Nor have the zero to 4 months credit scheme changed. (§2410.) The only thing that has changed is the Board's increase in the duration of confinement of these offenders.

In 1991, when Partida committed his offense, for the preceding 6 years the median of time served calculated to 7.2 years for second degree murder. In 1992 the increase began at a median of 12 years, a 78% increase. By 2001, at his initial parole hearing, the increase from 7.2 years in 1991 was 16.6 years (median) for an increase of about 100%. By 2003, the increase from 7.2 years in 1991 was 17.9 years for an increase of 149%. By the end of 2004, the increase, or just prior to his 2005 hearing, the 7.2 years of 1991 was now at 21.5 years, for an increase of about 200%. (**Exhibit R,** Stats 1986-2006, with chart.)

By contrast, in 1986, ***first degree*** murder offenders were serving a median of 168.9 months (14 years) and a mean of 169.4 months (14.1 years). From the years 1985 to 1993, the median was 175.5 months (14.6 years), with a mean of 173.4 months (14.4 years). From the years 1994 to 1997 inclusive, not a single first degree murder offender was paroled. Governor Pete Wilson's no-parole policy (that the Supreme Court says never existed, of course) was in effect. In 1998, one DSL murder offender was released after serving 241.7 months (20.1 years), and one ISL murder offender was released after serving 361.3 months (30.1 years). No first degree murder offender was released in 2000, and only one, a DSL offender, was released in 2001 after serving 251.4 months (20.9 years). In 2002 only one DSL murder offender was released after serving 240.0 months (20 years). In 2003, only two DSL murder offenders were released after serving 243.2 months (20.3 years). In 2004, 7 pre-78 DSL murder offenders were released after serving a median of 336.6 months (28.1 years), and 8 post-78 25-life murder offenders were released after serving a median of 286.4 months (23.9 years). (*Id.,* **Exhibit R.**)

The Court may be wondering what all this has to do with Daniel Partida. These figures show a significant increase in actual time served by second degree murders over these years. In fact, by comparison, currently, they are serving actual sentences that only first degree murder offenders served up until 1993. This increase in actual service of time

1  without any change in the regulations should concern this Court. The abiding question is
2  who authorized the Board to increase the actual *service* of time in general <u>without changing</u>
3  <u>the regulations</u>. It is true, of course, that the regulations' maximum provide up to 21 years
4  for second degree murder, but only in context with the intersecting matrix. The Board is
5  making these offenders serve at least the maximum of the matrix even though their offenses
6  actually fall in a lesser category. This policy and practice violates due process.

7      Mr. Partida's parole panel did not cite to any evidence that would justify a
8  conclusion that his offense was particularly egregious or that the record showed he currently
9  poses an unreasonable risk of danger to society. Instead, the panel told him he just needs to
10 do more time. Why? He has already served his matrix term, with the application of
11 goodtime credits he clearly has earned. Why does he need to serve more time? What can he
12 look forward to at his next hearing based upon what the commissioner said, i.e., that at his
13 previous hearing he received a three year denial, and this is only a two year denial? At his
14 next hearing, will he be denied for one year with the statement, well, you only got a two
15 year denial at your previous hearing, and this time you only got one year? Perhaps the next
16 panel might grant him parole. (The proverbial 'carrot'!) At which time he would have
17 served 18 years, i.e., the maximum of his matrix category, with no value now to the
18 goodtime credits he will have earned. And, for no good reason except the Board is making
19 second degree murder offenders serve first degree murder time. Interesting. The chart at
20 **Exhibit R** summarizes these facts in support of his accusation.

21      The Court should be concerned. This Court is often backlogged with parole petitions
22 alleging abuse of discretion by the Board or Governors. In the instant case, despite the
23 Board's general acknowledgement that Partida was an excellent candidate for parole, it
24 cited to boilerplate regulations without any support but as justification for the Panel's
25 arbitrary opinion that he just needed to do more time. But more time is not needed under the
26 applicable regulations; more time would only serve to be excessive and deprive Partida of
27 his earned postconviction credits given under §2410, and unjustly continue his
28 imprisonment.

Partida alleges the Board never grants parole to any second degree murder offender until the prisoner has reached or exceeded the term specified by regulation as appropriate for the particular offense and culpability, and that this practice nullifies the regulation providing for application of earned postconviction credits pursuant to §2410. Under *Terhune v. Superior Court, supra,* 65 Cal.App.4[th] at 873 (1998), the Board must follow its own regulations; it can't nullify by deed what it establishes by policy.

As the Court can see, the Board has increased the actual duration of confinement by 200% since Partida's offense in 1991. He is entitled to be considered by the sentencing standards applied at the time of his offense, and specifically by the regulations in place which have not changed since 1979. If the Board were to calculate his duration of confinement, it would fall in Category III-A, at 17-18-19 years. Selecting the middle term of 18 years, Partida now has 14 years in the prison system, and is entitled to 4 months each year of postconviction credits to reduce that 18 years unless he has done something to forfeit them. His record has been outstanding, with only one CDC-115 in 1995 while in CYA. Eliminating that year for credits, he has amassed 48 months postconviction credits, which applies to reduce that 18 years to 14 years. With jail time credits, he has 15 years of confinement.  With the two year denial, he will have 56 months credits, but 17 years confinement, or three years beyond the sentencing standard as applied.  In other words, by unofficial administrative increase in actual time served before parole, by repeated denials of "suitability," the Board has effectively nullified the sentence and credits that would have been imposed and applied at the time of his offense.

Petitioner believes, and therefore alleges, that this change in policy and practice has deprived him of due process of law, and subjected him to ex post facto law by erecting purely arbitrary barriers against parole that were NOT in place at the time of his commitment offense.

The courts have been consistent in their holdings about the application of amended versions of sentencing guidelines or statutes that imposed harsher punishment retroactively violates the Ex Post Facto clause (U.S. Const., art. I, § 9, cl.3; art. I, § 10 cl.1.) *See, e.g., In*

*re Stanworth* (1982) 33 Cal.3d 176 [parole regulations are "laws" for ex post facto purposes]; *In re Dalton* (1987) 117 Cal.App.3d 521 ["Among laws having an ex post facto effect are those that retroactively modify the time of a discharge of a defendant convicted of a crime from custody to his substantial detriment."]; *In re Bray* (1979) 97 Cal.App.3d 506, 511-13; *In re Harper* (1979) 96 Cal.App.3d 138, 141 [statutes lengthening parole period].

The federal courts have likewise addressed the ex post facto implications of retroactively applied parole regulations. *Nulph v. Faatz*, 27 F.3d 451 (9th Cir. 1994), citing *Miller v. Florida* 482 U.S. 423, 430, 107 S.Ct. 2446 (1987), and *Weaver v. Graham*, 450 U.S. 24, 33, 101 S.Ct. 960 (1981); *Hamilton v. United States*, 67 F.3d 761, 764-65 (9th Cir. 1995); *United States v. Johns*, 5 F.3d 1267- 1271-72 (9th Cir. 1993); *Flemming v. Oregon Bd. Of Paroles*, 998 F.2d 721, 724-27 (9th Cir. 1993).

Petitioner asks the Court to find that the application of a policy and/or practice by the Board of never granting parole at the initial parole suitability hearing and of surreptitiously increasing the actual duration of confinement without an official change in policy or regulation by 200% not only violates due process but also the Ex Post Facto Clause. Petitioner asks the Court to find that the application of such policy to him has subjected him to "ex post facto law."

The Court is asked to note **Exhibit T,** which are statistics obtained on discovery in another case, and a follow-up statement thereof, which shows the Board rarely grants parole at the Initial parole hearing, as required by the statute (Section 3041); thus, the Board has made the exception to granting parole the rule that parole will NOT be granted.

The chart in **Exhibit R**, which is certified accurate based on original and official source documents, clearly gives an indication of misconduct by the Board in carrying out its functions. Clearly a policy that implicates substantive due process and a violation of the Ex Post Facto clause is viable in both state and federal courts. *In re Minnis*, 7 Cal.3d 639 (1972); *In re Rosenkrantz*, 29 Cal.4th 616, 683-684 (2002); *McQuillion v. Schwarzenegger*, 369 F.3d 1091 (9th Cir. 2004). The evidence above clearly indicates a prima facie showing

which, if true, would entitle him to habeas relief. A formal Order to Show Cause is warranted.

In the case of *Board of Prison Terms v. Superior Court (Ng0)*, 130 Cal.App.4th 1212, 31 Cal.Rptr.3d 70 (Cal.App. 6 Dist.,2005), the Sixth Appellate District addressed the efficacy and procedure for an order to show cause in habeas corpus cases.

> Our Supreme Court explained the role of the court in habeas proceedings in *People v. Romero* (1994) 8 Cal.4th 728, 35 Cal.Rptr.2d 270, 883 P.2d 388. "When presented with a petition for writ of habeas corpus, a court must first determine whether the petition states a prima facie case for relief--that is, whether it states facts that, if true, entitle the petitioner to relief--and also whether the stated claims are for any reason procedurally barred. [Citation.]" *1234 (*People v. Romero*, supra, 8 Cal.4th at p. 737, 35 Cal.Rptr.2d 270, 883 P.2d 388.) "To assist the court in determining the petition's sufficiency, the court may request an informal response from the petitioner's custodian or the real party in interest. [Citations.]" (*Ibid.*) "If the court determines that the petition does not state a prima facie case for relief or that the claims are all procedurally barred, the court will deny the petition outright, such dispositions being commonly referred to as 'summary denials.' [Citation.]" (*Ibid.*) "When, on the other hand, a habeas corpus petition is sufficient on its face (that is, the petition states a prima facie case on a claim that is not procedurally barred), the court is obligated by statute to issue a writ of habeas corpus." (*Ibid.*; § 1476.)

*Id.,* 130 Cal.App.4th at 1234.

In addition, the Court is asked to consider the findings of fact in the Santa Clara Superior Court case of *In re Criscione,* now on appellate review. (**Exhibit U.**) In this case, the court found by undisputable evidence and expert testimony that the Board 'drives' all murder offense into 15 CCR §2402(c) for the purpose of denying parole. This regulation is intended to implement the exception to granting parole under Section 3041(b), not to establish the rule. What the Board has done is to make denial of parole an across-the-board rule, and the granting of parole the exception. This unconstitutionally enlarges the statute. *Terhune v. Superior Court*, 65 Cal.App.4th 864, 873.

As the Court can easily see, the Board itself has been steadily increasing the actual time served and reducing the number of grants of parole, at the very least, since 1986.

(Attached as **Exhibit R** is <u>Table Of Time Served </u>First And Second Degree Murder Offenders:  Years 1983-2004 Median & Medians.)

## VIII.

## SUMMARY

In the Eastern District federal court, Magistrate Judge Gregory Hollows, in more than one case, has found that the parole system in California is in "complete disarray." *See, e.g., Bair v. Folsom State Prison*, 2005 WL 2219220 at *9 (E.D.Ca. 2005); *also, Devries v. Schwarzenegger*, 2005 WL 2603203 at 4 (E.D.Cal. 2005).  The Court is asked to review why Magistrate Hollows has said so.

Daniel Partida was 17 years old at the time of the offense. He lived amidst a territory infested by numerous gangs. He dealt with the reality of his environment, the only environment he had known. To say he should have "known better" is easy "armchair quarterbacking"  but un-informed and lacking comprehension of other social realities. He *associated* with the Ghetto Boys of his neighborhood, but was not a member of them. Originally they were into sports, not crime or gang warfare. They often played sports against the gangs. Things changed. Partida could not have been a Street Saints gang member living in Ghetto Boys' turf. His association with Jose Claro, a member of the Street Saints, was as his girlfriend's brother. Partida happened to like Jose because he was funny, and he went places with him, but not gang-related. Jose teased him with the name "Loverboy" because Partida dated his sister. It was not a gang-related moniker.

On his way to his girlfriend's and Jose's house the day of the crime, he spotted Jose, and stopped to say hello. He asked where Jose was going; Jose said home. Partida offered him a ride. Jose spoke with the person he was with, and that person, who remained unidentified, asked Partida for a ride. He accepted. He drove to a location at that unnamed person's direction. He stopped at his direction thinking that was where he lived. Instead, that person opened fire with the Uzi.

1    Before trial, in questioning him, the District Attorney asked him how could someone

2    get into his car carrying an Uzi machine pistol and he not see it. At that point Partida felt

3    that the DA was suspecting him of foreknowledge and active participation in the drive-by,

4    at which time he shut-up and wisely asked for an attorney. The answer to that question of

5    how come he didn't notice the Uzi may be answered by reasonable speculation, i.e., 1) he

6    wasn't looking, 2) the person may have had an overcoat, 3) the clip may not have in the

7    weapon making it much smaller and easier to conceal, or 4) he may have noticed a bulk

8    under the person's shirt or coat but didn't think about what it was. But it doesn't make sense

9    that he would deliberately do a drive-by in his Uncle Escobar's distinctive red Hyundai and

10   license plate.

11   If Partida was actually truthful about lack of foreknowledge and his version is

12   correct, it presents an unfortunate picture of an overly-aggressive prosecutor who simply

13   could not believe Partida's story, and who instead believed the highly questionable stories

14   of actual gang members who pointed the finger away from them and at Partida, who did

15   NOT belong to their gang. Giving credence to statements of these warring gang miscreants

16   and none to Partida, whose background did not indicate gang membership despite his

17   relationship with Jose Claro, or speculating about his motive for having prior possession of

18   small pistol, doesn't make a lot of sense.

19   Notwithstanding, the reality is that Partida stands convicted, and he has served the

20   appropriate amount of time for his culpability in this offense.  More to the point, he has

21   eschewed any affiliation with gangs while imprisoned, which is rather tough to do in

22   California prisons, and he has instead focused on positive personal and educational pursuits

23   and development. He has done so in an exemplary manner.  He has a psych clearance of low

24   risk, two of them. The Board panel found his performance in prison to be exceptional. He

25   has solid community and family support. (**Exhibit P**, letters) There is no evidence to

26   support any of the reasons the Panel gave to deny him parole. All of judicial precedents

27   governing those reasons favor granting the Writ.  "A parole date shall be set if the prisoner

28

1   is found suitable for parole under Section 2402(d)." *In re Rosenkrantz, supra,* 29 Cal.4th at

2   653.

3         The question before this Court, aside from the specific claims and whether under

4   prevailing standards "some evidence" supports them, is whether the State courts's treatment

5   of his case resulted in an abuse of discretion because they were contrary to, or involved an

6   unreasonable application of, clearly-established United States Supreme Court precedent, or

7   were an unreasonable application of the law to the facts in this case. Petitioner submits the

8   State courts are in violation on all points. Viewed correctly, there was not a shred of

9   reliable, relevant, or current evidence to support a conclusion that Partida posed an

10  unreasonable risk at the time of the hearing.  Because the overarching consideration is

11  "unreasonable risk" when considering public safety concerns, and no such evidence existed,

12  the State courts' determinations were contrary to *Superintendent v. Hill, supra,* 472 U.S.

13  445, 457 (1985), and must be overturned.

14        A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

15  some transgression of federal law binding on the state courts, see *Middleton v. Cupp,* 768

16  F.2d 1083, 1085 (9th Cir.1985), and is unavailable for alleged errors in the interpretation or

17  application of state law, see *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111

18  L.Ed.2d 606 (1990), unless that interpretation is untenable and a veiled attempt to avoid

19  review of federal questions.  In *Powell v. Ducharme,* 998 F.2d 710 (9th Cir. (Wash.) 1993),

20  the Ninth Circuit held that while the federal courts are normally bound by the interpretations

21  by the state's supreme court of its own statutes, the federal courts may find such

22  interpretation to be "untenable or a veiled attempt to avoid review of federal questions."

23  (citing *Oxborrow v. Eikenberry,* 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942,

24  110 S.Ct. 344 (1989).. California's statutory scheme governing parole "creates in every

25  inmate a cognizable liberty interest in parole which is protected by the procedural

26  safeguards of the Due Process Clause." *Biggs v. Terhune,* 334 F.3d 910, 914 (9th Cir.2003);

27  see also *Sass v. California Board of Prison Terms,* 461 F.3d 1123, 1127-28 (9th Cir.2006).

28  [T]he Supreme Court ha[s] clearly established that a parole board's decision deprives a

prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," *Sass*, 461 F.3d at 1128-29 (citing *Superintendent v. Hill*, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)); see also *Biggs*, 334 F.3d at 915 (citing *McQuillion*, 306 F.3d at 904), or is "otherwise arbitrary," *Hill*, 472 U.S. at 457, 105 S.Ct. 2768, 86 L.Ed.2d 356. *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir.2007). California law allows the Board to consider a myriad of factors when weighing the decision of granting or denying parole. Parole may be denied if the Board "determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for [the] individual." Cal.Penal Code § 3041(b). *Biggs*, at 915.

The regulations governing the parole process provide six nonexclusive factors tending to show unsuitability for parole and nine nonexclusive factors tending to show suitability. The factors tending to show unsuitability are:

> (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors; and (6) Institutional Behavior. 15 Cal.Code Regs. § 2402(c). In terms of the first factor, "Commitment Offense," the regulations explain that it tends to show unsuitability when "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. at § 2402(c)(1). The factors indicating suitability for parole are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for the Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for the Future; and (9) Institutional Behavior. 15 Cal.Code Regs. § 2402(d).

*Irons*, 505 F.3d at 851 n. 4. "Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made clear that the 'findings that are necessary to deem a prisoner unsuitable for parole,' *Irons*, 505 F.3d at 850, require additional evidence beyond the elements of the commitment offense that demonstrate the prisoner's release will unreasonably endanger public safety.

1 *Irons* at 663, quoting *In re Dannenberg*, 34 Cal.4th 1061, 1071, 23 Cal.Rptr.3d 417

2 (Cal.2005); <u>see</u> <u>also</u> *In re Weider*, 145 Cal.App.4th 570, 588, 52 Cal.Rptr.3d 147 (2006) (to

3 support denial of parole, the "factors beyond the minimum elements of the crime" "must be

4 predicated on "some evidence that the particular circumstances of [the prisoner's] crime

5 circumstances beyond the minimum elements of his conviction-indicated exceptional

6 callousness and cruelty with trivial provocation, and thus suggested he remains a danger to

7 public safety.")

8         By these regulations and authorities, the State courts' decisions were contrary to,

9 and/or an unreasonable application of, clearly established federal law, and/or an

10 unreasonable application of the law to the facts of this case.

11

12                                    **VI.**

13                               **CONCLUSION**

14         WHEREFORE, on good cause shown, and based upon this petition, its

15 memorandum, and the documents submitted as exhibits, the Writ of Habeas Corpus must be

16 GRANTED.

17    Date: July 28, 2008.

18

19

20                          Respectfully submitted,

21

22                          *Daniel Partida*

23                          DANIEL PARTIDA, in pro se

24

25

26

27

28

1
2
## DECLARATION OF SERVICE BY U.S. MAIL
3

**Court:**        UNITED STATES DISTRICT COURT, NORTHERN DISTRICT
4
**Case Name:**     *Partida v. Curry*
5
**Lower Ct #:**     **S160641, Cal Supreme Court**
6
B204834, 2nd App. Dist., Div. 2
7
BH004210, Los Angeles Superior Court
**Document Title:**     **PETITION FOR WRIT OF HABEAS CORPUS**
8

9
     I, Daniel Partida, declare that I am the petitioner in the foregoing Petition for
10
Review, proceeding in pro se. I am over the age of 18 years and a citizen of the United
11
States. On the below indicated date I have caused to be placed into the delivery system of
the United States Postal Service this Petition for Writ of Habeas Corpus to this Court, and
12
to the Attorney General of California, as counsel for Respondent, as addressed below,
13
proper postage affixed thereto.

14
           Attorney General of California
15
           Attn: Supervising D.A.G.
           300 South Spring Street
16
           Fifth Floor, North Tower
17
           Los Angeles, CA 90013

18
     SWORN TO UNDER PENALTY OF PERJURY, this 31st day of July, 2008, at
19
Soledad, CA.
20
21
                *Daniel Partida*
22
                Daniel Partida, in pro se, declarant
23
24
25
26
27
28