FILED
RECEIVED
AUG 5 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

E-filing    CV No.: 08    3751

DANIEL PARTIDA,            )
                          )
        Petitioner,        )
                          )
    v.                     )
                          )
BEN CURRY, Warden, CTF-C,  )
                          )
        Respondent.        )
_____)

CW

**EXHIBITS** TO THE
PETITION FOR WRIT OF
HABEAS CORPUS

Exhibit A,    Abstract and Sentencing Transcript ..............................................1, 8
Exhibit B     2001 Parole Hearing transcript, Decision pages..................................1, 9, 16
Exhibit C     2004 Life Prisoner Evaluation (LPE) ..............................................2, 13
Exhibit D     2005 BPH Parole Hearing transcript (complete)...........................................
Exhibit E     Court of Appeal Decision (*People v. Partida*) ..........................7, 25
Exhibit F     Jury's Verdict in *People v. Partida* .............................................7, 25
Exhibit G     California Youth Authority (CYA) Progress Reports............................9, 10
Exhibit H     08-25-04 Letter from Peter Partida .............................................9
Exhibit I     Declarations of Peter Partida, Modesta Salas, and
              Jacinto Alarcon, Social Worker, Los Angeles County ................................9
Exhibit J     CDCR Progress Reports ..........................................................12
Exhibit K     2000 Life Prisoner Evaluations (LPE) ..........................................13
Exhibit L     2001 Mental Health Evaluation .................................................13
Exhibit M     2004 Mental Health Evaluation .................................................14
Exhibit N     Arrest Report re "Mongo's" Statement ..........................................16
Exhibit O     Reporter's Transcript, *People v. Partida* ....................................18
Exhibit P     Letters of Support ...........................................................27, 41
Exhibit Q     Stats 1945-1981 (2nd Degree Murder) ...........................................33
Exhibit R     Stats 1986-2004 (2nd Degree Murder ) ..........................................33, 34
Exhibit S     Probation Report ............................................................. 25-26
Exhibit T     BPH Statistics re: INITIAL PAROLE HEARING DECISIONS.......... 33-34
Exhibit U     *In re Criscione,* slip opinion, Santa Clara Superior Court decision ...........39

*Daniel Partida*
DANIEL PARTIDA, #H-48181

# EXHIBIT A

# EXHIBIT A

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES   DEPT.

| Date | AUGUST 31 21 | | DEPT. 120 |
|---|---|---|---|
| HONORABLE | ROBERT PERRY | JUDGE | McKINNEY Deputy Clerk |
| 301 | J CUMMINS | Deputy Sheriff | J. GARDNER BROOKE Reporter |

CASE NO.   BA043905-01   (Parties and counsel checked if present)

PEOPLE OF THE STATE OF CALIFORNIA   Counsel for People:
DEPUTY DISTRICT ATTY:  J. WALKER ✓

vs

01 PARTIDA DANIEL
187.A  01CTS

CHARGE

Counsel for Defendant:  D BROCKWAY PVT ✓

x 1437702

(BOX CHECKED IF ORDER APPLICABLE)

NATURE OF PROCEEDINGS

71 ☐   PCS   CY4 DEPT REM   10-C3-91
☐ ____ IS SWORN AS THE ENGLISH ____ INTERPRETER. ☐ OATH FILED PER 68560 G.C.
☐ DUE TO CONFLICT OF INTERESTS, PUBLIC DEFENDER RELIEVED. PURSUANT TO PENAL CODE SECTION 987.2/GOVERNMENT CODE SECTION 31000 CODE ALTERNATE DEFENSE COUNSEL ____ IS APPOINTED.

72 ☐   CRIMINAL PROCEEDINGS ADJOURNED/REMAIN ADJOURNED/RESUMED.
73 ☐   DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PURSUANT TO PENAL CODE SECTION 1203.03.
☐ DEFENDANT ORDERED DELIVERED TO CYA FOR A DIAGNOSTIC STUDY PURSUANT TO SECTION 707.2 W.I.C.

74 ☐   ON ____ A.M. IN DEPT ____ MOTION, PROBATION AND SENTENCE HEARING/FURTHER PROCEEDINGS CONTINUED TO ____
AT ____ A.M. IN DEPT. ____   ☐ NON-APPEARANCE CALENDAR.
75 ☐   DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR SENTENCING.   ☐ DEFENDANT ORDERED TO RETURN.
☐ SUPPLEMENTAL PROBATION REPORT/PROGRESS REPORT ORDERED DUE ____

76 ☒   PROBATION DENIED/PROCEEDINGS SUSPENDED/SENTENCE IMPOSED AS FOLLOWS:  15 years to life as count 1
☒ IMPRISONED IN STATE PRISON FOR ____ ☒ TERM PRESCRIBED BY LAW ☒ TOTAL OF 15 YEARS ☒ LIFE
☐ PLUS ____ YEARS/MONTHS PURSUANT TO SECTION ____ OF THE ____ CODE.
☐ PLUS ____ AS INDICATED BELOW.
☒ TO BE HOUSED AT CALIFORNIA YOUTH AUTHORITY PURSUANT TO SECTION 1731.5(C) W.I.C.
☐ COMMITTED TO CALIFORNIA YOUTH AUTHORITY. THE TERM OF IMPRISONMENT TO WHICH THE DEFENDANT WOULD HAVE BEEN SENTENCED PURSUANT TO SECTION 1170 PENAL CODE IS ____ YEARS.

☐   IMPRISONED IN LOS ANGELES COUNTY JAIL FOR TERM OF ____ AS TO COUNT(S) ____
☐ PAY $ ____ FINE TO SUPERIOR COURT, PLUS PENALTY ASSESSMENT AND SURCHARGE.
☒ PAY $ 100 ____ RESTITUTION FINE PURSUANT TO SECTION 13967 (A) G.C. TO THE STATE VICTIMS RESTITUTION FUND.

77 ☐   SENTENCE IS SUSPENDED.
78 ☐   IMPOSITION OF SENTENCE IS SUSPENDED, PROBATION GRANTED FOR A PERIOD OF ____ YEARS.  ☐ TO BE WITHOUT FORMAL SUPERVISION.
79 ☐   DIVERSION GRANTED PER PENAL CODE SECTION 1000.2 FOR PERIOD OF ____ YEARS/MONTHS.
1 ☐   ☐ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR TRIAL.
☐ SPEND FIRST ____ DAYS/MONTHS IN COUNTY JAIL.   ☐ NOT TO BE ELIGIBLE FOR COUNTY PAROLE.
☐ WORK FURLOUGH PROGRAM RECOMMENDED.

2 ☐   PAY A FINE OF $ ____ PLUS PENALTY ASSESSMENT (1464 P.C. & 76000 G.C.) THROUGH THE PROBATION OFFICER.
☐ PAY $ ____ LAB FEE PURSUANT TO 11372.5 H&S CODE ($50 FOR EACH H&S VIOLATION) THROUGH THE PROBATION OFFICER.
3 ☐   PAY RESTITUTION TO THE VICTIM(S) PURSUANT TO 1203.04 P.C. IN AMOUNT OF $ ____ IN AMOUNT AND MANNER AS INSTRUCTED BY THE PROBATION OFFICER, INCLUDING A SERVICE CHARGE PER 1203.1 P.C. MINIMUM PAYMENT OF RESTITUTION TO BE $ ____
☐ PAY $ ____ RESTITUTION FINE PURSUANT TO SECTION 13967 (A) G.C. THROUGH THE PROBATION OFFICER.
☐ STAYED WHILE DEFENDANT PAYS RESTITUTION IS PAID IN FULL. STAY SHALL BE PERMANENT.
5 ☐   NOT DRINK OR POSSESS ANY ALCOHOLIC BEVERAGE AND STAY OUT OF PLACES WHERE THEY ARE THE CHIEF ITEM OF SALE.
6 ☐   NOT USE OR POSSESS ANY NARCOTICS, DANGEROUS OR RESTRICTED DRUGS OR ASSOCIATED PARAPHERNALIA, EXCEPT WITH VALID PRESCRIPTION, AND STAY AWAY FROM PLACES WHERE USERS, BUYERS OR SELLERS CONGREGATE.
7 ☐   NOT ASSOCIATE WITH PERSONS KNOWN BY YOU TO BE NARCOTIC OR DRUG USERS OR SELLERS.
8 ☐   SUBMIT TO PERIODIC ANTI-NARCOTIC TESTS/ALCOHOL TESTS AS DIRECTED BY THE PROBATION OFFICER OR ANY OTHER PEACE OFFICER.
9 ☐   HAVE NO BLANK CHECKS IN POSSESSION; NOT WRITE ANY PORTION OF ANY CHECKS; AND, NOT HAVE BANK ACCOUNT UPON WHICH YOU MAY DRAW CHECKS, NOT USE OR POSSESS OR APPLY FOR ANY CREDIT OR ATM CARD.
10 ☐   NOT ASSOCIATE WITH ANY PERSON FROM ____
11 ☐   COOPERATE WITH PROBATION OFFICER IN A PLAN FOR ____
12 ☐   SUPPORT DEPENDENTS AS DIRECTED BY PROBATION OFFICER.
13 ☐   SEEK AND MAINTAIN TRAINING, SCHOOLING OR EMPLOYMENT AS APPROVED BY PROBATION OFFICER.
14 ☐   KEEP PROBATION OFFICER ADVISED OF YOUR RESIDENCE AT ALL TIMES.
15 ☐   SURRENDER DRIVER'S LICENSE TO CLERK OF COURT TO BE RETURNED TO DEPARTMENT OF MOTOR VEHICLES.
16 ☐   NOT DRIVE A MOTOR VEHICLE UNLESS LAWFULLY LICENSED AND INSURED.
17 ☐   NOT OWN, USE OR POSSESS ANY DANGEROUS OR DEADLY WEAPONS.
18 ☐   SUBMIT YOUR PERSON AND PROPERTY UNDER YOUR CONTROL TO SEARCH OR SEIZURE AT ANY TIME OF THE DAY OR NIGHT BY ANY PROBATION OFFICER OR OTHER PEACE OFFICER WITH OR WITHOUT A WARRANT, OR PROBABLE CAUSE.
19 ☐   OBEY ALL LAWS, OBEY ALL ORDERS, RULES AND REGULATIONS OF THE PROBATION DEPARTMENT AND OF THE COURT.
20 ☐   USE ONLY YOUR TRUE NAME, STATED TO BE ____
21 ☐   REPORT TO PROBATION OFFICER UPON RELEASE FROM CUSTODY/WITHIN ____
22 ☐   IF YOU LEAVE THE COUNTRY, YOU SHALL NOT REENTER THE UNITED STATES ILLEGALLY. IF YOU DO RETURN, REPORT TO THE PROBATION OFFICER WITHIN ____ AND PRESENT DOCUMENTATION WHICH PROVES YOU ARE IN THE UNITED STATES LEGALLY.

40 ☒   DEFENDANT GIVEN TOTAL CREDIT FOR 609 DAYS IN CUSTODY 406 DAYS ACTUAL CUSTODY and 203 DAYS GOOD TIME/WORK TIME.
41 ☐   SENTENCE/COUNTS TO RUN CONSECUTIVELY TO/CONCURRENTLY WITH ____
82 ☐   STAY OF EXECUTION OF ____
83 ☒   ON MOTION OF PEOPLE, COUNTS/ENHANCEMENTS REMAINING ARE DISMISSED IN FURTHERANCE OF JUSTICE.  GRANTED TO ____
84 ☒   COURT ADVISES DEFENDANT OF HIS APPEAL/PAROLE RIGHTS.   ☐ NOTICE OF APPEAL IS RECEIVED.
85 ☐   *NOTICE RE CERTIFICATE OF REHABILITATION AND PARDON* GIVEN TO DEFENDANT.
86 ☐   DEFENDANT TO PAY COSTS OF PROBATION SERVICES IN AMOUNT OF $ ____ /AMOUNT TO BE DETERMINED BY PROBATION OFFICER.
87 ☐   COURT FINDS DEFENDANT DOES NOT HAVE PRESENT ABILITY TO PAY COSTS OF INCARCERATION/LEGAL SERVICES/PROBATION SERVICES RENDERED.
85 ☐   DEFENDANT IS REFERRED TO THE TREASURER/TAX COLLECTOR FOR FINANCIAL EVALUATION.
89 ☐   PROBATION OFFICER IS ORDERED TO REGISTER THE DEFENDANT WITH CLI AND REPORT ANY NEW ARREST TO THE COURT.
90 ☒   FURTHER ORDER AS FOLLOWS/ADDITIONAL CONDITIONS OF PROBATION ____

THE ATTACHMENT FOR DEFAULTER ISSUED 5-22-92 FOR WITNESS
ROBERT CARIRAS, IS ORDERED RECALLED. RECALL NUMBER 239364
WRITTEN

91 ☐   SHERIFF IS ORDERED TO ALLOW DEFENDANT ____ PHONE CALLS AT DEFENDANT'S OWN EXPENSE.
92 ☐   DEFENDANT FAILS TO APPEAR WITH/WITHOUT SUFFICIENT EXCUSE.
93 ☐   BAIL, IF POSTED, FORFEITED/O.R. REVOKED. BENCH WARRANT ORDERED ISSUED/REISSUED/AND HELD UNTIL ____
☐ NO BAIL   ☐ BAIL FIXED AT $ ____   ☐ RECALL NO. ____
94 ☐   DEFENDANT APPEARING, BENCH WARRANT ORDERED RECALLED/QUASHED.   AUG 31 1992 ISSUED ☐ ABSTRACT FILED.

| ☒ REMANDED | ☐ BAIL | ☐ BAIL EXON. | ☐ BOND NO ____ | MINUTES ENTERED |
|---|---|---|---|---|
| ☐ RELEASED | ☐ O.R. | ☐ O.R. DISCHARGED | ☐ ON PROBATION | 8-31-92 |
| 78C7178 (REV. 8-92) 8-92 | ☐ BENCH WARRANT | | ☐ IN CUSTODY OTHER MATTER | 3 PAS |
| | | | ☐ ON DIVERSION | |

DEPT. 120    CDC

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Date:
HONORABLE:

**August 31, 1992**
**ROBERT PERRY**
**J CUMMINS**

JUDGE
Deputy Sheriff

**S MCKINNEY**
**J GARDNER**

, Deputy Clerk
, Reporter

(Parties and counsel checked if present)

BA043905

**PEOPLE OF THE STATE OF CALIFORNIA**

**VS**

X **PARTIDA, DANIEL    X1437702**

Counsel for
Plaintiff

Counsel for
Defendant

**IRA REINER**        , DISTRICT ATTY.    BY

X **J WALKER**                        DEPUTY

X **D BROCKWAY**        , XXXXXXXXXXXXXXX    XXXXX

NATURE OF PROCEEDINGS PROBATION AND SENTENCE

(Boxes checked if order applicable)

Pay $100.00 restitution fine pursuant to Section 13967(a)G.C. to the
state victims restitution fund.
Court advises defendant of his appeal rights.
The Attachment for Defaulter issued 5-22-92 for witness Robert Carlias
is ordered recalled.  Recall #239364 written.

PROBATION DENIED, SENTENCE AS INDICATED BELOW.
Whereas the said defendant having .... **been** ........ duly ........ **found** .................................
guilty in this court of the crime of  **MURDER (Sec 187(a) PC), as charged in Count 1 of the
information, which the Jury found to be Murder of the second degree**

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the
State Prison. **for the term of 15 years to Life.**
**Defendant sentenced pursuant to Section 1731.5(c) Welfare and Institutions
Code.**

☒ Defendant is given credit for ... **609** ................ days in custody (includes ___**203**___ days good time/work time).
It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles and
delivered by him into the custody of the Director of Corrections at the California State Institution
☐ for Men at Chino, California
☐ for Women at Frontera, California
☒ **CALIFORNIA YOUTH AUTHORITY**

**ORIGINAL FILED**

SEP 17 1992

**LOS ANGELES
SUPERIOR COURT**
JUDGMENT

PINK ORIGINAL TO FILE
WHITE COPY TO MICROFILM

ENTERED
**8-31-92**

**JAMES H DEMPSEY**
COUNTY CLERK
AND CLERK OF THE
SUPERIOR COURT

B    ☐ Remaining count(s) dismissed in interests of justice.
☐ Bail exonerated.

2    76J805A (REV. 7-82) 5-90
C-109

YELLOW COPY TO STATEWIDE DISTRIBUTION
GREEN COPY TO PROBATION EXPEDITER

1
2
3
4
5
6
7

8        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            FOR THE COUNTY OF LOS ANGELES

10   DEPARTMENT NO. 120          HON. ROBERT PERRY, JUDGE

11

12   THE PEOPLE OF THE STATE OF CALIFORNIA,   )
                                              )
13                              PLAINTIFF,    )
                                              )
14                  VS.                       )
                                              )   NO. BA043905
15   DANIEL PARTIDA,                          )
                                              )   STATE PRISON
16                          DEFENDANT.        )   APPEAL RIGHTS
                                              )
17   ─────────────────────────────────────── )

18        LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 31, 1992

19              10:20 A.M. SESSION

20        UPON THE ABOVE DATE, THE DEFENDANT BEING PRESENT

21   IN COURT AND REPRESENTED BY COUNSEL, DAVID BROCKWAY,

22   ATTORNEY AT LAW; THE PEOPLE BEING REPRESENTED BY JULIE

23   ANN WALKER, DEPUTY DISTRICT ATTORNEY OF LOS ANGELES

24   COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:

25        (JUDIE GARDNER, CSR #4723, OFFICIAL REPORTER.)

26
27
28

1    THE COURT:  THIS IS PEOPLE VERSUS PARTIDA.

2              THE MATTER IS HERE FOR SENTENCING FOLLOWING

3    THE DEFENDANT'S CONVICTION BY JURY OF MURDER IN THE

4    SECOND DEGREE.

5              WAIVE ARRAIGNMENT FOR JUDGMENT AND

6    SENTENCE.

7        MR. BROCWAY:  YES YOUR HONOR.

8        THE COURT:  ANY LEGAL CAUSE WHY SENTENCE CANNOT

9    NOW BE PRONOUNCED?

10       MR. BROCWAY:  I WILL SAY NO, THERE IS NOT.  I

11   WOULD MAYBE RESERVE FINAL DETERMINATION FOR THAT AS WE

12   PROCEED WITH THE ARGUMENT.

13       THE COURT:  OKAY.

14             LET'S GET INTO THE SENTENCE.

15             MAY WE HAVE APPEARANCES, PLEASE

16       MR. BROCWAY:  DAVID BROCKWAY FOR DANIEL PARTIDA

17   PRESENT IN CUSTODY.

18       MS. WALKER:  JULIE ANN WALKER FOR TERRY SCHWARTZ.

19       THE COURT:  ALL RIGHT.

20             THE PEOPLE CARE TO BE HEARD AS TO SENTENCE?

21       MS. WALKER:  YES, YOUR HONOR.

22             I SEE THAT THERE IS AMENABILITY TO

23   TERMINATION FROM CYA REQUESTING THAT THE DEFENDANT BE

24   COMMITTED TO CYA RATHER THAN JUST HOUSED AT CYA.

25             ALTHOUGH IN READING THE ENTIRE REPORT,

26   THERE APPEAR TO BE CONFLICTING THOUGHTS ON THAT AND THE

27   WORDING OF THE UNDERLYING TEST AND ANALYSIS BY OTHER

28   PEOPLE SEEM TO INDICATE PERHAPS WHAT THEY ARE THINKING

1    ABOUT IS HOUSING VERSUS COMMITMENT.

2                AT THE SAME TIME, NO MATTER WHERE THE MINOR

3    IS HOUSED, HE OUGHT TO THE GET TREATMENT.

4                MAYBE THEY REALLY DO KNOW THE DISTINCTION,

5    BUT I NOTE THE VERY LAST SENTENCE UNDER PAGE 3 OF THE

6    REPORT THAT IS ATTACHED TO THE BACK INDICATES THAT

7    OTHERWISE HE DOES NOT APPEAR MOTIVATED AT THIS TIME FROM

8    PROGRAMS OFFERED AT CYA.

9                AT LEAST ONE PERSON FELT IT THAT B

10   MR. PARTIDA DID NOT BENEFIT IN THE PROGRAMS AT CYA.

11               AND WHAT EVERYBODY AGREED WITH, MR. PARTIDA

12   HAS NO REMORSE AND IS ACCEPTING NO RESPONSIBILITY FOR

13   WHAT HE DID.

14               HOW THEY COME UP WITH AMENABILITY

15   RECOMMENDATION IS SOMEWHAT SURPRISING TO ME, GIVEN HE IS

16   NOT ACCEPTING RESPONSIBILITY.  HE HAS NO REMORSE.

17               ONE PERSON FEELS HE WOULDN'T BENEFIT FROM

18   THE PROGRAMS, SO THE PEOPLE WOULD OBJECT TO ANY

19   COMMITMENT OF MR. PARTIDA TO CYA.

20               IF HE IS COMMITTED TO CYA, THEN HE WILL GET

21   OUT AT AGE 25.  AND GIVEN THE NATURE AND  SERIOUSNESS OF

22   THIS OFFENSE, THE NEED TO PROTECT SOCIETY AND REALLY

23   INTEREST OF JUSTICE, MR. PARTIDA BEING ABLE TO BE ON THE

24   STREET AT AGE 25 WOULD NOT BE APPROPRIATE.

25               AND LOOKING AT WELFARE AND INSTITUTION CODE

26   SECTION 707 POINT 2, THE COURT IS REQUIRED TO TAKE INTO

27   ACCOUNT NOT JUST THE TRAINING AND TREATMENT OFFERED BY

28   CYA AND MINOR'S SUITABILITY TO THAT.

1          BUT THE FIRST ITEM LISTED ARE THE NEED TO

2   PROTECT SOCIETY NATURE AND SERIOUSNESS OF THE OFFENSE

3   AND INTEREST OF JUSTICE.

4          AND THOSE FACTORS PEOPLE FEEL ARE PARAMOUNT

5   IN IMPORTANCE HERE AND THOSE SHOULD BE CONTROLLING.  AND

6   THAT MR. PARTIDA SHOULD BE SENTENCED TO STATE PRISON BUT

7   HE CAN BE HOUSED THERE.

8          WE HAVE NO OBJECTION TO BEING HOUSED THERE

9   IF CYA THINKS HE IS AMENABLE TO SOME SORT OF TREATMENT

10  THERE.

11         BUT PEOPLE WOULD STRENUOUSLY OBJECT TO ANY

12  COMMITMENT TO C.Y.A.

13       THE COURT:  THANK YOU.

14       MR. BROCKWAY.

15     MR. BROCWAY:  YES, YOUR HONOR.

16         I HAVE READ AND CONSIDERED THE AMENABILITY

17  DETERMINATION.  IT WAS REQUIRED PURSUANT TO 707 POINT 2

18  OF THE WELFARE AND INSTITUTIONS CODE.

19         AND PURSUANT TO 1731.5, HE IS ELIGIBLE FOR

20  A COMMITMENT TO CALIFORNIA YOUTH AUTHORITY, PROVIDED

21  THAT YOUTH AUTHORITY FINDS HIM AMENABLE FOR TREATMENT.

22         THE REPORT IS BACK.  HE IS FOUND TO BE

23  AMENABLE FOR TREATMENT.

24         I UNDERSTAND, AFTER HAVING SPOKEN WITH

25  MR. PARTIDA ABOUT HIS STAY AT THE HOSPITAL, THE ONLY

26  PERSON WHO APPARENTLY STATED A NEGATIVE EVALUATION WAS

27  THE PSYCHIATRIC EVALUATION.

28         ALL OTHER PEOPLE WERE IN FAVOR OF HIS

1   COMMITMENT TO YOUTH AUTHORITY.   PSYCHIATRIC EVALUATION

2   WAS ATTACHED.

3              THE PROBLEM, WHEN I DISCUSSED THIS WITH

4   MR. PARTIDA, WAS THAT THE PSYCHIATRIST WAS ASKING HIM A

5   LOT OF QUESTIONS ABOUT HIS FAMILY AND PERSONAL

6   BACKGROUND, INCLUDING THE DEATH OF HIS FATHER, DEATH OF

7   HIS MOTHER, WHICH MR. PARTIDA FOUND DISTURBING AND

8   DIDN'T WANT TO DISCUSS WITH THE PSYCHIATRIST.

9              BECAUSE OF THAT, THE PSYCHIATRIST, HE SAID,

10  TOOK A NEGATIVE POSITION TOWARD HIM.

11             AND BECAUSE OF HIS AGE, HE WASN'T ABLE TO

12  WORK IT OUT.

13             THE COURT HEARD THE EVIDENCE IN THIS CASE.

14             THERE IS NO DOUBT THAT HE WAS NOT THE

15  SHOOTER IN THIS CASE.  HAD HE BEEN IN THE SHOOTER IN THE

16  CASE OR HAD THE JURY FOUND THAT HE USED A WEAPON, I

17  THINK THAT THERE WOULD BE NO QUESTION AS TO THE

18  SERIOUSNESS OF THE OFFENSE BEING PARTICULAR ENDANGERMENT

19  TO THE COMMUNITY.

20             BECAUSE THE JURY DID NOT FIND THE WEAPON

21  ALLEGATION TO BE TRUE, FOUND SECOND DEGREE, AND BECAUSE

22  IT WAS NEVER ALLEGED THAT HE WAS THE SHOOTER, IN FACT

23  THERE WAS A LOT OF EVIDENCE TO INDICATE THAT HE WAS THE

24  DRIVER, AND THAT IS, OF COURSE, WHAT HE ADMITTED TO THE

25  POLICE UPON HIS ARREST.

26             SO HE TOOK RESPONSIBILITY AT THAT TIME.

27             I FEEL THAT BECAUSE OF THE YOUTH AUTHORITY

28  FINDING THAT HE IS AMENABLE TO TREATMENT, THE COURT

1    SHOULD GIVE GREAT WEIGHT.

2            I WOULD INDICATE TO THE COURT THAT I HAVE

3    HAD A LOT OF CASES, THAT HAVING TO YOUTH AUTHORITY.  THE

4    MAJORITY OF THE THEM COME BACK, IN CASES SUCH AS THIS,

5    NOT AMENABLE FOR TREATMENT OR EVEN HOUSING AT CALIFORNIA

6    YOUTH AUTHORITY.

7            SO I WAS SOMEWHAT SURPRISED WHEN THE REPORT

8    CAME BACK.  BUT I WAS VERY GLAD THAT IT DID.

9            I WOULD INDICATE FOR THE COURT MR. PARTIA'S

10   UNCLE IS PRESENT IN THE COURTROOM SEATED IN THE LAST

11   ROW.   BROTHER IN THE SECOND TO THE LAST ROW.

12           HIS MOTHER DIED SHORTLY AFTER HIS BIRTH.

13   HIS FATHER, WHO HAD BEEN COMMITTED TO STATE PRISON WAS

14   KILLED IN A SHOOTING IN A BAR IN TIJUANA WHEN HE WAS

15   VERY YOUNG HE HAS ESSENTIALLY BEEN RAISED BY THE UNCLE

16   AND BROTHER, WHO IS 19 YEARS OLD.

17           HE LIVES AND RESIDES AT THE HOME OF HIS

18   MATERNAL GRANDMOTHER, WHO IS 77 YEARS OLD.

19           THEY HAVE DONE THE BEST THEY COULD.  HE

20   LIVES IN A VERY ROUGH AREA IN LOS ANGELES, THAT IS NOT

21   UNUSUAL TODAY, WHERE GANGS LITERALLY CONTROL THE

22   STREETS.

23           AND I THINK THERE WAS EVEN SOME EXPERT

24   EVIDENCE INDICATING THAT EVERY BLOCK IN THE AREA OF

25   NEWTON DIVISION WHERE HE LIVES IS CONTROLLED BY ONE GANG

26   OR ANOTHER.

27           BECAUSE OF THAT, HE DID BECOME, AT LEAST

28   PERIPHERALLY, INVOLVED WITH THE GANG.

1    THERE IS NO DOUBT THERE MY MIND ABOUT THAT.

2 HOWEVER, THE DETERMINATION BY CYA THAT HE IS NOT HEAVILY

3 VESTED IN GANG ACTIVITY, HE DOESN'T NECESSARILY IDENTIFY

4 HIMSELF WITH ANY PARTICULAR GANG, IS A VERY GOOD

5 INDICATION THAT HE NOT ONLY WOULD BE AMENABLE FOR

6 TREATMENT, BUT IN FACT CAN CHANGE HIS LIFE AROUND.

7    HE HAS BEEN CONVICTED OF AN EXTREMELY

8 SERIOUS FELONY.  15 TO LIFE IS THE NORMAL TERM

9 PRESCRIBED BY LAW.

10    WHILE COUNSEL INDICATES THAT IT WOULD BE

11 DANGER TO SOCIETY, IN THE COMMUNITY, IF HE WERE RELEASED

12 AT 25 YEARS OLD, YOU HAVE TO REMEMBER THAT HE WAS

13 INVOLVED IN THIS CRIME WHEN HE WAS 17 YEARS OLD.

14    THAT RELEASE AT AGE 25 WOULD MEAN THAT HE

15 WOULD BE INCARCERATED FOR SOMETHING LIKE 7 AND A HALF

16 YEARS, IF YOU CONSIDER THE HALF TIME SENTENCE OF 15 TO

17 LIFE, IF HALF TIME WERE AVAILABLE ON THOSE KINDS OF

18 SENTENCING, HE WOULD BE RELEASED FROM STATE PRISON AT 7

19 AND A HALF.

20    THE PREVIOUS LAW, WHICH WAS CHANGED ABOUT

21 TEN YEARS AGO SENTENCED PEOPLE CONVICTED OF SECOND

22 DEGREE MURDER TO FIVE YEARS TO LIFE.

23    THE AVERAGE SENTENCE UNDER THAT TERM WAS

24 APPROXIMATELY 7 AND ONE-HALF YEARS.

25    I THINK THAT MR. PARTIDA STANDS IN A

26 POSITION TO BENEFIT BY CYA TO BE GIVEN CONSIDERATION TO

27 WORK FOR HIS RELEASE.

28    I CAN INDICATE TO THE COURT THAT I HAVE

1   FOUND CASES WHERE IF HE VIOLATES THE RULES AT CYA OR

2   WERE PLACED ON PAROLE FROM CYA, AND COMMITTED ANOTHER

3   CRIME HE CAN BE RECOMMITTED FOR THE PERIOD ACTUALLY TO

4   LIFE.

5            I THINK, BASED UPON HIS INVOLVEMENT IN THIS

6   CASE, YOUR HONOR, CYA FINDING OF AMENABILITY AND HIS

7   CURRENT YOUTH, 18 YEARS OF AGE NOW, I WOULD ASK THE

8   COURT TO GIVE HIM A CHANCE, A CHANCE TO PROVE HIMSELF AT

9   Y.A.

10           A CHANCE TO OBTAIN WHATEVER BENEFIT HE CAN

11  THAT IS AVAILABLE THERE.  I KNOW HE HAS VERY STRONG

12  SUPPORT OF HIS FAMILY.

13           I WOULD INDICATE THAT HIS UNCLE, HIS

14  BROTHER AND MANY FRIENDS AND EVEN HIS GRANDMOTHER

15  APPEARED IN COURT MOST DAYS DURING THE TRIAL.

16           I KNOW THAT THEY HAVE VISITED HIM

17  CONTINUOUSLY WHILE HE HAS BEEN UNDER OBSERVATION AND

18  EVALUATION AT Y.A.

19           I KNOW THAT THEY STAND IN A POSITION WHERE

20  THEY WOULD SUPPORT HIM.

21           I WOULD INDICATE TO THE COURT THAT IF THE

22  COMMITMENT WERE TO CYA, THERE WOULD BE NO APPEAL OF THIS

23  CASE.  AND HE WOULD ACCEPT THE RESPONSIBILITY FOR WHAT

24  HE HAS DONE AND TAKE THE SENTENCE PROVIDED BY LAW AND BY

25  THIS COURT.

26           HE UNDERSTANDS, AT LEAST IN TALKING WITH

27  ME, THAT WHAT HE DID WAS WRONG.  HE DOES ACCEPT

28  RESPONSIBILITY FOR BEING THE DRIVER IN THE GANG

1  SHOOTING.

2            HE UNDERSTANDS IT IS WRONG TO BE A MEMBER

3  OF THE GANG, WRONG TO COMMIT ANY ACT OF VIOLENCE AGAINST

4  ANOTHER HUMAN BEING.

5            HIS POSITION, HE DOESN'T UNDERSTAND WHY

6  HE'S CONVICTED OF MURDER WHEN HE DIDN'T SHOOT ANYBODY.

7            THE COURT:  I SEE.

8            MR. BROCWAY:  THAT IS A LEGAL QUESTION.  AND AT

9  HIS AGE, MAYBE HARD TO UNDERSTAND.

10            SO I WOULD ASK THE COURT TO COMMIT HIM TO

11  CYA PURSUANT TO 1731 POINT 5.  I THINK HE IS A PERSON

12  WHO CAN BENEFIT BY THAT KIND OF SENTENCE.

13            THE COURT:  ALL RIGHT.

14            THANK YOU, MR. BROCKWAY.

15            MR. PARTIDA, YOU HAVE A RIGHT TO BE HEARD

16  AT THIS TIME IF YOU WOULD CARE TO.

17            THE DEFENDANT:  EVER SINCE I CAME INTO THIS

18  COURTROOM, I NEVER LET UP ON MYSELF, I AM CONVICTED OF

19  THE MURDER I DIDN'T COMMIT.

20            I DON'T SEE I SHOULD BE PAYING 15 TO LIFE

21  FOR SOMETHING I DIDN'T DO.

22            THE COURT:  ALL RIGHT.

23            COURT HAS READ AND CONSIDERED THE PROBATION

24  REPORT IN THIS MATTER. I HAVE ALSO READ AND CONSIDERED

25  THE AMENABILITY TO DETERMINATION PREPARED BY THE YOUTH

26  AUTHORITY.

27            I WAS THE TRIAL JUDGE DURING THE TRIAL.

28  AND I WOULD LIKE TO MAKE THE FOLLOWING COMMENT.  OUR

1    SOCIETY IS PRESENTLY RAFT WITH DRIVE-BY SHOOTINGS.

2            THIS WAS A DRIVE-BY SHOOTING.   THE

3    DEFENDANT WAS CONVICTED OF SECOND DEGREE MURDER FOR

4    HAVING PARTICIPATED IN THE DRIVE BY ASPECTS OF THE

5    SHOOTING BY DRIVING THE CAR, PROVIDED HIS CAR AND FOR

6    USE IN THE DRIVE-BY SHOOTING WHICH, INCIDENTALLY USED

7    SOLELY FOR THE PURPOSE OF TAKING ANOTHER PERSON'S LIFE.

8            THESE ARE VERY, VERY SERIOUS OFFENSES.   I

9    AM TOLD YOU HAVE MORE THAN 200 JUVENILES AWAITING TRIAL

10   AS ADULTS ON DRIVE-BY SHOOTINGS HERE IN LOS ANGELES

11   COUNTY.

12           THE MESSAGE MUST GO OUT THAT WE AS A

13   SOCIETY WILL NOT ACCEPT NOR TOLERATE THIS TYPE OF

14   ACTIVITY.

15           I NOTE PARTICULARLY THAT THE CYA REPORT

16   STATES THAT THE DEFENDANT EXPRESSED NO REMORSE OR SENSE

17   OF RESPONSIBILITY FOR EITHER OF THE ALLEGED CURRENT

18   OFFENSES, AS WELL AS FOR PRIOR OFFENSES.

19           ALSO STATES IN ANOTHER PORTION OF THE

20   REPORT THAT THE DEFENDANT HAS SOME REMORSE BUT MAINLY

21   FEELING FOR HIMSELF FOR BEING INCARCERATED.

22           ALTHOUGH THE CYA REPORT SAYS THAT CYA

23   COMMITMENT IS HIGHLY RECOMMEND, I, NEVERTHELESS, THINK

24   IN A CASE LIKE THIS IT IS NOT APPROPRIATE.

25           ACCORDINGLY, ████████████████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████

28           HOWEVER, PURSUANT TO WELFARE AND

1  INSTITUTIONS CODE SECTION ~~INTERPOINT 5.~~ IT IS ORDERED
2  ~~THAT THE DEFENDANT BE TRANSFERRED TO THE YOUTH AUTHORITY~~
3  ~~FOR THE PURPOSE OR HOUSING AND PARTICIPATION IN PROGRAMS,~~
4  ~~SINCE HE IS NOT.~~

5          BUT THAT DEFENDANT SHALL BE DEEMED TO BE
6  COMMITTED TO THE DEPARTMENT OF CORRECTIONS AND SHALL
7  REMAIN SUBJECT TO THE JURISDICTION OF THE DEPARTMENT OF
8  CORRECTIONS AND BOARD OF PRISON TERMS.
9          MR. BROCKWAY, WHAT ARE THE SENTENCING
10 CREDITS, DO YOU KNOW?
11         MR. BROCWAY:  I AM SORRY YOUR HONOR, I DON'T.
12         THE COURT:  THOSE WILL HAVE TO BE CALCULATED AND
13 ADDED TO THE SENTENCE.
14         FURTHERMORE, I BELIEVE THERE IS A VICTIM
15 RESTITUTION FINE OF $100 ON THE CASE LIKE THIS AND I SO
16 IMPOSE.
17         ALSO, MR. PARTIDA, IT IS APPROPRIATE AT
18 THIS TIME TO ADVISE YOU THAT YOU HAVE A RIGHT TO APPEAL.
19 AND IT IS MY DUTY TO ADVISE YOU THAT YOU HAVE THIS RIGHT
20 TO APPEAL FROM THE JUDGMENT AND SENTENCE OF THIS COURT.
21         THAT IF YOU WANT TO APPEAL, YOU HAVE 60
22 DAYS FROM TODAY IN WHICH TO FILE THE NOTICE OF APPEAL.
23         IF FILED, IT MUST BE FILED IN THIS COURT
24 AND NOT THE COURT OF APPEAL.
25         IT MUST BE IN WRITING AND MUST BE SIGNED BY
26 YOU OR YOUR LAWYER AND MUST INDICATE WHAT PORTION OF THE
27 RECORD THAT IT IS THAT YOU ARE APPEALING FROM YOU ARE
28 ENTITLED AT NO COST TO YOURSELF TO A RECORD AND

1    TRANSCRIPT OF THE TRIAL COURT PROCEEDINGS.

2              IF YOU WANT TO APPEAL AND DON'T HAVE THE

3    MONEY TO HIRE A LAWYER TO PROTECT YOUR APPEAL, THE

4    APPELLATE COURT WILL APPOINT A LAWYER TO REPRESENT YOU

5    FREE OF CHARGE.

6              IF YOU ARE QUALIFIED, IT BECOMES YOUR DUTY

7    TO KEEP THE COURT ADVISED OF THE MAILING ADDRESS SO THAT

8    HE CAN LET YOU KNOW WHETHER OR NOT YOU ARE ENTITLED TO A

9    FREE LAWYER, IF YOU DECIDE TO FILE NOTICE OF APPEAL.

10             THOSE ARE YOUR APPELLATE RIGHTS.

11             ONCE AGAIN, THIS SENTENCE IS 15 YEARS TO

12   LIFE.  BUT I AM ORDERING THAT THE DEFENDANT BE CONFINED

13   OR TRANSFERRED TO THE YOUTH AUTHORITY FOR THE PURPOSE OF

14   BEGINNING SERVICE OF THE SENTENCE.

15             AND THAT WILL BE THE ORDER.  WE'LL HAVE TO

16   GET THE CREDITS FROM MR. BROCKWAY.

17        MR. BROCWAY:  I WILL GET THEM TO YOU.

18        THE COURT:  CREDITS WILL BE ADDED TO THE MINUTE

19   ORDER.

20

21

22

23

24

25

26

27

28

1

2          SUPERIOR COURT OF THE STATE OF CALIFORNIA

3              FOR THE COUNTY OF LOS ANGELES

4    DEPARTMENT NO. 120          HON. ROBERT PERRY, JUDGE

5

6    THE PEOPLE OF THE STATE OF CALIFORNIA,   )
                                              )
                                PLAINTIFF,    )
7    _____ )

8              VS.                            )   NO.BA043905
                                              )
     DANIEL PARTIDA,                          )   REPORTER'S
9                                             )   CERTIFICATE
                                DEFENDANT.    )
10   _____ )

11
     STATE OF CALIFORNIA       )
12                             ) SS
     COUNTY OF LOS ANGELES     )
13
          I, JUDIE GARDNER, CSR #4723, OFFICIAL
14
     REPORTER OF THE SUPERIOR COURT OF THE STATE OF
15
     CALIFORNIA, FOR THE COUNTY OF LOS ANGELES, DO HEREBY
16
     CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
17
     TRANSCRIPT AT THE TIME OF
18
     PRONOUNCING SENTENCE AND NOTIFICATION OF APPEAL RIGHTS,
19
     PURSUANT TO RULE 250 OF THE CALIFORNIA RULES OF COURT;
20
     THAT THE VIEWS AND RECOMMENDATIONS OF THE COURT, IF
21
     ANY, ARE CONTAINED THEREIN, PURSUANT TO SECTION 1203.01
22
     OF THE PENAL CODE.
23
          DATED THIS 28TH DAY OF SEPTEMBER 1992.
24

25

26                        _____, CSR #4723
                          JUDIE GARDNER, OFFICIAL REPORTER
27

28

_____

              JUDIE GARDNER, COURT REPORTER

# EXHIBIT B

# EXHIBIT B

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life    )
Term Parole Consideration    )        CDC Number H-48181
Hearing of:                  )
                             )
DANIEL PARTIDA               )
                             )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 17, 2001

4:20 P.M.

PANEL PRESENT:

JONES MOORE, Presiding Commissioner
ELLIOT STEVENSON, Deputy Commissioner

OTHERS PRESENT:

DANIEL PARTIDA, Inmate
TIM O'HARA, Attorney for Inmate
KELLY SAKIR, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____✓_____ No
_____ Yes          See Errata Sheet

**Natalie Newton, Capitol Electronic Reporting**

**INMATE COPY**

60

# CALIFORNIA BOARD OF PRISON TERMS

## D E C I S I O N

**DEPUTY COMMISSIONER STEVENSON:** We're on the record.

**PRESIDING COMMISSIONER MOORE:** Thank you. Daniel Partida. The CDC Number Henry 48181. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The committing offense, the offense was carried out in a manner, which demonstrates an exceptionally callous disregard for human suffering. And the motive of the crime was inexplicable and very trivial in relationship to the offense. These conclusions were drawn from the Statement of Facts, wherein the prisoner was the driver in a drive-by shooting of the victim, Gabriel Sotelo. The victim was shot with a .9mm-type handgun, Uzi-type handgun. The victim was struck with a single bullet to the back of the head and fell to the pavement. The prisoner has an escalating pattern of criminal conduct. Criminal conduct that he was arrested for vandalism, as well as tampering with ID markers on

**DANIEL PARTIDA    H-48181    DECISION PAGE 1    10/17/01**

61

1    firearms, as well as possession of live
2    ammunition, as well as an arrest for robbery.
3    Let's see, the prisoner has programmed in a
4    limited manner while incarcerated. He's failed to
5    demonstrate evidence of positive change.
6    Misconduct while incarcerated includes five 128s
7    for unauthorized telephone usage, absence from
8    assignment twice, unauthorized shower as well as
9    emergency alarm procedures, as well as a 115 for
10   possession of contraband. Let's see -- The
11   hearing Panel notes that responses to PC 3042
12   Notices indicate opposition to a finding of parole
13   suitability. Specifically, the District
14   Attorney's Office of LA County, who is in
15   opposition to a finding of suitability at this
16   time. Other information bearing upon the
17   suitability is that the -- per prisoner's
18   counselor, a CCI D. Wade, W-A-D-E, writes in the
19   June 20th -- or, excuse me, the June 2000 Board
20   report that the prisoner poses a moderated degree
21   of threat if released to the public at this time.
22   The Panel makes the following findings, that
23   nevertheless the prisoner should be commended for
24   his positive work performance reports, as well as
25   achieving his education, taking correspondence
26   classes in the school of bookkeeping and
27   **DANIEL PARTIDA  H-48181  DECISION PAGE 2  10/17/01**

62

1    accounting, possessing certificates with the
2    machine shop and computer repair, as well as self-
3    help programming classes or seminar certificate
4    holding in the Hepatitis, sexual transmitted
5    diseases, as well as Hands of Peace Friends
6    Outside Workshop, as well as Life Plans for
7    Recovery and Substance Abuse, Substance Abuse
8    Education Program and the 12-step workshop
9    program.  However, these positive aspects of the
10   prisoner's behavior don't outweigh the factors of
11   unsuitability.  Mr. Partida, this is a three-year
12   denial.  And in a separate decision, the hearing
13   Panel finds that the prisoner has been convicted
14   of murder and it is not reasonable to expect that
15   the prisoner would be granted a date at a hearing
16   during the next three years.  The specific reasons
17   for the findings are as follows:  That the
18   prisoner committed the offense in an especially
19   cruel, callous manner.  Whereas the prisoner was
20   the driver in a drive-by shooting of the victor --
21   of the victim, excuse me.  And the victim was shot
22   with a .9mm style Uzi-type handgun.  The victim
23   was struck with one bullet to the back of the head
24   and fell dead at the scene.  The motive of the
25   crime was inexplicable and trivial in relationship
26   to the offense.  The offense was carried out in a
27   **DANIEL PARTIDA  H-48181  DECISION PAGE 3  10/17/01**

63

1   manner, which demonstrates an especially callous

2   disregard for human suffering. As noted already,

3   the prisoner has an escalating history of criminal

4   conduct, in terms of arrests for vandalism,

5   tampering with ID markers of firearms as well as

6   live ammunition and robbery. The prisoner has a

7   history of unstable, tumultuous relationships with

8   others in terms of his involvement as a gang

9   associate, as he admits himself to be an

10   associate. The prisoner's recently committed

11   serious disciplinary violations in terms of five

12   128s for unauthorized telephone calls, absence

13   from assignments, two of those, unauthorized

14   showers and emergency alarm procedures as well as

15   a possession of contraband. Therefore, a longer

16   period of observation or evaluation of the

17   prisoner is required before the Board should find

18   that the prisoner should be found suitable for

19   parole. The Panel recommends that the prisoner be

20   -- remain disciplinary free. He should work

21   towards reducing his custody level so that program

22   opportunities will become more available. If

23   available to upgrade vocationally, as well as, if

24   available, to participate in self-help and therapy

25   programming. Commissioner, any comments?

26       DEPUTY COMMISSIONER STEVENSON: None. Thank

27 DANIEL PARTIDA H-48181 DECISION PAGE 4 10/17/01

64

1    you.

2        PRESIDING COMMISSIONER MOORE:  Good luck to

3    you, sir.  This concludes our hearing.  The time

4    is 17:55 hours.  Good luck to you.  That's your

5    document.

6                    --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED THREE YEARS

26    EFFECTIVE DATE OF THIS DECISION_____ NOV 1 5 2001

27    DANIEL PARTIDA  H-48181  DECISION PAGE 5  10/17/01

21

1  programming.  He received a total of 170 hours of

2  instruction in upholstery and 99 hours of

3  instruction in the electronics trade.  He

4  continued to participate in available treatment.

5  Since he was no longer appealing his case, he

6  began to discuss the specifics regarding the

7  crime.  It was noted that he lacked remorse when

8  discussing his criminal behavior.  He admitted --

9  and this is a point I want to explore with you a

10 little bit at this time -- He admitted he was a

11 member of the Street Saints gang.

12         **INMATE PARTIDA:**  I've always been accused of

13 being a gang member.  When I spoke to my

14 counselor, I told her that -- I -- Jose was my

15 girlfriend's brother.  And I associated with Jose

16 a lot.  That's how I began -- I began to associate

17 with him and that's how I ended up in this crime,

18 because of Jose.  And that's -- Since then, I've

19 been labeled a gang member.  And that's what I

20 expressed to my counselor that day.  I told her

21 that I've never been a gang member.  I've been

22 labeled a gang member.  I told her, but I want

23 nothing to do with that.  That's not for me.

24 That's not my lifestyle.

25         **DEPUTY COMMISSIONER STEVENSON:**  Again.  This

26 statement goes a little beyond that.  It says that

27 you admitted that you were a member, but had

21

22

1    severed all ties with the gang subculture.  So,

2    it's a little different statement than the one

3    you're making today.

4           INMATE PARTIDA:  It is, but it's the way she

5    interpreted what I had expressed to her.

6           DEPUTY COMMISSIONER STEVENSON:  He did

7    continue upgrading academically, taking courses of

8    instruction in English, Economics, History -- U.S.

9    History, Science of Living and Math A.  Up to this

10   point, he had accumulated a total of 114 credits

11   and indicated at this time he planned to obtain a

12   high school diploma prior to attempting to enroll

13   in any college programs.  Continued upgrading

14   vocationally, participating in the electronics

15   program and business education programs.  Accrued

16   a total of 135 hours of instruction in electronics

17   and 81 hours of instruction in business education.

18   Period of January 1st, 1996, to May 1st, 1996, in

19   terms of addressing his commitment offense, it's

20   noted here that he denied firing the weapon that

21   killed the victim.  He accepted responsibility for

22   causing the death stating that, I drove the car.

23   He continued his academic upgrading in Math,

24   Physical Education and English.  He had, by this

25   time, accumulated a total of 122 credits toward a

26   high school diploma.  He also continued upgrading

27   vocationally in the business education program,

22

35

1  who was your supervisor in the central infirmary,

2  clinical laboratory, commending you for the good

3  job you did working for that unit.  While I'm

4  reviewing this material, Mr. Partida or Mr.

5  O'Hara, is there anything that I have omitted that

6  you want to be sure is on the record or about

7  which you wish to comment at this time?

8       INMATE PARTIDA:  Yes.  I would like to

9  discuss the statement where I admitted to being a

10  gang member.  I admitted to being an associate, to

11  associating with gang members.  And that's a

12  difference between being a gang member --

13       DEPUTY COMMISSIONER STEVENSON:  You mean

14  being jumped in and just hanging.

15       INMATE PARTIDA:  Exactly -- And just

16  associating.  Because I live there and -- I wanted

17  -- As a kid I had my bike taken all the time.  So,

18  I'm not going to go against these people.  I want

19  to make friends (inaudible).  So, that's -- I had

20  an association with them, but I'm not a gang

21  member.

22       DEPUTY COMMISSIONER STEVENSON:  Sometimes

23  associates, though, do things that further the

24  purposes of a gang.  Driving people around, you

25  know, committing crimes for which they're never

26  arrested.  Is any of that true with regard to your

27  experience?

35

36

1    **INMATE PARTIDA:**  No.  Not in my experience.

2    No.

3    **DEPUTY COMMISSIONER STEVENSON:**  Also, want

4    to note here a general chrono that was provided at

5    today's hearing.  It's dated July 24th, 2001, notes

6    that Mr. Partida has distinguished himself in the

7    vocational free press graphic arts program.  He is

8    reliable, competent and cooperative on special

9    projects when called upon.  He's to be commended

10   for his commitment to skills and values

11   acquisition.  He's an agreeable person and has a

12   positive outlook towards (indiscernible).  He is

13   to be commended for that.  Anything further on the

14   areas I've covered, up to this point.  I'm not

15   done with this portion of the presentation, but --

16   **ATTORNEY O'HARA:**  I just wanted to point out

17   that he is certified in machine shop and computer

18   repair.  The diplomas are in the back.

19   **DEPUTY COMMISSIONER STEVENSON:**  I saw a

20   vocational certificate for machine shop.  Let me

21   look again.  I'm not sure I saw -- There's a

22   certificate of competency on computer repair,

23   dated May 17th, 1995.  Is that what you're speaking

24   of?

25   **ATTORNEY O'HARA:**  Yeah.

26   **DEPUTY COMMISSIONER STEVENSON:**  Okay.  Fine.

27   Thank you.  That is in the files.  I'll go now to

36

1    any other tattoos?

2          INMATE PARTIDA:  Nope.

3          DEPUTY DISTRICT ATTORNEY SAKIR:  How is it

4    that you got the moniker Loverboy, you yourself?

5          INMATE PARTIDA:  That is not my moniker.

6          DEPUTY DISTRICT ATTORNEY SAKIR:  So, if you

7    were told that Jose, known as Shaggy, calls you

8    Loverboy and says that was your moniker, would he

9    be lying?

10         INMATE PARTIDA:  He would be because

11   Loverboy -- because I always spent time with his

12   sister and that's for him making fun of me.

13         DEPUTY DISTRICT ATTORNEY SAKIR:  And what

14   about the police and your rap sheet.  Why would

15   they have your moniker down as Loverboy? (Lie)

16         ATTORNEY O'HARA:  Well they probably got

17   that from Shaggy.

18         INMATE PARTIDA:  Yeah.  That's exactly where

19   they got it from.

20         DEPUTY DISTRICT ATTORNEY SAKIR:  Now, you

21   say that you didn't know the shooting was going to

22   happen, right?

23         INMATE PARTIDA:  True.

24         DEPUTY DISTRICT ATTORNEY SAKIR:  And you

25   said that after it happened you just drove away

26   and you didn't ask any questions.

27         INMATE PARTIDA:  True.

46

65

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, NATALIE NEWTON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 64, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of DANIEL PARTIDA, CDC No. H-48181, on OCTOBER 17, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 31, 2001, at Sacramento County, California.

Natalie Newton
Transcriber
**CAPITOL ELECTRONIC REPORTING**

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION (BPT §2041)

I.    [X]    PAROLE DENIED                                         *3 Year Denial*

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.   [ ]    PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|----------|-----------|---------|

B. Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + _____ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . + _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------|

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

E. Postconviction Credit From _____ To _____ − _____ Months
                                    (Date)              (Date)

F. Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

PANEL HEARING CASE

|  | Date |
|--|------|
|  | Date |
|  | Date 10-17-01 |

| Name | CDC NUMBER | INSTITUTION | HEARING DATE |
|------|------------|-------------|--------------|
| PARTIDA, DANIEL | H48181 | CTF SOLEDAD | 10/17/01 |

Distribution: White—C. File

# EXHIBIT C

# EXHIBIT C

# LIFE PRISONER EVALUATION REPORT
## PAROLE CONSIDERATION HEARING
### OCTOBER, 2004 CALENDAR

PARTIDA, DANIEL

H48181

## I. COMMITMENT FACTORS:

A. **Life Crime**: Murder 2nd, 187 PC (handgun). Los Angeles County case number BA043905. Victim: Gabriel Martinez Sotelo, age 16 years. Received in CYA at SACCO/YA on 5/5/93; received in CDC at CCI-RC on 8/20/96. Sentenced to 15 years to Life (Life Term started on 5/5/93). MEPD is 7/22/01.

1. **Summary of Crime**: All relevant documents from the previous hearing have been considered, and that information appears valid. The writer has no further information to add.

2. **Prisoner's Version**: In an interview for this report, Inmate Partida indicated that his version remains the same as stated in the previous hearing.

3. **Aggravating/Mitigating Circumstances**: Remain the same as stated in the previous hearing.

## II. PRECONVICTION FACTORS: 
Documents from the previous hearing have been considered, and that information appears valid. The writer has no further information to add.

## III. POSTCONVICTION FACTORS: 
Documents from the previous hearing have been considered, and the information remains valid. Partida attended his Initial Parole Consideration Hearing on 10/17/01. The panel acted to deny parole consideration for three years, placed him on the 10/04 Calendar for his Subsequent Parole Consideration Hearing #1, and recommended that he remain disciplinary free, work towards reducing his custody level, upgrade vocationally, and, as available, participate in self-help and therapy. During the period of time since the last hearing, the prisoner's behavior has remained stable, in that he has remained disciplinary free. Other than AA Group, there is no long term self-help or therapy available for him, or for other Life term inmates who do not have identifiable mental health concerns. Partida has participated in short term self-help through participation in a weekly Lifer's Group from 10/31/03 until the group ended on 7/16/04. As the BPT Panel members should be aware, Partida is unable to lower his custody level any further than where it currently is. See the Postconviction Progress Report for details.

## IV. FUTURE PLANS: 
Remain the same as indicated in the previous Board Report. In that report, Partida stated that he would be able to live with his grandmother (Modesta Salas) at 424 E. 27th St in Los Angeles (90011). The telephone number at that address remains (213) 747-8469. In an interview for this report, he stated that he would also be able to live with his brother, Pedro Partida at 453 Warren Place in Pomona. The telephone

number at that address is (909) 392-7656. He further stated that additional letters of support would be forthcoming shortly, and that if they do not arrive in time for dissemination through the normal channels, he will bring them to the hearing to share directly with the Board.

V.    **USINS Status**: None.

VI.    **SUMMARY**:

    A.    Not applicable, per the 8/5/04 memo of Cheryl K. Pliler, Deputy Director, Institutions Division.

    B.    Prior to release, the prisoner could benefit from remaining disciplinary free.

    C.    This report is based upon an interview with the prisoner on 8/25/04 lasting approximately one hour and a complete review of the central file.

    D.    Prisoner was afforded an opportunity to review his central file, per the Olson Decision, on 8/25/04. He examined his file, as documented on a CDC 128-B dated 8/25/04.

    E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

PARTIDA, DANIEL       H48181       CTF-Soledad       OCT/2004

G. Peabody                    8/26/04
_____       _____
G. Peabody                    Date
Correctional Counselor I


L. R. Baker, CCII (A)
_____       _____
L. R. Baker                   Date
Correctional Counselor II (A)


A. M. Padilla                 8-26-04
_____       _____
A. M. Padilla                 Date
Facility Captain (A)


D. S. Levorse   C&PR   8-27-04
_____       _____
D. S. Levorse                 Date
Classification and Parole Representative


PARTIDA, DANIEL          H48181          CTF-Soledad          OCT/2004





SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )    CDC Number H-48181
Hearing of:                )
                           )
DANIEL PARTIDA             )
_____)

**INMATE COPY**

CALIFORNIA STATE PRISON - LOS ANGELES COUNTY

SOLEDAD, CALIFORNIA

JUNE 14, 2005

8:48 A.M.

PANEL PRESENT:

PHILIP INGLEE, Presiding Commissioner
D. H. McBEAN, Deputy Commissioner

OTHERS PRESENT:

DANIEL PARTIDA, Inmate
BRUCE ZUCKER, Attorney for Inmate
MICHAEL DUARTE, Deputy District Attorney, Los Angeles
County

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum

**Elena Lara, Peters Shorthand Reporting**

2

1         **INMATE PARTIDA:**  Inmate Partida, P-a-r-t-i-d-a, CDC

2    Number is H-48181.

3         **PRESIDING COMMISSIONER INGLEE:**  We also have two

4    Correctional Peace Officers in the room.  Are here for

5    security purposes.

6         Mr. Partida, before you is an ADA Rights and Self-

7    Identification Statement which I'll now ask you to read out

8    loud.  It's underneath your documents there.

9         **INMATE PARTIDA:**  The Americans with Disabilities

10   Act is a law to help people with disabilities.

11   Disabilities are problems to make it harder for some people

12   to see, hear, breathe, talk, walk, learn, think, work or

13   take care of themselves than it is for others.

14        Nobody can be kept out of public places or

15   activities because of a disability.  If you have a

16   disability, you have the right to ask for help to get ready

17   for your BPT hearing, get to the hearing, talk, read forms,

18   and papers and understand the hearing process.

19        BPT will look at what you ask for to make sure that

20   you have a disability that is covered by the ADA.  And that

21   you have asked for the right kind of help.  If you do not

22   get help, or if you don't think you've got the kind of help

23   you need, ask for BPT a 1074 Grievance Form.  You can also

24   get help to fill it out.         **PRESIDING COMMISSIONER**

25   **INGLEE:**  Do you understand what these rights mean?

26        **INMATE PARTIDA:**  Yes, I do.

27        **PRESIDING COMMISSIONER INGLEE:**  Thank you.  The

3

1    record reflects that you signed a BPT Form 1073 which is

2    reasonable accommodation notice and request in accordance

3    with the provisions of the Americans with Disabilities Act

4    on August 26, 2004.

5            You indicated at the time that you do not have a

6    disability as defined under ADA.  Is that true?

7            INMATE PARTIDA:   Yes, that is true.

8            PRESIDING COMMISSIONER INGLEE:   Is the information

9    still current and correct?

10           INMATE PARTIDA:   Yes, it is.

11           PRESIDING COMMISSIONER INGLEE:   Do you have any

12   problems walking up and down stairs or for a distance of

13   100 yards or more?

14           INMATE PARTIDA:   No, I don't.

15           PRESIDING COMMISSIONER INGLEE:   Do you need glasses

16   or magnifying devices in order to see or to read documents?

17           INMATE PARTIDA:   Not to read documents.

18           PRESIDING COMMISSIONER INGLEE:   But you're able to

19   read everything that we have here today?

20           INMATE PARTIDA:   Yes, I can.

21           PRESIDING COMMISSIONER INGLEE:   Thank you.  Do you

22   have any hearing impairments?

23           INMATE PARTIDA:   No, I don't.

24           PRESIDING COMMISSIONER INGLEE:   Have you ever been

25   included in a CCMS or triple CMS or an EOP program?

26           INMATE PARTIDA:   No, I haven't.

27           PRESIDING COMMISSIONER INGLEE:   Do you know what

4

1      these terms mean?

2              INMATE PARTIDA:   Yes, I do.

3              PRESIDING COMMISSIONER INGLEE:   Have you ever taken

4      psychotropic medication either in prison or on the streets?

5              INMATE PARTIDA:   No, I haven't.

6              PRESIDING COMMISSIONER INGLEE:   How far did you go

7      in school prior to arriving in prison?

8              INMATE PARTIDA:   To the eleventh grade.

9              PRESIDING COMMISSIONER INGLEE:   Have you taken any

10     special education classes while growing up?

11             INMATE PARTIDA:   No, I did not.

12             PRESIDING COMMISSIONER INGLEE:   Do you suffer any

13     disability that would prevent you from participating in

14     today's hearing?

15             INMATE PARTIDA:   No, I don't.

16             PRESIDING COMMISSIONER INGLEE:   Counselor, are

17     there any -- do you have any comments or concerns regarding

18     ADA?  Either your client's ADA rights or the inmate's

19     ability to participate in the hearing?

20             ATTORNEY ZUCKER:   Commissioner, I haven't seen the

21     1073, but I heard you go over it.  The only possible issue

22     I flagged myself before today was glasses.  He appeared to

23     read the ADA form to my satisfaction and appears to be

24     wearing glasses now.  I've no other concerns at this time.

25             PRESIDING COMMISSIONER INGLEE:   Thank you.

26             This hearing is being conducted pursuant to Penal

27     Code Section 3041 and 3042, and the rules and regulations

5

1    of Board of Prison Terms governing parole consideration

2    hearing for life inmates.

3        The purpose of today's hearing is to consider your

4    suitability for parole.  In doing so, we will consider the

5    number and nature of the crimes you were committed for,

6    your prior criminal and social history, your behavior

7    programming since commitment.

8        We have had an opportunity to review your central

9    file and your prior hearing transcripts.  You will be given

10   an opportunity to correct or clarify the record.

11       We will consider your progress since your commitment

12   and since your last hearing.  Your updated counselor

13   report, your psychological report will also be considered.

14   Any change in parole plans should be brought to our

15   attention.

16       We will reach a decision today and inform you

17   whether or not we will find you suitable for parole and the

18   reasons for our decision.

19       If you are found suitable for parole, the length of

20   your confinement will be explained to you.   This hearing

21   will be conducted in two phases.  I will discuss with you

22   the crimes that you were committed for, your prior criminal

23   and social history, your parole plans, and any letters of

24   support or opposition that may be in file.

25       Deputy Commissioner McBean will discuss with you

26   your progress since your commitment, your counselor's

27   report and your psychological evaluation.

6

1        Once that is concluded, Commissioners, District

2    Attorney and your attorney will be given an opportunity to

3    ask you questions.  The questions for the District Attorney

4    shall be asked through the Chair, and your answers will be

5    directed to the panel.  Before we recess for deliberation,

6    the District Attorney, your attorney and you will be given

7    an opportunity to make a final statement regarding your

8    parole suitability.  Your statement shall be directed as to

9    why you feel you are suitable for parole.

10        We will then recess, clear the room and deliberate.

11   Once we have completed our deliberations, we will resume

12   the hearing and announce our decision.

13        The California Code of Regulations states that

14   regardless of the time served, a life inmate shall be found

15   unsuitable for, and denied parole if in the judgment of the

16   panel the inmate would pose an unreasonable risk of danger

17   to society if released from prison.

18        You have certain rights.  These rights include the

19   rights of timely notice of the hearing, the rights to

20   review your central file, and the right to submit relevant

21   documents.

22        Has your inmate's -- has your client's rights been

23   met in this regard?

24        ATTORNEY ZUCKER:   No objection at this time,

25   Commissioner.

26        PRESIDING COMMISSIONER INGLEE:   You will also have

27   the right to be heard by an impartial panel.

7

1          Mr. Partida, do you have any objection to the panel
2     this morning?
3          INMATE PARTIDA:   I don't.
4          PRESIDING COMMISSIONER INGLEE:   Counselor, do you
5     have any objections to the panel?
6          INMATE PARTIDA:   No objections.
7          PRESIDING COMMISSIONER INGLEE:   You will receive a
8     written tentative decision today.  That decision is subject
9     to review by the Decision Unit -- excuse me, Decision
10    Review Unit and by the entire Board meeting as a body.
11         It will become effective within 120 days.  It is
12    also subject to review by the Governor.  A copy of the
13    tentative decision and a copy of the transcript will be
14    sent to you.
15         As of May 1st, 2004, there were major changes
16    limiting your former rights to appeal Board decisions or
17    actions directed to the Board.  The old Board regulations
18    were repealed.  The current policy is entitled
19    Administrative Appeals, Correspondence and Grievances
20    Concerning Board of Prison Term Decisions.  It is available
21    in the prison library for your review.  You are not
22    required to admit your offense or discuss your offense if
23    you do not wish to do so.  However, this panel does accept
24    as true the findings of the court and you are invited to
25    discuss the facts and circumstances of the offense if you
26    desire.
27         The Board will review and consider your prior

8

1        statements you have made regarding the offense in

2        determining your suitability for parole.

3              Commissioner McBean, is there any confidential

4        material in the file whether or not we will be used.

5              DEPUTY COMMISSIONER McBEAN:   Yes, there is.

6              PRESIDING COMMISSIONER INGLEE:   You may view this

7        and pass that on to the Deputy District Attorney.

8              ATTORNEY ZUCKER:   Thank you.

9              MR. DUARTE:   Unfortunately for me, my boxes still

10       have not arrived from Southwest Airlines.

11             DEPUTY COMMISSIONER McBEAN:   Your files?

12             PRESIDING COMMISSIONER INGLEE:   Do you have ample

13       files to be able to conduct the meeting?

14             MR. DUARTE:   I'm good enough.

15             PRESIDING COMMISSIONER INGLEE:   Okay.

16             MR. DUARTE:   I'll just listen, and I can pick up on

17       what's going on.

18             PRESIDING COMMISSIONER INGLEE:   But you're

19       comfortable with --

20             MR. DUARTE:   Yes.

21             PRESIDING COMMISSIONER INGLEE:   I have passed the

22       hearing checklist marked Exhibit 1 to your attorney and to

23       the District Attorney to ensure that we're all proceeding

24       with the same set of documents.

25             Again, I ask the District Attorney, are you

26       satisfied with the document list that you received?

27             MR. DUARTE:   Yes, your Honor.   Yes, Commissioner.

9

1          **PRESIDING COMMISSIONER INGLEE:**    And also,

2     Counselor, are you satisfied with the document list?

3          **ATTORNEY ZUCKER:**    Yes, Commissioner.    The only

4     concern I would have is that we were not put on notice that

5     there was any existence of confidential information in the

6     file before now.

7          And I think we're entitled to know if there is

8     confidential information in existence.    I understand that

9     if it's not provided to us, but if it's in existence, I

10    think -- I'm not sure if we're supposed to know that before

11    today or not, but I'd like to note it at this time.

12         **DEPUTY COMMISSIONER McBEAN:**    Would you like me to

13    respond?

14         **PRESIDING COMMISSIONER INGLEE:**    Yes, go ahead.

15         **DEPUTY COMMISSIONER McBEAN:**    I don't think there's

16    any formal way to notice you of that.    We don't really

17    review the confidential information until we get to the

18    central file.

19         And your right to know is that there is something in

20    the confidential section that we will be taking into

21    consideration.

22         **ATTORNEY ZUCKER:**    Okay, thank you.

23         **INMATE PARTIDA:**    I would like to comment something

24    on that.

25         **ATTORNEY ZUCKER:**    Hang on, No, not right now.

26    We'd like to preserve that issue for possible

27    objection later.

10

1    **DEPUTY COMMISSIONER McBEAN:**    No problem.

2    **PRESIDING COMMISSIONER INGLEE:**    Counselor, are

3    there any additional documents you wish to submit?

4    **ATTORNEY ZUCKER:**    Not at this time.  I think my --

5    my client will be reading his parole plans that he's

6    prepared.

7    **PRESIDING COMMISSIONER INGLEE:**    Okay.

8    **ATTORNEY ZUCKER:**    My client brought some parole

9    plans with him.

10    **PRESIDING COMMISSIONER INGLEE:**    Are these the same

11    plans that are in his file?

12    **ATTORNEY ZUCKER:**    There's -- they're updated,

13    revised.

14    **PRESIDING COMMISSIONER INGLEE:**    They're fairly

15    extensive plans that I've reviewed.

16    **ATTORNEY ZUCKER:**    Yeah, they're just updating

17    essentially what's already in the file.  I'm going to have

18    my client talk about them at the appropriate time.

19    **PRESIDING COMMISSIONER INGLEE:**    I think you should

20    control your client also.

21    **ATTORNEY ZUCKER:**    Thank you, Commissioner.

22    **PRESIDING COMMISSIONER INGLEE:**    So you have no

23    additional documents that you wish to submit at this time?

24    **ATTORNEY ZUCKER:**    No, Commissioner.

25    **PRESIDING COMMISSIONER INGLEE:**    Okay.  Do you have

26    any preliminary objections?

27    **ATTORNEY ZUCKER:**    None other than I made.

11

1      PRESIDING COMMISSIONER INGLEE:   All right.  And

2  will your inmate be speaking to the panel?

3      ATTORNEY ZUCKER:   Yes, Commissioner.

4      PRESIDING COMMISSIONER INGLEE:   With that in mind,

5  would you please raise -- as best you can, please raise

6  your right hand.

7      Do you solemnly swear or affirm that the testimony

8  you will give at this hearing will be the truth, the whole

9  truth and nothing but the truth?

10      INMATE PARTIDA:   Yes, I do.

11      PRESIDING COMMISSIONER INGLEE:   Thank you.

12  Counselor, if there's no objections, we will incorporate by

13  reference the Statement of Facts from the Probation

14  Officer's Report dated August 8th, 1991, pages 3 through 5.

15      ATTORNEY ZUCKER:   Yes, Commissioner, let me just

16  make sure I have flagged that to make sure I have the same

17  document.  I'm sure I do.

18      PRESIDING COMMISSIONER INGLEE:   The one reviewed

19  under the juvenile court.

20      ATTORNEY ZUCKER:   I have a document, Probation

21  Officer's Report, page 2, it talks about elements and

22  relevant circumstances of the offense.  And we would like

23  to stipulate to those statements contained in that report.

24      PRESIDING COMMISSIONER INGLEE:   All right.

25      ATTORNEY ZUCKER:   I think we're talking about the

26  same document.  I only see one PO report.

27      PRESIDING COMMISSIONER INGLEE:   Actually, there are

12

1    several -- there are several instances in this file.

2              ATTORNEY ZUCKER:   Correct.

3              PRESIDING COMMISSIONER INGLEE:    Where there are

4    various discussions of what happened.

5              ATTORNEY ZUCKER:   I agree.

6              PRESIDING COMMISSIONER INGLEE:   The one seems to be

7    the most complete, and from my review, is one I noticed on

8    the Probation Officer's Report, again, August 8th of '91,

9    pages 3 through 5.   If you'd like to take a moment to

10   review that.

11             It's under the heading, I believe, the juvenile --

12             ATTORNEY ZUCKER:   Now, I'm -- let me just show you

13   what I'm looking at here.   The Superior Court of

14   California, Probation Officer's Report, and the face sheet

15   talks about count one being the instant offense.

16             PRESIDING COMMISSIONER INGLEE:    That's a later

17   report.   The one I'm referencing --

18             And I'll -- if you'll take a look at this.   It's in

19   there -- appears to be the earlier discussion statement of

20   fact.

21             This is Superior Court of California Juvenile Court,

22   August 8th, 1991, pages 3, 4 and 5.

23             ATTORNEY ZUCKER:    Okay.  I'll find that.  Okay,

24   I'm seeing that now.

25             PRESIDING COMMISSIONER INGLEE:    And if you go

26   midway down on the document, it starts talking about

27   petition dated February 21st alleges in the drive-by

13

1    shooting, minor, referring to the inmate.

2           **ATTORNEY ZUCKER:**  Okay, I see that.

3           **PRESIDING COMMISSIONER INGLEE:**  Fairly extensive.

4    It seems to be the one that's the clearest in my mind to --

5    able to get a description of the Statement of Fact.

6           **ATTORNEY ZUCKER:**  Yeah, and just to, you know, in

7    reviewing the Appellate Court decision, the sentencing

8    transcript and various versions of the probation report, we

9    do have different versions.

10        So --

11          **PRESIDING COMMISSIONER INGLEE:**  I acknowledge that.

12         **ATTORNEY ZUCKER:**  Okay.

13          **PRESIDING COMMISSIONER INGLEE:**  This is the one

14    that I read.

15         **ATTORNEY ZUCKER:**  Okay.

16         **PRESIDING COMMISSIONER INGLEE:**  The one that I'm

17    personally more comfortable with and seems to give a better

18    description of what occurred.

19        Would you agree with -- is that -- this is an

20    administrative hearing, obviously, not a court hearing.  So

21    I have to take what I have in front of me, and that's the

22    statement of fact that seems to be the clearest.

23         **ATTORNEY ZUCKER:**  Okay.

24         **PRESIDING COMMISSIONER INGLEE:**  So, again, if

25    there's no objection, we will then incorporate the

26    referenced Statement of Fact from the Probation Officer's

27    Report 8/8 of 1991, pages 3 through 5.

14

1              ATTORNEY ZUCKER:    We don't stipulate to this

2       particular version.

3              PRESIDING COMMISSIONER INGLEE:    Say that again?

4              ATTORNEY ZUCKER:    We don't stipulate to this

5       particular version of the Statement of Facts.   It

6       is -- as I pointed out, the other Probation Officer's

7       Report, we would stipulate to that.   We're not going to

8       necessarily stipulate to this particular version, but we

9       won't -- we will put -- not to the Board's considering

10      which you obviously are allowed, you know, and -- very well

11      deal.

12             PRESIDING COMMISSIONER INGLEE:    I think you said

13      Yes.

14             ATTORNEY ZUCKER:    Okay.

15             PRESIDING COMMISSIONER INGLEE:    All right.   Let's

16      go on to discuss the -- actually what occurred.

17             So do you -- I want you to take a moment and just

18      tell me what happened.   From your point of view, what was

19      the crime that you -- you're currently committed here for.

20      I'd like to get your side of it.

21             DEPUTY COMMISSIONER McBEAN:    Did you place him

22      under oath?

23             PRESIDING COMMISSIONER INGLEE:    Yes.

24             DEPUTY COMMISSIONER McBEAN:    Yes, okay.   Thank you.

25             INMATE PARTIDA:    On the night of the offense, I

26      had been working.   Got off at work at seven-thirty that

27      night.   I was going to go visit my girlfriend.   On my way

15

1   to visit her, I seen her brother, which is Jose Claro,
2   which is my co-defendant in this case with a couple of
3   companions of his.
4        As I was going to visit my girlfriend, I seen him
5   walking down the street with another -- with another friend
6   of his. I pulled over. I asked him where was he going.
7   He told me where he was going. That he was going to his
8   house. I told him that I'd give him a ride.
9        At that time his companion told him something, and
10  then Jose asked me if I would give his companion a ride
11  also.
12       I didn't think anything of it. I said, Yes, they
13  got in the car. Jose got in the back seat. His companion
14  sat in the front passenger seat. And I drove away.
15       Where they told me they were going was to 24th
16  Street. So I went to 24th Street and there was nobody
17  there. From there he asked me if I would drive him by the
18  DMV.
19       I drove him towards the DMV. I didn't know what
20  these guys intentions were. As I drove to the DMV, we
21  reached 37th and Grand, in front of an apartment complex.
22  There was people standing outside.     I thought this guy
23  was going to get off right there, so I stopped right in
24  front of the apartment complex, and my passenger pulled out
25  the gun and started shooting. She shot two times.
26       And my first -- my first reaction was that I thought
27  we were being shot at. So I went down and I stepped on the

16

1  accelerator.  I did a U-turn and when I turned over, I seen
2  that my passenger was the one that had the gun.
3      I fled and I was scared.  I didn't know that
4  somebody had actually gotten shot that night.  I came back
5  and they got off the car.  And that was it.  I never heard
6  anything about that any more.
7      PRESIDING COMMISSIONER INGLEE:  I have to ask you a
8  question because I think it's very important to this issue.
9      Were you a member of a gang at this time?
10     INMATE PARTIDA:  No, I was not, sir.
11     PRESIDING COMMISSIONER INGLEE:  Were the people in
12  your car members of a gang?
13     INMATE PARTIDA:  Yes, they were.
14     PRESIDING COMMISSIONER INGLEE:  Were they friends
15  of yours?
16     INMATE PARTIDA:  Only one individual.  And my only
17  relationship to him was because I had been dating his
18  sister for three years.
19     PRESIDING COMMISSIONER INGLEE:  But you were
20  knowledgeable, though, that they were in fact members of
21  the gang?
22     INMATE PARTIDA:  Yes, I was knowledgeable of that
23  and sorry about that.  I admit that I made a poor decision.
24  That I should have known better, and I'm sorry for that.
25     PRESIDING COMMISSIONER INGLEE:  I also have to ask
26  you, is he was armed?
27     INMATE PARTIDA:  Yes, he was.

17

1       **PRESIDING COMMISSIONER INGLEE:**  You had absolutely

2    no knowledge of the fact that he carried a weapon at that

3    time?

4       **INMATE PARTIDA:**  No, I did not.

5       **PRESIDING COMMISSIONER INGLEE:**  Do you know that he

6    in the past had ever carried a weapon?

7       **INMATE PARTIDA:**  I didn't know the guy.

8       **PRESIDING COMMISSIONER INGLEE:**  Are you familiar

9    with people in the gang area down and around there who did

10    in fact carry weapons?

11       **INMATE PARTIDA:**  I'm sure gang members, I'm sure.

12       **PRESIDING COMMISSIONER INGLEE:**  So you knew there

13    were gang members?

14       **INMATE PARTIDA:**  Yes, I did.

15       **PRESIDING COMMISSIONER INGLEE:**  Took them for a

16    ride?

17       **INMATE PARTIDA:**  Yes, I did.

18       **PRESIDING COMMISSIONER INGLEE:**  But you had

19    absolutely no knowledge whatsoever that he was going to

20    then shoot at an individual while he was in your car?

21       **INMATE PARTIDA:**  No, I did not.

22       **PRESIDING COMMISSIONER INGLEE:**  So, in fact, you

23    take no responsibility for the crime?

24       **INMATE PARTIDA:**  I do take responsibility.  I do

25    take responsibility because I had a choice that night.  I

26    knew that they were gang members, and I used poor judgment.

27    I allowed them to get into my car and drive them there.

18

1          I should have known better.  I should have known
2      that they're gang members.  They were up to no good.  But
3      yet I, like I said, I exercised poor judgment and I accept
4      my responsibility for that.

5          PRESIDING COMMISSIONER INGLEE:    That was my
6      question.  You knew they were gang members.

7          INMATE PARTIDA:    Yes.

8          PRESIDING COMMISSIONER INGLEE:    And then you said
9      they were up to no good.  How did you know they were up to
10     no good?

11         INMATE PARTIDA:    Well, gang members.

12         PRESIDING COMMISSIONER INGLEE:    Gang members have
13     their down moments also.  Not necessarily going out and
14     killing people.  I mean, there's --

15         INMATE PARTIDA:    True.

16         PRESIDING COMMISSIONER INGLEE:    -- people don't
17     stand around 24 hours a day killing people.  There is times
18     and places these things do in fact occur.

19         INMATE PARTIDA:    That's true.

20         PRESIDING COMMISSIONER INGLEE:    And you were
21     familiar with the neighborhood and so you were familiar
22     with the culture.  The gang culture I'm referring to.

23         Do you feel any remorse at all for what occurred?

24         INMATE PARTIDA:    Yes, I do feel remorse.  I'm very
25     sorry for what happened.  I never -- I never intended to
26     take anyone's life.  Honest to God, I lacked the knowledge
27     or the intent to commit murder.

19

1       But I know that -- that I played a part in that.

2   Whether I had knowledge or not, I had to accept my

3   responsibilities because a human life was taken.  And

4   there's nothing that I can say or do to replace that.

5       PRESIDING COMMISSIONER INGLEE:    I appreciate that,

6   but basically you're saying you're innocent?

7       INMATE PARTIDA:    I'm innocent of murder.  Yes, I

8   am.

9       ATTORNEY ZUCKER:    Can I ask a follow-up question?

10      PRESIDING COMMISSIONER INGLEE:    I'm sorry?

11      ATTORNEY ZUCKER:    Could I ask some follow-up

12  questions of my client?

13      PRESIDING COMMISSIONER INGLEE:    You'll have the

14  opportunity to ask questions in a few moments.

15      ATTORNEY ZUCKER:    Thank you.

16      PRESIDING COMMISSIONER INGLEE:    You have a juvenile

17  record.  In 3/21 of 1990 you were arrested by the Los

18  Angeles Police Department for vandalism.

19      INMATE PARTIDA:    Yes, I was.

20      PRESIDING COMMISSIONER INGLEE:    On December 6th,

21  1990 you were arrested by the Los Angeles Police Department

22  for tampering with -- with ID markers on the fire -- on a

23  firearm.

24      INMATE PARTIDA:    Yes, I was.

25      PRESIDING COMMISSIONER INGLEE:    And the removal of

26  an ID off a firearm.

27      INMATE PARTIDA:    Yes, I was.

20

1      PRESIDING COMMISSIONER INGLEE:   Again, you were

2    arrested essentially on the same day apparently for

3    possession of live ammunition without parental permission.

4         INMATE PARTIDA:   It was the same incident.

5         PRESIDING COMMISSIONER INGLEE:   So you had -- then

6    you had a weapon that the serial number had been filed off

7    or was filed off?

8         INMATE PARTIDA:   Yes, sir.

9         PRESIDING COMMISSIONER INGLEE:   And there were live

10   rounds with the weapon at that time?

11        INMATE PARTIDA:   True.

12        PRESIDING COMMISSIONER INGLEE:   So both those

13   instances are actually happened at the same time?

14        INMATE PARTIDA:   Yes.

15        PRESIDING COMMISSIONER INGLEE:   And then you did

16   not have any adult convictions until such time as the

17   current -- the current issue that you are now confined on

18   that as murder, second degree murder?

19        INMATE PARTIDA:   True.

20        PRESIDING COMMISSIONER INGLEE:   Personal factors.

21   The inmate was born in Los Angeles on November 8th, 1973.

22   His mother died when he was six years old.  His father was

23   killed when he was 12.

24        He was raised by his parental grandmother and a

25   parental uncle in the Los Angeles area.  He grew up in an

26   area known for heavy gang activity, but Partida denies any

27   gang membership.

21

1        He attended high school up until the 11th grade.

2     Partida denies any drug use, but admitted to drinking beer

3     on the weekend since he was 16.  He stated he would consume

4     about two or three beers on an average.

5        For approximately three years he worked after school

6     for his uncle in the auto sales business.

7        INMATE PARTIDA:   True.

8        PRESIDING COMMISSIONER INGLEE:    This is the

9     Brooklyn Auto Sales?

10       INMATE PARTIDA:   True.

11       PRESIDING COMMISSIONER INGLEE:   Okay.  Tell me a

12    little bit about your family.

13       INMATE PARTIDA:   I grew up in a dysfunctional

14    family.  My mother passed away when I was six years old.

15    My father was incarcerated.  After his release, he was

16    murdered.  I was raised by my grandmother and by my

17    paternal uncle with just one brother.

18       My childhood was hard.  I lacked self esteem.  I

19    lacked self esteem because -- because I lacked a positive

20    role model in my life. As far as a father figure, he was a

21    bad influence in my life.

22       PRESIDING COMMISSIONER INGLEE:    This is your

23    paternal --

24       INMATE PARTIDA:   Paternal father.

25       PRESIDING COMMISSIONER INGLEE:   Paternal father.

26       INMATE PARTIDA:   And, I mean, I believe that

27    because of that I did make poor decisions in life.  I mean,

22

1    but I also learned to care for myself.  I became working at

2    the age of 14 and attending school.  I never got involved

3    with gangs.  The people that I grew up with, I had their

4    support letters.  These are the friends that I grew up

5    with.

6         I made one bad decision of socializing with one

7    individual.  And because of that, that's why I find myself

8    here today.

9         PRESIDING COMMISSIONER INGLEE:   Okay.  But did you

10   not -- weren't you brought up by your uncle?

11        INMATE PARTIDA:   Excuse me?

12        PRESIDING COMMISSIONER INGLEE:   Were you not --

13   were you not raised by your uncle?

14        INMATE PARTIDA:   Yes, I was.  Yes, I was.

15        PRESIDING COMMISSIONER INGLEE:   And he was the one

16   who currently owns the Brooklyn Auto Sales?

17        INMATE PARTIDA:   Yes.

18        PRESIDING COMMISSIONER INGLEE:   All right.  Your

19   parole plans indicate that you will be living with your

20   grandmother, but we do not have any letter from your

21   grandmother in this regard.

22        INMATE PARTIDA:   True.

23        PRESIDING COMMISSIONER INGLEE:   Who will you be

24   living with?

25        INMATE PARTIDA:   With my grandmother.

26        PRESIDING COMMISSIONER INGLEE:   With your

27   grandmother.

23

1    **INMATE PARTIDA:**   She's eighty years old, and she's
2    illiterate.  She cannot read or write.
3        **PRESIDING COMMISSIONER INGLEE:**   She owns her own
4    home?
5        **INMATE PARTIDA:**   My brother does.  And she's living
6    in one of the units.
7        **PRESIDING COMMISSIONER INGLEE:**   Okay.  And you'll
8    be living specifically in the same -- in the same building
9    or is it an apartment or condominium?
10       **INMATE PARTIDA:**   It's a home. It's a house.
11       **PRESIDING COMMISSIONER INGLEE:**   It's a separate
12   standing home?
13       **INMATE PARTIDA:**   Yes, it is.
14       **PRESIDING COMMISSIONER INGLEE:**   It indicates down
15   here that you'll be working for your uncle, Jose Escobar at
16   the Brooklyn Auto Sales in Los Angeles.
17       We do not have a letter from your uncle, as we do
18   not have a letter -- we do not have a letter from your
19   grandmother.  And I understand you do say she's illiterate.
20   I understand that.  I didn't understand that until you said
21   that.
22       By the way, we will read through your letters.
23   We'll review your letters.  I'm talking about just your
24   plan right now.  Nor do we have a letter from --
25   specifically from your uncle in regard to the Brooklyn Auto
26   Sales.
27       **INMATE PARTIDA:**   If you don't mind, I would like to

24

1   provide you with a letter.

2        PRESIDING COMMISSIONER INGLEE:  Well, let's go

3   through the letters in a moment, and if you have another

4   letter, I'll certainly take a look at it.

5        But your general plan, though, is to live with your

6   grandmother and work for your uncle?

7        INMATE PARTIDA:  Yes, sir.

8        PRESIDING COMMISSIONER INGLEE:  Okay.  Okay.  We

9   have sent out five 3042 letters to the agencies directly

10  interested in your case.  These are the various police and

11  court agencies directly that were involved in your

12  incarceration.

13       We have received one letter in this regard from the

14  Los Angeles Police Department dated May 14th, 2005.

15  Counselor, that letter was received today.  Do you wish to

16  have this -- do you wish to object to this letter?

17       ATTORNEY ZUCKER:  No objection at this time.

18       PRESIDING COMMISSIONER INGLEE:  All right.  I'll

19  just give you -- I'll read the letter.  It is "The police

20  department welcomes the opportunity to comment and to give

21  its recommendations on parole suitability for Daniel

22  Partida, CDC H-48181, Court Case BA043905.  Mr. Partida is

23  known as a street Saints gang member.  Commitment offense

24  was carried out in a manner which exhibits a callous

25  disregard for life and suffering of others.  The motive for

26  the crime was very trivial in relation with the offense,

27  and he and his accomplices murdered the victim Gabriel

25

1    Sotelo by shooting him with a firearm during a rival gang

2    confrontation.  We recommend his parole be denied."

3         There is other information in here, but, basically,

4    it's administrative discussions.

5         In addition, we have a representative from the Los

6    Angeles County District Attorney's Office who will have an

7    opportunity to discuss their views on your suitability for

8    your parole.

9         I'd like to go through the letters now that we have

10   in your file.

11        The first letter is from a Peter Mann from the SYDA

12   Foundation Prison Project.  He has mentioned that you have

13   been a role in the Yoga medication correspondence course.

14   He's very supportive of you.  He said that his letter

15   indicates that he's been able to endure challenges.  You've

16   been able to include challenges in your incarceration and

17   because the insight you have gained through the course.

18        There's also a letter in here from the Brooklyn Auto

19   Sales.  This is not from your uncle but I think this is

20   apparently from your brother.  And that's Pedro.  And it

21   says -- I'll read the letter,

22   "My name is Pedro Partida.  I am Daniel Partida's

23            older brother.  By the way of this letter,

24            I'd like to take a moment to express and

25            state the following words.  In 1988 our

26            father's death, my brother Daniel and I

27            started working for the Brooklyn Auto Sales,

26

1   a very successful and known company to the

2   County of Los Angeles owned by our uncle

3   Jose Escobar.  In 1988 our uncle Jose

4   Escobar initially bought the business.

5   Daniel and I worked during the week after

6   school hours and on weekends.  We've been

7   employed in this company for over 16 years.

8   I am now -- and I am now part owner.  We

9   started working out -- we started working

10   out of the first location that is located in

11   2717 East Caesar Chavez Avenue, Los Angeles,

12   California, with only ten vehicles in

13   inventory.  We now own three locations in

14   Los Angeles County and with over 250

15   vehicles in inventory.  And are presently in

16   the process of purchasing an additional

17   location.  Therefore, I'd like to take this

18   opportunity to offer my brother Daniel a

19   full-time job at a very well-paying salary

20   if he wishes to come to work for us.  I

21   understand that he has completed numerous

22   study courses in his incarceration like

23   accounting and bookkeeping.  He will be a

24   great help to the business and do -- excuse

25   me -- and do us -- and us due to his way of

26   people enjoy communicating with others.  I'm

27   sure he will do well for himself and others

27

1          in a very short time because he has matured

2          very much. I'd also like very much to have

3          him come live with us and our 80-year-old

4          grandmother."

5          When he said come live with us, what you're saying

6      is you're not going to be living with your brother, you're

7      going to be living with your grandmother?

8          INMATE PARTIDA:  I'm going to be living with my

9      grandmother. My brother, he lives in Pomona. He just

10     purchased a lot there with two units, and he wants my

11     grandmother to move in with him. But she doesn't want to

12     because she wants me to parole first. Once I'm paroled,

13     then we will both be moving with my brother.

14         PRESIDING COMMISSIONER INGLEE:  Okay. I just want

15     -- because I'm trying to -- I'm trying to correlate what

16     I'm reading here in this letter and our previous discussion

17     as to where you're going to live.

18         "She has raised us and wants to watch us

19         grow. She's been by our side all our life.

20         She has a very special affection for my

21         brother and I, and there is nothing in the

22         world she wishes before -- before she leaves

23         this world to see Daniel a fine successful

24         man and man of good. Our grandmother

25         mentions all the time that Daniel and I grew

26         up very close and never been separated from

27         each other. We've had a normal childhood --

28

we had a normal childhood. Never joined or were involved in any gang or drug activities. Mostly just interested in sports activities such as baseball, basketball and football, and etcetera. We kept very busy for the most part. Daniel and I grew up with friends that were not older -- Daniel and I grew up with friends that were not older than a year or two of age. And I sincerely can say that I am very proud of them because they're all doing very good. Some -- they're all doing very good. Some graduated from major colleges and have very good jobs. I believe that this letter -- I believe that in this letter I have explained only briefly about Daniel and myself. Now I would like to take a moment to thank the people for taking time to read my expression."

And the rest of it basically is just thanking us and supporting you.

So to get this -- to be sure we understand, your uncle owns the business?

INMATE PARTIDA:   Yes, he does.

PRESIDING COMMISSIONER INGLEE:   Your brother -- what is your brother's position there?  He says he's a part owner.

29

1      INMATE PARTIDA:    Yes, he is because they purchased

2    several locations since I've been incarcerated.   And now my

3    brother's now part owner.

4          PRESIDING COMMISSIONER INGLEE:   But your uncle is

5    the majority owner, though?

6          INMATE PARTIDA:   Yes, he is.

7          PRESIDING COMMISSIONER INGLEE:    Why didn't your

8    uncle send you a letter?

9          INMATE PARTIDA:   Yes, he did.

10         ATTORNEY ZUCKER:   He's got it right here.

11         PRESIDING COMMISSIONER INGLEE:    That's -- okay.

12   May I have that letter?

13         ATTORNEY ZUCKER:   Yes.

14         PRESIDING COMMISSIONER INGLEE:    This letter was --

15   it's dated October of 2004.  Why wasn't this letter in the

16   file?  I mean, this is not -- and why I'm asking,

17   obviously, this is not a new letter.  This letter has been

18   outstanding for close to a year.

19         Is there some reason it was not in the file?

20         ATTORNEY ZUCKER:   I think the main letter came from

21   Pedro Partida who's an owner and taking an interest in his

22   brother and owns -- part owner in the car lot.  And that's

23   the one that provided the basis for the -- you know, in

24   there he mentions the job and he mentions the placement

25   plans.

26         This is, I think, cumulative.

27         PRESIDING COMMISSIONER INGLEE:    I see it's the time

30

1    difference I'm curious about.  Because we have -- I would

2    expected that this was coming in -- not in the file, it

3    would have been a recent date.

4              ATTORNEY ZUCKER:   Did you submit it?

5              PRESIDING COMMISSIONER INGLEE:   This is October of

6    last year.

7              INMATE PARTIDA:   In the Olsen review, when I did my

8    Olsen review, I gave a copy to my counselor about those

9    letters.  So they should have been in.

10             PRESIDING COMMISSIONER INGLEE:   Well, I'll read the

11   letter into the file, but let me first show the letter to

12   the representative of the District Attorney's Office.

13             Mr. Partida, you had a chance to go through your

14   central file to -- was a copy of that letter in the file?

15             INMATE PARTIDA:   I believe I gave the counselor a

16   copy that day.

17             DEPUTY COMMISSIONER McBEAN:   I'm not finding it in

18   the file yet.

19             PRESIDING COMMISSIONER INGLEE:   You have any

20   concern with this?

21             MR. DUARTE:   No.

22             PRESIDING COMMISSIONER INGLEE:   Then I'll read this

23   letter into the file.

24             "My name is Jose Escobar, owner of the

25             Brooklyn Auto Sales located at -- and it

26             shows three locations.  All three in Los

27             Angeles -- I am Daniel Partida's uncle.  I

' 31

1    have seen Daniel and Pedro grow up since I

2    first came to this country in 1973.  Daniel

3    was only one month old, and Pedro 13 months.

4    I'm very grateful to my brother, Lina

5    Partida, Daniel's father who brought us to

6    this country.  I was only 14 years old.  My

7    brother gave us a place to live and we

8    always had his support.  I used to take care

9    of his two kids when I was at home.  As the

10   year passed, I became more independent.  I

11   always loved cars and I became involved in

12   the used car business.  So I bought and sold

13   them.  The more successful I became, the

14   more independent I was, but I never forgot

15   about my family or roots.  I always carried

16   my uncle's two children with me at all

17   times.  My brother Lino used to get jealous

18   because two sons enjoyed my company.  I saw

19   Daniel grow up all his life.  He never --

20   and never saw him involved in gangs.  There

21   was a small group of kids that were from the

22   same block and they were almost all the same

23   age.  I knew all their parents and I still

24   speak to them in a frequent basis.  They

25   came around the business most of the time.

26   They have a very good relationship with me

27   and Pedro and all have excellent jobs.  I

32

1    ask myself asked Daniel what his plans for
2    the future if he became -- when he is
3    paroled.  He stated he wants to spend time
4    with his family and gain employment with the
5    Brooklyn Auto Sales as a sales
6    representative.  I told him I would love for
7    him to work with us and the family business.
8    While incarcerated, I sent some money to pay
9    for some courses that would prepare him for
10   the business of selling cars.  Throughout
11   the years I have been very close to him
12   during his incarceration.  And I speak
13   frequently with him.  I've seen him mature,
14   and I feel very sad and disappointed about
15   not doing a better job of intervention.  I
16   believe if Daniel is given a chance to live
17   in a normal population, he'll be very
18   productive.  I, myself, will make sure that
19   he remains busy in the  business because we
20   open from 8:00 a.m. to 10:00 p.m. Mondays
21   through Sunday.  He would also -- excuse me
22   -- he would also have a motivated guidance
23   because all of our people are very hard
24   earners.  I beg the people to take time to
25   review his record of incarceration and see
26   that he has been there for a long time.  I
27   think we all make mistakes and sometimes we

33

1          get caught in the wrong place at the wrong

2          time.  If we were entitled to a second

3          chance, then we should try to make good for

4          ourselves.  I thank you very much -- season

5          and God bless you all, yours truly, Jose

6          Escobar."

7          And then he has his signature notarized by a Notary

8     Public stating that in fact this is Mr. Escobar's signature

9     on the letter.

10          We'll put that into the central file.

11          All right.  Do we have another letter from Gilimo --

12     rather than mis-pronounce it, I'll just spell it.  B-a-r-a-

13     g-a-s.  He's a friend.  Very supportive.  I'm a childhood

14     of Danny Partida.  He said you were good at math, and that

15     your older brother is very successful in East Los Angeles.

16     Given the right opportunity, you are among the best --

17     right people that you that you would do well if paroled.

18          Louis Barcera, Mr. Pardita has bookkeeping knowledge

19     and communication skills.  In the future Mr. Partida wishes

20     work from me, I will -- I will have no inconvenient to hire

21     him.

22          Mr. Barcera has a professional accounting.  I called

23     and tried to verify the accounting company and I was not

24     able to get hold of anybody but that just may be they

25     weren't at home at that time.

26          This is from Oaks Realty, Diamond Bar, California.

27     This is a letter in regard to Mr. Partida.  I have known

34

1    Daniel and his family for over twenty years.  I've done
2    real estate transactions in the past years with his uncle.
3    He said if you get out and on parole that you would be in
4    good hands with the family.  And is sure that if you did
5    get out in a supportive family, you'd make a good turn-
6    around.  He's a family friend and supporter.
7           This is Vincent Sanbada in the Alhambra.  He
8    probably met you in 1989 when he had worked for Mr. Escobar
9    in the Brooklyn Auto Sales.  He says I am able to provide
10   transportation, financial aid, and also employment now that
11   I am the General Manager for a local publication, LA
12   Revista, and I can guarantee he has a job with us.
13          What would you be doing for this gentleman?
14          INMATE PARTIDA:   Desktop publishing.
15          PRESIDING COMMISSIONER INGLEE:   Desktop publishing.
16          If Daniel Partida is given a chance for parole, he
17   will be a productive member of society.  Daniel has the
18   support of many friends and family.  Thank you for your
19   time and patience.
20          This is from America Link.  Amerril-Link.  I am
21   Louis Manzo, Project Manager for Amerril-Link.  I called
22   this number.  I was unable to -- was unable to speak to
23   anybody there.  What type of business is this?
24          INMATE PARTIDA:   It's also desktop publishing.
25          PRESIDING COMMISSIONER INGLEE:   Okay.  He says he's
26   known you for 18 years.  Said he has proven to be loyal and
27   the type of character who does not give up in any

35

1    situation. Furthermore, it would be my pleasure to have
2    Daniel come and join our working crew. We need more people
3    like him who are willing to learn and be renovate
4    themselves to our society. I know he will be a great asset
5    to our company and a good citizen in our community. This
6    is why I ask that you take all consideration be -- this is
7    why I ask that you take all in consideration before drawing
8    any conclusions.

9        That's the letters we have for you, and also letters
10   from one of the police departments.

11       We'll now go to the post-conviction factors, and
12   this will be Deputy Commissioner McBean.

13       **DEPUTY COMMISSIONER McBEAN:**  Okay, Mr. Partida, in
14   this phase of the hearing we'll be looking at your
15   institutional adjustment. I've reviewed the central file,
16   the Board report, the psych evaluation. If I miss
17   anything, I'll be giving you and your attorney an
18   opportunity to add some things.

19       I see you last appeared before the Board of Prison
20   Terms on 10/7/01. Your case was postponed on 12/8/04 for a
21   new psych evaluation at your request.

22       So your last actual appearance was 10/7/01. At that
23   time you were given a three-year denial. You were asked to
24   remain disciplinary free, to reduce your custody level, to
25   upgrade vocationally and to participate in self-help and
26   therapy.

27       Your current classification score is 19. Your

36

1    custody level is medium A.  From an academic standpoint,

2    you have a TABE score of 7.9 was the most recent one I

3    could find.

4           I did find a copy of your GED from 1994 in the

5    central file that you acquired in Youth Authority; is that

6    right?

7           INMATE PARTIDA:   That is correct.

8           DEPUTY COMMISSIONER McBEAN:    Okay.  And you say

9    you went to the eleventh grade in school, and you have also

10   taken some courses on professional career development

11   through the professional career development institute since

12   May 21, '02.  Right?

13          INMATE PARTIDA:   That is correct.

14          DEPUTY COMMISSIONER McBEAN:    Okay.  From a

15   vocational standpoint, it looks like you completed the

16   vocational written graphic arts program in September '02.

17   And you've indicated that you completed a computer repair

18   course in the Youth Authority.  '93 to '95.  I'm not so

19   sure I have a copy of that.

20          Is that right?  Did you complete that in the Youth

21   Authority?

22          INMATE PARTIDA:   Yes, I did.

23          DEPUTY COMMISSIONER McBEAN:    Did you have a copy of

24   the certificate for that?

25          INMATE PARTIDA:   It was in the file also.

26          DEPUTY COMMISSIONER McBEAN:    It was in the file.

27   Okay, I'm going to take another look because I found it on

37

1    your list actually.  So I'll take another list.

2         What year did you finish that program?

3         INMATE PARTIDA:    I completed that in '95.

4         DEPUTY COMMISSIONER McBEAN:    Okay.  You were in Voc

5    Machine for a while.  Looks like you dropped that program

6    in '99 without completing it; is that correct?

7         INMATE PARTIDA:    No, I completed that.

8         DEPUTY COMMISSIONER McBEAN:    Okay.  When did you do

9    -- were you dropped and then you started it up again?

10         INMATE PARTIDA:    Yes.  I was dropped when I was in

11    Corcoran.

12         DEPUTY COMMISSIONER McBEAN:    Oh.

13         INMATE PARTIDA:    Because the close custody.

14         DEPUTY COMMISSIONER McBEAN:    Oh, I see.

15         INMATE PARTIDA:    So I was removed from the

16    program.  And then they changed the program again.  So I

17    was allowed to go back.  Then I was transferred to Donovan,

18    and I picked it up when I was at Donovan.

19         DEPUTY COMMISSIONER McBEAN:    And you finished it at

20    Donovan?

21         INMATE PARTIDA:    I completed it at Donovan.

22         DEPUTY COMMISSIONER McBEAN:    And what year was

23    that?

24         INMATE PARTIDA:    That was in '99, I believe.  Or

25    '98.

26         DEPUTY COMMISSIONER McBEAN:    Well, you were dropped

27    in '99.  So --

38

1      INMATE PARTIDA:   Then that is the year that I
2   completed it.

3      DEPUTY COMMISSIONER McBEAN:   The same year?
4      INMATE PARTIDA:   Yes, it is.

5      ATTORNEY ZUCKER:   There's a certificate for the
6   vocational machine shop.

7      DEPUTY COMMISSIONER McBEAN:   Oh, good.  Thank you.
8   Okay, very good.  5/99.  It says you completed
9   Vocational Machine Shop.  Great.  Good.  Thank you for
10  bringing that in.

11      I'm not sure that's in the file.  I'm going to look
12  again.  If it's not, it needs to get in here so you can get
13  credit for it.  But thank you for bringing it in.

14      So you've actually completed three vocs, then.
15  Computer repair, graphic arts, and voc machines.  Okay.
16  Anything else?  Any other vocational programs you've
17  completed?

18      INMATE PARTIDA:   No, that's it.

19      DEPUTY COMMISSIONER McBEAN:   Okay.  Okay, now let's
20  talk about your self-help.  You've done quite a bit of
21  self-help.  I'm pleased to see that you have participated
22  in the lifers group since -- this says October '03 to July
23  '04 you were involved in a weekly lifers group.

24      Are you still participating in that?

25      INMATE PARTIDA:   No, the group ended.

26      DEPUTY COMMISSIONER McBEAN:   Oh, it did.  Okay.
27  Also, you completed the impact program in 2002.  Passed a

39

1    peace in 2002.  You co-facilitated the self-esteem lifers
2    group in March of '05.

3         Is that a different lifers group?

4         **INMATE PARTIDA:**  No, this self esteem just started
5    in March of this year.

6         **DEPUTY COMMISSIONER McBEAN:**  This year.  Okay.  And
7    are you a co-facilitator?

8         **INMATE PARTIDA:**  Yes, I am.

9         **DEPUTY COMMISSIONER McBEAN:**  And is that through
10   the psych department?  Do you have a doctor working with
11   you, or --

12        **INMATE PARTIDA:**  Yes, it is.  She's our sponsor,
13   Dr. Brown.

14        **DEPUTY COMMISSIONER McBEAN:**  Dr. Brown, okay.

15        How did you come to be the co-facilitator?

16        **INMATE PARTIDA:**  Because I lacked self esteem when
17   I was growing up.  You know, I have an understanding of how
18   self esteem affects our behavior.  And that's something
19   that in every institution that I've been through, it hasn't
20   been available.

21        So myself, along with another inmate, we got
22   together because we wanted to give something to the rest of
23   the population and being that we're limited to the self-
24   help programs here, we decided that, you know what, a self
25   esteem would be something that a lot of us can benefit
26   from.

27        So we made a proposal to Dr. Brown about it, and she

40

1   agreed to sponsor a program and we've been pretty
2   successful.
3           DEPUTY COMMISSIONER McBEAN:   Okay, very good.  So
4   you were actually instrumental in establishing that
5   program, and finding a sponsor?
6           INMATE PARTIDA:   Yes, ma'am.
7           DEPUTY COMMISSIONER McBEAN:   Okay.  So as a co-
8   facilitator, do you help lead that group or --
9           INMATE PARTIDA:   Yes, I do.
10          DEPUTY COMMISSIONER McBEAN:   Okay.
11          INMATE PARTIDA:   Yes, I do.
12          DEPUTY COMMISSIONER McBEAN:   With Dr. Brown?
13          INMATE PARTIDA:   Yes, ma'am.
14          DEPUTY COMMISSIONER McBEAN:   And also Dr. Thomas
15  Gordon's Family Effectiveness Training, you participated in
16  that in February '05?
17          INMATE PARTIDA:   That's correct.
18          DEPUTY COMMISSIONER McBEAN:   And back in February
19  '01, you were instructor for the Inmate Peer Education
20  Program.
21          INMATE PARTIDA:   That's correct.
22          DEPUTY COMMISSIONER McBEAN:   Ckay.  I also see that
23  you -- I think these are the courses you did in connection
24  with the professional career development institute,
25  accounting and professional bookkeeping; right?
26          INMATE PARTIDA:   Yes, ma'am.
27          DEPUTY COMMISSIONER McBEAN:   Desktop publishing.

41

1       INMATE PARTIDA:    That was with vocational graphic
2   arts.

3       DEPUTY COMMISSIONER McBEAN:    Okay.  And then you've
4   done some FEMA courses.

5       INMATE PARTIDA:    Yes, I have.

6       ATTORNEY ZUCKER:    He has a transcript here from
7   that.  I don't know if that made it into the file.

8       DEPUTY COMMISSIONER McBEAN:    Oh, okay.  Are these
9   all separate classes?

10      INMATE PARTIDA:    Those were our other related
11  courses for the bookkeeping and accounting.

12      DEPUTY COMMISSIONER McBEAN:    Have you completed all
13  these?

14      INMATE PARTIDA:    Yes, I graduated in October of
15  2002.

16      DEPUTY COMMISSIONER McBEAN:    Okay.

17      ATTORNEY ZUCKER:    The percentage corresponds to the
18  grade, and the grade scale is on the bottom.

19      DEPUTY COMMISSIONER McBEAN:    So each of these was a
20  separate course of study --

21      INMATE PARTIDA:    Yes, ma'am.

22      DEPUTY COMMISSIONER McBEAN:    -- in the
23  professional career development institute?

24      INMATE PARTIDA:    Yes, it was.

25      DEPUTY COMMISSIONER McBEAN:    Very good.

26      I don't think you have that many chronos in the
27  files, though.  So it's nice that you have them made out

42

1    that way.

2              I saw some of them, but I didn't 16 of them.

3              ATTORNEY ZUCKER:    Yeah, and also the Family

4    Effectiveness Training you were referring to, here's the

5    certificate --

6              DEPUTY COMMISSIONER McBEAN:    Right.

7              ATTORNEY ZUCKER:    -- that he's completed.

8              DEPUTY COMMISSIONER McBEAN:    Okay.  And this Family

9    Effectiveness Program incorporated anger management?

10             INMATE PARTIDA:    Yes, it did.

11             DEPUTY COMMISSIONER McBEAN:    Okay.  Because I

12   hadn't seen a separate anger management program.  So did

13   any of your other courses address anger management?

14             INMATE PARTIDA:    Yes.  I've done, I believe, three

15   separate programs based on anger management and I have a

16   copy of the  -- hearing if you'd like to get a copy of

17   that.

18             DEPUTY COMMISSIONER McBEAN:    Were they in part and

19   parcel of the ones we've already mentioned, or they were

20   separate courses?

21             INMATE PARTIDA:    They were separate courses.

22             DEPUTY COMMISSIONER McBEAN:    Okay.  And what years

23   did you do that?

24             INMATE PARTIDA:    I believe this was in 2004.  Last

25   year.

26             DEPUTY COMMISSIONER McBEAN:    Was it Cage Your Rage,

27   or what was the name of the program?

43

1          ATTORNEY ZUCKER:   The chrono indicates that he

2     tried to get in Cage Your Rage but he was denied.

3          DEPUTY COMMISSIONER McBEAN:   Oh.

4          INMATE PARTIDA:   I tried to get involved in that

5     also.  This one was with the Muslim Chaplain, and there was

6     a self-help program.

7          DEPUTY COMMISSIONER McBEAN:   Okay.  So it was part

8     of a Muslim program.

9          ATTORNEY ZUCKER:   It's documented on 128b.

10         DEPUTY COMMISSIONER McBEAN:   Uh-huh.  But they

11    actually -- and they do the stress anger management?

12         INMATE PARTIDA:   Yeah.

13         ATTORNEY ZUCKER:   You know, I think it's in the

14    chrono, the Path to Peace Program.

15         DEPUTY COMMISSIONER McBEAN:   Okay.  I saw Path to

16    Peace.  Okay.

17         ATTORNEY ZUCKER:   It looks like it's sometime after

18    -- his copy doesn't have the date.  Oh, this one says

19    September '02, but that's for something else.

20         DEPUTY COMMISSIONER McBEAN:   Okay.

21         ATTORNEY ZUCKER:   April -- it would have to be

22    after September '02 if it's going in the right direction

23    here.

24         Should be on the 128b form.

25         DEPUTY COMMISSIONER McBEAN:   I see that it was

26    addressed in the impact program.

27         INMATE PARTIDA:   That's another -- that was another

44

1    separate program.

2           DEPUTY COMMISSIONER McBEAN:   Okay.  So impact and

3    Path to Peace both addressed anger management?

4           INMATE PARTIDA:   Yes, they did.

5           DEPUTY COMMISSIONER McBEAN:   Okay.  Okay.  That's

6    all I found since your last appearance.  Was there anything

7    else that I missed in terms of self-help since '01?

8           INMATE PARTIDA:   I believe that is it.

9           DEPUTY COMMISSIONER McBEAN:   Okay.  Prior to that

10   time, I noticed that you had done the 12-step program in

11   '98.  Life plan for recovery in '98 and you were a LABLOC

12   literacy tutor in '97.  Is that right?

13          INMATE PARTIDA:   Yes.

14          DEPUTY COMMISSIONER McBEAN:   What substances have

15   you used in the past?   What drugs have you used?

16          INMATE PARTIDA:   I have not used any drugs.

17          DEPUTY COMMISSIONER McBEAN:   Okay.  You haven't

18   even experimented with drugs?

19          INMATE PARTIDA:   I did on one occasion, and I never

20   did that again.  I experimented with marijuana on one .

21   occasion.  And after that, never again.

22          DEPUTY COMMISSIONER McBEAN:   Okay.  And why did you

23   take the 12-step program?

24          INMATE PARTIDA:   Because I wanted to gain insight

25   as far as how it affects people.  And everything that I've

26   done in here has been beneficial to me.  It's something

27   that I want to share when I get paroled from here.

45

1      **DEPUTY COMMISSIONER McBEAN:**   Okay.  What about

2  alcohol?  How much alcohol have you used in the past?

3        **INMATE PARTIDA:**   I drank on three occasions

4  throughout my whole life, and maybe two beers.

5      **DEPUTY COMMISSIONER McBEAN:**   So you grew up in a

6  gang-infested area surrounded by gang activity, drugs,

7  probably alcohol and crime.

8       **INMATE PARTIDA:**   Yes, ma'am.

9      **DEPUTY COMMISSIONER McBEAN:**   And you never joined a

10  gang.  You didn't use drugs.  And you didn't abuse alcohol.

11      **INMATE PARTIDA:**   No, I did not.

12      **DEPUTY COMMISSIONER McBEAN:**   How'd you do that?

13      **INMATE PARTIDA:**   Well, a lot of the time I was busy

14  when I was -- when I was at school.  When I got out of

15  school, I would go to work.  So that kept me out of the

16  streets a lot.  And the guys that I grew up with didn't --

17  my block, one corner to the other, there was maybe ten guys

18  that we were all the same age and we were always focused on

19  sports.

20      So that kept us away from other negative areas.

21      **DEPUTY COMMISSIONER McBEAN:**   Okay.  Let's look at

22  your 115's.  You have one -- one CDC 115 for possession of

23  contraband.  This is batteries and this was in the Youth

24  Authority back in 1995.

25      So you don't have any 115's since CDC.  You may be

26  commended for that.

27      You have -- you have six CDC 128's.  The most recent

46

1    one is 7/23/03 for being in possession of contraband which

2    was a compact disk player.  Is that what it was?

3              INMATE PARTIDA:   No, it was a CD.

4              DEPUTY COMMISSIONER McBEAN:   The CD itself?

5              INMATE PARTIDA:   Yes, ma'am.

6              DEPUTY COMMISSIONER McBEAN:   Okay.  Where did you

7    get that?

8              INMATE PARTIDA:   I had borrowed it.

9              DEPUTY COMMISSIONER McBEAN:   From where?

10             INMATE PARTIDA:   From one of the inmates.

11             DEPUTY COMMISSIONER McBEAN:   Are you not allowed to

12   have CD's?

13             INMATE PARTIDA:   Yes, but it was not a CD that was

14   purchased through the music industry.  It was a downloaded

15   music.

16             DEPUTY COMMISSIONER McBEAN:   I see.  Okay.  Your

17   other 115's are for things like unauthorized telephone

18   call, absent from work, your vocational class --

19             PRESIDING COMMISSIONER INGLEE:   I think you may

20   have said 115's.  I think you're saying --

21             DEPUTY COMMISSIONER McBEAN:   Oh, sorry, I meant

22   128's.  Thank you, Yes.

23             Showering and emergency alarm procedures.

24             Now, I wanted to ask you about the gang affiliation

25   because the file reflects that -- that at the time of your

26   arrest that you were a known gang member.  In looking at a

27   reception document into the Youth Authority back in 1992,

47

1    and it specifically says, from SRCC, the reception center,

2    that Daniel denied being an active member of a gang.

3    According to the law enforcement gang crash unit, the

4    defendant is an active member with either 66th Street or

5    Street Sync.

6              So that's what they thought at the time of your

7    reception.  So -- and the 8/12 shows you as a -- a member

8    of the Street Sync gang.

9              So why is it that the police would say that if you

10   didn't have any involvement in the gangs?

11             INMATE PARTIDA:   Because they got that information

12   from Jose, which was my co-defendant in this crime.

13             DEPUTY COMMISSIONER McBEAN:   Okay.  So you think

14   they based that all on your co-defendant's statement?

15             INMATE PARTIDA:   Yes, ma'am.

16             DEPUTY COMMISSIONER McBEAN:   Okay.  Let's take a

17   look at your most recent psych evaluation.  This is dated

18   11/27/04.  And it is by Dr. Melvin Macomber.

19             I notice, too, that at the time of your arrest you

20   were also arrested for a robbery; is that right?

21             INMATE PARTIDA:   That's correct, ma'am.

22             DEPUTY COMMISSIONER McBEAN:   What happened in that

23   robbery?

24             INMATE PARTIDA:   Ex-girlfriend of mine named Ruth

25   said that I had beat her up and that I had tooken a chain

26   from her.  The truth was that I did take the chain from

27   her, but I never -- I never beat her up.

48

1          And the incident happened in front of my house in

2     the presence of my grandmother.

3          **DEPUTY COMMISSIONER McBEAN:**  Uh-huh.  Did you

4     snatch the victim's necklace from her neck?

5          **INMATE PARTIDA:**  Yes, I did.

6          **DEPUTY COMMISSIONER McBEAN:**  Okay.  And then this

7     states that when she tried to retrieve the necklace, she

8     was struck several times with a closed fist and kicked by

9     Inmate Partida.

10         **INMATE PARTIDA:**  That is what she stated.

11         **DEPUTY COMMISSIONER McBEAN:**  Oh, did you do either

12    of those things?

13         **INMATE PARTIDA:**  No, I did not.

14         **DEPUTY COMMISSIONER McBEAN:**  And your psych

15    evaluation notes that the same thing I did that you were a

16    Mexican male living in an environment where there's a great

17    deal of pressure on Mexican males to join one of the prison

18    gangs.  Is unable to avoid involvement in these gangs.

19         And it says commendable.  Therefore, it's obvious,

20    his violence potential was in the controlled setting of the

21    institution is definitely below average in comparison to

22    other inmates.  Also looking at your prior history, he came

23    to that conclusion.

24         However, stated that if released to the community

25    his potential for dangerous behavior is no greater than

26    that of the average citizen in the community.

27         This is stated by the previous psychologist and I

49

1    agree with that assessment, his juvenile record as a minor.

2    He's consistently denied being involved in street gangs

3    although the opportunity was certainly available to him

4    when he was living in the community.

5         In addition, there are other factors that would

6    indicate a low potential for violence, and he's listed

7    eight different areas here indicating you do not have a

8    personality disorder that would contribute or cause

9    aggressive or violent behavior.

10        Absence of serious disciplinaries.  This says you're

11   pursuing an Associate of Arts Degree in Business; is that

12   correct?

13        INMATE PARTIDA:   That is correct, ma'am.

14        DEPUTY COMMISSIONER McBEAN:   He's completed courses

15   towards this.  He's anxious to make a positive

16   contribution.  He needed to have strong family ties and

17   support in the community.  Has several trades under

18   numerous self-help programs.  A strong work ethic.  No

19   history of alcohol or drug abuse in the community.  He

20   volunteered and wants to become involved with troubled

21   youth.  And that he has a good attitude.  He's not bitter.

22   Believes that God has a purpose in his being in prison, and

23   he is cheerfully submitting himself to that experience.

24        And, therefore, this states there were many factors

25   which were listed above that would indicate the inmate

26   Partida would make a good adjustment to the community.  The

27   prognosis for successful adjustment in society is excellent

50

1    in this case.  This is by Dr. Melvin Macomber.

2          Okay.  Was there anything else you wanted to add in

3    terms of your overall institutional adjustment or

4    accomplishments that I may have missed, Mr. Partida?

5          **INMATE PARTIDA:**  No, ma'am.

6          **DEPUTY COMMISSIONER McBEAN:**  Okay, Counsel, do you

7    want to add anything on post-conviction factors?

8          **ATTORNEY ZUCKER:**  Yes, Commissioner, I -- I just

9    have some comments I'd like to make from the reviewing the

10   file and things I'd like to point out to the Board.

11         **DEPUTY COMMISSIONER McBEAN:**  Uh-huh.

12         **ATTORNEY ZUCKER:**  First of all, I think -- I think

13   the Commissioner just reviewed the psych report in 2004,

14   and saw the same things that I wanted to highlight.  I'm

15   not going to say them again.

16         But, you know, he -- this psychologist found a very

17   low risk of harm -- and also, I thought it was interesting

18   to note that this psychologist had been a former parole

19   agent, and indicated that, you know, as a parole agent, as

20   a licensed psychologist, Mr. Partida is one who would make

21   a good adjustment on parole and he would not hesitate to

22   have on his caseload.

23         And that also in the terms of the risk assessment,

24   was also alluded to in the 2001 report.

25         And Mr. Partida's gone through 12-step programs, not

26   because of his substance  but because of the environment

27   that that has.  The very therapeutic environment.  Very

51

1    self discovery environment.

2         And there are instances of people who -- who benefit

3    greatly from those, and they're expanded into all different

4    types of addictive behavior from eating to -- to controlled

5    substances, alcohol, etcetera, and I think that's

6    commendable.  As the psychologist noted, that he did that.

7         As far as the gang association goes, you know, the

8    psychologist noted and the file certainly -- the C file

9    certainly shows that there's no evidence of that in custody

10   since his incarceration.

11        In terms of this -- what type of gang association

12   might have been out there when this  -- at and before this

13   commitment offense occurred, you know, there's something in

14   the A-12, there's something in the probation report, which

15   refers to arrest reports.

16        What I couldn't find from the file is where he was

17   in fact a validated gang member.  I mean, usually, I know

18   in the revocation context where I was looking to see is

19   there Cal gangs.  Is there something -- something clear --

20   clearly validated through a Cal gangs process or something

21   else.

22        And what I couldn't decipher from the file is who

23   was it that initially identified him as a validated gang

24   member.  Certainly no tattoos or anything else.

25        DEPUTY COMMISSIONER McBEAN:   Well, excuse me, not

26   validated in the CDC sense, just verified.

27        ATTORNEY ZUCKER:   Correct.

52

1          **DEPUTY COMMISSIONER McBEAN:**    It's a completely

2     different avenue.

3          **ATTORNEY ZUCKER:**    Okay.  I have not been able to

4     decipher what has been building on what -- what has been

5     building on what in the file.

6          Besides that, I think what's really commendable is

7     what the psychologist pointed out is his behavior in

8     custody has just been just been absolutely fabulous.  And

9     avoiding the gang life in custody which is not easy, as I

10     understand it, to do.

11          He's, you know, as Commissioner pointed out, he's

12     115-free.  I mean, there's only one 115 for possession of

13     batteries heard at YA.  Very -- right at his first

14     commitment, I think, first commitment ever.          Since

15     then he's been 115-free.  Ten years.  And the 128's, I

16     mean, I think, you know, 128's are things that are -- as

17     the Board well knows better than I do, they don't rise to

18     the level of 115's.

19          And I'm not so sure how much we should even think of

20     those in terms of infractions in that he doesn't have an

21     opportunity to challenge the 128 by the same mechanism he

22     would a 115.

23          But, again, as I saw the 128's, they're just --

24     they're minor infractions, and the psychologist also noted

25     that.

26          He's worked his points all the way down as far as he

27     can go.  As I see it.  My understanding is 19 is the lowest

53

1    he's got here.  19 or 20 now?

2              INMATE PARTIDA:   19.

3              ATTORNEY ZUCKER:   He's at 19.

4              PRESIDING COMMISSIONER INGLEE:   I think, by the

5    way, isn't 19 the lowest they can -- because he's here for

6    murder.

7              ATTORNEY ZUCKER:   Right.

8              PRESIDING COMMISSIONER INGLEE:   19 is the lowest

9    level because that dictates custody.

10             ATTORNEY ZUCKER:   Right.

11             PRESIDING COMMISSIONER INGLEE:   Obviously.

12             ATTORNEY ZUCKER:   Yeah, he's worked his -- the

13   point is he's worked as far as he can go.

14             PRESIDING COMMISSIONER INGLEE:   Well, we understand

15   that.

16             ATTORNEY ZUCKER:   Yeah, I'm just kind cf

17   highlighting all these things.

18             PRESIDING COMMISSIONER INGLEE:   Are you in your

19   summary now or are you discussing his C file?

20             ATTORNEY ZUCKER:   Just highlighting things from the

21   C file, and I'll submit -- because my summary is going to

22   be cumulative.

23             So I'm just kind of highlighting some of the things

24   that I just -- the Board's already did a lot of these

25   things.  But I just want to make sure that we're -- that

26   what I've seen is highlighted -- we want highlighted.

27             He's upgraded vocationally, I think, is exceptional.

54

1   You know, what he can do from custody.  The bookkeeping

2   courses, the GED that he received, the college courses.

3   That's bene highlighted.

4        Also want to note the, you know, all the self-help

5   classes that the -- that the Commissioner noted, I found in

6   my review of the C file, and what my client has told me,

7   and presented here today.  He's certainly been in a lot of

8   those programs.

9        I think those are all of the ones that I wanted to

10  highlight.  And I'm going to reserve -- I do want to

11  comment on the offense conduct, and I want to reserve that

12  to the end.

13       DEPUTY COMMISSIONER McBEAN:   Okay.

14       ATTORNEY ZUCKER:   That's -- that's, I think,

15  highlights what my client wanted to bring to the Board's

16  attention today.

17       DEPUTY COMMISSIONER McBEAN:   Okay, thank you for

18  your comments.  Return to the Chair.

19       PRESIDING COMMISSIONER INGLEE:   Thank you very

20  much.

21       It's probably in here, and I may have missed it, but

22  I assume you did not graduate from high school prior to

23  arriving in prison?

24       INMATE PARTIDA:   No.

25       PRESIDING COMMISSIONER INGLEE:   Had you finished

26  your GED?

27       INMATE PARTIDA:   Yes, I did.

55

1        **PRESIDING COMMISSIONER INGLEE:**   I assumed that was

2    the case.   I just didn't see that in the file.

3        **DEPUTY COMMISSIONER McBEAN:**   The CYA in '94.

4        **PRESIDING COMMISSIONER INGLEE:**   Good.

5        All right.   That's -- do you have any other

6    questions?

7        **DEPUTY COMMISSIONER McBEAN:**   No, thank you.

8        **PRESIDING COMMISSIONER INGLEE:**   I have no other

9    questions.

10       All right.   Deputy District Attorney, do you have

11   any questions for the inmate?

12       **MR. DUARTE:**   Yes, I do.   First of all, I'd like to

13   start off with this 211, the robbery that Deputy

14   Commissioner McBean mentioned where he was arrested for a

15   211.

16       And I think he admitted to taking the chain from his

17   girlfriend, but denied beating her up.   I -- since I don't

18   have anything, I don't know, was he prosecuted for this,

19   convicted, or was it a DA reject, or did the female just

20   refuse to testify?

21       Kind of a loaded question.   I think it's important.

22       **ATTORNEY ZUCKER:**   The petition was sustained on

23   that.   The 211.

24       **DEPUTY COMMISSIONER McBEAN:**   Are you -- did you

25   want to ask the inmate to --

26       **MR. DUARTE:**   Well, I'll ask him directly if it's

27   okay.

56

1          **PRESIDING COMMISSIONER INGLEE:**   Well, you're

2     addressing your questions to the -- obviously, the inmate

3     can hear it, and just reply --

4          **INMATE PARTIDA:**   She dismissed the charges.

5          **MR. DUARTE:**   Okay.  So I'm assuming what he's

6     saying is that the -- your girlfriend, the girlfriend did

7     not testify; is that correct?

8          **INMATE PARTIDA:**   The charges were dismissed.

9          **MR. DUARTE:**   My question is did she testify?

10         **INMATE PARTIDA:**   No, she did not.

11         **MR. DUARTE:**   Did you have anything to do with her

12    not testifying?

13         **INMATE PARTIDA:**   Not at all.

14         **MR. DUARTE:**   Are you sure about that?

15         **INMATE PARTIDA:**   Positive.

16         **MR. DUARTE:**   Now, but you do admit taking that

17    chain from her; is that correct?

18         **INMATE PARTIDA:**   That is correct.

19         **MR. DUARTE:**   Now, back in -- you were also arrested

20    for a vandalism charge.  I think that was in March -- March

21    21st, I forget of what year, as a juvenile.  Is that

22    correct?

23         **INMATE PARTIDA:**   That is correct.

24         **MR. DUARTE:**   Okay, what did you do there?

25         **INMATE PARTIDA:**   The window of a vent was broken.

26    And I got arrested for that.

27         **MR. DUARTE:**   And what happened with that case?

57

1        INMATE PARTIDA:  Charges were dismissed.

2        MR. DUARTE:  And what happened there?  Why?

3        INMATE PARTIDA:  I don't know.  I was just never

4  prosecuted for that.

5        MR. DUARTE:  Did you go to court on that?

6        INMATE PARTIDA:  No.

7        MR. DUARTE:  And how about the tampering of the

8  weapon, the firearm?

9        INMATE PARTIDA:  I didn't -- I never went to court

10  on that either.

11        MR. DUARTE:  What did you do there?

12        INMATE PARTIDA:  I was released to my grandmother's

13  custody.

14        MR. DUARTE:  What did you do, though?  What was

15  your involvement?

16        INMATE PARTIDA:  I had purchased a weapon.

17        MR. DUARTE:  And where did you get the weapon from?

18        INMATE PARTIDA:  I had purchased it from one of the

19  guys that I used to consume drugs from around the corner

20  from my house.

21        MR. DUARTE:  And why did you purchase the weapon

22  for?

23        INMATE PARTIDA:  Because of ignorance.

24        MR. DUARTE:  Well, what were you going to do with

25  the weapon?

26        INMATE PARTIDA:  I wasn't going to do anything with

27  the weapon.

58

1              MR. DUARTE:   How much did you purchase the weapon

2       for?

3              INMATE PARTIDA:   I believe it was -- I don't

4       remember.  Maybe seventy, eighty dollars, something like

5       that.

6              MR. DUARTE:   So what did you do with the weapon

7       once you purchased it?

8              INMATE PARTIDA:   I got arrested right after that.

9              MR. DUARTE:   And what kind of weapon was it?

10             INMATE PARTIDA:   It was a -- I believe it was a six

11      millimeter little weapon about three inches.  Three inches.

12             MR. DUARTE:   And at the time of this arrest, you

13      also had some live ammo?

14             INMATE PARTIDA:   Yes, it was loaded.

15             MR. DUARTE:   And how old were you when this

16      occurred?

17             PRESIDING COMMISSIONER INGLEE:   Was it 1990?

18             INMATE PARTIDA:   16 or 17.

19             MR. DUARTE:   Your uncle, this uncle that you're

20      going to work for, you say he's always been a positive role

21      model for you?

22             INMATE PARTIDA:   Yes, he has.

23             MR. DUARTE:   Okay.  Why didn't you listen to him

24      back when you were a juvenile?

25             ATTORNEY ZUCKER:   Objection as to what specifically

26      he wanted him to listen to.  I mean, clearly, the question

27      can be more clarified.

59

1    PRESIDING COMMISSIONER INGLEE:   I agree.

2    MR. DUARTE:   Okay.

3    PRESIDING COMMISSIONER INGLEE:   I think that was

4    unclear.

5    MR. DUARTE:   You were arrested for vandalism;

6    correct?

7    INMATE PARTIDA:   That's correct.

8    MR. DUARTE:   And did he talk to you about this

9    then?

10   INMATE PARTIDA:   He knew that I wasn't the one that

11   had broken the window.

12   MR. DUARTE:   Did he discuss it with you though?

13   INMATE PARTIDA:   Yes, we did.

14   MR. DUARTE:   Okay, did he tell you to stay out of

15   trouble then?

16   INMATE PARTIDA:   Yes, he did.

17   MR. DUARTE:   Why didn't you listen to him then?

18   INMATE PARTIDA:   -- that's --

19   MR. DUARTE:   Well, you got arrested again; right?

20   INMATE PARTIDA:   Yes, I did.

21   MR. DUARTE:   And you say you were purchasing a gun

22   on the streets from some drug user on the corner; right?

23   INMATE PARTIDA:   That is true.

24   MR. DUARTE:   So why didn't you listen to your

25   uncle?

26   INMATE PARTIDA:   Because I was being irresponsible.

27   MR. DUARTE:   And then you get arrested in this

60

1   case, and, again, you didn't listen to your uncle; correct?

2          INMATE PARTIDA:   That is correct.

3          MR. DUARTE:   How do we know that if they let you

4   out, you're going to listen to your uncle now?

5          INMATE PARTIDA:   Because of my behavior while in

6   prison that if I wanted to continue getting involved in

7   negative things, I have -- I have the choice of getting

8   involved out there in the yard.  If that is what I chose, I

9   learned from my mistake.  I know that I am the only one

10  that has to be responsible for my mistakes, and I learned

11  to exercise good judgment now.

12         MR. DUARTE:   How do we know you're not just saying

13  this because you've been locked up for this amount of time?

14         INMATE PARTIDA:   Because my record should speak for

15  itself.

16         MR. DUARTE:   What barrio did you grow up in?

17         INMATE PARTIDA:   What does that mean?

18         MR. DUARTE:   You don't know what the word barrio

19  means?

20         INMATE PARTIDA:   In South Central LA.

21         MR. DUARTE:   Did you grow up in South Central LA?

22         INMATE PARTIDA:   Yes, I did.

23         MR. DUARTE:   Where'd you grow up?

24         INMATE PARTIDA:   On 27th and Maple.

25         MR. DUARTE:   Okay.  What were the names of the

26  gangs in that area?

27         INMATE PARTIDA:   Clanton, Primera Flats, The Ghetto

61

1    Boys.

2         MR. DUARTE:    Do you know what those words signify?

3         INMATE PARTIDA:    What is that?

4         MR. DUARTE:    Do you know what those words mean?

5         INMATE PARTIDA:    What words?

6         MR. DUARTE:    You just named three different -- you

7    said three different words.    What do they mean?    What's

8    Primero Flats mean?

9         ATTORNEY ZUCKER:    If you know.

10         INMATE PARTIDA:    It's a gang.

11         MR. DUARTE:    Okay, and what's the other one?

12         INMATE PARTIDA:    It's also a gang.

13         MR. DUARTE:    What's the name of the -- name that

14    one again?

15         INMATE PARTIDA:    Clanton.

16         MR. DUARTE:    Clanton.

17         INMATE PARTIDA:    Yes.

18         MR. DUARTE:    That's the name of a gang?

19         INMATE PARTIDA:    Yes, it is.

20         MR. DUARTE:    And what's the third one?

21         INMATE PARTIDA:    Ghetto Boys.

22         MR. DUARTE:    And what does that mean?

23         INMATE PARTIDA:    That's also a gang.

24         MR. DUARTE:    Your partner that was arrested, I

25    think you said Jose.

26         INMATE PARTIDA:    Yes, sir.

27         MR. DUARTE:    What gang was he a member of?

62

1          INMATE PARTIDA:    He was from Street Sync.

2          MR. DUARTE:    Street Syncs?

3          INMATE PARTIDA:    Yes, sir.

4          MR. DUARTE:    And where do they hang out?

5          INMATE PARTIDA:    They hang out further down from

6      where I live.

7          MR. DUARTE:    How much further down?

8          INMATE PARTIDA:    Maybe ten blocks, ten-twelve

9      blocks.

10         MR. DUARTE:    So you're saying that in your whole

11     life, you've never heard the word barrio?

12         ATTORNEY ZUCKER:    He didn't say that.

13         MR. DUARTE:    Well, I'm asking him.

14         INMATE PARTIDA:    The barrio means neighborhood.

15     The neighborhood that I grew up in, which is South Central

16     LA.

17         MR. DUARTE:    My question is have you ever heard

18     that word barrio?

19         INMATE PARTIDA:    Yes, I have.

20         MR. DUARTE:    Now, have you ever heard this word --

21     is there a street -- a gang 66th Street?

22         INMATE PARTIDA:    No, I have not.  I believe that is

23     a CRIPS gang or something.  I don't know.

24         MR. DUARTE:    Now, your partner here, Jose, you're

25     saying he snitched you off and said you're a gang member?

26         INMATE PARTIDA:    That is what I believe.

27         MR. DUARTE:    Now, you -- what high school did you

63

1    go to?

2              INMATE PARTIDA:   I went to Jefferson High School.

3         MR. DUARTE:   And you dropped out in what year?

4              INMATE PARTIDA:   I believe it was '89.

5         MR. DUARTE:   At what grade -- I'm sorry, what

6    grade?

7              INMATE PARTIDA:   In tenth grade.

8         MR. DUARTE:   And why did you drop out?

9              INMATE PARTIDA:   Because I began working full time.

10        MR. DUARTE:   And you never went back?

11             INMATE PARTIDA:   I did go back.

12        MR. DUARTE:   When did you go back?

13             INMATE PARTIDA:   I went back for the eleventh

14   grade.

15        MR. DUARTE:   Now, you're saying that the night of

16   this offense or the day of this offense, you were just

17   driving down the street and you picked up these two guys?

18   Is that what you're telling us?

19             INMATE PARTIDA:   That is correct.

20        MR. DUARTE:   And when you picked up these two

21   individuals, you picked up -- one of them was Jose;

22   correct?

23             INMATE PARTIDA:   That is correct.

24        MR. DUARTE:   And you knew Jose was a gang member?

25             INMATE PARTIDA:   Yes, I did.

26        MR. DUARTE:   And how about this other individual?

27   Did you know he was a gang member?

64

1          INMATE PARTIDA:  I believe so, Yes.

2          MR. DUARTE:   And you know gang members always carry

3     guns; right?

4          INMATE PARTIDA:  Not all the time.

5          MR. DUARTE:  How do you know that?

6          INMATE PARTIDA:  I would have assume.

7          MR. DUARTE:  Why would you assume?

8          INMATE PARTIDA:  Because I went to school with

9     several of them, and they didn't always carry guns with

10    them.

11         MR. DUARTE:  Okay.  On the other hand, would you

12    see them with guns on any occasions?

13         INMATE PARTIDA:  No, sir.

14         MR. DUARTE:  Have you ever seen any of these gang

15    members with guns in the past?

16         INMATE PARTIDA:  Not -- not personally.

17         MR. DUARTE:  Have you ever at any time seen any of

18    these -- of your gang member buddies with a gun?

19         INMATE PARTIDA:  I don't know what you mean by your

20    gang member buddy.  The friends that I grew up with, were -

21    - never carried any weapons with them.

22         MR. DUARTE:  How about Jose?  Did you ever see him

23    with a gun?

24         INMATE PARTIDA:  No, sir.

25         MR. DUARTE:  How about this other guy that got in

26    your car, did you ever see him with a gun?

27         INMATE PARTIDA:  I never seen that guy before.

65

1          MR. DUARTE:   Have you ever seen anybody with a gun?

2          INMATE PARTIDA:   I'm sure.  I'm sure I might --

3    must have.

4          MR. DUARTE:   Well, you know what a gang member is;

5    right?

6          INMATE PARTIDA:   Yes, I do.

7          MR. DUARTE:   Have you ever seen a gang member with

8    a gun?

9          INMATE PARTIDA:   I don't socialize with gang

10   members besides my association with Jose.

11         MR. DUARTE:   Okay.  My question is have you ever

12   seen a gang member with a gun?

13         INMATE PARTIDA:   No, sir.

14         MR. DUARTE:   How often would you hang around with

15   this Jose guy?

16         INMATE PARTIDA:   We became pretty good friends.

17         MR. DUARTE:   How good?

18         INMATE PARTIDA:   Oh, I had a relationship with his

19   sister.  Every time I was there, he was there.  And the guy

20   had a sense of humor and I took a liking to him.

21         MR. DUARTE:   Okay.  Would you go out with him?

22         INMATE PARTIDA:   Yes, I would.

23         MR. DUARTE:   Where would you go?

24         INMATE PARTIDA:   We would go to the mall.  We would

25   go to the movies with his sister.  And just to have fun.

26         MR. DUARTE:   Jose would -- would Jose get into

27   trouble?

66

1   INMATE PARTIDA:   No, not while he was with me.

2   MR. DUARTE:   But he'd get in trouble without you?

3   INMATE PARTIDA:   Not that I -- not that I knew of.

4   MR. DUARTE:   So this night that you picked -- or

5   this day that you picked these two individuals up, just

6   walking on the street; correct?

7   INMATE PARTIDA:   That is correct.

8   MR. DUARTE:   They flagged you down?  Did you stop

9   for them?  What'd you do?

10   INMATE PARTIDA:   I stopped because I saw Jose

11   there.

12   MR. DUARTE:   And what all did they say to you?

13   INMATE PARTIDA:   I asked him where he was going,

14   and he said he was going to his grandmother's house, which

15   is the same place where I was going.  So I told him, come

16   on, get in.

17   And he went and talked to his friend and he came

18   back and asked me if we could give his friend a ride.  And

19   I agreed to that.

20   MR. DUARTE:   Did he tell you who his friend was?

21   INMATE PARTIDA:   I -- I don't recall.

22   MR. DUARTE:   Do you know his name?

23   INMATE PARTIDA:   No, I don't.

24   MR. DUARTE:   So --

25   PRESIDING COMMISSIONER INGLEE:   Probably your

26   questioning may be getting a little repetitive.

27   MR. DUARTE:   Now, when you -- when you stopped in

67

1    front of this apartment, did you know Jose had a gun?

2        INMATE PARTIDA:    Jose did not have a gun.

3        MR. DUARTE:    Who had a gun?

4        INMATE PARTIDA:    His companion that was with him

5    that night.

6        MR. DUARTE:    Now, why'd you stop in front of this

7    apartment?

8        INMATE PARTIDA:    Because I thought that the guy

9    lived there.

10        MR. DUARTE:    Did he tell you to stop?

11        INMATE PARTIDA:    Yes, he did.

12        MR. DUARTE:    When did you first see the gun?

13        INMATE PARTIDA:    After the shots had been fired.

14        MR. DUARTE:    How many shots were fired?

15        INMATE PARTIDA:    I believe three shots were fired.

16        MR. DUARTE:    Now, prior to the shots being fired,

17    did you say anything?

18        INMATE PARTIDA:    No, I did not.

19        MR. DUARTE:    Did Jose say anything?

20        INMATE PARTIDA:    No, he did not.  We were listening

21    to music.

22        MR. DUARTE:    Did this other third person say

23    anything prior to the shots being fired?

24        INMATE PARTIDA:    No, he did not.

25        MR. DUARTE:    How about after the shots were fired,

26    did any one of you three say anything?

27        INMATE PARTIDA:    No, nobody -- nobody said anything

68

1    after that.

2         MR. DUARTE:   Did the person get back in the car

3    after the shots were fired?

4         INMATE PARTIDA:   He never got out of the car.

5         MR. DUARTE:   Did he say anything after he shot?

6         INMATE PARTIDA:   No, he did not.

7         MR. DUARTE:   So he remained silent the rest of the

8    evening?

9         INMATE PARTIDA:   He might have said something.  I

10   don't recall exactly whether he did or if he didn't.  I was

11   too nervous to pay attention.

12        MR. DUARTE:   Now, did you plead guilty or were you

13   convicted?

14        INMATE PARTIDA:   I was convicted.

15        MR. DUARTE:   By a jury of twelve people; correct?

16        INMATE PARTIDA:   By a jury of twelve people.

17        MR. DUARTE:   So, basically, what you're saying is

18   you're innocent of this murder trial?

19        ATTORNEY ZUCKER:   Objection -- you're putting words

20   in his mouth, objection.

21        MR. DUARTE:   Well, are you saying that,

22   Mr. Partida?

23        ATTORNEY ZUCKER:   You know, I have to object

24   because, you know, he's convicted of second degree murder.

25   There's all kinds of theories of liability that we don't

26   have in the file as to -- I mean, he admits to being in the

27   car, and he admits to fleeting the scene.  He admits that

69

1   there were shots fired.  He admits that there was someone

2   killed.

3          Is it the felony murder rule that the jury went on.

4   There's conflicting evidence in the file.  Even the

5   appellate court in the footnote indicates that the -- one

6   of the persons recanted in terms of naming my guy the

7   shooter.  The probation report talks about -- about a

8   passenger, one of the passengers shooting.

9          So in terms -- I don't think he's ever said, you

10  know, on his own that he's innocent here.  He's admitting

11  responsibility.

12         So I object to the characterization of that

13  question.

14         **PRESIDING COMMISSIONER INGLEE:**   Well, I -- we're

15  getting very close to re-trying this case.  And this is an

16  administrative hearing for parole.  I want to hear all the

17  -- I want to hear any reasonable questions that the

18  District Attorney has, and certainly, I don't -- not

19  concerned about your -- I am very concerned, obviously,

20  about -- you object.

21         I think we need to start bringing this back into the

22  administrative aspect of this, and not get off and try to

23  re-try this issue on both sides.

24         I mean, let's see if we can finish.

25         **MR. DUARTE:**   Well, yeah, but the point is it's

26  whether he's telling the truth or lying, and a person being

27  present at the scene of a murder is not guilty of a murder.

70

1    And Counsel well knows that.

2          And a person -- the driver of a car who just drives

3    up, and doesn't know anything, doesn't see a gun, doesn't

4    know anything about anyone is shooting, is not guilty of

5    murder.   That is the law in the State of California.

6    Everybody knows that.

7          And so I think it's a legitimate question to ask

8    him, I'm at the end here, it's an absolutely legitimate

9    question.   I mean, we got -- whether he lies to you or

10   tells the truth I think is something important in this

11   administrative hearing.

12         **ATTORNEY ZUCKER:**   The jury acquitted on the gun

13   count.

14         **PRESIDING COMMISSIONER INGLEE:**   I asked a question

15   early on in my discussion.   I asked him very directly were

16   you guilty, and he gave me an answer, if you recall, you

17   recall his answer at that time.   And he indicated to me at

18   the time that it was -- it was bad judgment on his part to

19   be participating with gang members.   That was his answer to

20   me.

21         And I'm trying to recap our earlier discussion, and

22   that I asked him at that time, are you guilty, and he said,

23   I'm guilty of bad judgment.

24         And I'm not trying -- that is not -- that is not a

25   word for word, obviously, but I'm trying to get back into

26   the context of our earlier discussion.

27         **MR. DUARTE:**   He said I'm innocent of murder.   That

71

1      was his comment.

2              ATTORNEY ZUCKER:    I think from his perspective.

3      Not necessarily a legal perspective.  And I think we can --

4              MR. DUARTE:    Well --

5              ATTORNEY ZUCKER:    -- we can emphasize that -- and

6      this is what I wanted to address, that he was present,

7      someone was killed, he was the driver of the car, he left

8      the scene.

9              And the facts are somewhat in his own -- in his file

10     as to who actually was the trigger man.  The truth of his

11     knowledge, you know, I just don't think that he needs to

12     address that any further.

13             MR. DUARTE:    See I view this differently.  I view -

14     - we got -- we have the inmate lying and Counsel just come

15     in to try to save him based on some tough questions that

16     are being asked of him.  I think they're totally

17     appropriate questions.

18             PRESIDING COMMISSIONER INGLEE:    Have you finished

19     your questions?

20             MR. DUARTE:    Well, I have a couple more.

21             PRESIDING COMMISSIONER INGLEE:    Go ahead.

22             MR. DUARTE:    Okay.  You said you were innocent of

23     murder; correct?

24             ATTORNEY ZUCKER:    I instruct my client not to

25     answer that.

26             MR. DUARTE:    Well, this is his statement.  This is

27     exactly what he said.  Did you not tell the Commissioner

72

1    when he asked you the question, you said that you were

2    innocent of murder?

3            INMATE PARTIDA:    That is correct.

4        MR. DUARTE:    You want to tell us how in the world

5    you're innocent of murder?

6        ATTORNEY ZUCKER:    Objection, it's -- this is re-

7    trying the case.    The Commissioner pointed out that I think

8    he's made his point.

9        MR. DUARTE:    His response.

10       ATTORNEY ZUCKER:    -- exactly what he stipulates to.

11       MR. DUARTE:    I mean, you want him to -- you want

12   him to make whatever statements he wants to make, and then

13   you don't want him to have to answer why he made the

14   statement.

15       PRESIDING COMMISSIONER INGLEE:    Both of you

16   gentlemen will have an opportunity to make a summary.  Now,

17   are we getting close to that summary occurring now, or are

18   we still questioning?

19       ATTORNEY ZUCKER:    I'm going to advise my client not

20   to answer any further.

21       MR. DUARTE:    Well, if he's going to be --

22       ATTORNEY ZUCKER:    On advice of Counsel.

23       MR. DUARTE:    I mean, he wants him to say what he

24   wants to say, but he doesn't want to have him respond to

25   any of his responses to the Board.

26       ATTORNEY ZUCKER:    Normally, the questions come

27   through the Board into my client.    This is the first time

73

1    I've had the DA actually cross-examine my client.

2         MR. DUARTE:   Well, I think the Board is just trying

3    to speed things up here.  If I could get an answer, I

4    could, you know, I'd probably be done.

5         PRESIDING COMMISSIONER INGLEE:   I believe that your

6    -- the Counsel has told his client not to answer.   MR.

7    DUARTE:   That's fine.

8         PRESIDING COMMISSIONER INGLEE:   Correct?

9         MR. DUARTE:   Is he going to not answer?

10        ATTORNEY ZUCKER:   Yes.

11        MR. DUARTE:   Well, let's see what he wants to do.

12   It's up to him.

13        PRESIDING COMMISSIONER INGLEE:   Do you wish to

14   answer?

15        INMATE PARTIDA:   I will take my Counsel's advice.

16        PRESIDING COMMISSIONER INGLEE:   He's not going to

17   answer.

18        MR. DUARTE:   That's fine.

19        DEPUTY COMMISSIONER McBEAN:   No further questions?

20        MR. DUARTE:   No.

21        PRESIDING COMMISSIONER INGLEE:   All right.

22   Counselor, do you have any questions of your client?

23        ATTORNEY ZUCKER:   Nothing further.

24        PRESIDING COMMISSIONER INGLEE:   All right,

25   Mr. Duarte, do you have a closing statement?

26        MR. DUARTE:   Yes.

27        It's always easy for an inmate to say things that

74

1    are going to be helpful that would be taken in

2    consideration to determine whether he's suitable or not

3    when he can just say what he wants to say.

4         When you pose the tougher questions and you look at

5    the demeanor of the person and how they respond to certain

6    questions, I think that's an important factor for the Board

7    to take into consideration as to whether this inmate is

8    suitable for parole or not.

9         And just the simple questions in asking about --

10   inquiring about the -- his juvenile record, I think showed

11   the other side of this particular inmate and shows a side

12   of him that you had not seen in this hearing previous to

13   the questions as they got a little tougher.

14        And, specifically, when I started to ask him

15   questions about the gun that he bought on the corner, and

16   when he purchased this particular weapon for, you know, he

17   couldn't answer the question.

18        We know what he purchased this gun for.  He denies

19   being a gang member.  Denies knowing certain terminology.

20   That all gang members know.  Tried to deny there being

21   gangs in the area until it came out.

22        The bit about the uncle as a role model.  He's

23   always said he's never had a role model.  It seems, you

24   know, you -- I gave a lot of credit to this uncle here.

25   He's always trying to help this individual out. And there's

26   no doubt in my mind that he would have a job waiting for

27   him.

75

1       But the problem is is you got an inmate here that

2    has had problems throughout his life, and when he had that

3    role model there, he had somebody there to help him out.

4    He didn't want to take advantage of it.     And that's why

5    he's in the situation he's in.   In the situation he's in,

6    he's put himself here.   And he's doing better because of

7    the fact that he's locked up.   But it's our position that

8    if you let this -- give him a parole date and let him out,

9    that he's just going to fall right back into the trap that

10   he was in before.

11       And I think that for a -- to believe everything else

12   that he's telling you that he's going to abide by any

13   condition that the Board or the Parole Board would place on

14   him, you have to view him as a credible person.

15       And I believe the story that he told here to the

16   board as to how this happened, unfortunately, I don't have

17   a file here.

18       But I can just -- you can just read between -- I

19   mean, you can just read circumstantially as to how he says

20   this thing happened is just a ridiculous story for him to

21   come up with this story as to how this happened and then

22   claim that he's innocent of murder.

23       And the only thing he's guilty of he knew that they

24   were up to no good, he's sorry.   He's remorseful.   He knows

25   he played a part in it just because he was the driver, but

26   he's innocent of murder.

27       And I think he lied to you, and if he lied to you

76

1    about the things that he told you about the circumstances

2    of the crime, he's lied to you about how he was going to

3    perform when he gets out.

4            And he is unsuitable.  That is our position.

5            PRESIDING COMMISSIONER INGLEE:    Very well.  All

6    right, Counsel, do you have your closing statement?

7            ATTORNEY ZUCKER:    Yeah, I, you know, Commissioner,

8    it's always -- I think it's harder in a situation where a

9    case goes to trial and on appeal and continues, you know,

10   on some habeas and we have a stipulated Statement of Facts

11   in the plea agreement.

12           And I think with a couple of things that, as I

13   pointed out earlier, you know, just addressing briefly the

14   offense conduct, you know, you have probation reports

15   conflicting as to who the shooter was.

16           And that's really all my client is saying.  He's not

17   the shooter.  And -- but he's -- and also I think what's

18   particularly interesting about this case is that you have

19   him -- he's driving his uncle's car with a license plate

20   number when this occurred.

21           And it just doesn't make a lot of sense to me why

22   someone would commit -- would knowingly commit a crime or

23   at least intend to do that when they're on their way to a

24   crime scene when they have their uncle's car.  They're

25   driving their uncle's car.  It's so easily traceable.  And

26   that's what coming through here.

27           I think -- I think the offense conduct is in

77

1    dispute, and I think -- you know, my client is being as

2    forward as possible without, you know, without telling

3    incorrect information.  I think this innocent of murder

4    thing is being taken out of context and it's putting words

5    in his mouth.

6         But, more importantly, my client does not deny being

7    there.  Doesn't deny what occurred.  And growing up in gang

8    infested areas, you're not, you know, your passengers are

9    going to be from a neighborhood where there's other gang

10   activity going on.

11        I think, more importantly, the question is risk and

12   suitability.  And that's really, I think, the focus on it.

13   Because, you know, he's -- he's close to doubling his age

14   when this occurred.  When he was a juvenile.

15        I think what was particularly compelling are not

16   just the 2001 psych report, but the 2004 psych reports that

17   his -- basically, the 2004 psych report has come back with

18   very, very, very low risk.

19        Programmed very well.  And has remained essentially

20   disciplinary free since coming to CDC -- since coming to

21   the adult facility from the Youth Authority.

22        He continues to upgrade.  He's worked his points all

23   the way down.  He's been a leader in the self-help and

24   therapeutic process he's -- that has been available to him.

25   He's even tried to get into programs that he wasn't

26   eligible for because he does not have mental health

27   concerns.

78

1          I'm not going to -- I've already sort of recapped

2     earlier more of what my summation was based on the things

3     that I wanted to highlight from the report.

4          You know, I think, more importantly, you know, he

5     can't get past what happened back in -- what brought him

6     here.  And I -- and, but, nevertheless, his programming,

7     his lack of gang association, his lack of substance abuse,

8     his assessed low risk of harm, his remaining disciplinary

9     free, his participation in self-help, everything that he's

10    done since then, I think, goes to his well suitability for

11    parole.  His low risk to the community.

12         And I'd ask the Board to consider a date, or, in the

13    alternative, a one-year return.

14         **PRESIDING COMMISSIONER INGLEE:**   Thank you very

15    much.

16         Mr. Partida, you now have an opportunity to let us

17    know why you would be suitable for parole.  You can either

18    go on your attorney's statement or you can make your own

19    statement.

20         **INMATE PARTIDA:**   I would like to make my own

21    statement.  I have my parole plans here.  It states -- the

22    documentation herein is written to clarify the parole plans

23    of myself, Daniel Partida, to  -- on the granting of

24    parole.  Its content consists of a two-section format,

25    immediate and intermediate parole plans for successful re-

26    entry into society.

27         Each section identifies specific goals to be

79

1    achieved, key objectives necessary for their achievement,

2    and time estimates regarding the completion of each goal.

3         Family support and community resources.  As far as

4    housing, I was arrested in the Southern California.  I have

5    made arrangements to re-establish residence in Los Angeles

6    County.  My grandmother of eighty years old has medical

7    conditions, and I would be honored to assist in helping to

8    care for her as well as supervise greater companionship.

9         Her address -- her name is Molesta Salas.  Her

10   address is 424 East 27th Street, Los Angeles, California,

11   90011.  And her phone number is area code 213-747-8461.

12        PRESIDING COMMISSIONER INGLEE:   Let me ask you a

13   question.

14        INMATE PARTIDA:   Yes.

15        PRESIDING COMMISSIONER INGLEE:   The same -- I want

16   you to continue, but I want to be sure that you're not

17   giving me any new information I don't have  -- already have

18   on file.

19        INMATE PARTIDA:   I believe that there was some

20   information that might have been missed.

21        PRESIDING COMMISSIONER INGLEE:   I'm talking about

22   telephone numbers and addresses.

23        INMATE PARTIDA:   No, sir.

24        PRESIDING COMMISSIONER INGLEE:   These are all the

25   same?

26        INMATE PARTIDA:   Yes, sir.

27        PRESIDING COMMISSIONER INGLEE:   Because when we go

80

1     in to review this, I want to be sure that if I can look
2     into this file, at the same time and yet the same
3     information you're giving me, as I have a rather extensive
4     -- again, this is not to tell you to stop.  I just want to
5     be sure that the information I had is essentially the same
6     information you're giving me right now.
7                 INMATE PARTIDA:   Yes, it is.
8                 PRESIDING COMMISSIONER INGLEE:    All right.  Go
9     ahead.
10                INMATE PARTIDA:   It says my brother, Pedro Partida
11    has also offered alternative housing to me.  Mr. Partida
12    has been a resident of California for over thirty years,
13    and his address is 453 Warrant Place in Pomona, California.
14    Zip code 91768.
15          Employment goals and opportunities.  Currently, I
16    have four standing offers of employment, including a
17    promissory note of agreement for job placement in the
18    Brooklyn Auto Sales from Mr. Jose Escobar, owner and Mr.
19    Pedro Partida, part owner.
20          -- Becerra is offering me the opportunity to work
21    for him in the field of bookkeeping.  Mr. Vicente Zambada,
22    General Manager for a local publication, LA Revista, is
23    also offering me the opportunity of employment in desktop
24    publishing.  Mr. Luis Marzo, project manager, has also
25    offered employment in the Amerill-Link.
26          And community -- community resources -- community
27    service.  The only way to truly make amends with society

May 08 2006 9:40AM   HP LASERJET FAX                                          P.12

81

1    for my wrongdoing is to donate a percentage of my leisure
2    time to share my personal experience and skills with the
3    youth in the community.  I have very much to offer from
4    being a mentor to teaching about crime prevention.
5          Being a peer educator and may share my first-hand
6    experience with gangs in their attempt to break the cycle
7    of senseless violence and the loss of young lives.
8          I will be persistent and not sway in leading by
9    example to instill a firm set of moral convictions and
10   standards for living in our society.  To achieve this end,
11   I will seek out community resources and offer my services
12   on a voluntary basis.
13         I am sure that the parole department in my community
14   would be of tremendous help regarding the issues of
15   referrals to the appropriate venues that might be receptive
16   to utilizing my experience and skills in the manner for the
17   benefit of our youth.
18         Also, I want to take the time to apologize to this
19   panel, to society, and most importantly, to Gabriel's
20   family.  I'm sorry for what I've done, and nothing that I
21   can ever say or do, it's going to heal the pain that I've
22   caused.  I understand that.  And I accept my
23   responsibilities for that.
24         I also ask that the panel consider the factors of my
25   commitment offense.  I've been accused of lying.  There is
26   no reason for me to lie.  I've spent 14 years of my life
27   here.  Who do I have to lie for?

82

1          It's been very difficult for me.  It hasn't been

2     easy, and you know what, I accept my responsibilities.

3          I accept that.  I know that I used poor judgment.

4     And I had a choice that night, and I chose wrong.

5          But that also has been a learning experience for me,

6     and a very valuable lesson.  That has given me the insight

7     to learn about myself, to know that I am responsible for my

8     own actions and I'm utilizing that knowledge now, which is

9     the reason why I have remained disciplinary free.

10          What I don't get involved in negative behavior here

11     in prison.  And it's not easy.  It's difficult because I'm

12     living in a hostile environment.

13          So that, in itself, should demonstrate that I'm

14     making the right decisions.  That, you know what, I know

15     that what I did was wrong.  I understand that.  Where --

16     where does it --

17          **PRESIDING COMMISSIONER INGLEE:**  Take your time.  I

18     want him to have the opportunity to say what he wants to

19     say.

20          **INMATE PARTIDA:**  No, it's -- there's nothing that I

21     can ever do or say to replace Gabriel's life.  There's

22     nothing that I can do about that.

23          What I have done is I've grown within myself.  I've

24     gotten involved in all of the self-help programs that have

25     been available to me, and I have benefitted from all of

26     them.

27          The only thing that I feel that I can do is use my

83

1    personal experiences to share with the youth out there

2    because of what happened to me could happen to anybody.

3         PRESIDING COMMISSIONER INGLEE:   You may be

4    repeating yourself now.

5         INMATE PARTIDA:   And I just want to say that I'm

6    sorry.   That's --

7         PRESIDING COMMISSIONER INGLEE:   Thank you very

8    much.

9         This finishes your comments and we'll now recess for

10   deliberation.

11                     R E C E S S

12                      --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

84

1

2        CALIFORNIA BOARD OF PAROLE HEARINGS

3               D E C I S I O N

4        PRESIDING COMMISSIONER INGLEE:    The time is now

5    11:36 in the matter of Daniel Partida, CDC Number H-48181.

6    The panel reviewed all the information received from the

7    public and relied upon the following circumstances in

8    concluding the prisoner is not suitable for parole and

9    would still pose an unreasonable risk of danger to society

10   or a threat to public safety if released from prison.

11          The offense in this regard -- the offense was

12   carried out in a callous manner.  The motive for the crime

13   was inexplicable truly in relation to the offense.

14          These conclusions were drawn from the Statement of

15   Fact wherein the prisoner was the driver in a drive-by

16   shooting of a victim, Gabriel Sotelo, S-o-t-e-l-o.  The

17   victim was shot with a 9 millimeter handgun, Uzi-type

18   handgun.  The victim was struck with a single bullet to the

19   back of the head and fell to the pavement.

20          The prisoner, in fact, was the driver in the case of

21   this committed crime.

22          The prisoner has a pattern of escalated pattern of

23   criminal conduct in his youth.  Criminal conduct, at first

24   he was arrested for vandalism as well as

25   tampering with ID markers on a firearm, as well as

26   admitted possession of live ammunition and a pistol he

27   DANIEL PARTIDA    H-48181    DECISION PAGE 1    6/14/05

85

1   purchased on the street, and as well as initial arrest for

2   robbery.

3       The prisoner has had six 128 counseling chronos, the

4   last being on 1/30 of 1999 for leaving class without

5   authority.  He's had no 115's in the CDC.  However, he has

6   one 115 in the CYA in 7/6 of '95 for the possession of

7   contraband.

8       Psychiatric or psychological report dated 11/27 of

9   '04 by Melvin Macomber, Ph.D., was supportive.  In that the

10  doctor states there is no indication of any mental or

11  emotional problems in this case that would interfere with

12  granting of parole date.  There are many factors which are

13  listed above that would indicate that Inmate Partida would

14  make a good adjustment to the community.  The prognosis for

15  successful adjustment in society is excellent in this case.

16      Inmate Partida has adequate parole plans and strong

17  family support.  The hearing panel notes the response of

18  the 3042 notices indicate opposition to the granting of

19  parole suitability specifically at the Los Angeles Police

20  Department was the law enforcement agency who investigated

21  the case.  And also there was a representative from the

22  District Attorney's Office County who spoke in opposition

23  to his parole.

24      Other information bearing upon the suitability, the

25  inmate admits driving during the crime, but denies

26  involvement in the actual murder of the victim.  And his

27  DANIEL PARTIDA   H-48181   DECISION PAGE 2   6/14/05

86

1    participation -- and, in addition, his participation in

2    of LA local crimes which is however documented in the file.

3         We also have taken confidential information into

4    consideration in making our decision.

5         Nevertheless, the prisoner should be commended for

6    acquiring his GED, completing a course in professional

7    career development in the area of accounting, participation

8    in lifer groups, impact programs, Path to Peace, Family

9    Effectiveness Training,  -- for Self Esteem Lifers Group,

10   instructor for an inmate peer educational program, twelve-

11   step program, LAUBACH, L-A-U-B-A-C-H, Literacy Tutor, and

12   completed three vocational trade courses.

13        We are granting a two-year denial as the offense was

14   carried out in a manner which demonstrates an exceptional

15   callous disregard for human suffering.  The motive of the

16   crime was inexplicable or trivial in relation to the

17   offense.

18        Also, the prisoner has an unstable history with

19   others prior to his crime which has brought him to the --

20   position in prison.

21        The panel recommends the prisoner remain

22   disciplinary free.  If available, participate in self-help

23   programs.  Most of the other programs he has already

24   accomplished.  Has done an excellent job in getting ready

25   for eventual parole.

26        Mr. Partida, your -- no one can fault anything

27   **DANIEL PARTIDA    H-48181    DECISION PAGE 3    6/14/05**

May 08 2006 9:38AM    HP LASERJET FAX

87

1    you've done for preparing for your eventual      parole --

2    you'll put yourself in a position where eventually getting

3    out and becoming a worthwhile citizen and add to society.

4         I personally think you have to take a very hard look

5    at inside of our concern over your potential gang

6    involvement and possibly the concern of others in the

7    future.  I think you have to think about that.

8         Your family support is undeniable.  I think it's

9    meritorious what they -- your family has done and the fact

10   that you have an opportunity to eventually go and work into

11   the family business.

12        But I think you have a little more time to give some

13   consideration, and, therefore, we are -- we're giving you a

14   two-year denial on this.

15        Do you have any --

16        **DEPUTY COMMISSIONER McBEAN:**  Yeah.  Thank you.

17        Mr. Partida, we know you're disappointed today, but

18   we really took into consideration a lot of the good things

19   that you've done, and you have come

20   - you had a three-year denial last time.  This time we gave

21   you a two-year denial.

22        That tells you that you're going in the right

23   direction.

24        We are pleased with how much you have done.  You've

25   gotten very active since your last appearance in self-help,

26   and that is exactly what we want you to continue to do.

27   **DANIEL PARTIDA    H-48181    DECISION PAGE 4    6/14/05**

88

1    It's very important for you to continue doing all the
2    away -positive things that you have been doing.  Staying
3    disciplinary free.

4         You've got three vocs now.  That's, you know, we
5    can't ask you to do more than that.  You've upgraded
6    education as much as you're required to.  And, of course,
7    you stay working towards your AA, and that's great.  The
8    more you can get, the better off it will be for you.

9         Keep up the good work in terms of your self-help.
10   That should help you with insight.  That should help us
11   understand the extent to which you've been able to come to
12   terms of your crime.

13        So even though we know you're going to be
14   disappointed today, I want to leave you -- we want to leave
15   you with a positive -- on a positive note to just really
16   keep up that good work and don't let yourself slide back.

17        And I want to wish you good luck.  Okay?

18        **PRESIDING COMMISSIONER INGLEE:**   Also, this
19   concludes the hearing.  The time is 11:44 a.m.

                    --o0o--

20
21
22
23   **PAROLE DENIED TWO YEARS**
24   **THIS DECISION WILL BE FINAL ON** _____OCT 1 2 2005_____
25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE**
26   **DECISION IS MODIFIED.**
27   **DANIEL PARTIDA  H-48181   DECISION PAGE 5    6/14/05**

89

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, ELENA LARA, a duly designated transcriber, PETERS SHORTHAND REPORTING CORP., do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 88, and which recording was duly recorded at CALIFORNIA STATE PRISON - LOS ANGELES COUNTY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of DANIEL PARTIDA, H-48181, on JUNE 14, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated July 12, 2005, at Sacramento County, California.


ELENA LARA, Transcriber
**PETERS SHORTHAND REPORTING**

# EXHIBIT E



*Byrne*

NOT FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | ) B071301 |
| Plaintiff and Respondent, | ) (Super. Ct. No. BA043905) |
| | ) |
| v. | ) |
| | ) |
| DANIEL PARTIDA, | ) |
| Defendant and Appellant. | ) |

COURT OF APPEAL - SECOND DIS.

F I L E D

SEP 08 1994

JOSEPH A. LANE            Clerk

Daniel Partida appeals from the judgment entered following a jury trial that resulted in his conviction for second degree murder. He contends:

"First there was a violation of the substantive evidentiary rule that where the accused's connection to the charged offense consists solely of his own statements which as a whole are exculpatory, the prosecution is bound by the total statements if not contradicted by other evidence. Second there was a violation of appellant's constitutional right of silence by the receipt of evidence as to its invocation and comment by the prosecutor in argument. Third there was a violation of the statutory proscription of Evidence Code section 1101 by the allowance of inadmissible prejudicial character evidence against

2.

appellant based on his previous police detention for possession of a handgun.  Singularly and in combination these errors require reversal of the judgment in the case."

Appellant not having testified nor presented any affirmative defense, the People's evidence was essentially uncontradicted.  Of course, as today is virtually always true in the prosecution of gang-related, drive-by assassinations, witnesses who knew appellant and his companions, and who initially had advised the police they could identify the occupants of the subject car, declined to do so at trial as they did not wish to be considered "snitches."

Nonetheless, there was abundant proof that appellant, a member of the Street Saints gang, was driving his uncle's distinctive red Hyundai in territory claimed by the rival 39th Street gang, with whom the Street Saints were feuding.  He slowed the vehicle, first to permit its passengers to issue verbal challenges, and then to use a 9-millimeter Uzi to gun down a youth who apparently was not a gang member, but who at that moment had the misfortune to be with a person who was and into whose car bullets had been fired a few days earlier.

Following his arrest, after advisement and waiver of his constitutional rights, appellant admitted he was driving the car at the time of the murder.  He stated a

3.

fellow gang member, Jose Claro, had been with him, but he
claimed it was a man he did not know who fired the fatal
shots.[1]   In fact, he asserted, he had not even been aware
that this person was armed.  When the officer then inquired how
it was possible his passenger could have been carrying so large
a weapon without it being apparent, appellant stated he did not
wish to discuss the matter further without an attorney.  The
officer honored this declaration and immediately halted the
interrogation.

Evidence was also introduced to establish that only a month
earlier, appellant had been stopped while driving the same red
Hyundai with a semiautomatic handgun beneath the driver's seat.
Jose Claro had been a passenger at that time as well.

Appellant's initial contention is meritless.  It is based
on a derivative branch of the former procedural rule that held a
party vouched for the credibility of persons it called as
witnesses.  That is, it was said that if the People introduced a
defendant's statements, it was "bound by" even its self-serving
aspects.  (See People v. Estrada (1923) 60 Cal.App. 477 and its
progeny.)  This rule, of course, ended with the adoption of our
Evidence Code which made it possible for either party to elicit
the testimony of anyone who might have knowledge of the subject
in issue without that person becoming "the witness" of the

---

1.  One of the recanting witnesses had told the police
and the district attorney that Claro was the shooter.

4.

party calling him.   Evidence Code section 785, operative

January 1, 1967, now expressly provides, that "[t]he credibility

of a witness may be attacked or supported by any party,

including the party calling him."

Consequently, the People were free to introduce appellant's

incriminating admissions without being "bound by" his

self-serving, exculpatory averment that his unknown passenger

somehow had succeeded in concealing so large a firearm upon his

person that appellant had been completely unaware of its

presence until it was drawn and fired.

Of course, as the respondent points out, even under the

former rule the People would not have been "bound by"

appellant's claim of innocent ignorance since it was founded on

an assertion which, realistically, was physically impossible.

Appellant's second contention also fails.   In it he claims

he was deprived of his rights under Miranda v. Arizona (1966)

384 U.S. 436 when the jury was permitted to learn of the

question that had preceded his invocation of those rights.[2/]

---

2. The challenged exchange was as follows:
"Q.   [By Deputy District Attorney Susan Schwartz:]   When
he indicated to you that the right front passenger had a gun,
and that he didn't know he had a gun, did you ask him any
questions?
"A.   [By Detective John Garcia:]   I began.
"MR. BROCKWAY [defense counsel]:   Nonresponsive yes or no.
"THE COURT:   Answer yes or no.
"THE WITNESS:   Yes.
"Q.   BY MS. SCHWARTZ:   What did you ask him?
                    (Continued to Next Page --)

In a similar vein, he argues that the prosecutor's subsequent

reference thereto violated the proscription enunciated in

<u>Griffin</u> v. <u>California</u> (1965) 380 U.S. 609.[3/]  In each

instance he is mistaken.

It would truly pervert the rationale underlying these

decisions were a defendant permitted to get before the jury

---

(Continued --)
"A.  How could he not know a passenger have [sic] a
gun.  I remember giving him an example that if a person
with a large gun, for example, if he had it inserted in
his waistband or on his person in getting into a car, it
would seem it would be rather uncomfortable if carrying a
gun.  It can be uncomfortable carrying a gun in a
vehicle.  [¶]  It was about this time when he invoked his
Miranda rights and didn't want to speak any longer without
an attorney."

3.  During her opening argument the deputy district
attorney stated:
"Once he was questioned, how could you not know that
this Uzi was being carried by this unknown passenger.  As
soon as he got confronted with tough questions, it was at
that point he invoked his rights."
After defense counsel in argument had made much of the
favorable aspects of appellant's statement, the prosecutor
concluded in closing:
"I submit to you it is reasonable for this 17 year old
gang member to go in and be so bold to tell the police I
will talk to you.  I will try to pull one over on you and
sit down and start giving them a lot of garbage about it
was my car.  I was the driver.
"My home boy, Jose Claro, was in the back seat.  I
don't know the name of the shooter.  I don't know who that
was.  It was a stranger I gave a ride to.  He had a coat
and stuck an Uzi under his coat.  I didn't know it until
he pulled it out.  He thinks he can get away from it.
"The guy has an Uzi in a car.  He has it under his
coat, and you don't know that he has the gun there.  'What
are you telling me?'
.  'I don't want to talk anymore.  You didn't buy what I
had to tell you,' end of the conversation.  'I want a
lawyer.'  That's what the 17 year old naive does."

6.

the totality of his aborted interrogation, including those
self-serving assertions that he wishes to use as the basis
of his defense, while at the same time precluding its
members from discovering how or why the defendant elected
not to complete that interview. While an accused is under
no duty to aid in the development of the truth, he will
not be permitted to create the false picture that he
waived his right to silence and candidly responded to
questioning, when such was not the case. Moreover, even
were we to hold that the prosecutor's observations might
have been too bold, any potential harm resulting therefrom
would have been insufficiently prejudicial to warrant
reversal under any standard of proof.

Equally meritless is appellant's final contention
that it was error to receive evidence that on a prior
occasion shortly before the subject homicide, he had been
driving the same car, with the same member of his gang as
a passenger, with a semiautomatic weapon concealed
therein, albeit not the same one used in the subject
killing. As the trial court observed, each aspect of this
prior incident was "highly relevant." Naturally, it was
also "prejudicial" since this is true of all relevant
evidence favorable to the People. The fact that the court
did not explicitly refer to Evidence Code section 352 does
not indicate that it had never heard of this most

commonplace of sections or that it failed to perform its duty by exercising the discretion the provision authorizes.

The judgment is affirmed.

NOT TO BE PUBLISHED.

GATES, J.

We concur:

BOREN, P.J.

FUKUTO, J.

# EXHIBIT F



EXHIBIT F

SUPERIOR ... 'T OF CALIFORNIA, COUNTY' LOS ANGELES

DEPT. 120

| Date:<br>HONORABLE: | June 1, 1992<br>ROBERT J PERRY<br>S WALKER | JUDGE<br>Bailiff | S MCKINNEY<br>J FONSECA | Deputy Clerk<br>Reporter |
|---|---|---|---|---|

|  | BA043905-01<br>PEOPLE OF THE STATE OF CALIFORNIA<br>vs<br>01  PARTIDA, DANIEL  (X)<br>187.A 01 CT | (Parties and Counsel checked if present)<br>Counsel for People:<br>DEPUTY DISTRICT ATTY:    T. SCHWARTZ   (X)<br>Counsel for Defendant:<br>D. BROCKWAY, PVT (X) |
|---|---|---|

**NATURE OF PROCEEDINGS**    **JURY TRIAL**    **REM**                **10/03/91**

Trial, continued from May 29, 1992, resumes with all jurors present as heretofore.

At 9:35 a.m. the jury resumes deliberations.

OUT OF THE PRESENCE OF THE JURY:  Court and counsel confer on the record regarding a jury question.

At 11:18 a.m. the jury returns into the courtroom with counsel and the defendant present as heretofore and the court answers the jury question.

At 11:19 a.m. the jury resumes deliberations.

At 11:40 a.m. the jury returns into the courtroom with the following verdict:

                    "TITLE OF COURT AND CAUSE"

We, the Jury in the above-entitled action, find the Defendant, DANIEL PARTIDA, guilty of the crime of SECOND DEGREE MURDER, in violation of Penal Code Section 187, a felony, a lesser and necessarily included offense than that charged in Count 1 of the information.

We, further find the allegation that in the commission and attempted commission of the above offense a principal was armed with a firearm, to wit, a handgun, within the meaning of Penal Code Section 12022(a)(1) to be NOT TRUE.

This 1st day of June 1992,    John Gerardo, Foreperson

The verdict is read.  The jury is polled as to the verdict and all jurors answer in the affirmative.   The verdict is recorded; re-reading of the verdicts as recorded is waived.  The jury is discharged.  Instructions given and refused are filed.

Criminal proceedings are adjourned.  The defendant is referred to the California Youth Authority pursuant to Section 707.2 Welfare and Institutions Code.  The director of the Youth Authority is ordered to prepare a report and submit same to the court by August 31, 1992.

Probation and Sentence hearing is set 8-31-92, at 8:30 a.m. in Department 120. The defendant waives time for sentencing.

The defendant is ordered to return on the above date.


REMANDED

**MINUTE ORDER**

| MINUTES ENTERED |
|---|
| 6/1/92 |
| COUNTY CLERK |
| (9-91) |

# EXHIBIT G

# EXHIBIT G

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER:    POSTCONVICTION PROGRESS REPORT

- o    DOCUMENTATION HEARING
- o    PAROLE CONSIDERATION HEARING
- o    PROGRESS HEARING

**INSTRUCTIONS**

| | |
|---|---|
| TO CDC STAFF: | DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT |
| TO BPT STAFF: | FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT.  SEE BPT §§2290 2292, 2410 AND 2439. |

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10-13-92 | | | Committed to the California Youth Authority pursuant to Section 1731.5(c) of the Welfare and Institutions Code.  Convicted of 187(a) PC, Murder, second degree. |
| 05-05-93 | | | Received at the Southern Reception Center and Clinic from Los Angeles County Superior Court.  It was the impression of clinical staff that inmate Partida could materially benefit from the training and treatment afforded in the Youth Authority. |
| 06-08-93 | | | Inmate Partida was transferred to the Heman G. Stark Youth Training School and placed on the A/B Orientation Program.  Once he completed orientation classes, he was assigned to a general population program. |
| 08-03-93 to 12-31-93 | | | Inmate Partida was placed on M/N Treatment Team.  He was assigned the following treatment and training objectives:  Address commitment offense and cultural factors; and increase education/employability skills. |

| CORRECTIONAL COUNSELOR SIGNATURE | DATE |
|---|---|
| | 05-03-96 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, Daniel | H48181 M9141 | H. G. Stark Y.T.S. | Post Conviction Hearing | ~~05-07-96~~ 6-11-96 |

BPT 1004 (Rev 7/86)                    PAGE 1 of 7

BOARD OF PRISON TERMS                                                                      STATE OF CALIFORNIA

## CONTINUATION SHEET:    LIFE PRISONER:    POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 08-03-93 to 12-31-93 (cont.) | | | Inmate Partida was afforded the opportunity to participate in small group discussions and individual counseling sessions, as well as complete written casework assignments. Based on the fact that his case was under appeal, inmate Partida would not discuss the details of his commitment offense. During his first year on M/N Treatment Team, areas of concern included his level of involvement in the gang subculture. Although inmate Partida's offense was viewed as being gang related, he denied being a member of any particular gang. In the area of behavior, inmate Partida received disciplinary documentation for failing to follow instructions. The disposition was handled by the treatment team. |
| | | | _Academic_ |
| | | | 1. Government - U.S. 2. Science of Living 3. Algebra |
| | | | Inmate Partida's TABE (Testing Adults in Basic Education) scores reached the 12.9 grade level in reading, mathematics and language. Up to this point, he had earned 54.5 high school credits. |

**ORDER:**

O   BPT date advanced by _____ months          O   BPT date affirmed without change.

O   PBR date advanced by _____ months          O   PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

O   Previously imposed conditions affirmed.

O   Add or modify _____

_____

O   Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, Daniel | H48181 M9141 | H. G. Stark Y.T.S. | Post Conviction Hearing | 05-07-96 |

BPT 1004 (Rev 7/86)                         PAGE 2 of 7                         PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET:   LIFE PRISONER:   POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 08-03-93 to 12-31-93 (cont.) | | | **Vocational** <br><br> 1. Upholstery <br><br> Inmate Partida had accrued 63 hours of instruction. It was noted that he was making good use of time in the trade. |
| 01-01-94 to 12-31-94 | | | Inmate Partida was assigned treatment objectives to address the dynamics surrounding his commitment offense and victim's issues. Again, he would not discuss the specifics surrounding the offense. However, inmate Partida would address other topics of concern. With respect to victim's issues, he expressed empathy for the victim and the victim's family, but did not feel responsible for his death. <br><br> Inmate Partida received disciplinary documentation for failing to follow instructions. The disposition was handled by the treatment team. Overall, he was not considered a management problem. <br><br> **Academic** <br><br> 1. GED Prep <br> 2. Science of Living |

**ORDER:**

O   BPT date advanced by _____ months          O   BPT date affirmed without change.

O   PBR date advanced by _____ months          O   PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

O   Previously imposed conditions affirmed.

O   Add or modify _____

_____

O   Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, Daniel | H48181 <br> M9141 | H. G. Stark Y.T.S. | Post Conviction Hearing | 05-07-96 |

BPT 1004 (Rev 7/86)                          PAGE 3 of 7                          PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

CONTINUATION SHEET:    LIFE PRISONER:    POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 01-01-94 to 12-31-94 (cont.) | | | <u>Academic</u> (cont.)<br><br>3. Physical Education<br>4. Algebra<br>5. Science - Earth<br>6. English<br><br>Inmate Partida continued to work toward completing the requirements for a high school diploma. Up to this point, he had accumulated 79 credits. Also, inmate Partida passed the General Educational Development (GED) exam on 08-12-94. His plan was to enroll in college courses if accepted into the program.<br><br><u>Vocational</u><br><br>1. Upholstery<br>2. Electronics<br><br>Inmate Partida had received a total of 171 hours of instruction in the Upholstery trade, and attained helper trade skills. He had also received 99 hours of instruction in the Electronics trade. Both instructors felt that inmate Partida was taking advantage of available training. |

**ORDER:**
O  BPT date advanced by _____ months          O  BPT date affirmed without change.

O  PBR date advanced by _____ months          O  PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
O  Previously imposed conditions affirmed.
O  Add or modify _____

_____

O  Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, Daniel | H48181<br>M9141 | H. G. Stark Y.T.S. | Post Conviction Hearing | 05-07-96 |

BPT 1004 (Rev 7/86)                          PAGE 4 of 7                          PERMANENT ADDENDA

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 01-01-95 to 12-31-95 | | | Inmate Partida continued to participate in available treatment. Since he was no longer appealing his case, inmate Partida began to discuss specifics regarding the crime. It was noted that he lacked remorse when discussing his criminal behavior. However, it was believed that he could continue to benefit from reformatory opportunities available within the institution. Inmate Partida admitted that he was a member of the Street Saints gang, but had severed all ties to the gang subculture. Inmate Partida received disciplinary action for possessing contraband (CDC Div. F: Section 3315A, #3). In spite of this, he was not viewed as a management problem. |

Academic

1. English
2. Economics
3. History - U.S.
4. Science of Living
5. Math A

**ORDER:**

O  BPT date advanced by _____ months        O  BPT date affirmed without change.

O  PBR date advanced by _____ months        O  PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

O  Previously imposed conditions affirmed.

O  Add or modify _____

_____

O  Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, Daniel | H48181 M9141 | H. G. Stark Y.T.S. | Post Conviction Hearing | 05-07-96 |

BPT 1004 (Rev 7/86)            PAGE 5 of 7            PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

**CONTINUATION SHEET:   LIFE PRISONER:   POSTCONVICTION PROGRESS REPORT**

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 01-01-95<br>to<br>12-31-95<br>(cont.) | | | Although inmate Partida had earned a GED, he continued to work toward completing the credits necessary for a high school diploma. Up to this point, he had accumulated 114 credits.  Inmate Partida now planned to obtain a high school diploma prior to attempting to enroll in the college program.<br><br>Vocational<br><br>1. Electronics<br>2. Business Education<br><br>Inmate Partida had accrued a total of 135 hours of instruction in the Electronics trade.  He had also accrued 81 hours of instruction in Business Education. According to his Business Education instructor, inmate Partida had attained helper trade skills. |
| 01-01-96<br>to<br>05-01-96 | | | Inmate Partida has continued to address treatment objectives surrounding his commitment offense and victim's issues.  Although he had denied firing the weapon that killed the victim, he has accepted responsibility for causing the death of another individual. Inmate Partida acknowledged this by stating, "I drove the car." |

**ORDER:**
O  BPT date advanced by_____ months          O  BPT date affirmed without change.

O  PBR date advanced by _____ .months          O  PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
O  Previously imposed conditions affirmed.
O  Add or modify _____

_____

O  Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, Daniel | H48181<br>M9141 | H. G. Stark Y.T.S. | Post Conviction Hearing | 05-07-96 |

BPT 1004 (Rev 7/86)                      PAGE 6 of 7                      PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

## CONTINUATION SHEET:   LIFE PRISONER:   POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 01-01-96<br>to<br>05-01-96<br>(cont.) | | | At this point, team staff are encouraged by his willingness to finally accept responsibility for the death of an innocent victim. It is anticipated that inmate Partida will continue to benefit from available treatment in the Youth Authority.<br><br>_Academic_<br><br>1. Math A<br>2. Physical Education<br>3. English<br><br>Inmate Partida has continued to work toward earning a high school diploma. Currently, he has accumulated 122 credits.<br><br>_Vocation_<br><br>1. Business Education<br><br>Inmate Partida has accrued a total of 108 hours of instruction in Business Education. According to his instructor, he has taken advantage of available training. |

**ORDER:**
O  BPT date advanced by _____ months          O  BPT date affirmed without change.

O  PBR date advanced by _____ months          O  PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
O  Previously imposed conditions affirmed.
O  Add or modify _____

_____

O  Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, Daniel | H48181<br>M9141 | H. G. Stark Y.T.S. | Post Conviction<br>Hearing | 05-07-96 |

BPT 1004 (Rev 7/86)                      PAGE 7 of 7                      PERMANENT ADDENDA

# EXHIBIT H

# EXHIBIT H

# BROOKLYN AUTO SALES

## 4300 East 3rd Street
## Los Angeles, California 90022
## (323) 263-7244/Fax: (323) 268-7296

August 25, 2004

To Whom It May Concern:

My name is Pedro Partida, I am Daniel Partida's older brother (one year older). By way of this letter I'd like to take a moment to express and state the following words.

In 1988 after our father's death, my brother Daniel and I started working for Brooklyn Auto Sales a very successful and known company throughout the County of Los Angeles owned by our uncle Jose Escobar.

In 1988 our uncle Jose Escobar initially bought the business, Daniel and I worked during the week after school hours and on weekends. I have been employed at this company for over 16 years and I am now part owner. We started working out of the first location that is located at 2617 E. Cesar E. Chavez Ave., Los Angeles, CA 90033 with only 10 vehicles in inventory, We now own three (3) locations in the Los Angeles County with over 250 vehicles in inventory and are presently in the process of purchasing an additional location.

Therefore, I would like to take the opportunity to offer my brother Daniel a full time job at a very well paying salary, if he wishes to come work with us. I understand that he has completed numerous study courses during his incarceration like accounting & bookkeeping. I feel he will be great help for the business and us due to his way with people and enjoys communicating with others. I am sure he will do very well for himself and others in a very short time because he has matured very much.

I would also like very much for him to come live with us and our 80 year old grandmother, Modesta Salas she has raised us and watched us grow up, she has been by our side all of our lives, she has a very special affection for my brother and I, there is nothing in the world she wishes before she leaves this world that to see Daniel a fine successful man and a man of good. Our grandmother mentions all the time that "Daniel

Page 2...
RE: Daniel Partida

and I grew up very close and never have been separated from one another; we had a normal childhood, never joined or were involved in any gang or drug activities and mostly just interested in sports activities such as baseball; basketball; football, etc; we kept busy for the most part.

Daniel and I grew up with friends that were not older than a year or two of age and I sincerely can say that I am very proud of them because they are all doing very good some graduated from major colleges and have very good jobs.

I believe that in this letter I have explained only briefly about Daniel and Myself. Now I would like to take a moment to thank the people for taking the time to read my expression. I am very interested in my brother's well being. Daniel has 100% support from me Pedro Partida and that I am able to offer him a job and a permanent place to live if he wishes.

I believe that if Daniel is given the opportunity to parole, he will do very well for himself and others in society. He has support from many people specially the family and close friends.

Once again I thank you very much for your patience and time.

Respectfully,

Pedro Partida, Brother

# EXHIBIT I

# EXHIBIT I

# *STATEMENTS OF:*

## *PEDRO PARTIDA*

## *MODESTA SALAS*

## *JACINTO ALARCON*

### *POINTS:*

Daniel Partida was never a gang member, and certainly not a member of the Street Saints.

Daniel Partida never struck or kicked or otherwise assaulted Ruth Jimenez. She actually assaulted Daniel. He never ripped her gold chain off of her neck; it fell. It was picked up off of the ground by neighbor Jose Pelayo.

**EXHIBIT I -- DECLARATIONS**

**EXHIBIT I**
DECLARATION OF PEDRO PARTIDA

# DECLARATION OF PEDRO PARTIDA

I, Pedro Partida, declare:

1.    I am the older brother of Daniel Partida.

2,    I am writing this declaration to explain some history and facts about Daniel Partida as he was growing up and the neighborhood in which he lived.

3.    I am also going to explain some facts about the gangs that are in this part of Los Angeles.

4.    I also wish to explain the circumstances regarding the allegation that Daniel robbed a girl by the name of Ruth Jimenez of her gold chain.

5.    I believe there is some incorrect facts being cited as "official facts" and some confusion about whether Daniel belonged to a gang.

### *The Neighborhood*

6.    My brother Daniel and I grew up at 424 East 27th Street, Los Angeles, CA 90011, in between Maple Avenue and Trinity Street. We grew up with approximately 15 kids of ages no different than three years apart. We all attended 28th Street school (elementary) and John Adams High Jr. High. After that, we attended Thomas Jefferson High School. Every since we were kids until even now we were involved in sports (football, baseball, basketball, etc.). Around 1984, when some of us we were in Jr. High and some still in elementary, mostly every kid around the neighborhoods started getting their own groups of kids, and began calling themselves by a name. But it was all a bunch of kids playing sports. In our block they called themselves the Ghetto Boys and they would hang out at the corner of 27th Street and Maple Avenue. All 15 of us were NOT Ghetto Boys, however, and we did not call ourselves anything. The Ghetto Boys would consistently ask us to join them, or ask us to play sports with them because for about three years we were undefeated in street football. About 1986 or 1987 all the old football teams that were around started to become gang affiliated. Every three blocks approximately there was a different gang and most of them became rivals.

### *Daniel and My Upbringing*

7.    In 1988 my uncle Jose Escobar bought a small business place on 2619 Brooklyn Avenue, Los Angeles. Daniel and I both worked after school and on weekends all day from 9:00 AM to late, sometimes. Daniel sometimes would leave earlier than I would. I would stay to close.  I still work in the business, which is Brooklyn Auto Sales. On our way home we would take I-10 West and exit on San Pedro Street, turn left on Trinity, and would pass through all the

DECLARATION OF PEDRO PARTIDA                                               1

gangs that were on the way home. On Washington Blvd. there were the
Washington Boys. On 21st Street, the Flats. On 23rd Street to 25th Street, the
Street Saints. From Adams Street to 28th Street the Ghetto Boys. From 29th
Street to 31st Street were the 29th Street Gang. From 31st Street to 36th Street, the
Central City Criminals. From 34th Street to 36th Street, the 36th Street Gang.
And the list goes on and on.

### Daniel's Association

8.      On Daniel's way home he would often stop at Yecel Claro's house
on Trinity and 25th Street. Yecel was his girlfriend. She lived in front of Trinity
Park. Yecel's brother was Jose Claro, aka "Shaggy." He was a member of the
Street Saints. He also had 1 or 2 cousins affiliated with them. Daniel was never
a Street Saints member. That would have been impossible because of where we
lived. The Ghetto Boys gang would have never tolerated a person from another
gang and neighborhood to live in their neighborhood. That would have resulted
in injury, maybe death. Daniel would spend most of his spare time with our
little group doing our sports activities or whatever was going on at the time. But
we all remained non-gang affiliated.

### The Status of the Original 15

9.      Most of all the guys that grew up with us are still in communication
with each other. We still hang out on the weekends, have bar-b-ques, go off-
roading or do outdoor activities. Our kids interact. All of these guys have decent
jobs, and have done well for themselves. All remained law-abiding, and only
Daniel ended up in prison. We were an example that it is possible to live in the
midst of gangs and survive and prosper without becoming one of them.

### Daniel's Offense

10.     I believe that my brother was a 'patsy' used by the Street Saints in
the drive-by shooting that day. I do not believe he knew that he was doing
anything other than giving Jose Claro and Jose's friend a ride home. I believe
that Carlias "Mongo" pointed the finger at Daniel and lied to the police to take
the heat off of Jose Claro and the actual shooter. And I believe Jose Claro did
the same. I believe my brother was completely innocent of knowing this drive-
by was going to happen. I believe he took the fall for a gang drive-by shooting.
I do not believe the police ever tried to find out the truth, once Carlias pointed
the finger.

### *The Alleged Robbery of Ruth Jimenez*

10.    On the day of the alleged assault, Daniel and I were at our grandmother's house, Modesta Salas , for dinner. Daniel's ex-girlfriend Ruth Jimenez came to our front sidewalk and called Daniel outside. They were talking at first, but after a few minutes she began to raise her voice, then screaming at Daniel. Grandmother and I came to the front porch to observe. Out of nowhere Ruth began to swing at Daniel, and slapped him at least a couple of times. She rushed at him, with Daniel blocking her hands away. At no time did Daniel ever strike her with his fists or open hands, nor did he ever kick her. But he did push her away. My grandmother came out of the house to stop what was going on. At that time Ruth ran off to her house, which was on the other side of the block. During the pushing and shoving, the gold chain must have been torn off. Jose Pelayo, a neighbor, found her chain on the ground, and gave it to Daniel. We waited outside in the street for awhile for other family members we were waiting on for dinner. Although Ruth filed a robbery complaint against Daniel and alleged an assault, it was dismissed after she dropped the charges. There was never an assault on the part of Daniel, and he did not take her chain.

UNDER PENALTY OF PERJURY, by the laws of California, I swear that the above and foregoing is true and correct, this _15_ day of May, 2006, at Los Angeles, California.

PEDRO PARTIDA

State of California, County of *Los Angeles*
Subscribed and sworn to (or affirmed) before me
on this *15* day of *MAY* , 20*06* ,
by *PEDRO PARTIDA*
personally known to me or proved to me on the
basis of satisfactory evidence to be the person(s)
who appeared before me.
Signature: *Lydia C. Valdez*



LYDIA C. VALDEZ
COMM. #1354152
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires May 26, 2008

DECLARATION OF PEDRO PARTIDA                                          3

**EXHIBIT I**
DECLARATION OF MODESTA SALAS

## DECLARATION OF MODESTA SALAS

I, Modesta Salas, declare:

1.      I am the grandmother of Daniel and Pedro Partida. I am 81 years old. I reside at 424 East 27th St.. Los Angeles, California, 90011, for 34 years, every since my son Lino Partida, Daniel's father, brought us to this country in 1972.

2.      I swear and declare that Daniel and Pedro has been by my side every since I came to this country.

3.      I and his father Lino, and also my youngest son Jose Escobar, helped to raise those 2 kids, which I love dearly with al my heart. Both never showed me a bad disposition that I could ever remember. Always, and now that they are grown men, they are still very loving with me.

3.      I give this sworn statement about the incident involving Daniel's former girlfriend Ruth Jiminez.

4.      That evening, my son Jose had prepared a dinner evening for myself and all the family. We were to go out and have dinner. We were all gathering together at my house to leave all at the same time. Daniel and a few of his friends were outside on the sidewalk. I heard a young girl very loud and shouting at someone. I came outside the house and watched. She was insulting Daniel. She began to get more offensive, so I went to where Daniel and the girl was. As I approved, she started to swing at Daniel, and at that moment I screamed at her, and she ran to her house. I asked Daniel why did she come at you that way. He said, because she was mad at him because he was talking to other girls, and she was jealous. At no time whatsoever did I see my grandson hit her. He was covering himself when she began to slap him. When I screamed at her, she ran off to her house.

5.      If anyone has any other questions about this incident, you may contact me.

SWORN TO UNDER PENALTY OF PERJURY, and Notarized, this 15th day of May, 2006, at Los Angeles, California.

*Modesta Salas*

—————————————
Modesta Salas

**EXHIBIT I**
DECLARATION OF JACINTO ALARCON

# DECLARATION OF JACINTO ALARCON

I, Jacinto Alarcon, declare:

I am a friend of Pedro and Daniel Partida since childhood. I am a 2001 USC graduate majoring in Political Science and Sociology. I am employed as a Social Worker for the non-profit United States Veteran' Initiative, an affiliate of the Long Beach Veteran's Administration.

I can attest to the following:

I, Jacinto Alarcon, can attest that Daniel Partida was never affiliated with the Streets Saints gang except with a member who was his brother-in-law. Daniel had a girlfriend named Yecel Claro that he met while attending John Adams Junior High School. She had a brother named Jose Claro who was an active participant with the Streets Saints gang. Yecel lived on Trinity and 25th Streets; the heart of the Streets Saints gang territory. Everyday after Daniel ended his shift at Brooklyn Auto Sales he would stop by on his way home and visit his girlfriend, Yecel. Occasionally Daniel would socialize with Jose Claro when Jose was home.

It would have been impossible for Daniel Partida to be affiliated with the Streets Saints gang because of the geographical location Daniel was living at the time. Daniel, myself and about twelve other kids were being raised on the 27th Street block between Trinity and Maple Streets, in Los Angeles. On the corner block of Maple and 27th Streets was a gang that loitered called the Ghetto Boys. The Ghetto Boys were very territorial and wouldn't have allowed a Street Saints gang member to live in Ghetto Boys territory. The Ghetto Boys would have literally killed Daniel if he would have been actively involved with the Streets Saints gang.

The only interaction Daniel, myself and the other twelve kids had with the neighborhood gangs were when we played football against them when they were football teams. Daniel, myself and the twelve other kids were even called the Jocks because of our athleticism.

It all started in the summer of 1988. It was a time when junior high schools and high schools would give the students summer vacation from mid-May to late August. Their was an abundance of kids transitioning from elementary to junior high at the time. We had all summer off and there wasn't much to do in the neighborhood but have fun. We couldn't work because we were too young. Football, because of its competitive nature, became very popular. Kids living in the same neighborhood began getting together and playing football amongst themselves. They then became a team and started playing against teams from different geographical areas.

Seven neighborhoods ended up forming teams. On 27th and Maple Streets the team called themselves *"The Ghetto Boys"*. On 25th and Trinity Streets they called

themselves *"The Street Saints"*. On 29th and Trinity Streets they called themselves *"29[th] Street"*. On Adams and San Pedro they called themselves the *"Westside Boys"*. On 26th and Maple Streets they called themselves *"36[th] Street"*. On 31st and Maple Streets they called themselves *"Central City Criminals"*. Between Maple and Trinity on 27th Street, Daniel Partida, myself, Peter Partida, Guillermo Barajas, Miguel Castellon, Oscar Chaidez, Oscar Castaneda, Efrain Wesby, Apolonio Guzman, Miguel Rivas, Jesus Pelayo, Federico Romero, and Cornelio Gonzales became known as *"27[th] Street"*. Each team had a captain that would go to the different teams and set up time and date to play football. We never kept a roster of who won or lost, it just gave you bragging rights. We usually played in Trinity Park on 25th and Maple Streets.

Over time four out of the seven teams converted into gangs. The teams that converted were *"The Ghetto Boys"*, *"Central City Criminals"*, *"36[th] Street"*, and *"The Street Saints"*. Teams began wearing jerseys to represent their gang. They developed hand signs to signal their gang. They began writing graffiti where they would gather to mark their territory and show unity. Since the gangs were close in proximity, fights began erupting during football games over territorial disputes. It was usually instigated by the members who were on the sidelines. The gangs stopped playing football and they began fighting and killing each other when one member was caught in a territory in which he didn't belong.

The members from the other three football teams both stopped playing football and moved on to better things, or they were sucked into one of the four gangs. Daniel Partida decided to not join a gang. This is the reason he was allowed to live in *"Ghetto Boys"* neighborhood and visit his girlfriend in *"Street Saints"* neighborhood.

Sworn to under penalty of perjury, this 13th day of May, 2006, at Los Angeles, CA.


*Jacinto Alarcon*
JACINTO ALARCON

# EXHIBIT J

# EXHIBIT J

BOARD OF PRISON TERMS
LIFE PRISONER POSTCONVICTION PROGRESS REPORT
STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING   (Life term started 5/5/93)

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/01 to 5/02 | | | **PLACEMENT:** Remained at CTF Central during this period.<br>**CUSTODY:** Medium A.<br>**VOCATION:** Assigned as a student in the Vocational Offset Print/Graphic Arts program with satisfactory ratings and positive comments on 128-E chronos dated 6/30/01, 12/30/01 and 3/31/02. 128-B Laudatory Chrono dated 7/24/01 documents skills and positive attitudes in this program.<br>**ACADEMIC:** None during this period.<br>**WORK:** Assigned to a Vocational Education program during this period.<br>**GROUP ACTIVITIES:** Completed the 13-week IMPACT program by 4/29/02.<br>**PSYCH TREATMENT:** None during this period.<br>**PRISON BEHAVIOR:** Remained disciplinary free during this period.<br>**OTHER:** TB Alert Code 22 dated 5/3/01 and 5/4/01. |

CORRECTIONAL COUNSELOR'S SIGNATURE

PARTIDA, DANIEL          H48181          CTF SOLEDAD

DATE  8/26/04          OCT/2004

T 1004 (REV 7/86)          Page _1_

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/02 to 5/03 | | | **PLACEMENT**: Remained at CTF Central during this period. **CUSTODY**: Medium A. **VOCATION**: Completed the Vocational Offset Print/Graphic Arts program, and dropped on 9/25/02. **ACADEMIC**: Enrolled in correspondence courses from the Professional Career Development Institute, beginning 5/21/02. **WORK**: Assigned as a dining hall worker on 9/27/02 and then to a food cart/porter relief position in the Infirmary on 9/28/02. No CDC 101 chronos are available for this period. **GROUP ACTIVITIES**: Completed the 12-week Millati Islami (The Path to Peace) Addiction Recovery Program by 9/4/02. **PSYCH TREATMENT**: None during this period. **PRISON BEHAVIOR**: Remained disciplinary free during this period. **OTHER**: TB Alert Code 22 dated 5/6/02. Two cotton blankets authorized, due to wool allergy, per 9/13/02 128-C. |

ORDER:
☐ BPT date advanced by        months.        ☐ BPT date affirmed without change.
☐ PBR date advanced by        months.        ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐ Previously imposed  conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

PARTIDA, DANIEL            H48181                    CTF SOLEDAD            OCT/2004

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/03 to 5/04 | | | **PLACEMENT:** Remained at CTF Central during this period. **CUSTODY:** Medium A. **VOCATION:** None during this period. **ACADEMIC:** None during this period. **WORK:** Work assignment alternated between a food cart/porter relief position and a food cart attendant position, both of which are in the infirmary. **GROUP ACTIVITIES:** Request to participate in the "Cage Your Rage" Anger Management Group was denied on 1/7/04 due to ineligibility, since Partida is not a participnt in the Mental Health Services Delivery System. Participated in a weekly Lifer's Group from 10/31/03 through the end of the period. **PSYCH TREATMENT:** None during this period. **PRISON BEHAVIOR:** Remained disciplinary free during this period. **OTHER:** TB Alert Code 22 dated 5/6/03. |

ORDER:

☐ BPT date advanced by ___ months.   ☐ BPT date affirmed without change.
☐ PBR date advanced by ___ months.   ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

PARTIDA, DANIEL          H48181          CTF SOLEDAD          OCT/2004

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/04 to Present (8/25/04) | | | **PLACEMENT:** Remained at CTF Central during this period. **CUSTODY:** Medium A. **VOCATION:** None during this period. **ACADEMIC:** None during this period. **WORK:** Work assignment continued to alternate between the food cart/porter relief position and the food cart attendant position, both of which are in the infirmary. **GROUP ACTIVITIES:** Continued participation in the weekly Lifer's Group until 7/16/04, when the group ended, per 128-C dated 7/27/04. **PSYCH TREATMENT:** None during this period. **PRISON BEHAVIOR:** Remained disciplinary free during this period. **OTHER:** TB Alert Code 22 is dated 5/7/04. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

PARTIDA, DANIEL          H48181          CTF SOLEDAD          OCT/2004

BOARD OF PRISON TERMS          STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING          **ADDENDUM**

☐ PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/00 to Present | | | **PLACEMENT:** Partida transferred from RJD to CTF on 8-25-00 as a non-adverse transfer and released to the General Population. **CUSTODY:** MED A **CLASSIFICATION SCORE:** Reduced from 28 to 20. **ACADEMIC:** Partida is currently enrolled in a correspondence course in the School of Bookkeeping and Accounting through the Professional Career Development Institute (See 128B dated 3-12-01). Additionally, he has successfully completed a course in the cause, prevention, treatment and management of tuberculosis, HIV/AIDS, hepatitis and sexually transmitted disease. See 128Bs dated 10-5-00, 10-6-00 and 10-10-00. **WORK:** Partida was assigned as a Clerk in Medical Central Supply at RJD and received a Work Supervisor Report dated 8-22-00 with satisfactory grades. **VOCATION:** Partida is currently assigned to Vocational Print Shop as of 1-27-01. No Educational Progress Reports in the Central file. **GROUP ACTIVITIES:** Partida has participated and completed the basic 22 hour Hands of Peace/Friends Outside Creative Conflict Resolution Workshop. See 128B dated 5-7-00. **PSYCH TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** Partida has remained disciplinary-free during this period. **OTHER:** An Olson Review was conducted on 5-15-01. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | DATE |
|---|---|
| M. Aguirre for CCI AD Tarbakhsh | 6/6/01 |

PARTIDA, DANIEL     H48181        CTF        JUN/2000

BPT 1004 (REV 7/86)             1

Case 4:08-cv-03751-CW   Document 3-2   Filed 08/05/2008   Page 39 of 104

_____
H. Farbakhsh
Correctional Counselor I

_____
G. Severino
Correctional Counselor II

_____
R. Pope
Facility Captain

_____
S.L. Hill
Classification and Parole Representative(A)

PARTIDA, DANIEL        H48181                    CTF                    JUN/2000

PT 1004 (REV 7/86)                    2

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐     DOCUMENTATION HEARING

☒     PAROLE CONSIDERATION HEARING

☐     PROGRESS HEARING

INSTRUCTIONS
     TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
     TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
         ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/98 to 6/99 | | | **PLACEMENT:** Remained housed at RJD-CF. **CUSTODY:** Medium A Custody remains appropriate. **CLASSIFICATION SCORE:** Classification score reduced to 28 points. **ACADEMIC:** None noted for this period. **WORK:** None noted for this period. **VOCATION:** Remained assigned to Vocational Machine Shop. Education Progress Reports dated 6-27-98, 9-30-98, 12-31-98, 4-1-99 and 6-30-99. Reflect good grades and positive commentary. **GROUP ACTIVITIES:** Partida completed a 120 hour course in "Life Plan for Recovery Substance Abuse Education Program," with chrono dated 6-3-98. He also completed a 22 hour workshop in "Hand of Peace/Friends Outside Creative Conflict Resolution." With Laudatory chrono dated 8-18-98. He participated in Rapha 12-step program with informative chrono dated 8-26-98. He also participated in the "Walk-a-Thon" with chrono dated 5-5-99. **PSYCH TREATMENT:** None noted for this period. **PRISON BEHAVIOR:** CDC 128-A dated 11-25-98 for unauthorized showers. CDC 128-A dated 1-30-99 for absent from work. CDC 128-A dated 6-19-99 for absent from work. CDC 128-A dated 6-19-99 for absent from work. |

D. Wach CCI

DATE 5-31-01

| PARTIDA, DANIEL | H-48181 | CTF-SOLEDAD | JUN/2000 |

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/99 to 6/00 | | | **PLACEMENT**: Remained housed at RJD-CF. **CUSTODY**: Medium A Custody remains appropriate. **CLASSIFICATION SCORE**: Classification score reduced to 20 points. **ACADEMIC**: None noted for this period. **WORK**: Was assigned to Laboratory Porter on 8-14-99. Work reports dated 8-14-99 and 12-15-99 reflect satisfactory grades. he was reassigned to Medical Supply Clerk on 5-18-00. Work Supervisor's report dated 8-22-00 reflects good grades and positive commentary. **VOCATION**: Remained assigned to Vocational Machine Shop until reassigned on 8-13-99. **GROUP ACTIVITIES**: He completed the basic, 22 hour work-shop in "Hands of Peace"/Friends outside creative conflict resolution workshop with laudatory chrono dated 5-7-00. **PSYCH TREATMENT**: None noted for this period. **PRISON BEHAVIOR**: CDC 128-A dated 7-23-00 for unauthorized telephone calls. |

ORDER:
- ☐ BPT date advanced by ____ months.
- ☐ PBR date advanced by ____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

PARTIDA, DANIEL          H-48181              CTF-SOLEDAD              JUN/2000

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                                                           STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/00 to Present | | | **PLACEMENT:** Transferred to CTF-II on 8-25-00. **CUSTODY:** Medium Custody remains appropriate. **CLASSIFICATION SCORE:** Classification score remains at 20 points. **ACADEMIC:** None noted for this period. **WORK:** Remained assigned to Medical Supply Clerk until transferred to CTF-II on 8-25-00. **VOCATION:** Was assigned to Vocational Off-Set Printing on 9-16-00. **GROUP ACTIVITIES:** None noted for this period. **PSYCH TREATMENT:** None noted for this period. **PRISON BEHAVIOR:** Remained disciplinary free this period. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

- ☐ Schedule for Progress Hearing on appropriate institutional calendar

**PARTIDA, DANIEL**        H-48181              CTF-SOLEDAD              JUN/2000

BOARD OF PRISON TERMS                                                           STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

- ☒ DOCUMENTATION HEARING
- ☐ PAROLE CONSIDERATION
- ☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT. FOR
TO BPT STAFF: EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS
ORIGINALLY ESTABLISHED, I.E., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§ 2290 - 2292, 410
AND 2439.

| POST CONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6-11-96 TO 6-10-97 | | | Remained at SACCO/YA. He was assigned restricted custody due to Lifer status and no classification score (CS) assigned. Prisoner received by CDC on 8-20-96, from SACCO/YA. Committed from Los Angeles County for the offense of Murder 2nd degree. He was given a 15 year to life term. He was initially housed at CCI-RC. He was not assigned a custody designation with a CS of 52 points. 10-7-96, prisoner endorsed to COR-III with CS reduced by 4 to 48 points. 10-10-96 received at CSP-Corcoran. 10-23-96, appeared before Initial Classification and custody designated as CLO B, work group/ privilege group: A1/A. Placed on a vocational and ABE-III waiting list. 1-16-97, appeared before UCC for Program Review. Placed on I/S waiting list for Clerk position. 6-4-97, appeared before UCC for Annual Review. CS reduced by 4 to 44 points. Case referred to CSR for transfer RX: RJD-III, alternate retention COR-III. Placed on PIA waiting list and referred to ICC for Close Custody Review. <br><br>**VOCATIONAL INSTRUCTION:** CDC 128-E dated 12-18-96 reflects 10-25-96 enrolled into Vocational Machine Shop and terminated 12-17-96, due to reduction in custody level. Performance level, satisfactory. <br><br>**ACADEMIC EDUCATION:** 8-20-96, TABE survey reflects total GPL of 7.9. 7-17-96, HSG status report reflects passing grades in math, reading, and language. July 1996, report from Youth Training School (YTS), report period 4-1-96 through 6-29-96, reflects GPA of 2.81. 8-20-96, YTS transcript reflects GED awarded on 5/94 and all classes attended while at YTS. 4-30-97, Certificate of Completion for Volunteer Tutor Workshop by Laubach Lit Action. |

| CORRECTIONAL COUNSELOR SIGNATURE | | DATE 5-12-99 |
|---|---|---|

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **PARTIDA, DANIEL** | H-48181 | RJDCF | 6-99 | **JUNE 14, 1999** |

BPT 1004 (REV 7/86)         PAGE 1 of 4         Copy sent to inmate ___5.17.99___



BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POST CONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| CONT'D<br>6-11-96<br>TO<br>6-10-97 | | | **WORK PARTICIPATION:** CDC 101 dated 3-31-97 reflects 2-4-97, assigned as Teacher's Clerk. Received below average, unsatisfactory, satisfactory, above average, and exceptional work reports in this assignment.<br><br>**PARTICIPATION IN SELF-HELP GROUPS:** None noted this period. |
| | | | **DISCIPLINARY:** None noted this period.<br><br>**LAUDATORY:** CDC 128-B dated 1-4-97, reflects successful completion of Literacy Thinking Lifeskills Self-Help program, volunteer classroom format 40 hours. CDC 128-B dated 1-18-97, reflects Partida successfully completed Literacy Thinking, Organization, and Interaction of Life Skills. CDC 128-B dated 3-22-97, reflects successful completion of how best to tutor/instruct fellow inmates (8) hours, Literacy Thinking Lifeskills Self-Help as a Tutor(Instructor). CDC 128-B dated 3-22-97, reflects Partida completed 80 hours of instruction in Thinking Skills and 20 hours in learning interactive thinking. |
| 6-11-97<br>TO<br>6-10-98 | | | Remained at COR-III. Custody: CLO B. CS: 44. WG/PG: A1/A. 6-20-97, ICC action for Close Custody Review, denied Close Custody reduction and maintained CLO B Custody. 9-17-97, case referred to CSR for transfer RX: RJD-III, alternate COR-III retention. 11-15-97, endorsed for transfer to RJD-III. 12-3-97, received at RJDCF. 12-12-97, appeared before Initial Classification, transferred to Facility 1, and placed on Vocational Machine Shop and SSWL. Close Custody reduced to MED A. 6-2-98, UCC for Annual review, CS reduced by eight points for new CS of 36 points. |

ORDER:
☐ BPT date advanced by_____months.        ☐ BPT date affirmed without change.
☐ PBR date advanced by_____months.        ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐ Previously imposed conditions affirmed.
☐ Add or modify_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **PARTIDA, DANIEL** | **H-48181** | **RJDCF** | **6-99** | **JUNE 14, 1999** |

BPT 1004 (REV 7/86)                          PAGE 2 of 4                          PERMANENT ADDENDA

BOARD OF PRISON TERMS
CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                STATE OF CALIFORNIA

| POST CONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| CONT'D 6-11-97 TO 6-10-98 | | | **VOCATIONAL INSTRUCTION:** CDC 128-E dated 9-30-97 reflects 6-26-97 assigned Vocational Machine Shop at COR-III.  Received satisfactory performance in this assignment.  CDC 128-E dated 1-16-98 reflects 12-16-97, assigned Vocational Machine Shop at RJDCF.  Received satisfactory performance in this assignment.<br><br>**ACADEMIC EDUCATION:** None noted this period.<br><br>**WORK PARTICIPATION:** 2-4-97, assigned as Teacher's Clerk.  CDC 101 dated 7-1-97, reflects unsatisfactory, below average, satisfactory, above average, and exceptional performance.<br><br>**PARTICIPATION IN SELF-HELP GROUPS:** 6-3-98, CDC 128-B reflects Completion of 120 hours of Life Plan for Recovery.<br><br>**DISCIPLINARY:** CDC 128-A dated 5-21-98, Emergency Alarm Procedure.<br><br>**LAUDATORY:** CDC 128-B dated 6-19-97, reflects Partida completed five hours of orientation and 12 hours course work on how best to tutor/instruct inmates in literacy instruction.  CDC 128-B dated 8-1-97, reflects 40 hours of instruction to inmates in Literacy Thinking.  CDC 128-B dated 6-30-97, reflects Partida provided 52 hours of instruction to other inmates as a certified Laubach Tutor. CDC 128-B dated 10-1-97, reflects Partida provided four hours of instruction to other inmates in literacy areas as a Certified Laubach Tutor. CDC 128-B dated 3-24-98, inmate completed 22 hours of Hands of Peace/Friends Outside Creative Conflict Resolution Workshop. |

**ORDER:**
- [ ] BPT date advanced by_____ months.
- [ ] PBR date advanced by_____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify_____

- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| **PARTIDA, DANIEL** | **H-48181** | **RJDCF** | **6-99** | **JUNE 14, 1999** |

BOARD OF PRISON TERMS                                              STATE OF CALIFORNIA
CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POST CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6-11-98 TO PRESENT | | | Remained at RJDCF. Custody: MED A. CS: 36. WG/PG: A1/A. 8-28-98, UCC absentia granted "S" time for period of 8-20-96 to 10-23-96, because during reception process, all inmates received by CYA are to receive "S" time during Reception Center process.. |

**REASONS** (continued):

**VOCATIONAL INSTRUCTION:** CDC 128-E dated 1-10-98 reflects 12-16-97 assigned to Vocational Machine Shop. 6-27-98, 9-30-98, 12-31-98, and 4-1-99, CDC 128-E's reflect satisfactory performance. 5-26-99, inmate received his vocational educational certificate for Vocational Machine Shop.

**ACADEMIC EDUCATION:** None noted this period.

**WORK PARTICIPATION:** None noted this period.

**PARTICIPATION IN SELF-HELP GROUPS:** CDC 128-B dated 8-26-98, reflects attendance in Rapha 12 step program.

**DISCIPLINARY:** CDC 128-A dated 11-25-98, Unauthorized Shower. CDC 128-A dated 1-30-99, Unauthorized Leaving Work.

**LAUDATORY:** CDC 128-B dated 8-18-98, reflects completion of 22 hours Advanced Hands of Peace/ Friends Outside Creative Conflict Resolution Workshop.

**PREPARED BY:**                              **REVIEWED BY:**

A. HERNANDEZ                              R. ESTES
CC-II                                     CAPTAIN

**ORDER:**
- [ ] BPT date advanced by_____ months.
- [ ] PBR date advanced by_____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify_____

- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| PARTIDA, DANIEL | H-48181 | RJDCF | 6-99 | JUNE 14, 1999 |

BPT 1004 (REV 7/86)                            PAGE 4 of 4                           PERMANENT ADDENDA

# EXHIBIT K

# EXHIBIT K

PARTIDA, DANIEL                                                    H-48181

I.    **COMMITMENT FACTORS:**

    A.    **LIFE CRIME:** 187(A) PC, Murder 2nd degree, with Use of a Firearm; 12022.5 PC Los Angeles Case #BA043905. Victim: Gabriel Sotelo, age 16 years old. Received CDC on 5-5-93. Sentence to 15 years to Life. MEPD: 7-22-2001.

        1.    **Summary of Crime:** On January 9, 1991, the victim, Gabriel Sotelo, was standing outside of his residence at 3101 South Grande Avenue with a group of people, when a late model four-door Hyundi vehicle containing four Hispanic males approached and stopped at the victim's location. According to a witness, Partida was driving the car and one of the passengers drew a Uzi-type handgun, and fired several shots. The victim was struck with a single bullet in the back of the head and fell to the pavement. Paramedics responded to the scene and transported the victim to the hospital where he was pronounced dead. Police investigation revealed that the location of the offense is known as 39th Street Gang territory and 39th Street Gang was presently at war with the 36th Street Gang. Police believe that Partida is a member of the Saints Gang and was earning his stripes by committing this crime. He was taken into custody on 1-31-91.

        2.    **Prisoner's Version:** Partida admits that he was the driver of the car on the day of the offense, but he was not the man who did the shooting. He further stated that he had no idea that a shooting was going to happen that day, but he takes responsibility for what occurred. Partida says that despite what law-enforcement agencies say, he is not a gang member. His only association with gang members was through a girl he was dating whose brother was a gang member.

    B.    **AGGRAVATING/MITIGATING CIRCUMSTANCES:**

        1.    **Aggravating Factors:** The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime. The murder was wanton and apparently senseless in that it served no purpose.

PARTIDA, DAVID            H-48181            CTF-SOLEDAD            JUN/2000

2.    **Mitigating Factors**:  The prisoner was 17 years old at the time of the offense.

## II.    PRECONVICTION FACTORS:

A.    **Juvenile Record**:.

On 3-21-90 he was arrested by LAPD for Vandalism-None detained petition.

On 12-6-90 he was arrested by LAPD for Tamper with ID Markers of Firearm-None detained petition.

Arrested on 12-6-90 by LAPD for Possess Live Ammo Without Parental Permission.

B.    **Adult Convictions**:

On 1-31-91 he was arrested by LAPD for 187 PC Murder 2nd. He was sentenced to 15 years to Life. (He was also charged with an earlier robbery). This is the instant offense.

C.    **Personal Factors**: Partida was born in Los Angeles on 11-8-73. His mother died when he was 6 years old and his father was killed when he was 12. He was raised by his parental grandmother and parental uncle in the Los Angeles area. He grew-up in a area known for heavy gang activity but Partida denies any gang membership. He attended high school up to the 11th grade. Partida denies any drug use, but admitted to drinking beer on the weekends since he was 16. He stated that he would consume about two or three beers on average. For approximately 3 years he worked after school for his uncle in the auto sales business.

## III.    POSTCONVICTION FACTORS:

A.    **Special Accommodations/Disability**:  None.

B.    **Custody History**:

Partida was received into CDC on 5-5-93 at SACCO/YA, for the offense of Second Degree Murder. He received a sentence of 15 years to Life. While in YA he received his GED. He transferred to CCI on 8-20-96 and CSP-Corcoran on 10-10-96. While at Corcoran, he participated in the Corcoran Peers Tutor Literacy Program as a certified Laubach Turtor. He was transferred to RJD on 12-3-97.

PARTIDA, DANIEL          H-48181              CTF-SOLEDAD          JUN/2000

During this time he was assigned to Vocational Machine Shop, and Laboratory Porter. On 8-25-00 he was transferred to CTF-II. He is currently assigned to Vocational Print Shop.

**C.** **Therapy & Self-Help Activities:**

While housed at RJD, Partida completed courses in "Peace/Friends Outside Creative Conflict Resolution Workshop." He also completed 120 hours in "Life Plan for Recovery Substance Abuse Education Program," and participated in Rapha 12-step Program. During this time he also participated in the RJD "Walk-Thon."

Dates of Participation or Completion:

Peace/Friends Outside Workshop; March 13-15 1998, August 7-9-1998, May 7-9-2000. Rapha 12-Step Program; April 29, 1998 thru August 26, 1998.
Life-Plan; June 3, 1998
Walk-A-Thon; May 5, 1999

**D.** **Disciplinary History:**

| Date | Institution | Disposition |
|------|-------------|-------------|
| 7-6-95 CDC 115 | CYA | Possession and/or knowledge of possession of contraband guilty, 30 days loss of credit. |
| 5-21-98 CDC 128-A | RJD | Emergency Alarm Procedures. |
| 11-25-98 CDC 128-A | RJD | Unauthorized Shower. |
| 1-30-99 CDC 128-A | RJD | Absent from assignment. |
| 6-19-99 CDC 128-A | RJD | Absent from assignment. |
| 7-23-00 CDC 128-A | RJD | Unauthorized telephone call. |

**IV.** **FUTURE PLANS:**

**A.** **Residence:** Partida plans to live with his grandmother at 424 East 27th Street. Los Angeles, CA 90011. Telephone: #213-747-8469.

PARTIDA, DANIEL          H-48181          CTF-SOLEDAD          JUN/2000

**B.**     **Employment:**. He plans to work for his uncle, Mr. Jose Escobar, at Brooklyn Auto Sales 4300 East 3rd. Street Los Angeles, CA 90022. Partida stated that his uncle offered to pay his for his tuition for a higher education.

**V.**     **USINS STATUS:** None.

**VI.**     **SUMMARY:**

    **A.**     Considering the commitment offense, prior record and prison adjustment, I believe that Partida would pose a moderate degree of threat to the public if released at this time.

    **B.**     Prior to release, Partida would benefit from remaining disciplinary free, continuing to upgrade vocationally and participation in self-help and therapy when available, maintaining full time assignments.

    **C.**     This Board Report is based upon a thorough review of the C-File and extensive interview with Partida and incidental contact in the housing unit. Partida reviewed his Central File during the interview on 10-25-00 per Olson.

PARTIDA, DANIEL       H-48181        CTF-SOLEDAD       JUN/2000

_G.T. Notcalfe (4)_

D. Wade
Correctional Counselor I


_M. Arfa_

R. Gilliam
Correctional Counselor II


_L. Clancy_

J.L. Clancy
Facility Captain


_WBChildon_

S.L. Hill
Classification and Parole Representative(A)


PARTIDA, DANIEL          H-48181                    CTF-SOLEDAD          JUN/2000

# DISCIPLINARY SHEET

**CDC 128As:**

| | | |
|---|---|---|
| 5-21-98 | RJD | Emergency alarm procedures. |
| 11-25-98 | RJD | Unauthorized shower. |
| 1-30-99 | RJD | Absent from assignment. |
| 6-19-99 | RJD | Absent from assignment. |
| 7-23-00 | RJD | Unauthorized telephone call. |

**CDC 115s:**

| | | |
|---|---|---|
| 7-6-95 | CYA | Possession and/or Knowledge of Possession of Contraband; Guilty, 30 days loss of credit. |

PARTIDA, DANIEL          H48181          CTF-SOLEDAD          JUN/2000

# EXHIBIT L

# EXHIBIT L

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JUNE 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
DECEMBER 27, 2000

This is the second psychological evaluation for the Board of Prison Terms on inmate Daniel Partida, CDC# H-48181.  This report is the product of a personal clinical interview of the inmate, conducted on 12/27/00, as well as a review of his Central file and unit health record.  This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

Inmate Partida is a 27-year-old, single, Hispanic male.  His date of birth is 11/08/73.  He has no stated religious preference.  No unusual physical characteristics were observed and he denied ever using any nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

Inmate Partida had no significant developmental history.  He reports that his childhood years were essentially normal, with speech and motor development milestones achieved at appropriate ages.  He denied any childhood history of physical or sexual abuse as either a perpetrator or a victim.

III.  EDUCATIONAL HISTORY:

Inmate Partida stated that he attended public school, but was arrested for the commitment offense in the middle of the 11th grade.  He received average grades while in school, but was chronically truant.  Although he denied ever being expelled from school, he did report being suspended a few times for fighting.  He received his GED in 1994 while in CYA.  He reports no history of special education or academic problems in

PARTIDA        H-48181        CTF-NORTH        01/06/01        gmj

PARTIDA, DANIEL
CDC NUMBER: H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

school. He denies having a history of any learning disability. Currently, he is interested in participating in a college program and plans to attend business college once released.

IV.   **FAMILY HISTORY**:

Inmate Partida was born in Los Angeles and raised primarily by his paternal grandparents. His mother died when he was young and his father was murdered in 1987. The inmate did not provide any further details regarding the incident. He reported that his father served approximately two years in prison, but the inmate did not know further details since his contact with his biological father was minimal. He continues to have a close relationship with his uncle and grandmother, both of whom continue to be supportive and will assist him in "getting on his feet" when released. He denied any history of abuse in these relationships with his family members.

V.    **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION**:

Inmate Partida stated that he is a heterosexual male. He denied any history of sexual aggression or high-risk behavior.

VI.   **MARITAL HISTORY**:

Inmate Partida stated that he has never been married and has no children.

VII.  **MILITARY HISTORY**:

The inmate denied any history of military service.

VIII. **EMPLOYMENT AND INCOME HISTORY**:

Inmate Partida states that prior to his incarceration, he worked as a car salesman for the family business for approximately two years. Since the current crime was committed when he was 17 years old, he has a minimal employment history.

However, since his incarceration, he has held many jobs and has participated in numerous programs. While in

PARTIDA        H-48181        CTF-NORTH        01/06/01        gmj

PARTIDA, DANIEL
CDC NUMBER:  H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

CYA, he completed a computer repair program.  While in
Richard J. Donovan Correctional Facility, he completed
the vocational machine shop course.  He has currently
been working in the CTF vocational print shop and is
certified as a peer tutor.  Self-help program
involvement has included Life Skills, a Christian
12-step program, and Life Plan for Recovery.

IX.    SUBSTANCE ABUSE HISTORY:

Inmate Partida denied having any history of either drug
or alcohol abuse.  He reported to have "tried"
marijuana on one occasion and declined any further
involvement, stating, "It just wasn't for me."

Throughout his incarceration, however, he has
participated in a 12-step program, as well as
continuous Alcoholics Anonymous meetings.  When asked
about this, in light of his lack of substance abuse
history, he stated, "It helps me to learn more about
myself, and I know the Board will recommend that I
participate."

X.     PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Partida denies any prior history of medical or
psychiatric hospitalizations.  He denies any
psychiatric history or suicide attempts.  He denies a
history of serious accidents or head injuries, or a
history of seizures or other neurological conditions.
He is taking no medications at this time.

XI.    PLANS IF GRANTED RELEASE:

If granted parole, inmate Partida plans to live in the
Los Angeles area with his uncle and/or grandmother.  He
also plans to attend business college, preferably with
a major in either accounting or bookkeeping.  His
family continues to own a car dealership and have
offered him the opportunity to work in the business
portion.  His family has also offered to help him pay
for his college education.  His grandmother is quite
elderly with numerous medical problems and he is
extremely motivated to "do whatever it takes to get
paroled" in order to be able to see her, stating, "She
is what keeps me going."

PARTIDA       H-48181       CTF-NORTH       01/06/01       gmj

PARTIDA, DANIEL
CDC NUMBER:  H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Partida was alert
and oriented to person, place and time.  He was well
dressed and groomed.  His speech, flow of thought and
affect were all within the normal range.  He answered
questions which were asked; however, he offered little
detail except when prompted.  He approached the
interview process in a similar guarded and defensive
manner.  However, he continued to be cordial and
cooperative throughout, but rapport was difficult to
establish.  His intellectual functioning was estimated
to be in the average range.  There was no evidence of a
mood or thought disorder and his judgment appeared to
be sound.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      No Contributory Clinical Disorder.
AXIS II:     No Contributory Personality Disorder.
AXIS III:    No Contributory Physical Disorder.
AXIS IV:     Incarceration.
AXIS V:      GAF = 85.

XIII. REVIEW OF LIFE CRIME:

Inmate Partida described the circumstances surrounding
his commitment offense.  He does not agree with the
official version of the offense and states that he was
not the individual who shot at the crowd of people,
killing one of the victims.  However, he was the only
one arrested and charged with the crime.  Although the
incident occurred in relation to a gang-related
shooting, he denied being affiliated with any such
gang.  When asked how he explains the fact that he was
the only one arrested for this offense, he shrugged his
shoulders and said, "Don't ask me if I believe in
justice."

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  Inmate Partida's violence potential within a
controlled setting is considered to be
significantly below average relative to this Level
II inmate population.  This conclusion is based on

PARTIDA        H-48181        CTF-NORTH        01/06/01        gmj

PARTIDA, DANIEL
CDC NUMBER: H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

several factors, including his lack of any violent
criminal history, as well as his lack of CDC-115
violations (his one and only 115 was in 1995 and
was of a nonviolent nature). He also lacks any
substance abuse history, which is neither confirmed
nor disconfirmed by his Central file.

B.  If released to the community, his violence
potential is estimated to be no more than the
average citizen in the community. Although he has
a juvenile record prior to the commitment offense,
the charges were either dropped or he was counseled
and released to his grandmother's custody.

C.  Substance abuse does not present a risk factor
which may be a precursor to violence for this
individual.

XV.  <u>CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS</u>:

A.  This inmate is competent and responsible for his
behavior. He has the capacity to abide by
institutional standards and has generally done so
during his incarceration period.

B.  This inmate does not have a mental health disorder
which would necessitate treatment either during
his incarceration period or following parole.

C.  The only risk factor which could be a precursor for
this individual would be his return to gang
affiliation, and therefore should be monitored
closely for negative associations.

R. S. COATE, Psy.D.
Senior Supervising Clinical Psychologist
Correctional Training Facility, Soledad

RSC/gmj

D:  12/27/00
T:  01/06/01

PARTIDA        H-48181        CTF-NORTH        01/06/01        gmj

HEMAN G. STARK YOUTH TRAINING SCHOOL

CALIFORNIA DEPARTMENT OF CORRECTIONS
BOARD OF PRISON TERMS

PSYCHOLOGICAL EVALUATION

TO:     Board of Prison Terms              DATE:   May 13, 1996

FROM:   Haig J. Kojian, Ph. D.            SUBJ:   Partida, Daniel
        Staff Psychologist, Clinical              M9141
        Mental Health Services

REASON FOR REFERRAL

Mr. Daniel Partida was referred for a Psychological Evaluation
prior to his documentation hearing.  The inmate is currently at the
California Youth Authority -- Heman G. Stark Youth Training School
and is currently housed on IJ Company.  A clinical interview, and
the Bender Visual Motor Gestalt test were used during the course of
this evaluation.  The inmate was interviewed for approximately 1
1/2 hours.

IDENTIFYING INFORMATION AND MENTAL STATUS

Mr. Daniel Partida is a twenty-two year old Hispanic male who was
committed to the California Youth Authority in 1992 for 187 PC --
Second Degree Murder.  Mr. Partida's maximum confinement time is
indeterminate.  He is currently at the California Youth Authority -
- Heman G. Stark Youth Training School under Section 1731.5 (c) of
the Welfare and Institutions Code.  His earliest possible release
date from the California Youth Authority is on his twenty-fifth
birthday, November 8, 1998.

Mr. Partida has received a social evaluation at the Southern
Reception Center and Clinic during a 90 day observation in 1992,
and a Psychiatric evaluation dated July 20, 1992 by Harold Kates,
M.D.  This is the first psychological evaluation on the inmate.

At the time of the evaluation, Mr. Partida's grooming and hygiene
were unremarkable.  The inmate admitted to having a tattoo of his
name on his back.  He states he used to associate with the "Ghetto
Boys" gang in the South Central Los Angeles area and was known by
"Danny."

Mr. Partida's affect was unrestricted at the time of the
evaluation, and his mood was euthymic. His thinking was clear with
no demonstration of bizarre thought.  He was oriented in all
spheres.  There is no evidence for psychotic or delusional
thinking.  There were no demonstrations of unusual mannerisms or
expressions.

Mr. Partida's mental tracking was mildly impaired; he had difficulty with serial 7's and serial 3's. His memory for immediate and delayed recall of verbally presented stimuli was unimpaired, however. Mr. Partida's attention and concentration were unimpaired.

The subject noted that he has experienced numerous head injuries as a result of being hit with rocks and a brick when he was young. He noted that he lost consciousness one time, but was not taken to the hospital. He denied experiencing seizures, serious headaches, dizziness, black outs or memory problems. Testing with the Bender revealed intact functioning. There is no evidence for gross organicity at this time.

The inmate denied a history of suicidality, and did not present as being suicidal currently. He spoke in clear English with unremarkable rate, articulation and fluency.

Throughout the interview Mr. Partida was cooperative and readily participated in the evaluation. Rapport was established and maintained without difficulty. The current evaluation is considered to be an accurate reflection of the inmate's current functioning.

## RELEVANT HISTORY

According to the inmate and the available record, the inmate was born in Los Angeles but moved back and forth from Mexico. Mr. Partida noted that at age 6 his mother passed away, but did not know how or why she died. He noted his father was incarcerated, the inmate doesn't know why, and was murdered in Mexico when the inmate was 12 years old. Mr. Partida was raised primarily by a paternal grandmother who lived in the Los Angeles area, and a paternal uncle. He apparently had little contact with his natural father even when he was alive.

The inmate minimized his gang involvement. He noted he hung out with gang members since he grew up with them and knew them from school and the streets. He denied participating in juvenile delinquency. The record indicates, however, that the inmate was "an active member with either 66th Street or Street Saints." Prior to the instant offense, the inmate had a number of contacts with the law. At age 16 he was arrested for vandalism. At 17 he was arrested for destructive presence at school. He was also arrested for possession of live ammunition, carrying a loaded firearm, and tampering with ID marks on a firearm. Additionally, he was arrested for an armed robbery charge. In each case, the charges were either dropped, or he was counseled and released to his grandmother's custody. He states he was never committed to juvenile hall or camp.

By self-report the inmate last schooled to the eleventh grade and was receiving average grades. He notes he found school to be moderately difficult, and was chronically truant. He states he was

suspended a few times for fighting.

The inmate denied any drug use, but admitted to drinking beer on the weekends since age 16. He noted he would consume about two or three beers on average. He denied involvement in drug sales.

## HISTORY OF INSTANT OFFENSE

The inmate does not agree with the official version of the instant offense. According to the record, in January 1991 the subject and three co-offenders were involved in a gang related drive-by shooting. The record indicates that the inmate pointed a hand gun at rival gang members who had congregated on the street, and fired several shots, one of which struck a victim in the back of the head. The victim was pronounced dead shortly after being shot.

The inmate indicates that he was framed by the co-offenders. He indicates that he picked up two acquaintances on that day, and was told to drive to the 39th street area to drop one of them off. He indicates he did not know that the person riding in the back seat had a gun. He notes that as he stopped in front of the apartment complex to drop the passenger off, the passenger pulled out a gun and began firing at the crowd. He states that he then drove away.

Mr. Partida has appealed his case. He states that his appeal has been denied.

## DIAGNOSIS

According to the history and current evaluation, the following diagnoses are warranted:

AXIS I       312.8       Conduct Disorder

AXIS II      Deferred

AXIS III     None Known

## CONCLUSION AND RECOMMENDATIONS

Mr. Partida was committed to the California Youth Authority in 1992 for second degree murder. Since his commitment, the inmate states he has participated in computer repair, business education and upholstery. He also reportedly obtained his GED, and is currently working in the education department.

The inmate denies his participation in the murder as noted in the record. He was screened by this clinician for possible inclusion in PC 187 therapy in March 1995, but noted at the time that he felt he didn't need therapy as he had not murdered anyone, and that his case was under appeal and he did not want to discuss the circumstances surrounding the offense. Currently, the inmate indicates that he is interested in participating in PC 187 therapy. He will be placed on the waiting list.

It is recommended that Mr. Partida continue to be placed at the
Youth Authority under section 1731.5 (c) of the Welfare and
Institutions Code until his twenty-fifth birthday in order to
participate in 187 group therapy.

Haig J. Kojian, Ph. D.
Staff Psychologist

# EXHIBIT M

# EXHIBIT M

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**SEPTEMBER 2004 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**NOVEMBER 27, 2004**

This is a psychological evaluation for the Board of Prison Terms on inmate Partida, CDC# H-48181.

Inmate Daniel Partida is a 31-year-old (date of birth: 11/08/73), single, Mexican male who is serving a 15-year-to-life sentence from Los Angeles County for the offense of PC 187, murder second degree. This offense occurred on 01/09/91.

Inmate Partida was 17 years of age. He has been incarcerated now for 14 years. MEPD is 07/22/01. He is a Christian.

SOURCES OF INFORMATION: This evaluation is based upon two psychodiagnostic interviews which totaled about two to three hours. In addition, the central file and medical file were reviewed.

The previous psychosocial assessment completed on 01/06/01 by R. S. Coate, Psy-D., is still current and valid. Therefore, that information will not be repeated in this current evaluation.

## CLINICAL ASSESSMENT

## XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Partida was alert, well oriented, and cooperative. His hygiene and grooming were appropriate. His eye contact was good. His speech was normal, fluent, and goal-oriented. His affect was appropriate. There was no evidence of depression or anxiety. He was not at all defensive or guarded. His manner is friendly, cheerful, and cooperative. Intellectually, he is functioning in the average range. There is no evidence of organic impairment or deficits in this case. There is no evidence of a mood or thought disorder. His judgment is intact. His self-awareness and insight is also good.

Inmate Partida explained that his grandmother, uncle, and brother are still living and doing well. They live in the Los Angeles area. They are very supportive and keep in close contact with him. His family has hired an investigator to locate the brother of inmate Partida's girlfriend at the time of the offense. He was a witness

**PARTIDA          H-48181          CTF-CENTRAL          11/27/04          gmj**

PARTIDA, DANIEL
CDC NUMBER: H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

to this offense, and would be able to correct errors in the record. Inmate Partida stated that he was a driver of the vehicle, but was not the person that shot the victim. He stated that he had no idea this was going to happen, and he was taken by surprise when shots were fired.

Inmate Partida stated that he has never had any gang involvement, although he was a friend to Jose, the 15-year-old brother of his girlfriend, who was a gang member. He denied any history of drug or alcohol abuse. He experimented with marijuana on one occasion, but did not like it. He drank a few beers, but never to excess, and never to intoxication. He did describe his juvenile arrests. These juvenile offenses were either dismissed, or he was released to the care of his grandmother. There are no convictions.

Inmate Partida has made a very good adjustment to his prison experience. He has actively involved himself in activities designed for self-improvement. He has completed several vocational trades. He has completed vocational computer repair, vocational machine shop, vocational printing, and he currently is involved in taking college classes by correspondence. His goal is to obtain an Associate of Arts degree in business. He has completed several business-related courses. In addition, he has been actively involved in several self-help programs. He also has participated in Alcoholics Anonymous, although he does not have a drinking problem. The reason he participated was that he wanted to gain in self-awareness and insight, and acquire knowledge and skills that would help other people. In addition, he is a certified tutor for academic programs. He also has been a peer education instructor, instructing other inmates on infectious diseases, etc.

There is no history of mental disorder in this case. In the interviews, it is evident that there are no mental or emotional problems. Inmate Partida does not have a personality disorder of any type. He is not an individual that is antisocial or sociopathic in his thinking or values. He has a great deal of warmth and empathy towards other people. He continues to have a friendly and cheerful attitude in spite of his years of incarceration. He has a positive outlook on the future. There is no evidence of psychopathology in this case.

## CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

AXIS I:      No contributory clinical disorder.
AXIS II:     No contributory personality disorder.
AXIS III:    No contributory physical disorder.
AXIS IV:     Life-term incarceration.
AXIS V:      Current GAF = 90.

## XIII.   REVIEW OF LIFE CRIME:

When inmate Partida was arrested, he was charged with two offenses. He was charged with PC 211, second-degree robbery. According to the probation

PARTIDA          H-48181          CTF-CENTRAL          11/27/04          gmj

PARTIDA, DANIEL
CDC NUMBER: H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

officer's report, the female victim had an argument with the defendant, who
snatched the victim's necklace from her neck. When she tried to retrieve the
necklace, she was struck several times with a closed fist and kicked by inmate
Partida. Inmate Partida stated that this was his girlfriend, and the necklace was a
necklace he had given her. The relationship was breaking up, as he had another
girlfriend. He grabbed the necklace from her neck. She ran away and called the
police. He denied kicking her or punching her at all. He stated that his elderly
grandmother was there during this altercation, which happened in his
grandmother's front yard. He stated he would never disrespect his girlfriend or
his grandmother by being aggressive or violent towards his ex-girlfriend.

When questioned about the commitment offense, he stated that he had absolutely
no intent to commit this offense. He stated the problem was that he had
accidentally associated with a negative person who was the assailant in this
offense. He had no idea who this person was, or what his intent was. He stated
that, after work, he was driving over to see his girlfriend, and he saw his
girlfriend's brother. He stopped and asked the brother if he wanted a ride. The
brother, Jose, age 15, was walking with an older associate that was unknown to
inmate Partida. He stated he was about 19. He asked for a ride also, and so they
both got into the car.

As they were driving towards his girlfriend's home, the other individual asked to
be taken to a nearby apartment building. Inmate Partida stated that he assumed
that was where the individual lived. He pulled up to the curb in order to let him
out. He immediately heard a shot and thought that someone was shooting at him.
He stated he ducked down and put his foot on the throttle in an effort to get out of
the area. He heard two more shots, and then realized that the person sitting in the
passenger seat next to him was shooting the gun at bystanders on the sidewalk.

Inmate Partida stated that he felt panicked, and he drove away quickly. He went
to Trinity Park, where the assailant was dropped off. He stated that Jose was
arrested for this offense, but then released. He was told that Jose had protected
his friend, and accused inmate Partida of this offense. The actual assailant in this
offense was not arrested, and he believes he must have left the area. He suspected
that he was from South America. He stated that he had no idea how to defend
himself, and how to obtain legal counsel. He stated that his public defender never
questioned Jose, who could have explained the truth of what really happened.

Inmate Partida stated, "I'm guilty of accessory after the facts." He stated that
"I'm also guilty for fleeing the scene and not calling the police immediately." He
stated that his behavior was irresponsible, and he should have called authorities
immediately. He stated that he is guilty for these omissions, and he believes that
he deserves punishment for his irresponsible and inappropriate decision-making at
the time. He also expressed a great deal of sorrow and remorse about the offense
itself. He stated that the victim was a 16-year-old child who was totally innocent,
and certainly did not deserve to be killed like he was. It is evident that he feels

PARTIDA, DANIEL
CDC NUMBER: H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

with the actual murderer, and not having the judgment and discernment that he now has that would have avoided this whole situation. It is obvious that his feelings of remorse are sincere and genuine.

## XIV.    ASSESSMENT OF DANGEROUSNESS:

A.    In assessing inmate Partida's potential for violence within the controlled setting of the institution, his only disciplinary was in 1995, in the California Youth Authority. He has possession of two batteries that were not allowed. There is absolutely no history of violence, aggression or gang involvement in the institutional setting. It should be noted that inmate Partida is a Mexican male who is living in an environment where there is a great deal of pressure on Mexican males to join one of the prison gangs. He has been able to avoid involvement in these gangs. This behavior is commendable, and shows very good judgment. It is obvious that his violence potential within the controlled setting of the institution is definitely below average in comparison to other inmates.

B.    If released to the community, his potential for dangerous behavior is no greater than that of the average citizen in the community. This was stated by the previous psychologist, and I agree with that assessment. His juvenile record is minor. He has consistently denied being involved in street gangs, although the opportunity was certainly available to him when he was living in the community. In addition, there are other factors that would indicate that he has a low potential for dangerous behavior.

1)    Inmate Partida does not have a personality disorder that would contribute or cause aggressive or violent behavior. He is not at all antisocial in his thinking or values. This fact would contribute towards inmate Partida making a responsible and constructive adjustment to the community.

2)    Inmate Partida's absence of serious disciplinaries while in the institution is commendable. It does show improvement in his judgment, and gains in maturity. It is not easy to live in an institutional environment with all of its stressors, conflicts, racial altercations, and a general hostile environment, and remain disciplinary-free. The fact that he has remained disciplinary-free shows that he has a strong potential to make a good adjustment to the community.

3)    Inmate Partida is forward-thinking in his values. He is pursuing an Associate of Arts degree in business. He has completed courses towards this. He is anxious to make a positive contribution to the community. This would not be seen in an individual who was only

PARTIDA          H-48181          CTF-CENTRAL          11/27/04          gmj

PARTIDA, DANIEL
CDC NUMBER: H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

community. This would not be seen in an individual who was only interested in continuing hedonistic, self-centered, or illegal activities.

4)    Inmate Partida continues to have strong family support in the community. Research has demonstrated that strong family support is a very positive characteristic that contributes towards successful community adjustment.

5)    Inmate Partida has completed several trades, which were listed above. He has completed several self-help programs also. He has four active, current, standing job offers in the community in areas where he has achieved skills. He has a very strong work ethic, and he is very eager to immediately obtain employment. Strong employment potential in the community is a strong indicator of successful adjustment.

6)    Inmate Partida has no history of alcohol or drug abuse in the community, or in the institution. Therefore, this will not be a hindrance to his successful adjustment to the community.

7)    Inmate Partida volunteered that he wants to become involved with troubled youth in the community when he is released. He has plans for volunteering with troubled youth, and sharing with them how not being careful about what you do, and not considering the consequences of your actions can be devastating. He speaks about this possibility in an enthusiastic and eager manner. It is evident that his feelings about this opportunity are sincere. This also is a strong indicator that he certainly won't become involved in delinquent activities himself.

8)    Inmate Partida has a very good attitude. He is not at all bitter, sullen, or negative. He stated that coming to prison has been a very valuable lesson to him. It has given him the opportunity to grow in knowledge, wisdom, and maturity. He stated that he is very appreciative of this opportunity. He believes that God has a purpose in his being in prison, and he is cheerfully submitting himself to that experience. This attitude is very commendable. This attitude also demonstrates his ability to rise above adversity and hardship. This should be of great assistance to him when he is released to the community.

C.    There are no current risk factors in this case that would be a precursor to violence in the community. Inmate Partida does not have a substance abuse problem or any other problem that would contribute towards criminality.

PARTIDA          H-48181          CTF-CENTRAL          11/27/04          gmj

PARTIDA, DANIEL
CDC NUMBER: H-48181
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX


XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

There is no indication of any mental or emotional problems in this case that would
interfere with granting a parole date. There are many factors which were listed
above that would indicate that inmate Partida would make a good adjustment to
the community. The prognosis for successful adjustment in society is excellent in
this case.

As a former parole agent who has had numerous lifers on my caseload in the Los
Angeles area, I would not hesitate to have inmate Partida on my caseload.


Melvin Macomber, Ph.D.
Licensed Psychologist
Correctional Training Facility, Soledad


B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

MM/gmj

D: 11/27/04
T: 11/29/04

*D:\Word Files\BPT - 2004\PARTIDA   H-48181   12-04   MACOMBER.doc*

PARTIDA          H-48181          CTF-CENTRAL          11/27/04          gmj

**MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
OCTOBER 2002 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 7, 2002**

Inmate Daniel Partida, CDC# H-48181, was seen for a
psychological evaluation for the Board of Prison Terms by R.
Coate, Ph.D., Staff Psychologist at the Correctional
Training Facility (CTF), on 12/27/00 for the June 2000 Lifer
Calendar.

According to the instructions given to Wardens and Health
Care Managers by Steven Cambra, Jr. (CDC), and G. Lewis
Chartrand, Jr. (BPT) in September 1998, once a mental health
evaluation is completed in the new format, revised in August
1998, a new evaluation is not necessary when an inmate
appears before the Board of Prison Terms unless the BPT has
filed a BPT 1000A request for a new report.

Since there is no BPT 1000A request on file, a mental health
evaluation was not conducted at this time.

**BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD**

BZ/gmj

D:  06/07/02
T:  06/07/02

PARTIDA        H-48181        CTF-CENTRAL        06/07/02        gmj

# EXHIBIT N

# EXHIBIT N

| REG. NO. | ARRESTEE'S NAME (LAST, FIRST, MIDDLE) | | | | | MT. | | EVID RPT | GANG MEMBER | | | LA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Partida, Daniel NMN | | | | | N | | | 91-1304284 | | | 2341262P |
| | ADDRESS | | | CITY | | SEX | | | VICTIM'S NAME | | CII | |
| | 424 E. 27th Street | | | Los Angeles | | M | | | 01002834 | | | |
| | DESCENT | HAIR | EYES | HEIGHT | WEIGHT | BIRTHDATE | | AGE | MAIN | | FBI | |
| | Hisp | Blk | Bro | 6-0 | 160 | 11-8-73 | | 17 | | | | |
| | VEH. LIC. NO. | | STATE | R.D | DESC/AKA/NICKNAME | | | | | | | |
| | -- | | -- | 13 | "Lover Boy" | | | | | | | |
| | BIRTHPLACE (CITY & STATE) | | PROB INV UNIT | | JUV DETAINED AT | | AD. CHG. | | | | | |
| | Unknown | | Newton | | -- | | -- | | | | | |
| | DIVISION & DETAIL ARRESTING | | DATE & TIME ARRESTED | | | TIME BKD | | | | | | |
| | Newton Det. | | 1-31-91  1430 | | | -- | | | | | | |
| | LOCATION OF ARREST | | | | BAIL, INC. PA | | | | | | | |
| | 1354 E. Newton Street, Los Angeles | | | | -- | | | | | | | |
| | TYPE | CHARGE (SECTION, CODE, DEFINITION) | | | WARRANT NO. | | | | | | | |
| | F | 602 WIC 187(A) PC | | | | | | | | | | |

DR NO. 91-1304284

SHOTS FIRED

ADDITIONAL CHARGES (ON ADD. WARRS., LIST NO., COURT, AND BAIL, INC. PA)
-- 

ADMONITION OF RIGHTS (when applicable)
THE FOLLOWING STATEMENT WAS READ TO THE ARRESTEE
"YOU HAVE THE RIGHT TO REMAIN SILENT. IF YOU GIVE UP THE RIGHT
TO REMAIN SILENT, ANYTHING YOU SAY CAN AND WILL BE USED AGAINST
YOU IN A COURT OF LAW. YOU HAVE THE RIGHT TO SPEAK WITH AN
ATTORNEY AND TO HAVE THE ATTORNEY PRESENT DURING QUESTIONING.
IF YOU SO DESIRE AND CANNOT AFFORD ONE, AN ATTORNEY WILL BE
APPOINTED FOR YOU WITHOUT CHARGE BEFORE QUESTIONING."
THIS ADMONITION WAS READ TO THE ARRESTEE BY
(NAME & SERIAL NO.):
Not Given

| ARRAIGN. DATE | TIME | COURT | LOCATION CRIME COMMITTED | | R.D. | SOCIAL SECURITY NO. | RES. PHONE NO. |
|---|---|---|---|---|---|---|---|
| -- | -- | -- | 36th St. and Grand Avenue | | 13 | Unknown | 747-8469 |
| OCCUPATION / GRADE | | EMPLOYER (FIRM OR PERSON'S NAME, CITY & PHONE) / SCHOOL | | | | OBSERVABLE PHYSICAL ODDITIES | |
| Unknown | | Central High Continuation | | | | Scar rt hand/TT rt hand | |
| CLOTHING WORN | | | | EXACT LOCATION/DISPOSITION ARRESTEE'S VEHICLE | | | HOLD FOR: |

USE OF FORCE

| LIST CONNECTING RPTS. BY TYPE & IDENTIFYING NOS. | | VEHICLE USED (YEAR, MAKE, MODEL, TYPE, COLORS, LIC. NO., ID MARKS.) | PASSENGERS |
|---|---|---|---|
| Crime, Death | | 87, Hyundai, 4 door, Red, Lic. #2PHR505 | M  F |
| COMPLAINTS/EVID. OF ILLNESS/INJ. - BY WHOM TREATED | | DRIVING VEH. (DIRECTION & NAME OF STREET) AT OR BETWEEN STREETS | 3  - |

DSD (GAS) CRASH

INVOLVED PERSONS  Code: V-VICTIM  W-WITNESS  P/A-PRIVATE PERS.  R-PERSON RPTG.  459: B-PERSON SECURING  B-PERSON DISCOVERING  JUV: B-BOTH PARENTS  G-GUARDIAN

| | NAME | V & W S | SEX | DESC | DOB | ADDRESS | | CITY | | PHONE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| V | Sotelo, Gabriel | M | Hisp | 5-22-72 | R | | | | | | |
| | | | | | B | DECEASED | | | | | |
| | | | | | R | | | | | | |
| | | | | | B | | | | | | |
| | | | | | R | | | | | | |
| | | | | | B | | | | | | |

| COMBINED CRIME REPORT | IF MULT. ARRESTEES, THIS SECTION & ABOVE CRIME RPT. CHECK, BOX IS COMPLETED ON ONLY ONE FACE SHEET. | | TYPE OFFENSE | | VICT'S OCCUPATION |
|---|---|---|---|---|---|
| DATE AND TIME CRIME OCCURRED | | TYPE PROPERTY | | TOTAL $ | EST. DAMAGE  TYPE PREMISES |
| 459 - BFV ONLY - POINT AND METHOD OF ENTRY | | | WEAPON / FORCE / INSTRUMENT USED | | TFV / BFV ONLY - VICT'S. VEH. (YR, MAKE, TYPE, LIC.) |
| MO (UNIQUE ACTIONS) | | | | | |
| | SEE CRIME REPORT | | | | |

| COMBINED EVID. RPT. | USE THIS SECTION IN LIEU OF PROPERTY REPORT IF ONLY ONE ARRESTEE, NO GUN, AND NO MORE THAN 3 ITEMS | | | LOC. EVID BKD | 10.10 GIVEN | PRELIM. DRUG TEST | SUPV INV. OFCR  TESTING | SER. NO. | WITNESS OFCR. | SER. NO. |
|---|---|---|---|---|---|---|---|---|---|---|
| ITEM/QUAN | ARTICLE | | SERIAL NO. TYPE TEST OF DRUG | BRAND / DRUG WEIGHT UNITS | MODEL NO. / DRUG TEST RESULT | MISC. | | | | |
| | SEE EVIDENCE REPORT | | | | | | | | | |

EXTRA COPY TO:

| APPROVAL / REPORTING OFFICERS | SUPERVISOR APPROVING REPORT | | SERIAL NO. | REPORTING OFFICER(S) | | SERIAL NO. | DIV. & DETAIL | VACATION |
|---|---|---|---|---|---|---|---|---|
| | F.D. Fierr | | 14490 | J. Garcia | | 23694 | Newton | Apr-May |
| | DATE & TIME REPRODUCED | | DIV. | J. Pirro | | 21966 | Homicide | -- |
| | | | CLERK | (P.P. ARREST - OFCR. BKG. EVID. IF LISTED ON THIS PAGE) | | | | |

| JUVENILE DISPO. | Petition Request: ☐ DETAINED ☐ RELEASED ☐ NON-BOOK ☒ NON-BOOK & WARR. | INVEST. OFCR. | SERIAL # | DIV. |
|---|---|---|---|---|
| FINAL CHARGE, IF DIFFERENT THAN ORIGINAL (SECTION, CODE & DEFINITION) | IF REFERRED, AGENCY & PERSON ACCEPTING REFERRAL | J. Garcia | 23694 | NIN |
| | | SUPERVISOR APPROVING | SERIAL NO. | |
| | | F.D. Fierr | 14490 | |
| | PROPERTY BOOKED (Y) (N) | JUV. COORD. REVIEWING | | |

| 11 ☐ C & R | 13 ☐ EXON-INNOCENT | 04 ☐ CYA | 18 ☐ JUV. TRAF. MISD. | 16 ☐ DPSS |
|---|---|---|---|---|
| 11 ☐ ACTION SUSP. | 12 ☐ REL-INSUF. EVID. | 03 ☐ PROBATION | 17 ☐ FIRE DEPT. | ☐ OTHER: |
| 14 ☐ PROVED ADULT | 03 ☐ COMMUNITY SERVICE | 05 ☐ OTH. LAW ENF. AGENCY | 10 ☐ DEPT. MENTAL HEALTH | |

LAPD 05.02.0 (7/83) PAGE 1A OF BOOKING SLIP

ARREST REPORT

CONTINUATION SHEET

15.09

| PAGE NO.<br>2/3 | TYPE OF REPORT<br>NON BOOK PET & WARRANT | BOOKING NO. | DR NO.<br>9113-04284 |
|---|---|---|---|

SUBJECT: Partida, Daniel

CHARGES: (1) ct 187(a) P.C. (Murder)

STATEMENTS: None

SOURCE OF ACTIVITY:

On January 9, 1991 Detectives J. Garcia #23694, and J. Pirro #21966, of Newton Homicide were assigned investigative responsibilities of a homicide which occurred at 37th Street and Grand Avenue. Victim Gabriel Sotelo, a male Hispanic 18 years of age was standing outside his residence located at 3701 South Grand Avenue, when a late model 4 door, Hyundai containing four male Hispanics approached and stopped. Suspect #1 Partida pointed a 9mm semi automatic handgun in the victim's direction and fired several shots. The victim was struck by a single bullet in the back of the head and fell to the pavement mortally wounded. RA-15 responded to the scene and transported the victim to California Hospital. Dr. Simcoe was in attendance and pronounced death at 1959 hours.

On January 10, 1991 my partner and I informed Newton Division Crash Patrol officers of this homicide. They informed us that 37th Street and Grand Avenue was claimed as "39 Street" gang territory and they were presently at war with "36 Street" gang. "36 Street" gang and "Street Saints" gang are on friendly terms. Both gangs are considered enemies with "39 Street".

OBSERVATIONS

During the course of our investigation, we spoke with several gang members regarding this homicide. On January 17, 1991, my partner and I spoke with Robert Alex Carlias, AKA "Mongo". Mr. Carlias was told by Jose A. Claro, AKA "Shabby" (presently in custody for same offense) that Danny AKA "Loverboy" had committed a shooting on "39th Street" territory.

CONTINUATION SHEET

15.09

| PAGE NO. 3/3 | TYPE OF REPORT NON BOOK PET & WARRANT | BOOKING NO. | DR NO. 9113-04284 |
|---|---|---|---|

In an interview with investigating officers, Jose A Claro, AKA "Shaggy" told investigating officers that he and another unknown male Hispanic accompanied subject Partida to "39th Street" territory in the subject's red vehicle to commit a drive-by shooting.

Jose A. Claro continued to say that subject Partida approached him and initiated the conversation regarding a drive-by on "39th Street." Jose A. Claro also stated that as they drove by "39th Street" territory, the unknown male Hispanic who was seated in the front with the subject withdrew a possible uzi handgun and shot at a group of people who were standing on the corner of 37th Street and Grand Ave.

Using department resources, my partner and I identified subject Daniel Partida, AKA as Loverboy with a home address of 426 E. 27th Street, Los Angeles. We responded to his home address and learned that he had left to Mexico with his guardian, While at the location, my partner and I observed a red Hyundai license number 2PHR505 parked in the front court yard of 426 E. 27th Street. We were informed by a resident of 426 E. 27th Street that the vehicle belonged to subject Partida. The vehicle was subsequently impounded at Swanney McDonald Tow where photographs were taken.

A booking photograph of subject Partida was obtained  and placed in a photo line-up.

Investigating Officers then met with witness Carlias who after being admonished was shown the photos. Witness Carlias positively identified subject Partida as the person driving the red Hyundai Excel, who was in possession of the uzi type weapon and who stated he was going to do a drive-by on 39th Street gang on the night of January 9, 1991.

Witness Carlias also told investigating officers that on January 10, 1991, he talked with Danny Partida and Jose Claro. Danny Partida was bragging about doing a drive-by shooting on 39th Strteet. Danny Partida told witness Carlias that he did the shooting.

ARREST

Subject not arrested.

BOOKING

Subject not booked.

# EXHIBIT O

# EXHIBIT O

1

1        IN THE MUNICIPAL COURT OF LOS ANGELES JUDICIAL DISTRICT

2           COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

3

4    HON. MICHAEL E. PASTOR, JUDGE     DIVISION NO. 48

5

6    THE PEOPLE OF THE STATE    )
      OF CALIFORNIA           )

7                      )
              PLAINTIFF,   )

8                      )
        V.             )      NO.BA043905

9                      )
    DANIEL PARTIDA         )

10                      )
                      )

11          DEFENDANT(S).  )

12    ———————————————————————).

13                REPORTER'S TRANSCRIPT

14          THURSDAY, SEPTEMBER 19, 1991

15                  --OOO--

16

17    APPEARANCES:

18    FOR THE PEOPLE:         MARK ARNOLD
                         DEPUTY DISTRICT ATTORNEY

19

20

21    FOR THE DEFENDANT:      IRWIN PRANSKY
                         ADC

22

23

24        **ORIGINAL**

25

26    HTA: 10/3/91           MARK D. KRAVEITZ
    DEPT: 120            OFFICIAL REPORTER
                         C.S.R. NO. 2091

27

28



FILED

SEP   0 1991

JAMES H. DEMPSEY, CLERK

1        FOLLOWS:

2              THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR

3        NAME FOR THE RECORD, SPELLING YOUR FIRST AND LAST NAME.

4              THE WITNESS:  ANTHONY KETELSLEGER, A-N-T-H-O-N-Y

5        K-E-T-E-L-S-L-E-G-E-R.

6              THE CLERK:  THANK YOU.

7              THE COURT:  MR.  ARNOLD.

8

9                    DIRECT EXAMINATION

10       BY MR. ARNOLD:

11             Q      WAS IS YOUR OCCUPATION?

12             A      DETECTIVE FOR THE CITY OF LOS ANGELES,

13       ASSIGNED TO NEWTON ROBBERY.

14             Q      HOW LONG HAVE YOU BEEN A POLICE OFFICER?

15             A      21 YEARS.

16             Q      AND AS PART OF YOUR PRESENT DUTIES, DO YOU

17       INVESTIGATE ROBBERIES?

18             A      YES.

19             Q      AND IN CONNECTION WITH YOUR INVESTIGATIVE

20       DUTIES, DID YOU CONTACT A LADY BY THE NAME OF RUTH

21       JIMENEZ,  J-I-M-E-N-E-Z.

22             A      YES, I DID.

23             Q      AND DID SHE TELL YOU THAT SOMETHING HAD

24       HAPPENED TO HER?

25             A      YES, SHE DID.

26             Q      WHERE DID YOU SPEAK WITH HER?

27             A      AT THE POLICE STATION.

28             Q      WHEN WAS IT THAT YOU SPOKE TO HER?

```
1        A        I BELIEVE IT WAS THE 17TH OF JUNE.

2        Q        OF WHAT YEAR?

3        A        OF THIS YEAR, '91.

4        Q        WHAT IS IT THAT SHE SAID HAD OCCURRED TO
5   HER?

6        A        SHE TOLD ME SHE WAS IN THE FRONT OF 430 EAST
7   27TH STREET, HAVING A CONVERSATION WITH THE DEFENDANT IN
8   THIS MATTER, BY THE  - -WITH A GUY BY THE NAME OF DANIEL.

9                 DURING THIS CONVERSATION DANIEL BECAME ANGRY
10  AND SNATCHED HER CHAIN FROM HER NECK.  UPON DOING SO, THE
11  VICTIM TRIED TO RETRIEVE HER CHAIN AND THE DEFENDANT HIT
12  HER SEVERAL TIMES WITH HIS FIST IN THE FACE AND UPON DOING
13  THAT HE LAUGHED AND WALKED AWAY.

14       Q        NOW, THIS RUTH JIMENEZ, DID SHE DESCRIBE THE
15  SUSPECT AS - - DID SHE CALL HIM THE DEFENDANT OR DID SHE
16  PROVIDE SOME TYPE OF NAME FOR HIM?

17       A        SHE CALLED HIM DANIEL, A PERSON THAT SHE HAS
18  KNOWN FOR SEVERAL YEARS IN THE NEIGHBORHOOD.

19       Q        NOW, DID YOU ATTEMPT TO VERIFY OR ASCERTAIN
20  EXACTLY WHICH DANNY SHE WAS TALKING ABOUT?

21       A        YES, I DID.

22       Q        AND IN CONNECTION WITH THAT, DID YOU SHOW A
23  PHOTOGRAPH OF ANYONE TO HER?

24       A        YES, I DID.  I SHOWED HER A PHOTOGRAPH, A
25  BOOKING PHOTOGRAPH OF THE DEFENDANT'S PRIOR ARREST.

26       Q        FROM A PRIOR ARREST?

27       A        YES.

28       Q        UPON SHOWING THE PHOTOGRAPH TO RUTH JIMENEZ
```

1    OF THE DEFENDANT, DID SHE MAKE SOME TYPE OF RESPONSE TO

2    YOU?

3           A       SHE POSITIVELY IDENTIFIED THE DEFENDANT AS

4    BEING THE PERSON THAT SNATCHED HER CHAIN AND HIT HER IN

5    THE MOUTH.

6           Q       DID SHE DESCRIBE THE CHAIN TO YOU THAT WAS

7    TAKEN?

8           A       JUST A GOLD CHAIN.

9           Q       AND DID SHE EVER INTIMATE EITHER DIRECTLY OR

10   INDIRECTLY THAT THE DEFENDANT HAD PERMISSION TO DO THAT?

11          A       YES, SHE STATED THAT HE DID NOT HAVE

12   PERMISSION TO TAKE THE CHAIN.

13          Q       AND THE AREA OF 430 EAST 27TH STREET, IS

14   THAT IN LOS ANGELES COUNTY?

15          A       YES, IT IS.

16          MR. ARNOLD:  I HAVE NOTHING FURTHER.

17          THE COURT:  THANK YOU, MR.  ARNOLD.

18             CROSS EXAMINATION, PLEASE, MR. PRANSKY.

19

20                  CROSS EXAMINATION

21   BY MR. PRANSKY:

22          Q       DID MISS JIMENEZ TELL YOU THAT SHE HAD KNOWN

23   THIS DANIEL PRIOR TO THE DATE OF THIS ALLEGED OFFENSE?

24          A       YES, SHE'S KNOWN HIM FOR SEVERAL YEARS.  HE

25   LIVES TWO BLOCKS FROM THE VICTIM.

26          Q       AND DID SHE TELL YOU THAT SHE GOT INTO AN

27   ARGUMENT WITH HIM PRIOR TO THE REMOVAL OF THE CHAIN?

28          A       YES.

1       Q     DID YOU ASK HER WHAT THIS ARGUMENT WAS

2    ABOUT?

3       A     I BELIEVE IT WAS REGARDING SOMETHING THAT HE

4    SAID ABOUT HER, ABOUT THE VICTIM.

5       Q     SOMETHING THAT HE HAD SAID ABOUT HER OR WAS

6    IT SOMETHING THAT SHE HAD SAID ABOUT DANIEL'S MOTHER?

7       A     I BELIEVE IT WAS SOMETHING THAT THE

8    DEFENDANT HAD SAID ABOUT THE VICTIM.

9       Q     DO YOU RECALL WHAT SHE CLAIMS HE HAD SAID

10    ABOUT HER?

11       A     I DON'T RECALL, NO.

12       Q     SHE WAS RATHER VAGUE ABOUT THAT?

13       A     TO MY RECOLLECTION, YES.

14       Q     DID SHE TELL YOU THAT SHE RIPPED A CHAIN OFF

15    OF DANIEL'S NECK BEFORE DANIEL REMOVED THE CHAIN FROM HER

16    NECK?

17       A     NO.

18       Q     NOW, WHAT WAS THE DATE OF THIS ALLEGED

19    OFFENSE?

20       A     JUNE 15TH OF THIS YEAR, OF 1991.

21       Q     DID YOU SAY FEBRUARY 15TH?

22       A     JUNE 15TH.

23       Q     JUNE 15.

24            AND WHEN DID YOU HAVE THIS CONVERSATION WITH

25    HER?

26       A     I TALKED TO HER SEVERAL TIMES.  I BELIEVE

27    THE FIRST TIME I TALKED TO HER WAS ON THE 17TH OF JUNE,

28    TWO DAYS AFTER THE ALLEGED OFFENSE.

1    Q    OKAY.  NOW, SHE STATED THAT DANIEL HAD

2    STRUCK HER AND KICKED HER; IS THAT CORRECT?

3    A    YES.

4    Q    DID YOU ASK HER IF SHE HAD ANY TYPE OF

5    INJURY THAT SHE COULD SHOW YOU TO VERIFY THIS TYPE OF

6    CONDUCT?

7    A    WHEN I SPOKEN TO HER, SHE HAD NO VISIBLE

8    INJURIES THAT I COULD SEE.

9    Q    DID YOU ASK HER IF ANYBODY ELSE WAS PRESENT

10   AT THE TIME THAT THIS OCCURRED, OTHER THAN SHE AND DANIEL?

11   A    I BELIEVE SO, YES.

12   Q    AND WHAT DID SHE SAY?

13   MR. ARNOLD:  OBJECTION, IRRELEVANT.

14   THE COURT:  THE OBJECTION WILL BE SUSTAINED.

15   MR. PRANSKY:  THIS IS ONLY TO DETERMINE WHETHER OR

16   NOT THERE WERE ANY OTHER WITNESSES.  I THINK IT IS

17   RELEVANT SINCE THE FACT IS THAT WE GOT JUST HER WORD FOR

18   WHAT OCCURRED, AND I THINK IN ORDER TO DETERMINE THE

19   VERACITY OF THE WITNESS - -

20   THE COURT:  IT GOES TO DISCOVERY, NOT RELEVANT FOR

21   THESE PURPOSES.

22   SUSTAIN THE OBJECTION.

23   MR. PRANSKY:  I HAVE NO FURTHER QUESTIONS.

24   THE COURT:  MR. PRANSKY, THANK YOU.

25   ANY REDIRECT, MR. ARNOLD?

26   MR. ARNOLD:  NO, SIR.

27   THE COURT:  DETECTIVE KETELSLEGER, THROUGHOUT YOUR

28   TESTIMONY, YOU MADE REFERENCE TO THE DEFENDANT.

```
 1      MODEL?

 2            A      1988, '89.

 3            Q      DID YOU ASK HIM ANY QUESTIONS ABOUT WHETHER

 4      HE HAD HEARD SHOTS AROUND THAT TIME?

 5            A      YES, HE DID.

 6            Q      WHAT DID HE SAY?

 7            A      HE SAID, ABOUT TWO OR THREE MINUTES AFTER

 8      THE CAR - -

 9            MR. PRANSKY:  YOUR HONOR, I AM GOING TO IMPOSE AN

10      OBJECTION, BECAUSE I ANTICIPATE WE ARE GOING TO HAVE

11      HEARSAY ON HEARSAY, AND I WOULD OBJECT TO THAT.

12            THE COURT:  AT LEAST AT THIS POINT I THINK THE

13      QUESTION ONLY CALLS FOR WHETHER HE HEARD THE SHOTS.  I

14      DON'T KNOW IF THE OBJECTION IS PREMATURE OR CALLS  FOR HIM

15      TO RELATE SOMETHING ELSE.

16            MR. PRANSKY:  I MAY BE PREMATURE, BUT I WOULD

17      ASK  - -

18                  WELL, I WILL WITHDRAW THE OBJECTION.

19            THE COURT:  THANK YOU.

20

21      BY MR. ARNOLD:

22            Q      DID HE SAY HE HEARD SHOTS?

23            A      YES, HE DID.

24            Q      WHAT DID HE SAY?

25            A      HE SAID HE HEARD APPROXIMATELY THREE SHOTS,

26      I BELIEVE, TWO, THREE MINUTES AFTER THE CAR HAD PASSED.

27            Q      IN CONNECTION WITH YOUR INVESTIGATIVE

28      DUTIES, DID YOU INTERVIEW A PERSON NAMED ROBERT
```

1      C-A-R-L-I-A-S.

2          A      YES, I DID.

3          Q      WHEN DID YOU INTERVIEW HIM?

4          A      AGAIN, IF I CAN LOOK AT MY NOTES TO REFRESH

5   MY MEMORY?

6          Q      GO AHEAD.

7          MR. PRANSKY:  WHAT IS THE NAME AGAIN?

8          THE COURT:  CARLIAS?

9          THE WITNESS:  OKAY.

10

11   BY MR. ARNOLD:

12         Q      WHEN DID YOU INTERVIEW MR. CARLIAS?

13         A      JANUARY 21ST, 1991.

14         Q      DID MR. CARLIAS PROVIDE YOU WITH SOME

15   INFORMATION THAT ASSISTED YOU IN YOUR INVESTIGATION OF

16   THIS CASE?

17         A      YES, HE DID.

18         Q      WHAT DID MR. CARLIAS TELL YOU?

19         A      MR. CARLIAS TOLD ME THAT ON THE DAY OF THE

20   INCIDENT IN QUESTION, HE WAS  - -

21         MR. PRANSKY:  I AM GOING TO OBJECT TO THAT, THAT

22   DOES NOT APPEAR TO BE WHAT  - -

23         THE COURT:  I WILL SUSTAIN THE OBJECTION, IT MAY BE

24   AMBIGUOUS, AS WELL.

25              YOU MAY REASK OR CLARIFY, MR. ARNOLD.

26

27   BY MR. ARNOLD:

28         Q      DID YOU ASK - - DID YOUR CONVERSATION WITH

1    MR.  CARLIAS CONCERN THE SHOOTING THAT OCCURRED AT 37TH

2    AND GRAND, ON JANUARY THE 9TH OF 1991?

3         A    YES.

4         Q    A LITTLE WHILE AGO WHEN YOU SAID THE

5    CONVERSATION WAS CONCERNING THE INCIDENT IN QUESTION, ARE

6    THOSE YOUR WORDS, OR ARE THOSE MR.  CARLIAS' WORDS?

7         A    THOSE ARE MY WORDS.

8         Q    BEFORE MR.  CARLIAS GAVE YOU ANY INFORMATION

9    REGARDING ANYTHING, DID YOU TELL HIM THAT YOU WERE

10   INVESTIGATING THE SHOOTING THAT OCCURRED AT 7:30 IN THE

11   EVENING, ON JANUARY THE 9TH OF 1991, AT 37TH AND GRAND?

12        A    YES.

13        Q    WHAT DID HE TELL YOU?

14        A    HE SAID HE WAS STANDING AT 21ST AND TRINITY

15   STREET, WHEN A RED HYUNDAI DROVE UP AND THE DEFENDANT,

16   DANNY, GOT OUT OF THE CAR; THAT DANNY WAS VERY, VERY UPSET

17   BECAUSE DANNY HAD RECEIVED THREATS VIA THE TELEPHONE FROM

18   THE 39TH STREET GANG.

19        Q    NOW, DID MR. CARLIAS TELL YOU OR DO YOU HAVE

20   ANY INFORMATION AS TO WHETHER MR.  CARLIAS IS A MEMBER OF

21   A GANG?

22        A    YES.

23        Q    WHAT INFORMATION IS THAT?

24        MR. PRANSKY:  I AM GOING TO OBJECT, NO PROPER

25   FOUNDATION.

26        THE COURT:  OVERRULE THE OBJECTION.  IT GOES TO THE

27   WITNESS'S RECOLLECTION OF HIS CONVERSATION WITH CARLIAS.

28   I WILL THEN BE ABLE TO EVALUATE IT.

```
 1                    OVERRULED.

 2                    YOU CAN TELL US WHAT CARLIAS TOLD YOU, SIR.

 3                    DID HE SAY SOMETHING ABOUT HIS MEMBERSHIP OR

 4     DID YOU FIND IT OUT FROM SOME OTHER SOURCE?

 5              THE WITNESS:  HE IS CURRENTLY ON FILE WITH THE LOS

 6     ANGELES POLICE DEPARTMENT AS A GANG MEMBER.

 7

 8     BY MR. ARNOLD:

 9              Q      AND WHAT GANG IS HE A MEMBER OF?

10              A      STREET SAINTS.

11              Q      NOW, YOU MENTIONED THAT CARLIAS TOLD YOU

12     THAT THE DEFENDANT DROVE UP AND THAT HE WAS UPSET; IS THAT

13     CORRECT?

14              A      YES.

15              Q      AND HE PROVIDED A NAME FOR YOU, OF THE

16     PERSON, OF THE DEFENDANT?

17              A      DANNY.

18              Q      NOW, WHEN YOU USE THE WORD DEFENDANT, IS

19     THAT YOUR WORD OR IS THAT MR. CARLIAS' WORD?

20              A      THAT'S MY WORD.

21              Q      HOW DID MR. CARLIAS DESCRIBE THE PERSON WHO

22     DROVE UP IN THE HYUNDAI AND WAS UPSET?

23              A      HE DESCRIBED HIM AS BEING HYPER.

24              Q      NO, NO, I DIDN'T MEAN THAT.

25                     I MEANT, HOW DID HE DESCRIBE HIS IDENTITY,

26     DID HE SAY ANYTHING MORE THAN DANNY?

27                     DID HE GIVE ANY OTHER NAMES?

28              A      I BELIEVE HE ALSO CALLED HIM LOVER BOY.
```

1    Q    DID MR. CARLIAS STATE TO YOU WHETHER THIS

2    PERSON WHO YOU DESCRIBED AS DANNY OR LOVER BOY WAS

3    AFFILIATED WITH A GANG?

4    A    YES.

5    Q    AND WHAT INFORMATION DID YOU RECEIVE

6    REGARDING THAT?

7    A    HE TOLD ME HE, THAT DANNY, AKA LOVER BOY,

8    WAS ALSO A STREET SAINTS GANG MEMBER.

9    Q    NOW, DID YOU - - DID YOU SHOW ANY

10    PHOTOGRAPHS TO MR. CARLIAS TO ASCERTAIN WHICH DANNY HE

11    WAS TALKING ABOUT?

12    A    YES.

13    Q    HOW MANY PHOTOGRAPHS DID YOU SHOW HIM?

14    A    SIX.

15    Q    DID HE SELECT A PHOTOGRAPH?

16    A    YES, HE DID.

17    Q    AND OF THE PHOTOGRAPH THAT HE SELECTED, WHAT

18    DID HE SAY ABOUT THAT PHOTOGRAPH?

19    A    HE SAID THAT THE PHOTOGRAPH IN WINDOW NUMBER

20    SIX, CARD A, WAS THE PERSON THAT HE SAW GET INTO THE RED

21    HYUNDAI.  THIS IS THE SAME PERSON WHO ALSO WAS  - -

22    Q    ALL I WANT TO KNOW, HE PICKED OUT A

23    PHOTOGRAPH; IS THAT CORRECT?

24    A    YES.

25    Q    AND YOU ARE SAYING IT IS PHOTO NUMBER SIX ON

26    CARD A?

27    A    YES.

28    Q    WHO DID HE SAY THAT PERSON WAS?

1          A        DANNY.

2          Q        AND WHOSE PHOTOGRAPH IS IN SPOT NUMBER SIX,

3     ON CARD A?

4          A        THE DEFENDANT, DANIEL PARTIDA.

5          Q        IS THAT PERSON IN COURT TODAY?

6          A        YES, HE IS.

7          Q        WHERE IS HE SEATED RIGHT NOW?

8          A        TO THE END OF COUNSEL TABLE, WEARING THE

9     ORANGE JUMP SUIT.

10         THE COURT:  IDENTIFYING DEFENDANT PARTIDA.

11

12    BY MR. ARNOLD:

13         Q        NOW, I APOLOGIZE FOR ASKING YOU ABOUT THE

14    PHOTOS, PROBABLY BROKE YOUR TRAIN OF THOUGHT.

15              I WANT TO GET BACK TO NOW WHAT CARLIAS TOLD

16    YOU ABOUT WHAT THE DEFENDANT DID.  HE DROVE UP IN THE

17    HYUNDAI, HE WAS UPSET.  THEN WHAT, IF ANYTHING, DID

18    CARLIAS TELL YOU?

19         A        CARLIAS SAID THAT DANNY WAS UPSET, HE WAS

20    HYPER, THAT DANNY TOLD HIM THAT HE HAD JUST BEEN

21    THREATENED BY SOMEONE IN 39TH STREET GANG ON THE

22    TELEPHONE.

23         Q        BASED UPON YOUR DUTIES AND YOUR TRAINING AND

24    YOUR EXPERIENCE, ARE YOU AWARE OF A RELATIONSHIP THAT

25    EXISTS BETWEEN 39TH STREET AND STREET SAINTS?

26         A        YES.

27         Q        WHAT IS THE RELATIONSHIP?

28         A        THEY ARE RIVAL GANG MEMBERS, RIVAL GANGS.

1        Q      GO AHEAD, PLEASE, WITH WHAT CARLIAS TOLD

2    YOU.

3        A      HE CONTINUED - - CARLIAS CONTINUED TO SAY

4    THAT DANNY WAS HIGHLY UPSET AND HE HAD LEFT IN THE VEHICLE

5    AND RETURNED A SHORT TIME LATER.

6               IN THE INTERIM, ANOTHER FELLOW GANG MEMBER

7    BY THE NAME OF JOSE CLARO, C-L-A-R-O, WALKED UP TO MR.

8    CARLIAS, JUST THEN THE DEFENDANT DANNY DROVE UP IN HIS RED

9    VEHICLE WITH AN UNKNOWN MALE HISPANIC.

10           DANNY GOT OUT OF THE CAR, OPENED THE TRUNK

11    AND PROCEEDED TO DISPLAY AN UZI TYPE HANDGUN TO MR. CLARO,

12    AND MR. CARLIAS. DANNY PROCEEDED TO TELL MR. CLARO,

13    WHAT HAD HAPPENED REGARDING THE THREATS FROM 39TH STREET

14    GANG AND MR. PARTIDA STATED, LET'S - - SOMETHING TO THE

15    EFFECT OF LET'S GO.

16           MR. CLARO SAID, LET'S DO IT, AND THEY GOT

17    INTO THE CAR AND DROVE AWAY.

18        Q      IN WHAT KIND OF CAR?

19        A      THE RED HYUNDAI THAT THE DEFENDANT DROVE UP

20    ON.

21        Q      DID MR. CARLIAS PROVIDE YOU ANY ADDITIONAL

22    INFORMATION REGARDING THIS INCIDENT?

23        A      YES, HE SAID THE FOLLOWING DAY, HE SPOKE

24    WITH DANNY AND MR. CLARO, AND MR. CLARO AND DANNY WERE

25    TALKING ABOUT THE SHOOTING.

26        MR. PRANSKY: I AM GOING TO OBJECT TO THAT ON THE

27    BASIS THAT IT APPEARS TO BE A CONCLUSION.

28        THE COURT: I WILL SUSTAIN THE OBJECTION.

1                    THE ANSWER, THEY WERE TALKING ABOUT A

2       SHOOTING, IS STRICKEN.

3

4       BY MR. ARNOLD:

5            Q       DETECTIVE, WHEN YOU JUST STATED NOW THAT YOU

6       WERE TOLD THAT CLARO TOLD YOU THE DEFENDANT AND CLARO WERE

7       TALKING ABOUT A SHOOTING, IS THAT - - ARE THOSE YOUR WORDS

8       OR ARE THOSE THE WORDS OF CARLIAS?

9            A       THOSE ARE MY WORDS.

10           Q       ACCORDING TO CARLIAS, DID THE DEFENDANT AND

11      THIS CLARO PROVIDE INFORMATION REGARDING - - DID THEY

12      PROVIDE INFORMATION - - PROVIDE INFORMATION ABOUT A

13      SHOOTING THAT OCCURRED.

14           MR. PRANSKY:  OBJECT, COMPOUND.

15           THE COURT:  SUSTAINED, REPHRASE WITH SPECIFICITY.

16

17      BY MR. ARNOLD:

18           Q       WHAT DID - - ACCORDING TO CARLIAS, DID THE

19      DEFENDANT SAY ANYTHING TO HIM REGARDING A SHOOTING THAT

20      HAD OCCURRED THE DAY BEFORE?

21           A       YES.

22           Q       WHAT DID HE SAY?

23           A       MR.  CARLIAS SAID THAT DANNY TOLD HIM HE HAD

24      SHOT SOMEONE AT 37TH AND GRAND.

25           Q       NOW, THE AREA OF 37TH AND GRAND, DOES ANY

26      PARTICULAR GANG CLAIM THAT AREA?

27           A       YES.

28           Q       WHAT GANG CLAIMS THAT AREA?

```
1         Q       AND DID YOU ASK HIM WHETHER HE KNEW THE

2    PERSON NAMED RICHARD CANO?

3         A       YES.

4         Q       WHAT DID HE SAY?

5         A       HE SAID HE DID KNOW MR.   CANO.

6         Q       HE SAID HE DID OR DID NOT?

7         A       HE DID, NO.

8         Q       AND DID HE DESCRIBE FOR YOU THE

9    RELATIONSHIP, IF ANY, THAT HE HAD WITH RICHARD CANO?

10        A       YES.

11        Q       WHAT DID - -  HOW DID HE DESCRIBE THAT

12   RELATIONSHIP?

13        A       HE SAID THEY WERE ENEMIES.

14        Q       DID THE DEFENDANT DESCRIBE A WEAPON, THE

15   WEAPON THAT WAS USED?

16        A       YES.

17        Q       HOW DID HE DESCRIBE THE WEAPON?

18        A       A BLACK UZI TYPE HANDGUN.

19        Q       NOW, DID THE DEFENDANT DESCRIBE FOR YOU HOW

20   THE INCIDENT STARTED?

21        A       YES.

22        Q       WHAT DID HE SAY?

23        A       HE SAID THEY WENT TO THE - - HE DROVE TO THE

24   AREA OF 37TH AND GRAND WITH A MALE HISPANIC, WHOM I - - HE

25   DID NOT KNOW THIS PERSON'S NAME.

26                HE DESCRIBED THIS PERSON AS WEARING A HEAVY

27   COAT, AND THEY WENT DRIVING AROUND AND THEY DROVE TO 37TH

28   AND GRAND, WHEN THIS PERSON WEARING THE HEAVY COAT TOLD
```

1    HIM TO STOP.

2            HE DID SO.  THIS PERSON WITH THE HEAVY COAT

3    STEPPED OUT OF THE VEHICLE AND BEGAN SHOOTING INTO A

4    CROWD.

5       Q     DID THE DEFENDANT TELL YOU THERE WAS ANYBODY

6    ELSE IN THE CAR BESIDES HIMSELF AND THIS UNKNOWN MALE?

7       A     HE MAY HAVE, I DON'T RECALL.

8       Q     WOULD YOU -- DID YOU RECORD THE INTERVIEW OR

9    THE STATEMENTS THAT WERE MADE TO YOU BY THE DEFENDANT IN

10    ANY TYPE OF A POLICE REPORT?

11       A     YES.

12       Q     I AM SHOWING YOU WHAT APPEARS TO BE PAGE 3

13    OF 5 OF THE POLICE REPORT.

14            DO YOU RECOGNIZE WHAT I AM SHOWING YOU?

15       A     YES.

16       Q     ARE YOU THE AUTHOR OF THIS POLICE REPORT?

17       A     YES.

18       Q     DOES PAGE 3 OF 5 EITHER CONTAIN VERBATIM OR

19    A SUMMARY OF YOUR INTERVIEW WITH THE DEFENDANT?

20       A     YES.

21       Q     DRAWING YOUR ATTENTION TO THE SENTENCE THAT

22    IS IN THE MIDDLE OF THE PAGE, LIKE YOU TO READ THAT TO

23    YOURSELF AND TELL US IF YOU RECALL WHETHER THE DEFENDANT

24    TOLD YOU HE WAS ALONE IN THE RED HYUNDAI.

25            I SHOULD SAY, DID HE TELL YOU WHETHER THERE

26    WAS ANYBODY ELSE IN THE CAR BESIDES THE MALE MEXICAN WITH

27    THE HEAVY COAT?

28       A     YES.

1      Q      WHO ELSE DID HE SAY WAS IN THE CAR AT THE

2   TIME OF THE SHOOTING?

3      A      JOSE CLARO WHO WAS SEATED TO THE REAR.

4      Q      NOW, YOU MENTIONED EARLIER THAT 37TH AND

5   GRAND IS AN AREA CLAIMED BY THE 39TH STREET GANG?

6      A      THAT'S CORRECT.

7      Q      THE AREA OF 38TH AND GRAND, WHO CLAIMS THAT?

8      A      39TH STREET.

9      Q      AND WHAT ABOUT 39TH, 37TH?

10          WHAT ABOUT 37TH AND GRAND?

11     A      39TH STREET.

12   MR. ARNOLD:  I HAVE NOTHING FURTHER.

13   THE COURT:  MR. ARNOLD, THANK YOU.

14          MR. PRANSKY.

15   MR. PRANSKY:  THANK YOU, YOUR HONOR.

16

17              CROSS EXAMINATION

18   BY MR. PRANSKY:

19     Q      IN REGARDS TO YOUR CONVERSATION WITH JOSE

20   LEMUS, DID HE DESCRIBE WHAT THE INDIVIDUAL LOOKED LIKE WHO

21   WAS THE PASSENGER OF THIS HYUNDAI?

22     A      HE DESCRIBED SOMEONE, I DON'T RECALL IF THE

23   PERSON WAS THE PASSENGER OR WHAT POSITION IN THE VEHICLE

24   HE WAS IN.

25     Q      WOULD IT REFRESH YOUR RECOLLECTION, IF YOU

26   SAW YOUR REPORT?

27     A      YES, IT WOULD.

28     Q      WOULD YOU TAKE A LOOK AT YOUR REPORT.

1      A      YES.  IS THIS CORRECT, YOU ARE TALKING ABOUT
2   LEMUS?

3      Q      YES, JOSE LEMUS.

4      A      OKAY, I HAVE DONE SO.

5      Q      WHAT WAS THE DESCRIPTION HE GAVE OF THE
6   PERSON THAT WAS THE PASSENGER?

7      A      HE DESCRIBED THE PASSENGER AS A MALE
8   HISPANIC, 16 TO 17 YEARS OF AGE, ROUND FACE, LIGHT
9   COMPLECTED, WEARING A BLACK CAP.

10     Q      THAT WAS THE EXTENT OF HIS DESCRIPTION?

11     A      HE SAID THAT HE LOOKED LIKE A GANG MEMBER.

12     Q      AND IS THAT THE EXTENT OF HIS DESCRIPTION?

13     A      YES.

14     Q      NOW, LOOKING FURTHER DOWN ON THAT REPORT,
15   YOU TESTIFIED THAT MR.  LEMUS HEARD TWO OR THREE GUNSHOTS.
16            DOES THAT REFRESH YOUR RECOLLECTION AS TO
17   WHETHER OR NOT HE DID, IN FACT, HEAR TWO OR THREE
18   GUNSHOTS?

19     A      YES.

20     Q      AND DID HE, IN FACT, HEAR TWO OR THREE
21   GUNSHOTS?

22     A      HE DID NOT, HIS FATHER DID.

23     Q      NOW, IN REGARDS TO THE CONVERSATION THAT YOU
24   HAD WITH DANIEL PARTIDA, WAS THIS CONVERSATION RECORDED ON
25   A TAPE RECORDER?

26     A      NO, IT WAS NOT.

27     Q      DID YOU CONSCIENTIOUSLY MAKE A DECISION NOT
28   TO TAPE THE CONVERSATION?

# EXHIBIT P

# EXHIBIT P

H4818H

0910-07-0910

# Valley Adult School

## Certificate of Completion

### Accounting (Semester 1 & 2)

## D. Partida

E U4Usof A

Certificate Number: 07/001078

Instructor: Joseph W. Kingston
10/20/04

Supervisor of Academic Instruction
Mr. M. Abdul-Mateen S.A.I.

Supervisor of Education
G. Atchley S.E.P.



# EMERGENCY MANAGEMENT INSTITUTE

## *Certificate of Achievement*

*This Certificate of Achievement is to acknowledge that*

**DANIEL PARTIDA**

Has reaffirmed a dedication to serve in times of crisis through continued professional development and completion of the independent study course:

**Principles of Emergency Management**

*Issued this 14th Day of July,  2004*

1.0 CEU

**Stephen G. Sharro**
*Director, Training Division*

**UNITED STATES FIRE ADMINISTRATION**



# Valley Adult School

## Certificate Of Completion

AWARDS A

Pre-Press & Desktop Publishing

IN

Graphic Arts

TO

**Daniel Partida**

PRESENTED ON THE 8TH DAY OF April 2002   CERTIFICATE NUMBER:   12,588

INSTRUCTOR:
L. Petrali

SCEP
G. Atchley

Supervisor Of Vocational Instruction
E. R. Parham

CERT. #
12,588
H-48181

| SKILLS ATTAINED | A | B | C | D |
|---|---|---|---|---|
| Orientation | | | X | |
| Shop Safety | | | X | |
| Copy Planning | | | X | |
| Mechanical Type | | | X | |
| Proofreading | | | X | |
| Photo Typesetting | | | X | |
| Desktop Publishing | | | X | |
| Design | | X | X | |
| Paste-Up | | X | X | |
| Journeyman | | | | |
| 1 - 2 - 3 - 4 - 5 - 6 - 7 - 8 | | Apprentice | | Phase of Training |

| ATTITUDES | A | B | C | D | F |
|---|---|---|---|---|---|
| (1) Effort | | | X | | |
| (2) Cooperation | | | X | | |
| (3) Initiative | | | X | | |
| (4) Adaptability | | | X | | |
| (5) Reliability | | | | X | |

**Related Technical Training**

Hours: _____ 5000 _____ Grade: _____ C

On the Job:

Total Hours completed: _____ 5000

Composite Grade: _____ C

| SKILLS ATTAINED | A | B | C | D |
|---|---|---|---|---|
| Process Camera | | | X | |
| Negative Stripping | | | X | |
| Plate Making | | | X | |
| Press Operations | | | X | |
| Bindery | | | X | |
| Shop Management | | | X | |
| Job Preparation | | | | |
| Journeyman | | | | |
| 1 - 2 - 3 - 4 - 5 - 6 - 7 - 8 | | Apprentice | | Phase of Training |

**COMMENTS OR OBSERVATIONS:**

Mr. Partida has completed the minimal standards for the Graphic Arts program.

_____    _____
Date                                          Instructor

PCFAX FROM CW LESSEN TO WESTERN 09/2002 PM 07:44

# Valley Adult School

## Certificate Of Completion

AWARDS A

IN

*Vocational Printing & Graphics*

TO

## Daniel Partida

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

PRESENTED ON THE 3RD DAY OF September 2002.  CERTIFICATE NUMBER: 12566

INSTRUCTOR: *[signature]*

LINDA G. FERRARI

*E. R. Parham*
E. R. PARHAM
Supervisor Of Vocational Instruction

*[signature]*
G. ATCHLEY
Supervisor Of Education

H4B181

| SKILLS ATTAINED | A | B | C | D |
|---|---|---|---|---|
| Orientation | X | | | |
| Shop Safety | | X | | |
| Copy Planning | | X | | |
| Mechanical Type | | X | | |
| Proofreading | | X | | |
| Photo Typesetting | | X | | |
| Desktop Publishing | | X | | |
| Design | | X | | |
| Paste-Up | | X | | |
| Journeyman — — — — — — Apprentice | | | | |
| 1 - 2 - 3 - 4 - 5 - 6 - 7 - 8 Phase of Training | | | | |

| ATTITUDES | A | B | C | D | F |
|---|---|---|---|---|---|
| (1) Effort | X | | | | |
| (2) Cooperation | X | | | | |
| (3) Initiative | X | | | | |
| (4) Adaptability | | X | | | |
| (5) Reliability | | X | | | |

**Related Technical Training**

Hours: 2025    Grade: B

On the Job:

Total Hours completed: 2025

Composite Grade: B

| SKILLS ATTAINED | A | B | C | D |
|---|---|---|---|---|
| Process Camera | X | | | |
| Negative Stripping | X | | | |
| Plate Making | X | | | |
| Press Operations | X | | | |
| Bindery | X | | | |
| Shop Management | X | | | |
| Job Preparation | | X | | |
| | | | | |
| | | | | |
| Journeyman — — — — — — Apprentice | | | | |
| 1 - 2 - 3 - 4 - 5 - 6 - 7 - 8 Phase of Training | | | | |

**COMMENTS OR OBSERVATIONS:**

Mr. Partida has demonstrated skills in several aspects of offset print production. His expertise lies in the area of Process Camera from single, small format design to 4 color process, large format. He is trained, skilled, and literate in several elements of Computer Graphics. His training has primarily been with the Power Mac 9500, and possesses knowledge of the following software(s): Adobe Photo Shop, PageMaker, and Microsoft Word. He also possesses skills in other aspects of the field.

9-2-02
Date

_[signature]_
Instructor

# PROFESSIONAL CAREER DEVELOPMENT INSTITUTE

*430 Technology Parkway • Norcross, Georgia 30092 • 800-223-4542*

October 29, 2002

To whom it may concern:    *H48181*

This letter is to verify that Daniel Partida has completed The Professional Bookkeeping and Accounting Course with a cumulative grade of 92.

Essential to successfully completing this course were the abilities to work independently and complete the assigned studies in a timely manner. Being a self-starter and having the discipline to stick with a task until it is completed certainly are highly desirable traits for any employee.

Our curriculum is based on college level textbooks and materials from leading publishers. In addition, our expert instructors share their own practical experiences through material written exclusively for our students.

In sum, this course required an investment of substantial time and effort. The result is a well-trained individual who gained a high level of applied learning with which to begin a career.

Should you desire additional information about this program we would be pleased to respond to your questions.

Cordially,

*Milton Miller*

Dr. Milton Miller
National Director of Education

# The School of Bookkeeping and Accounting

## PROFESSIONAL CAREER DEVELOPMENT INSTITUTE

In recognition of completion of the Prescribed Course

# The Professional Bookkeeping and Accounting Program

this Diploma is hereby awarded to

### Daniel Partida    # 48181

In testimony whereof, this Diploma has been conferred in Atlanta, Georgia, whereupon the undersigned have affixed their names on this day

### October 24, 2002





President,
Professional Career
Development Institute

President,
The School of Bookkeeping
and Accounting

NAME: PARTIDA, D.          NUMBER: H48181                    CELL: ZW-329

I/M **PARTIDA** has completed Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program. This program consists of six two-hour sessions covering the following topics: A Credo for Your Relationships; Participative Rule-Setting; Solving Problems You Own; The Pitfalls of Punishments and Rewards; Helping Others Find Solutions to Their Own Problems; Resolving Conflicts Peacefully/Anger Management; Dealing with Values, Collisions, and Courage for Learning the Skills – Rewards for Using Them. This program is recognized by CTF Psychology staff as a beneficial limited instruction self-help program.

INSTITUTION/FACILITY  **CTF Central**

**Original** C-File
**CC:** CCI
          Inmate

**Date:** 2/24/05                    **Information Chrono**

R. Cauntay
Sr. Librarian
Program Facilitator

CDC-128B

Inmate PARTIDA, D. H48181 has     cessfully participated in and complete    e twelve-week Millati Islami (The Path To Peace) Addiction Recovery , rogram. Millati Islami is a nationally recognized Islamic oriented addiction recovery program. The program at the Correctional Training Facility is sponsored by the Muslim Development Center and offers this program to Muslims and non-Muslims alike who are seeking relief from addiction. Inmate PARTIDA, D. is to be commended for his efforts in recognizing his problems and taking the necessary steps to combat them.

Original:     Central File
    cc:     Chaplain
         Inmate

Imam Anfar Jannah
Muslim Chaplain
Correctional Training Facility

ADDICTION RECOVERY COURSE COMPLETION          CA-0003

DATE: September 4, 2002                                     GENERAL CHRONO

NAME and NUMBER          PARTIDA, D.   H48181   ZW-329L          CDC-128-B (Rev. 4/74)

Inmate PARTIDA, D., H48181, ZW-329L, has successfully completed the thirteen-week IMPACT workshop. The IMPACT Program is a self-help-group designed to provide an opportunity for education and awareness as to the profound negative impact of crime on its victims. Throughout the thirteen weeks, the inmate participants are actively engaged in an open dialogue covering many areas of crime to include Child Abuse, Domestic Violence, Drugs and Alcohol, Gang Violence, Theft and Property Crimes, Murder, Anger Management, and Victims' Rights. IMPACT is a voluntary self-help group and receives support from numerous outside agencies such as the Monterey County District Attorney's office, the Social Services Department, Housing Authority, Santa Cruz Barrios Unidos Project, and the Women's Crisis Center. In addition, survivors of various crimes, i.e., Domestic Violence, Gang Violence, family members of Murder victims, and Sexual Assault, appear as guest speakers and make presentations on the crimes that affect their lives. Inmate PARTIDA, D. is to be commended for his participation and willingness to gain insight and empathy for the victims of crime.

Original: Central File
    CC: IMPACT File
         Writer
         Inmate

I. Guerra, Facility Captain
IMPACT Program Coordinator
Correctional Training Facility

DATE: 05/15/02          LAUDATORY (CORRECTED COPY)          GENERAL CHRONO

NAME and NUMBER          PARTIDA, D.   H48181   ZW-329L          CDC-128-B (Rev. 4/74)

Inmate PARTIDA, D., H48181, ZW-329L, has successfully completed the thirteen-week IMPACT workshop. The IMPACT Program is a self-help group designed to provide an opportunity for education and awareness as to the profound negative impact of crime on its victims. Throughout the thirteen weeks, the inmate participants were actively engaged in an open dialogue covering many areas of crime to include Child Abuse, Domestic Violence, Drugs and Alcohol, Elderly Abuse, Gang Violence, Sexual Assault, Theft and Property Crimes, Murder, and Victims' Rights. IMPACT is a voluntary self-help group and received support by presentations given by guest speakers from outside agencies such as the Monterey Rape Crisis Center, the Social Services Department, the Santa Cruz Barrios Unidos Center, and the Salinas Women's Crisis Center. In addition, survivors of various crimes, i.e., Domestic Violence, Gang Violence, and the family members o Murder victims appeared as guest speakers and made presentations on the crimes that affected their lives. Inmat PARTIDA, D. is to be commended for his participation and willingness to gain insight and empathy for the victims of crime

Original: Central File
    CC: IMPACT File
         Writer
         Inmate

I. Guerra, Facility Captain
IMPACT Program Coordinator
Correctional Training Facility

DATE: 04-29-02          LAUDATORY          GENERAL CHRON

# PAROLE PLAN
# MR. DANIEL PARTIDA

# TABLE OF CONTENTS

FAMILY BACKGROUND ............................................. PAGE 01

EDUCATIONAL BACKGROUND ............................ PAGE 02

FINANCIAL SUPPORT ................................................ PAGE 03

HOUSING ................................................................. PAGE 04

SHORT & LONG TERM GOALS .............................. PAGE 05

# FAMILY BACKGROUND

I Daniel Partida, have always been close to my family and I have been able to maintain strong family ties throughout my confinement. All of my family members have visited me, and we communicate through regular correspondence, and telephone calls. My family owns and operates a car dealership, several homes, and other properties in Los Angeles. Thus my family is not only willing and able to provide emotional and moral support, but also able to assist me with parole transition, aftercare support, and accommodations. My family is also willing to assist me with my college education as well as other support contributing to my successful re-entry.

Mrs. Modesta Salas, age 77, is my paternal grandmother. Mrs. Modesta Salas, raised my brother Pedro Partida, and myself since the death of my mother in 1979, serving as a mother figure. Mrs. Modesta Salas, resides in the city of Los Angeles in one of the family homes.

Mr. Jose Escobar, age 43, is my uncle (father's brother), and has served as my legal guardian from the age of eight years of old. Mr. Escobar, is self employed, and the owner of Brooklyn Auto Sales in the city of Los Angeles.

Mr. Pedro Partida, age 29, is my brother. Mr. Partida, is self employed, and the General Manager of a family auto dealership. Mr. Partida, his wife and two children reside in the city of Los Angeles, family's home.

Ms. Rosie Partida, age 15, is my sister. Rosie Partida, lives with her grandmother in the city of Los Angeles, she attends school.

Page 1

# EDUCATIONAL BACKGROUND

2001 • Enrolled in Bookkeeping and Accounting Correspondence Courses.

2000 - 2001 • Currently enrolled in CTF's vocational Printing and Graphic Arts Program.

1999 - 2000 • Served as advisor to troubled youth, through CROP (convicts reaching out to people) Program at RJD-CF.

1996 - 1999 • Completed vocational Machine Shop Program at RJD-CF.

1999 • Completed Inmate Peer Education Training Program, where I became qualified to teach information about infectious disease and risky behavior.

1997 • Participated in a course with Laubach, where I became certified to tutor other inmates in various subjects.

1995 - 1996 • Enrolled in Business Education at CYA.  Unable to complete due to my transfer to CDC.

1993 - 1995 • Completed vocational Computer Repair Program at CYA.

1994 • Obtained my GED at CYA.

1989 - 1991 • Attended Jefferson High School in Los Angeles, to the 11th grade.

# FINANCIAL SUPPORT

For finance, I have secured employment in the family business upon my release. The General Manager of Brooklyn Auto Sales, offered to sponsor me in a correspondence course in Bookkeeping and Accounting. My motivation to master these skills are worthwhile as I love the challenges and responsibilities that come along with this profession. I look forward to being very productive and beneficial to the business. I also have several family members and friends that are offering financial aid, as well as other sorts of support to assure my successful re-entry to society. Attached are letters I have received from my future employment and friends.

Jose Escobar.

Pedro Partida.

Luis A. Becerra.

Jacinto Alareon.

Miguel Castellon.

Avelina Ridriguez.

Brenda Villabisencio.

Rodolfo Rodriguez.

# HOUSING

Upon my parole, I plan to live with my grandmother Modesta Salas, at 424 East 27th Street, Los Angeles, California 90011. Tele. (213) 747-8469. I have several housing options with other family members. However, I have maintained a very close relationship with my grandmother throughout the years. I desire to be there for her in her twilight years as she was there for my brother and myself following my mother's death. She is 77 years old, has medical conditions and I would love to assist my family in helping to care for her, as well as to provide greater companionship.

# SHORT TERM GOALS

My short term goals are to reconnect with family members. Begin working in the family business. Enroll in college, and spend lots of quality time with my loved ones.

# LONG TERM GOALS

My long term goals are to become a CPA (Certified Public Accountant). Work for several businesses as an Accountant. Volunteer for community service, working with youth, crime prevention etc, teaching kids about peer education, and share my experiences with troubled yourt to help set them on the right path. I also wish to get married and raise children.

Siddha Yoga Meditation Prison Project
PO Box 99140
Emeryville, CA 94662

(510) 428-1836
Email:  prisonproject@compuserve.com

September 27, 2004

Board of Pardons and Paroles
Correctional Training Facility
PO Box 689
Soledad   CA   93960-0689

Dear Members of the Board of Pardons and Paroles,

This letter is to inform you that Daniel Partida, inmate number H48181, has been enrolled in our Siddha Yoga Meditation Correspondence Course since 2/3/1998 0:00:00.  This course is a basic introduction to the theory, principles and practices of eastern philosophy and spirituality.  It teaches students to begin and maintain a disciplined practice of meditation, contemplation and study of the ancient scriptures on Self-realization.

Daniel Partida has completed all required assignments and has returned his monthly report forms in a timely manner.  His recent letter indicates that he has been able to endure the challenges of his incarceration with greater equanimity because of the insights he has gained through his study of the course.

I will be happy to answer any questions regarding his participation in the course.  Please feel free to contact me at the above telephone number.

Sincerely,

Peter Mann
Director of Programs
SYDA Foundation Prison Project

cc: Daniel Partida    ID H48181

Daniel Partida    ID H48181
Correctional Training Facility
PO Box 689          C-W-321
Soledad   CA   93960-0689

H 48181

# BROOKLYN AUTO SALES

## 4300 East 3rd Street
## Los Angeles, California 90022
## (323) 263-7244/Fax: (323) 268-7296

August 25, 2004

To Whom It May Concern:

My name is Pedro Partida, I am Daniel Partida's older brother (one year older).  By way of this letter I'd like to take a moment to express and state the following words.

In 1988 after our father's death, my brother Daniel and I started working for Brooklyn Auto Sales a very successful and known company throughout the County of Los Angeles owned by our uncle Jose Escobar.

In 1988 our uncle Jose Escobar initially bought the business, Daniel and I worked during the week after school hours and on weekends.  I have been employed at this company for over 16 years and I am now part owner.  We started working out of the first location that is located at 2617 E. Cesar E. Chavez Ave., Los Angeles, CA 90033 with only 10 vehicles in inventory, We now own three (3) locations in the Los Angeles County with over 250 vehicles in inventory and are presently in the process of purchasing an additional location.

Therefore, I would like to take the opportunity to offer my brother Daniel a full time job at a very well paying salary, if he wishes to come work with us.  I understand that he has completed numerous study courses during his incarceration like accounting & bookkeeping.  I feel he will be great help for the business and us due to his way with people and enjoys communicating with others.  I am sure he will do very well for himself and others in a very short time because he has matured very much.

I would also like very much for him to come live with us and our 80 year old grandmother, Modesta Salas she has raised us and watched us grow up, she has been by our side all of our lives, she has a very special affection for my brother and I, there is nothing in the world she wishes before she leaves this world that to see Daniel a fine successful man and a man of good.  Our grandmother mentions all the time that "Daniel

Page 2...
RE: Daniel Partida

and I grew up very close and never have been separated from one another; we had a normal childhood, never joined or were involved in any gang or drug activities and mostly just interested in sports activities such as baseball; basketball; football, etc; we kept busy for the most part.

Daniel and I grew up with friends that were not older than a year or two of age and I sincerely can say that I am very proud of them because they are all doing very good some graduated from major colleges and have very good jobs.

I believe that in this letter I have explained only briefly about Daniel and Myself. Now I would like to take a moment to thank the people for taking the time to read my expression. I am very interested in my brother's well being. Daniel has 100% support from me Pedro Partida and that I am able to offer him a job and a permanent place to live if he wishes.

I believe that if Daniel is given the opportunity to parole, he will do very well for himself and others in society. He has support from many people specially the family and close friends.

Once again I thank you very much for your patience and time.

Respectfully,

Pedro Partida, Brother

Thursday, August 26, 2004

Guillermo Barajas
435 E 27th Street
Los Angeles, CA. 90011
213-746-9417

To Whom It May Concern:

I am a childhood friend of Danny Partida. I have been neighbors with the Partida family for twenty three years. The Partida Faimily is well known in our community. They have been involved with the community church (St. Vincent Parish) for many years and have a positive outlook on life.

I can share many good times spent with Danny and his brother Peter. We went to elementary and middle school together. In school, Danny was an intelligent individual and well known with his peers. Competing for the best grades in math is what I remember the most of our middle school years. Not only were we friends in the class room but we were also team mates. We played organized football for the Trinity Park and Recreation Center. Danny was always a competitor and would never settle for anything less that 110 percent.

Perer Partida. Danny's older brother is a successful business man in East Los Angeles. He, too is well known in the community. As a successful business man Peter can guide Danny in becoming a well rounded citizen.

If given the opportunity, Danny will be surrounded by positive individuals working with him to guide him down the right path. After speaking with Danny on many occasions I feel that he is a changed man. I believe that he is ready to rejoin his family and be a part of his community.

If anyone is requesting more information on my relationship with him please call me at my home number 213-746-9417 or at my office number 909-623-6517 ext. 2281.

Sincerely,

Guillermo Barajas

## Luis A. Becerra

Professional Accounting
and Tax Services

3509 Hilton Headway                    Phone (562) 463-7759
Pico Rivera, Ca. 90660                  Fax (562) 463-7739

August 27, 2004

To Whom it may concern .

---

Through this letter, I want to inform you that I have known Mr. –

DANIEL PARTIDA since 1990 .

Mr. Partida has bookkeeping knowledge and communications skills.

If in the near future Mr. Partida wishes to work for me. I will have

no inconvinient to hire him .

Sincerely

Luis A. Becerra

# Oaks Realty

### 23555 Golden Springs Dr, Suite K-1

### Diamond Bar, Ca. 91766

### 909-396-4411

---

September 9, 2004

To Whom It May Concern:

This letter is in regards to Daniel Partida, I have known Daniel and his family for over 20 years.

I have done many Real Estate transactions is the past years with his Uncle Jose G. Escobar. His uncle is a very respected Business Man in the City of East Los Angeles for over 17 years.

I know for a fact that Daniel Partida will be in very good hands with his family. I have seen his uncle take Daniels' brother Peter at a very young age and has taught him to have respect and morals in life. He has also showed him how to run the    business on his own. Peter now has his family owns a couple of homes and he is also respected in his community. When Daniel Partida gets out he will have employment and a home I know that this is something that is very important for many young men.

I know Daniel was ... to be when he was first .... but now he is a young man with different thoughts. He has been involved in different programs while he has been incarcerated.

I know if Daniel was given a chance, and with the support of his family can and will make a turn around in his life.

I'm pleading with the Parole Board to please find it in your hearts to give Daniel Partida a second chance in Life.

Respectfully,

*Brenda Villabisencio*

Brenda D. Villabisencio

Vicente Sanbada
509 W. Granada Ave.
Alhambra, CA 91801
(626)284-7111


Re: Daniel Partida #H4-8181

Thursday, August 26, 2004

To Whom It May Concern:

My name is Vicente Sanbada and I met Mr. Partida in 1989. I worked with him when I worked for his uncle Mr. Escobar at "Brooklyn Auto Sales". Daniel Partida was a good worker he was a very well motivated young man. Daniel always wanted to learn more and more about the business, he always wanted to contribute and help people in some way.

I am very interested in Daniel Partida's well being. He has my full support upon his release. I am able to provide transportation, financial aid, and also employment now that I am the General Manager for a local publication "L.A. Revista" and I can guarantee he has a job with us.

If Daniel Partida is given a chance to parole, he will be a productive member of society. Daniel has the support of many friends and his family. Thank you for your time and patience and hope you consider Daniel as a candidate for parole.


Sincerely,

Vicente Sanbada



To Whom It May Concern:

I'm Luis manzo project manager for AmeriLink I'm writing this letter of recommendation on Daniel Partida's behalf because I really feel that he a person of good and honest character I've known Daniel for over eighteen year. As a teenager, Danny was always involved in school and sports activities with in our neighborhood. Daniel has always been a people person who's always willing to help when needed. I know for a fact that he is a responsible and very hard worker.

He has proved to be loyal and the type of character who dose not give up in any given situation. Furthermore it would be my pleasure to have Daniel come join our working crew. We need more people like him who are willing to learn and renovate themselves to our society. I know he will be a great asset to our company and good citizen in our community. This is why I ask that you take all in consideration be for drawing any conclusion. Thank you for your time and please feel free to contact me for any question or concerns.

Sincerely,

Luis Manzo Project Manager

2301W Empire Bl. Burbank, CA.91504
lmanzo@amerilink.com
818.729.1882
323.833.3496

# EXHIBIT Q

# EXHIBIT Q

HISTORICAL DATA FOR

TIME SERVED BY MALE FELONS

PAROLED FROM INSTITUTIONS

1945 through 1981

Offender Information Services
Administrative Services Division
Department of Corrections

State of California

October 5, 1982

Offender Information Services
Administrative Services Division
Department of Corrections

Youth and Adult Correctional Agency
State of California
October 5, 198_

Table 3

MURDER 2ND

Time Served In Prison And Term Set

Male Felons First Paroled

1945 - 1981

Indeterminate Sentencing Law:

| Statutory citation | Statutory sentence | Minimum parole date | As of |
|---|---|---|---|
| 190 | 15-life | 120 mo. | |
| 190 | 5 yr.-life | 20 mo. | 6/30/77 |
| 190 | 5 yr.-life  5 yr.-life CS | 40 mo. | |

| Year of parole | Number | Time served in months | | Median Term In years |
|---|---|---|---|---|
| | | Median | Range middle 80% of the cases | |
| 1945 | 26 | 69 | | |
| 1946 | 23 | 65 | | |
| 1947 | 29 | 82 | 40-144 | 15 |
| 1948 | 33 | 56 | | |
| 1949 | 25 | 59 | | |
| 1950 | 27 | 54 | 39-89 | 14 |
| 1951 | 41 | 59 | 46-84 | 12 |
| 1952 | 38 | 67.5 | 48-91 | 14 |
| 1953 | 43 | 65 | 41-111 | 12 |
| 1954 | 50 | 60.5 | 42-106 | 8 |
| 1955 | 52 | 61.5 | 36-96 | 8 |
| 1956 | 47 | 63 | 36-84 | 9 |
| 1957 | 38 | 69 | 36-108 | 9 |
| 1958 | 23 | 48 | 39-123 | 8 |
| 1959 | 48 | 72 | 51-120 | 10 |
| 1960 | 43 | 63 | 42-102 | 10 |
| 1961 | 58 | 69.5 | 48-114 | 10 |
| 1962 | 52 | 61 | 46-91 | 10 |
| 1963 | 38 | 64 | 42-112 | 10 |
| 1964 | 39 | 66 | 49-78 | 10 |
| 1965 | 66 | 66 | 48-96 | 10 |
| 1966 | 73 | 63 | 42-120 | 10 |
| 1967 | 43 | 62 | 43-90 | 9 |
| 1968 | 54 | 65.5 | 48-120 | 10 |
| 1969 | 84 | 73.5 | 48-102 | 10 |
| 1970 | 117 | 72 | 46-113 | 10 |
| 1971 | 160 | 66 | 44-138 | 10 |
| 1972 | 161 | 59 | 35-109 | 9 |
| 1973 | 96 | 54 | 34-87 | 8 |
| 1974 | 57 | 60 | 39-103 | 10 |
| 1975 | 268 | 66 | 44-123 | - |
| 1976 | 196 | 58 | 40-82 | - |
| 1977 | 232 | 60 | 40-100 | - |
| 1978 | 169 (-) | 61 (-) | 42-79 (-) | - |
| 1979 | 203 (1) | 58 (-) | 42-81 (-) | - |
| 1980 | 209 (4) | 55 (-) | 43-77 (-) | - |
| 1981 | 221 (44) | 57 (42.5) | 42-77 (40-49) | - |

Note:  Median term in years not available after 1974.
Data in parentheses represent those committed under the determinate sentencing
law and are included in total number.

- 4 -

# EXHIBIT R

# EXHIBIT R

## TABLE OF TIME SERVED
## FIRST AND SECOND DEGREE MURDER OFFENDERS:  YEARS 1983-2004
### MEDIAN & MEDIANS

| YEAR | SECOND DEGREE MURDER | | | FIRST DEGREE MURDER | | |
|---|---|---|---|---|---|---|
| | MEAN | MEDIAN | Number PAROLED | MEAN | MEDIAN | Number PAROLED |
| 1986 | 76.3 (6.4 yrs) | 68 (5.7 yrs) | 20 | 168.9 (14.0 yrs) | 169.4 (14.1 yrs) | 33 |
| 1987 | 103.2 (8.6 yrs) | 85.9 (7.2 yrs) | 9 | 167.7 (14.0 yrs) | 157.7 (13.1 yrs) | 75 |
| 1988 | 41.0 (3.4 yrs) | 41 (7.2 yrs) | 1 | 158.6 (13.2 yrs) | 159 (13.2 yrs) | 42 |
| 1989 | 61.9 (5.2 yrs) | 52 (4.3 yrs) | 3 | 166.3 (13.9 yrs) | 166 (13.8 yrs) | 51 |
| 1990 | 120.6 (10.1 yrs) | 136.5 (11.4 yrs) | 9 | 174.6 (14.6 yrs) | 171.6 (14.3 yrs) | 33 |
| 1991 | 92.8 (7.7 yrs) | 88.9 (7.4 yrs) | 18 | 168.9 (14.1 yrs) | 169.4 (14.1 yrs) | 33 |
| 1992 | 125.3 (10.4 yrs) | 144.1 (12 yrs) | 9 | 205.5 (17.1 yrs) | 200.3 (16.7 yrs) | 8 |
| 1993 | 155.1 (12.9 yrs) | 165.7 (14.0 yrs) | 10 | 193.7 (16.1 yrs) | 193.7 (16.1 yrs) | 2 |
| 1994 | 149.1 (12.4 yrs) | 164.5 (13.7 yrs) | 5 | 0 | 0 | 0 |
| 1995 | 113.0 (9.4 yrs) | 141.4 (11.8 yrs) | 8 | 0 | 0 | 0 |
| 1996 | 145.9 (12.2 yrs) | 164.1 (13.7 yrs) | 10 | 0 | 0 | 0 |
| 1997 | 165.8 (13.8 yrs) | 190.1 (15.8 yrs) | 18 | 0 | 0 | 0 |
| 1998 | 186.8 (15.6 yrs) | 183.7 (15.3 yrs) | 12 | ISL 361.3 (30.1 yrs) DSL 241.7 (20.1 yrs) | ISL 361.3 (30.1 yrs) DSL 241.7 (20.1 yrs) | 1 1 |
| 1999 | 126.3 (10.5 yrs) | 126.3 (10.5 yrs) | 2 | ISL 286.2 (23.9 yrs) | ISL 286.2 (23.9 yrs) | 2 |
| 2000 | 151.1 (12.6 yrs) | 165.8 (13.8 yrs) | 4 | 0 | 0 | 0 |
| 2001 | 187.0 (15.6 yrs) | 198.8 (16.6 yrs) | 1 | DSL 251.4 (21 yrs) | DSL 251.4 (21 yrs) | 1 |
| 2002 | 221.1 (18.5 yrs) | 221.1 (18.5 yrs) | 1 | DSL 240.0 (20 yrs) | DSL 239.1 (19.9 yrs) | 3 |
| 2003 | 212.6 (17.7 yrs) | 214.2 (17.9 yrs) | 12 | DSL 253.2 (21.1 yrs) | DSL 243.2 (18.7 yrs) | 2 |
| 2004 | 248.3 (20.7 yrs) | 257.5 (21.5 yrs) | 49 | Pre-78: 342.5 (28.5 yrs) Post-78: 284.7 (23.7 yrs) | PRE-78 336.6 (28.1 yrs) DSL 286.4 (23.9 yrs) | 7 8 |
| 2005 | 241.3 (20.1 yrs) | 228.1 (19.0 yrs) | 5 | Post-78: 282.4 (23.5 yrs) | Post-78: 282.4 (23.5 yrs) | 2 |
| 2006 | 268.4 (22.4 yrs) | 277.2 (23.1 yrs) | 27 | Post-78: 310.8 (25.9 yrs) | Post-78: 315.8 (26.3 yrs) | 3 |

**Source:**  California Department of Corrections, Offender Information Services Branch, Statistics and Analysis, Annual Reports
Note:  This table has been compiled by McQuillion Paralegal Services of Napa, California, declaration attached.  This declaration and the source documents are attached as **Exhibit R.)**

38

## DECLARATION OF CARL MCQUILLION
## MCQUILLION PARALEGAL SERVICE

I, Carl D. McQuillion, declare:

1.      I am a freelance paralegal licensed as a business by the City of Napa, license number 23308. I have been in business since October 2003;

2.      I contract with various law firms to do research and brief-writing primarily in the area of parole law;

3.      For many years I have been compiling research regarding the paroles and releases of life prisoners;

4.      I have documents (regulations, directives, resolutions) from the former Adult Authority dating back many years as well as statistics from 1945-1981 regarding the releases of all classes of offenders;

5.      I have regulations from Register 76 (Adult Authority), Register 77 and 78 (Community Release Board), and Register 79 et seq. (Board of Prison Terms);

6.      I have Board of Prison Terms Annual reports from 1982 to 1990, when the Board eliminated its research and statistical department;

7.      I have statistical summaries up to 1996 showing the number of paroles and denials, when the Board stopped producing those as well;

8.      I have Annual Reports regarding incarcerated offenders and parolees produced by the Department of Corrections, dating from 1986 through 2004;

9.      I have some recidivism statistics;

10.      I have various news articles following the parole policies and practices of the Board of Prison Terms since 1992;

11.      I have depositions and transcribed testimony of former Board commissioner Albert Leddy which describes misconduct of the Board of Prison Terms;

12.      I am contracted to work on the instant case short-titled *Partida v. Kane*, now before this Court;

13.      I created the table used in this petition from the research materials I have available;

14.      I can attest to the accuracy of the table.

15.      I can testify as an expert on this matter as well as other matters relating to paroles in California.

SWORN TO UNDER PENALTY OF PERJURY, this 13th day of May, 2006, at Napa, California.

*Carl D. McQuillion*
Carl D. McQuillion

# CDC STATISTICS
## Offender Information Services

# TOTAL TIME SERVED IN MONTHS
# FELONS FIRST RELEASED TO PAROLE
# BY OFFENSE GROUP

# YEARS 1986 TO 2003

## EXCERPTED SECTIONS



OFFENDER INFORMATION SERVICES BRANCH
ADMINISTRATIVE SERVICES DIVISION
DEPARTMENT OF CORRECTIONS

YOUTH & ADULT CORRECTIONAL AGENCY
STATE OF CALIFORNIA
FEBRUARY 16, 1988

TABLE 1 A
TOTAL TIME SERVED IN MONTHS
INCLUDING PRECONFINEMENT CREDITS FOR
FELONS FIRST RELEASED TO PAROLE BY OFFENSE GROUP
CALENDAR YEAR 1986

| | TOTAL TIME SERVED | | | TIME SERVED IN CDC INSTITUTIONS | | PRECONFINEMENT TIME | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN | MEAN | MEDIAN | MEAN | MEDIAN |
| FELONS FIRST RELEASED TO PAROLE | 23,898 | | | | | | |
| MISSING OFFENSES | 178 | | | | | | |
| TOTAL RELEASES BY OFFENSE GROUP | 23,720 | 25.5 | 19 | 17.8 | 13 | 7.7 | 6 |
| MURDER 1ST | 51 | 166.0 | 155 | 158.6 | 148 | 7.4 | 7 |
| MURDER 2ND | 20 | 76.3 | 68 | 63.3 | 57 | 13.0 | 11 |
| MANSLAUGHTER | 466 | 41.8 | 40 | 31.1 | 31 | 10.7 | 9 |
| MANSLAUGHTER BY VEHICLE | 92 | 20.0 | 17 | 13.5 | 12 | 6.5 | 5 |
| ROBBERY | 3,480 | 33.2 | 27 | 25.2 | 21 | 8.0 | 6 |
| ASSAULT W/DEADLY WEAPON | 1,544 | 29.2 | 24 | 20.9 | 17 | 8.3 | 7 |
| OTHER ASSAULT | 292 | 39.9 | 30 | 31.7 | 23 | 8.2 | 7 |
| RAPE | 602 | 48.3 | 43 | 38.0 | 36 | 10.3 | 7 |
| LEWD ACT/W CHILD | 499 | 33.6 | 28 | 25.6 | 23 | 8.0 | 5 |
| OTHER SEX | 354 | 37.2 | 26 | 27.2 | 20 | 10.0 | 6 |
| KIDNAPPING | 158 | 52.5 | 45 | 41.1 | 35 | 11.4 | 10 |
| BURGLARY 1ST | 2,765 | 25.7 | 23 | 19.3 | 18 | 6.4 | 5 |
| BURGLARY 2ND | 2,442 | 18.5 | 15 | 11.5 | 10 | 7.0 | 5 |
| GRAND THEFT | 1,181 | 18.0 | 16 | 11.8 | 11 | 6.2 | 5 |
| PETTY THEFT WITH PRIOR | 1,072 | 15.0 | 12 | 10.0 | 9 | 5.0 | 3 |
| REC. STOLEN PROPERTY | 1,024 | 18.5 | 16 | 11.3 | 10 | 7.2 | 6 |
| OTHER THEFT | 161 | 17.0 | 15 | 11.1 | 11 | 5.9 | 4 |
| GRAND THEFT AUTO | 279 | 17.4 | 15 | 10.7 | 10 | 6.7 | 5 |
| VEHICLE THEFT | 824 | 17.8 | 15 | 11.5 | 10 | 6.3 | 5 |
| FORGERY AND CHECKS | 772 | 18.1 | 16 | 11.6 | 11 | 6.5 | 5 |
| CSS I+II | 2,517 | 19.3 | 16 | 12.6 | 11 | 6.7 | 5 |
| CSS III, IV, V | 1,271 | 19.6 | 16 | 12.8 | 11 | 6.8 | 5 |
| MARIJUANA | 662 | 16.1 | 15 | 10.2 | 10 | 5.9 | 5 |
| OTHER DRUGS | 89 | 20.0 | 13 | 16.4 | 11 | 3.6 | 2 |
| ESCAPE | 98 | 17.3 | 14 | 13.3 | 11 | 4.0 | 3 |
| DRUNK DRIVING | 262 | 16.2 | 14 | 10.8 | 10 | 5.4 | 4 |
| ARSON | 136 | 27.4 | 23 | 19.0 | 16 | 8.4 | 7 |
| POSSESSION OF WEAPON | 410 | 18.8 | 15 | 12.4 | 10 | 6.4 | 5 |
| OTHER | 197 | 21.2 | 18 | 13.5 | 11 | 7.7 | 7 |

REPORT # TIME-2

PAGE 1

ESTIMATES AND STATISTICAL ANALYSIS SECTION
OFFENDER INFORMATION SERVICES BRANCH
DEPARTMENT OF CORRECTIONS

YOUTH AND ADULT CORRECTIONAL AGENCY
STATE OF CALIFORNIA
JUNE 1, 1988

TABLE 1 A
TIME SERVED IN PRISON
FELONS FIRST RELEASED TO PAROLE BY OFFENSE

CALENDAR YEAR 1987

| | | TOTAL TIME SERVED | | TIME SERVED IN CDC INSTITUTIONS | | PRECONFINEMENT TIME | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | NUMBER | MEAN | MEDIAN | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL FELONS | 28,134 | | | | | | |
| MISSING OFFENSES | 173 | | | | | | |
| KNOWN OFFENSES | 27,961 | 23.6 | 17.1 | 16.9 | 12.0 | 6.7 | 5.1 |
| VIOLENT OFFENSES | 7,876 | 34.8 | 27.2 | 27.0 | 21.1 | 7.8 | 6.1 |
| MURDER 1ST | 75 | 167.7 | 157.7 | 160.4 | 151.5 | 7.3 | 6.2 |
| MURDER 2ND | 9 | 103.2 | 85.9 | 86.0 | 75.9 | 17.2 | 10.0 |
| MANSLAUGHTER | 406 | 42.3 | 38.8 | 30.1 | 28.7 | 12.2 | 10.1 |
| MANSLAUGHTER BY VEHICLE | 109 | 23.5 | 19.0 | 17.0 | 13.3 | 6.5 | 5.7 |
| ATTEMPTED MURDER | 90 | 62.1 | 62.1 | 52.8 | 54.3 | 9.3 | 7.8 |
| ROBBERY | 3,593 | 31.1 | 24.1 | 24.0 | 19.3 | 7.1 | 5.6 |
| ASSAULT W/DEADLY WEAPON | 1,624 | 28.7 | 24.1 | 20.5 | 17.4 | 8.2 | 6.7 |
| OTHER ASSAULT | 249 | 27.5 | 22.0 | 19.5 | 15.2 | 8.0 | 6.8 |
| RAPE | 586 | 46.2 | 41.0 | 37.7 | 34.9 | 8.5 | 6.1 |
| LEWD ACT/W CHILD | 644 | 37.2 | 37.3 | 29.8 | 32.1 | 7.4 | 5.2 |
| OTHER SEX | 292 | 38.4 | 29.4 | 30.6 | 23.7 | 7.8 | 5.7 |
| KIDNAPPING | 199 | 41.6 | 30.4 | 33.7 | 24.3 | 7.9 | 6.1 |
| PROPERTY OFFENSES | 12,014 | 19.8 | 15.5 | 13.6 | 11.0 | 6.2 | 4.5 |
| BURGLARY 1ST | 3,493 | 27.0 | 24.0 | 20.3 | 19.0 | 6.7 | 5.0 |
| BURGLARY 2ND | 2,647 | 17.0 | 14.3 | 11.0 | 10.0 | 6.0 | 4.3 |
| GRAND THEFT | 1,257 | 17.4 | 14.7 | 11.1 | 10.0 | 6.3 | 4.7 |
| PETTY THEFT WITH PRIOR | 1,322 | 15.2 | 13.0 | 10.4 | 9.7 | 4.8 | 3.3 |
| REC. STOLEN PROPERTY | 1,143 | 17.3 | 14.7 | 11.0 | 10.1 | 6.3 | 4.6 |
| OTHER THEFT | 169 | 17.0 | 14.2 | 10.8 | 9.9 | 6.2 | 4.3 |
| GRAND THEFT AUTO | 348 | 15.6 | 13.8 | 10.1 | 10.0 | 5.5 | 3.8 |
| VEHICLE THEFT | 846 | 16.9 | 14.5 | 10.6 | 9.9 | 6.3 | 4.6 |
| FORGERY AND CHECKS | 789 | 17.6 | 15.3 | 11.1 | 10.4 | 6.5 | 4.9 |
| DRUG OFFENSES | 6,720 | 18.1 | 15.6 | 11.8 | 10.6 | 6.3 | 5.0 |
| CSS I+II | 4,066 | 18.1 | 15.5 | 11.8 | 10.6 | 6.3 | 4.9 |
| CSS III, IV, V | 1,637 | 18.7 | 16.4 | 12.6 | 11.5 | 6.1 | 4.9 |
| MARIJUANA | 916 | 16.8 | 15.1 | 10.3 | 9.9 | 6.5 | 5.2 |
| OTHER DRUGS | 101 | 17.2 | 14.1 | 11.4 | 9.8 | 5.8 | 4.3 |
| OTHER OFFENSES | 1,351 | 19.7 | 16.0 | 13.3 | 11.0 | 6.4 | 5.0 |
| ESCAPE | 79 | 26.4 | 15.0 | 21.3 | 11.6 | 5.1 | 3.4 |
| DRUNK DRIVING | 451 | 18.5 | 15.8 | 12.3 | 10.8 | 6.2 | 5.0 |
| ARSON | 127 | 25.9 | 21.5 | 16.8 | 14.4 | 9.0 | 7.1 |
| POSSESSION OF WEAPON | 440 | 17.8 | 15.2 | 12.1 | 10.8 | 5.7 | 4.4 |
| OTHER | 254 | 19.8 | 16.3 | 12.7 | 10.8 | 7.0 | 5.5 |

ESTIMATES AND STATISTICAL ANALYSIS SECTION
OFFENDER INFORMATION SERVICES BRANCH
DEPARTMENT OF CORRECTIONS

YOUTH AND ADULT CORRECTIONAL AGENCY
STATE OF CALIFORNIA
NOVEMBER 1, 1990

TABLE 1 A

AVERAGE TIME SERVED IN MONTHS
**TOTAL FELONS**
FIRST RELEASED TO PAROLE BY OFFENSE

CALENDAR YEAR 1988

| OFFENSE | TOTAL TIME SERVED | | | TIME SERVED IN CDC INSTITUTIONS | | PRE-PRISON CREDITS | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL................................ | 31,883 | 24.1 | 18 | 16.8 | 12 | 7.3 | 6 |
| VIOLENT OFFENSES.................... | 8,511 | 35.1 | 27 | 26.9 | 21 | 8.2 | 6 |
| HOMICIDE......................... | 608 | 47.0 | 36 | 36.4 | 28 | 10.6 | 8 |
| MURDER 1ST................... | 42 | 158.6 | 159 | 152.3 | 153 | 6.3 | 6 |
| MURDER 2ND................... | 1 | 41.0 | 41 | 32.0 | 32 | 9.0 | 9 |
| MANSLAUGHTER............... | 426 | 42.2 | 39 | 29.8 | 29 | 12.4 | 10 |
| MANSLAUGHTER BY VEHICLE........... | 139 | 27.7 | 27 | 21.5 | 22 | 6.2 | 5 |
| ROBBERY........................ | 3,803 | 32.3 | 25 | 24.7 | 19 | 7.6 | 6 |
| ASSAULT........................ | 2,375 | 30.6 | 24 | 21.9 | 17 | 8.7 | 7 |
| ASSAULT WITH DEADLY WEAPON...... | 1,650 | 29.6 | 25 | 20.9 | 18 | 8.7 | 7 |
| ATTEMPTED MURDER 1ST........... | 77 | 29.0 | 61 | 18.9 | 52 | 10.1 | 9 |
| ATTEMPTED MURDER 2ND........... | 62 | 63.5 | 60 | 53.1 | 52 | 10.4 | 8 |
| OTHER ASSAULT/BATTERY........... | 586 | 25.7 | 21 | 17.2 | 14 | 8.5 | 7 |
| SEX OFFENSES.................... | 1,583 | 42.5 | 40 | 34.7 | 34 | 7.8 | 6 |
| RAPE....................... | 468 | 52.8 | 47 | 44.1 | 40 | 8.7 | 7 |
| LEWD ACT WITH CHILD........... | 793 | 37.2 | 37 | 30.2 | 32 | 7.0 | 5 |
| ORAL COPULATION............... | 153 | 51.5 | 45 | 43.5 | 39 | 8.0 | 6 |
| SODOMY..................... | 37 | 49.8 | 34 | 33.7 | 24 | 16.1 | 10 |
| PENETRATION WITH OBJECT........... | 30 | 37.6 | 37 | 30.2 | 31 | 7.4 | 6 |
| OTHER SEX........................ | 102 | 22.2 | 19 | 15.3 | 14 | 6.9 | 5 |
| KIDNAPPING..................... | 142 | 49.8 | 42 | 40.0 | 34 | 9.8 | 8 |

Report # TIME-6

(Continued)

Page 4

ESTIMATES AND STATISTICAL    ALYSIS SECTION
OFFENDER INFORMATION SERVICES BRANCH
DEPARTMENT OF CORRECTIONS

YOUTH AND .    LT CORRECTIONAL AGENCY
STATE OF CALIFORNIA
NOVEMBER 1, 1990

TABLE 1 A

AVERAGE TIME SERVED IN MONTHS
**TOTAL FELONS**
FIRST RELEASED TO PAROLE BY OFFENSE

CALENDAR YEAR 1989

| OFFENSE | TOTAL TIME SERVED | | | TIME SERVED IN CDC INSTITUTIONS | | PRE-PRISON CREDITS | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL.......................... | 37,224 | 23.0 | 17 | 16.4 | 12 | 6.6 | 5 |
| VIOLENT OFFENSES.................... | 8,782 | 35.3 | 27 | 27.4 | 21 | 7.9 | 6 |
| HOMICIDE.......................... | 651 | 48.4 | 37 | 38.5 | 29 | 9.9 | 8 |
| MURDER 1ST........................ | 51 | 166.3 | 166 | 160.0 | 160 | 6.3 | 6 |
| MURDER 2ND........................ | 3 | 61.9 | 52 | 46.2 | 45 | 15.7 | 7 |
| MANSLAUGHTER..................... | 404 | 42.8 | 40 | 30.5 | 30 | 12.3 | 10 |
| MANSLAUGHTER BY VEHICLE............ | 193 | 28.6 | 27 | 22.9 | 23 | 5.7 | 4 |
| ROBBERY.......................... | 3,704 | 32.8 | 26 | 25.4 | 20 | 7.4 | 6 |
| ASSAULT.......................... | 2,591 | 29.9 | 24 | 21.6 | 17 | 8.3 | 7 |
| ASSAULT WITH DEADLY WEAPON....... | 1,735 | 28.4 | 24 | 20.2 | 17 | 8.2 | 7 |
| ATTEMPTED MURDER 1ST.............. | 81 | 70.9 | 70 | 60.8 | 61 | 10.1 | 9 |
| ATTEMPTED MURDER 2ND.............. | 76 | 62.6 | 63 | 51.9 | 53 | 10.7 | 10 |
| OTHER ASSAULT/BATTERY............. | 699 | 25.5 | 20 | 17.3 | 13 | 8.2 | 7 |
| SEX OFFENSES....................... | 1,673 | 42.2 | 39 | 34.9 | 33 | 7.3 | 6 |
| RAPE............................. | 467 | 52.1 | 44 | 43.7 | 37 | 8.4 | 7 |
| LEWD ACT WITH CHILD.............. | 861 | 38.9 | 38 | 32.1 | 33 | 6.8 | 5 |
| ORAL COPULATION................. | 152 | 46.0 | 42 | 38.8 | 36 | 7.2 | 6 |
| SODOMY.......................... | 34 | 55.8 | 55 | 46.2 | 48 | 9.6 | 7 |
| PENETRATION WITH OBJECT.......... | 29 | 35.8 | 34 | 28.0 | 28 | 7.8 | 6 |
| OTHER SEX........................ | 130 | 21.7 | 19 | 15.6 | 14 | 6.1 | 5 |
| KIDNAPPING........................ | 163 | 54.6 | 48 | 44.8 | 39 | 9.8 | 9 |

Report # TIME–6

(Continued)

Page 4

ESTIMATES AND STATISTICAL ANALYSIS SECTION     YOUTH AND ADULT     CORRECTIONAL AGENCY
OFFENDER INFORMATION SERVICES BRANCH                                 STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS                                          OCTOBER 1991

TABLE 1

TIME SERVED ON PRISON SENTENCE

TOTAL FELONS

FIRST RELEASED TO PAROLE BY OFFENSE*

CALENDAR YEAR 1990

| OFFENSE | TOTAL TIME SERVED (Months) | | | TIME SERVED IN CDC INSTITUTIONS (Months) | | TIME IN CUSTODY PRIOR TO CDC (Months) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL.................... | 44,421 | 20.6 | 15.3 | 16.0 | 11.5 | 4.6 | 3.5 |
| VIOLENT OFFENSES............ | 9,015 | 33.7 | 26.0 | 28.2 | 20.8 | 5.5 | 4.2 |
| HOMICIDE.................... | 684 | 44.8 | 37.4 | 37.8 | 29.5 | 7.0 | 6.1 |
| MURDER 1ST............ | 33 | 174.6 | 171.6 | 166.4 | 165.9 | 8.2 | 7.6 |
| MURDER 2ND............ | 9 | 120.6 | 136.5 | 109.1 | 119.3 | 11.5 | 12.6 |
| MANSLAUGHTER............ | 494 | 40.3 | 38.2 | 32.6 | 30.9 | 7.7 | 6.6 |
| MANSLAUGHTER BY VEHICLE......... | 148 | 26.0 | 24.7 | 21.9 | 18.2 | 4.1 | 2.7 |
| ROBBERY.................... | 3,681 | 31.5 | 25.1 | 26.4 | 19.9 | 5.1 | 3.9 |
| ASSAULT.................... | 2,828 | 27.8 | 21.7 | 22.1 | 16.8 | 5.7 | 4.5 |
| ASSAULT WITH DEADLY WEAPON.... | 1,820 | 26.4 | 22.3 | 20.7 | 17.1 | 5.7 | 4.5 |
| ATTEMPTED MURDER 1ST......... | 80 | 73.8 | 73.5 | 66.8 | 65.8 | 7.0 | 5.9 |
| ATTEMPTED MURDER 2ND......... | 98 | 60.6 | 61.4 | 53.6 | 54.7 | 7.0 | 6.3 |
| OTHER ASSAULT/BATTERY............ | 830 | 22.5 | 19.0 | 17.3 | 12.7 | 5.2 | 4.0 |
| SEX OFFENSES.................... | 1,674 | 42.5 | 37.9 | 37.1 | 34.2 | 5.4 | 3.9 |
| RAPE.................... | 434 | 51.5 | 46.7 | 44.8 | 38.5 | 6.7 | 4.9 |
| LEWD ACT WITH CHILD............ | 911 | 38.9 | 37.6 | 34.1 | 34.0 | 4.8 | 3.5 |
| ORAL COPULATION.................... | 151 | 50.5 | 47.9 | 44.9 | 41.8 | 5.6 | 4.1 |
| SODOMY.................... | 36 | 55.7 | 49.6 | 49.0 | 45.1 | 6.7 | 4.0 |
| PENETRATION WITH OBJECT............ | 37 | 44.1 | 43.7 | 37.6 | 36.0 | 6.5 | 5.7 |
| OTHER SEX.................... | 105 | 20.8 | 18.6 | 16.4 | 13.2 | 4.4 | 3.3 |
| KIDNAPPING.................... | 148 | 51.1 | 44.8 | 44.7 | 35.6 | 6.4 | 5.2 |

Report # TIME-6

(Continued)

*First releases to parole include new admissions paroled for the first time and parole violators returned with a new term from the courts and paroled for the first time following the new offense.
**The median time served in CDC and prior to CDC may not add to the total median time served because the medians were calculated separately.

ESTIMATES AND STATISTICAL ANALYSIS SECTION    YOUTH AND ADULT CORRECTIONAL AGENCY
OFFENDER INFORMATION SERVICES BRANCH    STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS    AUGUST 1992

TABLE 1A
TIME SERVED ON PRISON SENTENCE
TOTAL FELONS
FIRST RELEASED TO PAROLE BY OFFENSE*
CALENDAR YEAR 1991

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL........................... | 49,204 | 21.0 | 15.8 | 16.2 | 11.7 | 4.8 | 3.6 |
| VIOLENT OFFENSES............... | 10,146 | 33.1 | 25.4 | 27.4 | 19.0 | 5.7 | 4.3 |
| HOMICIDE....................... | 747 | 48.5 | 39.5 | 40.7 | 33.2 | 7.8 | 6.0 |
| MURDER 1ST.................... | 33 | 168.9 | 169.4 | 163.0 | 164.2 | 5.9 | 5.3 |
| MURDER 2ND.................... | 18 | 92.8 | 88.9 | 78.5 | 71.7 | 14.3 | 9.9 |
| MANSLAUGHTER................. | 548 | 46.5 | 40.7 | 37.7 | 34.5 | 8.8 | 7.4 |
| VEHICULAR MANSLAUGHTER....... | 148 | 23.9 | 16.8 | 20.3 | 13.2 | 3.6 | 2.5 |
| ROBBERY........................ | 4,097 | 30.5 | 22.8 | 25.1 | 17.7 | 5.4 | 4.0 |
| ASSAULT........................ | 3,282 | 27.1 | 21.4 | 21.4 | 16.2 | 5.7 | 4.5 |
| ASSAULT WITH DEADLY WEAPON... | 2,053 | 26.6 | 22.7 | 20.9 | 17.1 | 5.7 | 4.6 |
| ATTEMPTED MURDER 1ST......... | 54 | 77.5 | 73.3 | 69.7 | 67.2 | 7.8 | 6.3 |
| ATTEMPTED MURDER 2ND......... | 104 | 64.4 | 62.4 | 55.4 | 54.7 | 9.0 | 6.5 |
| OTHER ASSAULT/BATTERY........ | 1,071 | 21.8 | 17.5 | 16.6 | 12.1 | 5.2 | 4.1 |
| SEX OFFENSES................... | 1,854 | 42.1 | 37.6 | 36.7 | 33.2 | 5.4 | 4.0 |
| RAPE.......................... | 483 | 49.7 | 40.9 | 43.4 | 35.6 | 6.3 | 5.1 |
| LEWD ACT WITH CHILD.......... | 993 | 39.1 | 37.6 | 34.3 | 33.6 | 4.8 | 3.6 |
| ORAL COPULATION.............. | 168 | 51.0 | 39.2 | 44.6 | 35.0 | 6.4 | 4.6 |
| SODOMY....................... | 29 | 56.3 | 58.4 | 50.3 | 49.1 | 6.0 | 5.8 |
| PENETRATION WITH OBJECT...... | 43 | 44.5 | 39.3 | 37.9 | 35.6 | 6.6 | 4.6 |
| OTHER SEX.................... | 138 | 21.6 | 17.2 | 17.4 | 12.1 | 4.2 | 3.4 |
| KIDNAPPING.................... | 166 | 50.8 | 40.5 | 41.9 | 34.6 | 8.9 | 5.6 |

(Continued)

*First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the courts and paroled for the first time following the new offense.

*The median time served in CDC and prior to CDC may not add to the total median time served because the medians were calculated separately.

ESTIMATES AND STATISTICAL ANALYSIS SECTION
OFFENDER INFORMATION SERVICES BRANCH
DEPARTMENT OF CORRECTIONS

YOUTH AND ADULT CORRECTIONAL AGENCY
STATE OF CALIFORNIA
JULY 1993

TABLE 1A
## TIME SERVED ON PRISON SENTENCE
## TOTAL FELONS
## FIRST RELEASED TO PAROLE BY OFFENSE*
CALENDAR YEAR 1992

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL.................................................. | 50,911 | 21.0 | 15.6 | 16.8 | 12.1 | 4.2 | 3.0 |
| VIOLENT OFFENSES............................ | 11,105 | 33.0 | 25.2 | 27.7 | 19.4 | 5.3 | 4.0 |
| HOMICIDE............................................ | 836 | 46.4 | 39.9 | 38.2 | 32.0 | 8.2 | 6.6 |
| MURDER 1ST.................................... | 8 | 205.5 | 200.3 | 189.3 | 178.9 | 16.2 | 9.4 |
| MURDER 2ND.................................... | 9 | 125.3 | 144.1 | 116.7 | 136.0 | 8.6 | 6.9 |
| MANSLAUGHTER............................... | 677 | 48.5 | 44.7 | 39.7 | 36.5 | 8.8 | 7.3 |
| VEHICULAR MANSLAUGHTER........... | 142 | 22.2 | 17.0 | 17.8 | 12.9 | 4.4 | 3.1 |
| ROBBERY............................................. | 4,472 | 30.6 | 22.6 | 25.8 | 18.3 | 4.8 | 3.6 |
| ASSAULT.............................................. | 3,723 | 27.6 | 21.4 | 22.2 | 17.1 | 5.4 | 4.1 |
| ASSAULT WITH DEADLY WEAPON... | 2,289 | 27.5 | 22.6 | 22.0 | 17.8 | 5.5 | 4.3 |
| ATTEMPTED MURDER 1ST................. | 37 | 86.3 | 82.9 | 76.9 | 75.0 | 9.4 | 6.9 |
| ATTEMPTED MURDER 2ND................ | 164 | 60.5 | 56.5 | 52.1 | 48.2 | 8.4 | 6.7 |
| OTHER ASSAULT/BATTERY............. | 1,233 | 21.7 | 18.8 | 17.0 | 12.8 | 4.7 | 3.5 |
| SEX OFFENSES.................................... | 1,902 | 41.6 | 37.4 | 36.6 | 32.3 | 5.0 | 3.9 |
| RAPE.................................................. | 505 | 49.0 | 38.5 | 43.5 | 33.8 | 5.5 | 4.6 |
| LEWD ACT WITH CHILD.................... | 1,031 | 39.2 | 37.5 | 34.5 | 33.2 | 4.7 | 3.6 |
| ORAL COPULATION.......................... | 154 | 51.1 | 43.5 | 45.8 | 36.8 | 5.3 | 4.4 |
| SODOMY............................................ | 32 | 55.2 | 51.6 | 49.1 | 47.1 | 6.1 | 4.8 |
| PENETRATION WITH OBJECT............ | 47 | 38.7 | 36.8 | 33.7 | 29.4 | 5.0 | 3.9 |
| OTHER SEX......................................... | 133 | 18.8 | 15.3 | 14.2 | 11.6 | 4.6 | 3.4 |
| KIDNAPPING........................................ | 172 | 53.0 | 49.0 | 45.5 | 38.2 | 7.5 | 5.9 |

(Continued)

* First released to parole includes new admissions paroled for the first time and parole violators returned with a new term by the courts and paroled for the first time following the new offense.

**The median time served in CDC and prior to CDC may not add to the total median time served because the medians were calculated separately.

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections
State of California
May 1994

TABLE 1A
TOTAL FELON
FIRST RELEASES TO PAROLE*
BY OFFENSE AND TIME SERVED ON PRISON SENTENCE
CALENDAR YEAR 1993

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL | 54,213 | 21.1 | 15.6 | 16.7 | 12.1 | 4.4 | 3.1 |
| VIOLENT OFFENSES | 11,586 | 32.6 | 25.0 | 27.3 | 19.1 | 5.3 | 4.1 |
| Homicide | 751 | 48.5 | 43.2 | 40.1 | 35.2 | 8.4 | 6.7 |
| Murder 1st (offense prior to 7/1/77) | 2 | 193.7 | 193.7 | 184.5 | 184.5 | 9.2 | 9.2 |
| Murder 2nd | 15 | 140.3 | 163.7 | 127.8 | 145.7 | 12.5 | 12.1 |
| Murder 2nd (offense prior to 7/1/77) | 5 | 110.5 | 108.4 | 92.7 | 82.3 | 17.8 | 15.8 |
| Murder 2nd (offense on or after 7/1/77) | 10 | 155.1 | 165.7 | 145.3 | 149.6 | 9.8 | 8.3 |
| Manslaughter | 627 | 50.1 | 46.1 | 41.1 | 37.2 | 9.0 | 7.4 |
| Vehicular Manslaughter | 107 | 23.1 | 20.6 | 19.2 | 16.4 | 3.9 | 2.9 |
| Robbery | 4,797 | 30.3 | 22.9 | 25.5 | 18.3 | 4.8 | 3.7 |
| Assault | 3,879 | 26.8 | 21.0 | 21.3 | 16.6 | 5.5 | 4.3 |
| Assault with Deadly Weapon | 2,341 | 26.7 | 22.1 | 21.1 | 17.5 | 5.6 | 4.5 |
| Attempted Murder 1st | 17 | 117.1 | 122.4 | 102.6 | 108.6 | 14.5 | 7.3 |
| Attempted Murder 2nd | 189 | 61.7 | 60.3 | 54.1 | 51.4 | 7.6 | 6.4 |
| Other Assault/Battery | 1,332 | 20.9 | 16.3 | 16.0 | 12.2 | 4.9 | 3.7 |
| Sex Offenses | 1,974 | 42.2 | 37.4 | 37.1 | 32.3 | 5.1 | 4.0 |
| Rape | 509 | 48.7 | 38.2 | 42.8 | 33.0 | 5.9 | 4.4 |
| Lewd Act with Child | 1,122 | 40.0 | 37.5 | 35.3 | 33.0 | 4.7 | 3.8 |
| Oral Copulation | 120 | 56.9 | 46.2 | 50.7 | 39.3 | 6.2 | 4.8 |
| Sodomy | 30 | 65.4 | 61.1 | 58.5 | 55.8 | 6.9 | 4.6 |
| Penetration with Object | 62 | 39.9 | 37.5 | 34.5 | 31.4 | 5.4 | 3.9 |
| Other Sex | 131 | 18.8 | 14.1 | 14.8 | 12.0 | 4.0 | 3.0 |
| Kidnapping | 185 | 49.0 | 42.5 | 42.1 | 35.9 | 6.9 | 5.8 |

* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the courts and paroled for the first time following the new offense.

**The median time served in CDC and prior to CDC may not add to the total median time served because the medians were calculated separately.

Page 5

Department of Corrections
State of California
April 1995

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

## TABLE 1A
## TOTAL FELON
## FIRST RELEASES TO PAROLE*
### BY OFFENSE AND TIME SERVED ON PRISON SENTENCE
### CALENDAR YEAR 1994

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL | 58,044 | 21.3 | 15.8 | 17.1 | 12.4 | 4.2 | 3.0 |
| VIOLENT OFFENSES | 12,513 | 33.4 | 25.7 | 28.1 | 20.2 | 5.3 | 4.1 |
| Homicide | 753 | 47.5 | 41.7 | 39.3 | 34.6 | 8.2 | 6.6 |
| Murder 1st | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 2nd | 7 | 118.2 | 151.5 | 101.6 | 140.5 | 16.6 | 14.3 |
| Murder 2nd (old law) | 2 | 40.9 | 40.9 | 26.6 | 26.6 | 14.3 | 14.3 |
| Murder 2nd (new law) | 5 | 149.1 | 164.5 | 131.5 | 149.1 | 17.6 | 13.1 |
| Manslaughter | 646 | 50.2 | 44.4 | 41.6 | 36.5 | 8.6 | 7.0 |
| Vehicular Manslaughter | 100 | 24.6 | 24.8 | 19.9 | 17.2 | 4.7 | 2.8 |
| Robbery | 5,049 | 32.3 | 25.6 | 27.5 | 20.9 | 4.8 | 3.7 |
| Assault | 4,423 | 27.4 | 21.1 | 22.1 | 16.7 | 5.3 | 4.2 |
| Assault with Deadly Weapon | 2,551 | 27.6 | 22.6 | 22.2 | 17.8 | 5.4 | 4.3 |
| Attempted Murder 1st | 18 | 105.5 | 101.2 | 96.6 | 87.2 | 8.9 | 9.2 |
| Attempted Murder 2nd | 224 | 64.1 | 57.4 | 56.2 | 51.1 | 7.9 | 7.0 |
| Other Assault/Battery | 1,630 | 21.1 | 16.2 | 16.3 | 12.3 | 4.8 | 3.7 |
| Sex Offenses | 2,091 | 41.9 | 37.3 | 36.9 | 32.3 | 5.0 | 3.9 |
| Rape | 489 | 51.5 | 40.1 | 45.8 | 35.6 | 5.7 | 4.5 |
| Lewd Act with Child | 1,233 | 39.4 | 37.3 | 34.7 | 32.3 | 4.7 | 3.6 |
| Oral Copulation | 121 | 53.1 | 39.8 | 46.6 | 35.5 | 6.5 | 4.4 |
| Sodomy | 35 | 55.5 | 50.3 | 48.8 | 46.4 | 6.7 | 4.8 |
| Penetration with Object | 63 | 41.4 | 37.8 | 36.4 | 33.8 | 5.0 | 3.6 |
| Other Sex | 150 | 19.4 | 16.1 | 15.1 | 12.6 | 4.3 | 3.3 |
| Kidnapping | 197 | 53.2 | 45.6 | 45.7 | 40.0 | 7.5 | 6.0 |

* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the courts and paroled for the first time following the new offense.

** The median time served in CDC and prior to CDC may not add to the total median time served because the medians were calculated separately.

TIME-6

2

Data Analysis Unit                                    Department of Corrections
Estimates and Statistical Analysis Section                  State of California
Offender Information Services Branch                   (Revised) October 1, 1997

Table 1.
Time Served on Prison Sentence
Felons First Released to Parole
During Calendar Year 1995
Total Admissions, Male and Female

| Commitment Offense | | | Total Paroled | Total Months Served | | Jail Months Served | | CDC Months Served | |
|---|---|---|---|---|---|---|---|---|---|
| Category | Type | Group | | Mean | Median | Mean | Median | Mean | Median |
| Total | | | 56,864 | 22.1 | 16.8 | 4.4 | 3.1 | 17.8 | 12.7 |
| Personal | | | 12,480 | 35.0 | 27.1 | 5.5 | 4.2 | 29.5 | 22.3 |
| | Homicide | | 762 | 50.1 | 44.6 | 8.9 | 7.1 | 41.2 | 35.5 |
| | | Murder 1st (old law) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Murder 1st (new law) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Murder 2nd (old law) | 2 | 53.9 | 53.9 | 16.1 | 16.1 | 37.8 | 37.8 |
| | | Murder 2nd (new law) | 8 | 113.0 | 141.4 | 8.8 | 7.3 | 104.2 | 135.8 |
| | | Manslaughter | 655 | 53.3 | 47.0 | 9.5 | 7.9 | 43.8 | 38.2 |
| | | Vehicular Manslaughter | 97 | 23.1 | 18.9 | 4.6 | 3.2 | 18.4 | 13.2 |
| | Robbery | | 4,905 | 34.2 | 27.8 | 4.9 | 3.8 | 29.3 | 23.6 |
| | | Robbery | 4,905 | 34.2 | 27.8 | 4.9 | 3.8 | 29.3 | 23.6 |
| | Assault | | 4,636 | 28.6 | 21.6 | 5.5 | 4.4 | 23.0 | 17.1 |
| | | Assault w. Deadly Weapon | 2,598 | 29.1 | 24.8 | 5.8 | 4.5 | 23.3 | 18.4 |
| | | Attempted Murder 1st | 16 | 129.3 | 122.4 | 9.0 | 8.8 | 120.3 | 112.8 |
| | | Attempted Murder 2nd | 261 | 65.9 | 61.6 | 8.0 | 6.7 | 57.9 | 54.1 |
| | | Other Assault/Battery | 1,761 | 21.3 | 18.3 | 4.8 | 3.6 | 16.5 | 12.8 |
| | Sex Crimes | | 1,964 | 44.5 | 38.0 | 5.3 | 4.1 | 39.1 | 33.2 |
| | | Rape | 366 | 63.4 | 51.8 | 6.3 | 5.1 | 57.1 | 46.5 |
| | | Lewd Act With Child | 1,162 | 41.3 | 37.9 | 5.1 | 3.8 | 36.2 | 33.2 |
| | | Oral Copulation | 127 | 57.2 | 44.4 | 6.3 | 5.0 | 50.9 | 36.6 |
| | | Sodomy | 40 | 61.2 | 49.4 | 5.1 | 3.7 | 56.0 | 46.2 |
| | | Penetration With Object | 57 | 43.7 | 37.3 | 5.7 | 4.5 | 37.9 | 32.4 |
| | | Other Sex | 212 | 18.7 | 16.0 | 4.3 | 3.1 | 14.5 | 12.2 |
| | Kidnapping | | 213 | 52.9 | 47.3 | 6.5 | 5.6 | 46.4 | 39.4 |
| | | Kidnapping | 213 | 52.9 | 47.3 | 6.5 | 5.6 | 46.4 | 39.4 |
| Property | | | 19,604 | 18.8 | 14.4 | 3.8 | 2.4 | 15.0 | 11.7 |
| | Burglary | | 7,309 | 23.8 | 16.3 | 4.3 | 2.7 | 19.5 | 13.0 |
| | | Burglary 1st | 3,369 | 33.3 | 27.0 | 5.0 | 3.4 | 28.3 | 23.0 |
| | | Burglary 2nd | 3,940 | 15.6 | 13.8 | 3.6 | 2.3 | 12.0 | 11.1 |

Time-6

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

<div align="right">
8
Department of Corrections
State of California
(Revised) October 1, 1997
</div>

Table 1.
Time Served on Prison Sentence
Felons First Released to Parole
During Calendar Year 1996
Total Admissions, Male and Female

| Commitment Offense | | | Total | Total Months Served | | Jail Months Served | | CDC Months Served | |
|---|---|---|---|---|---|---|---|---|---|
| Category | Type | Group | Paroled | Mean | Median | Mean | Median | Mean | Median |
| Total | | | 57,520 | 22.6 | 17.3 | 4.5 | 3.2 | 18.1 | 12.6 |
| Personal | | | 12,725 | 36.0 | 27.9 | 5.6 | 4.2 | 30.4 | 22.9 |
| | Homicide | | 772 | 55.0 | 51.0 | 9.5 | 7.6 | 45.6 | 41.7 |
| | | Murder 1st (old law) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Murder 1st (new law) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Murder 2nd (old law) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Murder 2nd (new law) | 10 | 145.9 | 184.1 | 10.7 | 8.9 | 135.1 | 150.5 |
| | | Manslaughter | 682 | 57.8 | 59.9 | 10.0 | 8.0 | 47.8 | 47.3 |
| | | Vehicular Manslaughter | 80 | 20.2 | 14.5 | 4.8 | 3.0 | 15.4 | 11.0 |
| | Robbery | | 4,832 | 36.0 | 31.0 | 5.1 | 3.9 | 30.8 | 24.6 |
| | | Robbery | 4,832 | 36.0 | 31.0 | 5.1 | 3.9 | 30.8 | 24.6 |
| | Assault | | 4,928 | 28.1 | 21.7 | 5.5 | 4.3 | 22.6 | 16.9 |
| | | Assault w. Deadly Weapon | 2,567 | 29.9 | 25.7 | 5.7 | 4.6 | 24.2 | 19.4 |
| | | Attempted Murder 1st | 5 | 129.8 | 143.8 | 7.5 | 7.7 | 122.2 | 139.7 |
| | | Attempted Murder 2nd | 249 | 67.4 | 64.4 | 7.8 | 6.5 | 59.7 | 57.3 |
| | | Other Assault/Battery | 2,107 | 21.1 | 18.1 | 5.0 | 3.7 | 16.1 | 12.5 |
| | Sex Crimes | | 1,992 | 45.8 | 38.3 | 5.3 | 4.0 | 40.5 | 34.3 |
| | | Rape | 308 | 66.2 | 51.7 | 6.4 | 4.8 | 59.8 | 47.2 |
| | | Lewd Act With Child | 1,191 | 44.8 | 38.8 | 5.1 | 3.8 | 39.7 | 35.2 |
| | | Oral Copulation | 128 | 63.7 | 52.7 | 5.4 | 4.5 | 58.3 | 48.5 |
| | | Sodomy | 32 | 53.7 | 46.1 | 5.8 | 4.5 | 47.9 | 41.0 |
| | | Penetration With Object | 51 | 46.5 | 39.2 | 7.2 | 5.5 | 39.3 | 33.0 |
| | | Other Sex | 282 | 18.8 | 15.4 | 4.6 | 3.6 | 14.3 | 12.2 |
| | Kidnapping | | 201 | 56.2 | 50.6 | 6.9 | 5.5 | 49.3 | 45.1 |
| | | Kidnapping | 201 | 56.2 | 50.6 | 6.9 | 5.5 | 49.3 | 45.1 |
| Property | | | 18,365 | 19.1 | 14.4 | 3.9 | 2.6 | 15.1 | 11.5 |
| | Burglary | | 6,892 | 24.1 | 18.7 | 4.3 | 2.9 | 19.7 | 12.9 |
| | | Burglary 1st | 3,051 | 34.1 | 27.4 | 5.1 | 3.5 | 29.0 | 23.1 |
| | | Burglary 2nd | 3,841 | 16.1 | 13.7 | 3.7 | 2.4 | 12.4 | 10.6 |

Time-6

TABLE 53A (1997)
TOTAL FELON
FIRST RELEASES TO PAROLE*
BY OFFENSE AND TIME SERVED ON PRISON SENTENCE
CALENDAR YEAR 1997

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| TOTAL | 60,329 | 23.0 | 18.6 | 4.5 | 3.1 | 18.4 | 12.8 |
| CRIMES AGAINST PERSONS | 13,152 | 36.2 | 27.6 | 5.9 | 4.5 | 30.3 | 22.3 |
| Homicide | 759 | 57.0 | 49.9 | 9.2 | 7.1 | 47.8 | 42.3 |
| Murder 1st (old law) | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 1st (new law) | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 2nd (old law) | 1 | 198.7 | 198.7 | 0.0 | 0.0 | 198.7 | 198.7 |
| Murder 2nd (new law) | 18 | 165.8 | 190.1 | 6.1 | 5.3 | 159.6 | 186.7 |
| Manslaughter | 655 | 58.3 | 54.0 | 9.9 | 8.0 | 48.4 | 46.1 |
| Vehicular Manslaughter | 85 | 21.9 | 16.8 | 4.4 | 3.1 | 17.5 | 11.3 |
| Robbery | 4,731 | 37.1 | 31.4 | 5.4 | 4.2 | 31.7 | 24.4 |
| Assault and Battery | 5,504 | 28.5 | 21.6 | 5.9 | 4.6 | 22.6 | 16.5 |
| Assault with Deadly Weapon | 2,771 | 29.5 | 24.7 | 6.2 | 4.9 | 23.3 | 18.0 |
| Attempted Murder 1st | 3 | 124.5 | 137.3 | 3.0 | 2.8 | 121.5 | 131.5 |
| Attempted Murder 2nd | 304 | 72.3 | 69.1 | 8.7 | 7.3 | 63.7 | 61.1 |
| Other Assault/Battery | 2,426 | 21.7 | 19.2 | 5.2 | 3.8 | 16.5 | 12.7 |
| Sex Offenses | 1,938 | 45.0 | 38.5 | 5.6 | 4.3 | 39.4 | 33.8 |
| Rape | 285 | 64.9 | 51.1 | 6.7 | 5.2 | 58.1 | 45.5 |
| Lewd Act with Child | 1,085 | 46.5 | 39.6 | 5.5 | 4.0 | 41.1 | 35.6 |
| Oral Copulation | 114 | 55.9 | 43.1 | 6.0 | 4.8 | 49.9 | 37.8 |
| Sodomy | 33 | 72.0 | 60.0 | 6.0 | 4.4 | 66.0 | 55.3 |
| Penetration with Object | 57 | 51.4 | 43.0 | 5.4 | 4.2 | 46.0 | 36.6 |
| Other Sex | 364 | 18.1 | 15.2 | 4.8 | 3.7 | 13.3 | 11.9 |
| Kidnapping | 220 | 58.9 | 50.2 | 7.3 | 5.8 | 51.6 | 41.7 |

* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the
  courts and paroled for the first time following the new offense.

**The median time served in CDC and prior to CDC may not add to the total median time served because the medians were
  calculated separately.

(Continued)

TABLE 53A (1998)
TOTAL FELON
FIRST RELEASES TO PAROLE*
BY OFFENSE AND TIME SERVED ON PRISON SENTENCE
CALENDAR YEAR 1998

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| **TOTAL** | **60,500** | **23.1** | **17.0** | **4.5** | **3.0** | **18.6** | **12.6** |
| **CRIMES AGAINST PERSONS** | **12,695** | **36.8** | **26.5** | **5.9** | **4.4** | **30.9** | **21.2** |
| Homicide | 649 | 60.6 | 56.7 | 9.5 | 7.5 | 51.0 | 47.2 |
| Murder 1st (old law) | 1 | 361.3 | 361.3 | 0.0 | 0.0 | 361.3 | 361.3 |
| Murder 1st (new law) | 1 | 241.7 | 241.7 | 5.3 | 5.3 | 236.4 | 236.4 |
| Murder 2nd (old law) | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 2nd (new law) | 12 | 186.8 | 183.7 | 6.5 | 4.1 | 180.2 | 180.8 |
| Manslaughter | 464 | 66.1 | 67.0 | 11.5 | 9.6 | 54.6 | 54.7 |
| Vehicular Manslaughter | 171 | 33.9 | 30.8 | 4.4 | 3.6 | 29.5 | 25.5 |
| Robbery | 4,102 | 39.8 | 32.1 | 5.7 | 4.4 | 34.1 | 25.4 |
| Assault and Battery | 5,639 | 28.3 | 20.9 | 5.7 | 4.3 | 22.6 | 15.8 |
| Assault with Deadly Weapon | 2,546 | 30.1 | 23.7 | 6.0 | 4.9 | 24.0 | 17.7 |
| Attempted Murder 1st | 4 | 163.4 | 153.5 | 11.3 | 12.6 | 152.1 | 143.5 |
| Attempted Murder 2nd | 302 | 77.8 | 71.2 | 8.9 | 7.1 | 68.9 | 64.5 |
| Other Assault/Battery | 2,787 | 21.2 | 18.1 | 5.1 | 3.6 | 16.1 | 12.6 |
| Sex Offenses | 2,113 | 43.6 | 31.9 | 5.4 | 4.1 | 38.2 | 28.9 |
| Rape | 285 | 68.0 | 56.0 | 6.6 | 4.6 | 61.3 | 50.1 |
| Lewd Act with Child | 1,059 | 48.7 | 39.7 | 5.5 | 4.3 | 43.2 | 34.9 |
| Oral Copulation | 102 | 63.9 | 50.1 | 6.0 | 4.5 | 57.9 | 44.6 |
| Sodomy | 29 | 46.3 | 30.7 | 5.9 | 3.9 | 40.4 | 26.8 |
| Penetration with Object | 57 | 50.6 | 40.7 | 5.5 | 4.6 | 45.1 | 35.6 |
| Other Sex | 581 | 18.1 | 15.2 | 4.5 | 3.2 | 13.7 | 11.4 |
| Kidnapping | 192 | 66.2 | 56.7 | 7.5 | 6.0 | 58.7 | 50.9 |

* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the
  courts and paroled for the first time following the new offense.

**The median time served in CDC and prior to CDC may not add to the total median time served because the medians were
  calculated separately.

(Continued)

TABLE 53A
TOTAL FELON
FIRST RELEASES TO PAROLE*
BY OFFENSE AND TIME SERVED ON PRISON SENTENCE
CALENDAR YEAR 1999

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| **TOTAL** | **59,553** | **23.5** | **17.1** | **4.4** | **3.0** | **19.1** | **12.7** |
| **CRIMES AGAINST PERSONS** | **12,823** | **36.7** | **25.7** | **5.8** | **4.5** | **30.9** | **20.0** |
| Homicide | 613 | 61.8 | 63.6 | 10.1 | 8.6 | 51.7 | 52.4 |
| Murder 1st (old law) | 2 | 286.2 | 286.2 | 23.4 | 23.4 | 262.9 | 262.9 |
| Murder 1st (new law) | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 2nd (old law) | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 2nd (new law) | 2 | 126.3 | 126.3 | 14.1 | 14.1 | 112.2 | 112.2 |
| Manslaughter | 441 | 69.2 | 70.9 | 11.8 | 10.4 | 57.4 | 58.9 |
| Vehicular Manslaughter | 168 | 38.9 | 37.6 | 5.3 | 4.5 | 33.6 | 29.6 |
| Robbery | 3,898 | 40.7 | 30.0 | 5.7 | 4.4 | 35.0 | 24.4 |
| Assault and Battery | 6,079 | 28.3 | 20.7 | 5.6 | 4.3 | 22.7 | 15.7 |
| Assault with Deadly Weapon | 2,597 | 30.1 | 23.1 | 5.9 | 4.7 | 24.1 | 17.7 |
| Attempted Murder 1st | 3 | 131.3 | 165.0 | 7.9 | 7.6 | 123.4 | 158.5 |
| Attempted Murder 2nd | 272 | 82.2 | 79.1 | 8.7 | 7.1 | 73.6 | 70.7 |
| Other Assault/Battery | 3,207 | 22.1 | 18.9 | 5.0 | 3.8 | 17.1 | 12.7 |
| Sex Offenses | 2,039 | 44.2 | 30.8 | 5.5 | 4.1 | 38.8 | 26.5 |
| Rape | 258 | 76.5 | 61.3 | 8.2 | 6.0 | 68.3 | 52.9 |
| Lewd Act with Child | 932 | 50.8 | 39.2 | 5.5 | 4.4 | 45.3 | 34.1 |
| Oral Copulation | 96 | 60.8 | 37.9 | 5.6 | 4.2 | 55.2 | 31.0 |
| Sodomy | 25 | 77.0 | 51.4 | 6.3 | 4.8 | 70.8 | 42.4 |
| Penetration with Object | 51 | 44.8 | 30.9 | 4.9 | 4.7 | 39.9 | 27.7 |
| Other Sex | 677 | 19.3 | 16.0 | 4.3 | 3.2 | 15.0 | 12.0 |
| Kidnapping | 194 | 63.6 | 56.3 | 7.6 | 6.2 | 56.0 | 49.5 |

* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the
  courts and paroled for the first time following the new offense.

**The median time served in CDC and prior to CDC may not add to the total median time served because the medians were
  calculated separately.

(Continued)

CALIFORNIA PRISONERS AND PAROLEES

TABLE 48A
TOTAL FELON
FIRST RELEASES TO PAROLE*
BY OFFENSE AND TIME SERVED ON PRISON SENTENCE
CALENDAR YEAR 2000

| OFFENSE | TOTAL TIME SERVED (MONTHS) | | | TIME IN CUSTODY PRIOR TO CDC (MONTHS) | | TIME SERVED IN CDC INSTITUTIONS (MONTHS) | |
|---|---|---|---|---|---|---|---|
| | NUMBER | MEAN | MEDIAN** | MEAN | MEDIAN | MEAN | MEDIAN |
| **TOTAL** | **57,940** | **24.3** | **18.6** | **4.4** | **3.0** | **19.9** | **13.1** |
| **CRIMES AGAINST PERSONS** | **12,645** | **37.9** | **26.3** | **5.9** | **4.5** | **32.0** | **21.1** |
| Homicide | 579 | 67.5 | 69.7 | 10.8 | 9.4 | 56.7 | 56.5 |
| Murder 1st (prior 11/8/78) | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 1st | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Murder 2nd (prior 11/8/78) | 1 | 47.2 | 47.2 | 10.9 | 10.9 | 36.3 | 36.3 |
| Murder 2nd | 4 | 151.1 | 165.8 | 14.5 | 12.4 | 136.6 | 154.5 |
| Manslaughter | 444 | 74.5 | 74.1 | 12.5 | 10.8 | 62.0 | 61.9 |
| Vehicular Manslaughter | 130 | 41.0 | 37.5 | 5.0 | 2.9 | 36.0 | 33.0 |
| Robbery | 3,477 | 41.2 | 31.7 | 5.8 | 4.4 | 35.4 | 25.2 |
| Assault and Battery | 6,167 | 30.1 | 21.4 | 5.6 | 4.3 | 24.4 | 16.7 |
| Assault with Deadly Weapon | 2,644 | 32.7 | 25.2 | 6.0 | 4.8 | 26.7 | 18.8 |
| Attempted Murder 1st | 2 | 136.6 | 136.6 | 6.5 | 6.5 | 130.0 | 130.0 |
| Attempted Murder 2nd | 285 | 87.2 | 84.8 | 10.2 | 8.0 | 76.9 | 75.0 |
| Other Assault/Battery | 3,236 | 22.8 | 19.5 | 4.9 | 3.7 | 17.9 | 13.6 |
| Sex Offenses | 2,226 | 44.2 | 30.8 | 5.5 | 4.3 | 38.8 | 26.7 |
| Rape | 247 | 75.4 | 61.5 | 7.0 | 5.7 | 68.4 | 56.8 |
| Lewd Act with Child | 1,022 | 52.8 | 40.9 | 5.8 | 4.5 | 47.1 | 35.5 |
| Oral Copulation | 85 | 68.3 | 58.9 | 7.6 | 5.9 | 60.7 | 47.3 |
| Sodomy | 20 | 69.0 | 56.4 | 5.3 | 5.2 | 63.6 | 54.2 |
| Penetration with Object | 54 | 49.5 | 30.8 | 5.4 | 4.5 | 44.1 | 29.1 |
| Other Sex | 798 | 20.0 | 16.8 | 4.4 | 3.2 | 15.6 | 12.3 |
| Kidnapping | 196 | 64.7 | 51.2 | 7.3 | 6.2 | 57.4 | 40.7 |

\* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the
   courts and paroled for the first time following the new offense.

\*\*The median time served in CDC and prior to CDC may not add to the total median time served because the medians were
   calculated separately.

(Continued)

CALIFORNIA PRISONERS AND PAROLEES

TABLE 47A
TOTAL FELON
FIRST RELEASES TO PAROLE*
BY OFFENSE AND TIME SERVED ON PRISON SENTENCE
CALENDAR YEAR 2001

| Commitment Offense | | | Total Paroled | Total Months Served | | Jail Months Served | | CDC Months Served | |
|---|---|---|---|---|---|---|---|---|---|
| Category | Type | Group | | Mean | Median | Mean | Median | Mean | Median |
| Total | | | 55,479 | 25.1 | 18.8 | 4.5 | 3.0 | 20.6 | 13.3 |
| | | ------------------------ | | | | | | | |
| Personal | | | 12,208 | 39.1 | 26.6 | 6.0 | 4.5 | 33.1 | 21.4 |
| | | ------------------------ | | | | | | | |
| | Homicide | | 502 | 68.8 | 68.1 | 10.7 | 8.6 | 58.1 | 57.7 |
| | | ------------------------ | | | | | | | |
| | | Murder 1st (Pre 11-8-78) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Murder 1st | 1 | 251.4 | 251.4 | 9.2 | 9.2 | 242.3 | 242.3 |
| | | Murder 2nd (Pre 11-8-78) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | Murder 2nd | 5 | 187.0 | 198.8 | 10.0 | 10.1 | 177.0 | 195.1 |
| | | Manslaughter | 376 | 76.6 | 74.6 | 12.4 | 10.5 | 64.2 | 64.5 |
| | | Vehicular Manslaughter | 120 | 37.8 | 35.9 | 5.3 | 4.2 | 32.5 | 27.3 |
| | | ------------------------ | | | | | | | |
| | Robbery | | 2,982 | 48.2 | 37.7 | 6.1 | 4.7 | 42.1 | 31.7 |
| | | ------------------------ | | | | | | | |
| | | Robbery | 2,982 | 48.2 | 37.7 | 6.1 | 4.7 | 42.1 | 31.7 |
| | | ------------------------ | | | | | | | |
| | Assault | | 6,261 | 30.0 | 21.1 | 5.6 | 4.3 | 24.4 | 16.4 |
| | | ------------------------ | | | | | | | |
| | | Assault w. Deadly Weapon | 2,526 | 34.2 | 26.0 | 6.1 | 4.8 | 28.1 | 19.7 |
| | | Attempted Murder 1st | 3 | 182.7 | 204.9 | 3.0 | 1.5 | 179.7 | 195.5 |
| | | Attempted Murder 2nd | 198 | 94.6 | 92.9 | 8.8 | 7.4 | 85.8 | 83.6 |
| | | Other Assault/Battery | 3,534 | 23.2 | 19.1 | 5.1 | 3.7 | 18.1 | 13.2 |
| | | ------------------------ | | | | | | | |
| | Sex Crimes | | 2,307 | 43.3 | 30.8 | 5.6 | 4.4 | 37.7 | 26.0 |
| | | ------------------------ | | | | | | | |
| | | Rape | 246 | 70.9 | 61.3 | 7.3 | 5.5 | 63.7 | 53.0 |
| | | Lewd Act With Child | 990 | 53.7 | 50.8 | 6.0 | 4.6 | 47.7 | 42.9 |
| | | Oral Copulation | 101 | 63.7 | 47.6 | 5.6 | 5.2 | 58.1 | 40.3 |
| | | Sodomy | 33 | 68.6 | 61.4 | 7.4 | 7.4 | 61.2 | 47.5 |
| | | Penetration With Object | 53 | 42.8 | 31.2 | 5.7 | 4.8 | 37.1 | 29.0 |
| | | Other Sex | 884 | 20.8 | 18.7 | 4.8 | 3.5 | 16.1 | 12.7 |
| | | ------------------------ | | | | | | | |
| | Kidnapping | | 156 | 73.7 | 54.0 | 8.2 | 6.2 | 65.5 | 46.8 |
| | | ------------------------ | | | | | | | |
| | | Kidnapping | 156 | 73.7 | 54.0 | 8.2 | 6.2 | 65.5 | 46.8 |
| | | ------------------------ | | | | | | | |
| Property | | | 15,461 | 21.7 | 14.9 | 4.0 | 2.5 | 17.7 | 11.9 |
| | | ------------------------ | | | | | | | |
| | Burglary | | 5,000 | 26.9 | 17.4 | 4.5 | 3.0 | 22.3 | 13.2 |
| | | ------------------------ | | | | | | | |
| | | Burglary 1st | 1,869 | 38.4 | 27.1 | 5.7 | 3.9 | 32.6 | 21.7 |
| | | Burglary 2nd | 3,131 | 20.1 | 14.4 | 3.8 | 2.5 | 16.2 | 11.5 |
| | | ------------------------ | | | | | | | |

* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the courts and paroled
  for the first time following the new offense.
NOTE: The median time served in CDC and prior to CDC may not add to the total median time served because the medians were calculated
separately.

CALIFORNIA PRISONERS AND PAROLEES

TABLE 50
CALIFORNIA FELON PAROLEES
SUPERVISED BY THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
BY OFFENSE AND SEX
DECEMBER 31, 2002

| | TOTAL | | MALE | | FEMALE | |
|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| TOTAL OFFENSE DATA | 112,992 | | 100,931 | | 12,061 | |
| | | | | | | |
| CRIMES AGAINST PERSONS | 28,609 | 27.0 | 27,225 | 27.0 | 1,384 | 11.5 |
| Homicide | 1,986 | 1.8 | 1,833 | 1.8 | 153 | 1.2 |
| Murder 1st | 6 | 0.0 | 5 | 0.0 | 1 | 0.0 |
| Murder 2nd | 607 | 0.6 | 582 | 0.6 | 25 | 0.2 |
| Manslaughter | 1,009 | 0.9 | 921 | 0.9 | 88 | 0.7 |
| Vehicular Manslaughter | 364 | 0.3 | 325 | 0.3 | 39 | 0.3 |
| Robbery | 6,836 | 6.4 | 6,442 | 6.4 | 394 | 3.3 |
| Assault and Battery | 13,628 | 12.7 | 12,878 | 12.7 | 750 | 6.2 |
| Assault Deadly Weapon | 5,967 | 5.5 | 5,600 | 5.5 | 367 | 3.0 |
| Other Assault/Battery | 7,661 | 7.2 | 7,278 | 7.2 | 383 | 3.2 |
| Sex Offenses | 5,761 | 5.4 | 5,691 | 5.6 | 70 | 0.5 |
| Rape | 638 | 0.6 | 635 | 0.6 | 3 | 0.0 |
| Lewd Act with Child | 2,786 | 2.7 | 2,756 | 2.7 | 30 | 0.2 |
| Oral Copulation | 228 | 0.2 | 226 | 0.2 | 2 | 0.0 |
| Sodomy | 59 | 0.1 | 59 | 0.1 | 0 | 0.0 |
| Penetration with Object | 146 | 0.1 | 144 | 0.1 | 2 | 0.0 |
| Other Sex Offenses | 1,904 | 1.7 | 1,871 | 1.9 | 33 | 0.3 |
| Kidnapping | 398 | 0.4 | 381 | 0.4 | 17 | 0.1 |
| | | | | | | |
| PROPERTY CRIMES | 29,950 | 26.5 | 25,546 | 25.3 | 4,404 | 36.5 |
| Burglary | 10,276 | 9.1 | 9,222 | 9.2 | 1,054 | 8.7 |
| Burglary 1st | 4,098 | 3.6 | 3,820 | 3.8 | 278 | 2.3 |
| Burglary 2nd | 6,178 | 5.5 | 5,402 | 5.4 | 776 | 6.4 |
| Theft | 12,109 | 10.7 | 9,990 | 10.0 | 2,119 | 17.6 |
| Grand Theft | 3,048 | 2.7 | 2,504 | 2.5 | 544 | 4.5 |
| Petty Theft with Prior | 6,190 | 5.5 | 4,902 | 4.9 | 1,288 | 10.7 |
| Receiving Stolen Property | 2,871 | 2.5 | 2,584 | 2.6 | 287 | 2.4 |
| Vehicle Theft | 4,167 | 3.7 | 3,895 | 3.9 | 272 | 2.3 |
| Forgery/Fraud | 2,757 | 2.4 | 1,920 | 1.9 | 837 | 6.9 |
| Other Property | 641 | 0.6 | 519 | 0.5 | 122 | 1.0 |
| | | | | | | |
| DRUG CRIMES | 42,827 | 37.9 | 37,192 | 36.8 | 5,635 | 46.7 |
| CS Possession | 20,158 | 17.8 | 16,880 | 16.7 | 3,278 | 27.2 |
| CS Possession for Sale | 12,479 | 11.0 | 11,123 | 11.0 | 1,356 | 11.2 |
| CS Sale | 4,769 | 4.2 | 4,225 | 4.2 | 544 | 4.5 |
| CS Manufacturing | 2,478 | 2.2 | 2,273 | 2.3 | 205 | 1.7 |
| CS Other | 662 | 0.6 | 523 | 0.5 | 139 | 1.2 |
| Hashish Possession | 47 | 0.0 | 42 | 0.0 | 5 | 0.0 |
| Marijuana Possession for Sale | 1,393 | 1.2 | 1,336 | 1.3 | 57 | 0.5 |
| Marijuana Sale | 669 | 0.6 | 627 | 0.6 | 42 | 0.3 |
| Marijuana Other | 172 | 0.2 | 163 | 0.2 | 9 | 0.1 |
| | | | | | | |
| OTHER CRIMES | 11,606 | 10.3 | 10,968 | 10.9 | 638 | 5.3 |
| Escape | 181 | 0.2 | 149 | 0.1 | 32 | 0.3 |
| Driving Under the Influence | 3,446 | 3.0 | 3,281 | 3.3 | 165 | 1.4 |
| Arson | 368 | 0.3 | 318 | 0.3 | 50 | 0.4 |
| Possession of Weapon | 4,187 | 3.7 | 4,079 | 4.0 | 108 | 0.9 |
| Other Offenses | 3,424 | 3.0 | 3,141 | 3.1 | 283 | 2.3 |

NOTE: Components may not add to totals due to independent rounding.

**TABLE 47A**
**TOTAL FELONS**
**FIRST RELEASES TO PAROLE***
**BY OFFENSE AND TIME SERVIED ON PRISON SENTENCE**
**CALENDAR YEAR 2003**

| Commitment Offense Groups | | Total Paroled | Total Months Served | | Jail Months Served | | CDCR Months Served | |
|---|---|---|---|---|---|---|---|---|
| Groups | Sub-groups | | Mean | Median | Mean | Median | Mean | Median |
| Grand Total | | 53,520 | 26.1 | 18.7 | 4.7 | 3.3 | 21.4 | 13.2 |
| Crimes Against Persons | | 12,589 | 40.5 | 26.8 | 6.1 | 4.7 | 34.4 | 21.4 |
| Homicide | | 450 | 68.0 | 61.5 | 9.7 | 7.6 | 58.3 | 50.0 |
| | Murder 1st (Pre 11-8-78) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Murder 1st | 2 | 243.2 | 243.2 | 6.5 | 6.5 | 236.8 | 236.8 |
| | Murder 2nd (Pre 11-8-78) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Murder 2nd | 12 | 212.6 | 214.2 | 9.6 | 5.6 | 203.0 | 203.5 |
| | Manslaughter | 276 | 79.7 | 77.2 | 12.0 | 9.8 | 67.6 | 65.9 |
| | Vehicular Manslaughter | 160 | 34.9 | 33.7 | 5.7 | 4.2 | 29.2 | 26.5 |
| Robbery | | 2,591 | 52.2 | 37.1 | 6.2 | 4.7 | 46.1 | 32.0 |
| Assault | | 6,962 | 31.1 | 21.3 | 5.8 | 4.5 | 25.3 | 16.1 |
| | Assault w. Deadly Weapon | 2,617 | 36.8 | 26.2 | 6.5 | 5.3 | 30.3 | 20.0 |
| | Attempted Murder 1st | 2 | 152.7 | 152.7 | 5.3 | 5.3 | 147.4 | 147.4 |
| | Attempted Murder 2nd | 203 | 104.3 | 102.1 | 9.9 | 7.4 | 94.4 | 91.4 |
| | Other Assault/Battery | 4,140 | 23.9 | 19.2 | 5.1 | 3.8 | 18.7 | 13.2 |
| Sex Crimes | | 2,436 | 46.2 | 30.9 | 6.0 | 4.7 | 40.2 | 27.6 |
| | Rape | 245 | 74.6 | 61.4 | 7.8 | 6.0 | 66.9 | 56.5 |
| | Lewd Act With Child | 1,066 | 55.7 | 61.1 | 6.3 | 4.9 | 49.4 | 49.1 |
| | Oral Copulation | 109 | 63.6 | 34.7 | 6.8 | 5.5 | 56.8 | 29.7 |
| | Sodomy | 35 | 81.4 | 61.3 | 6.1 | 4.4 | 75.4 | 46.9 |
| | Penetration With Object | 68 | 56.4 | 38.1 | 6.9 | 5.5 | 49.5 | 35.9 |
| | Other Sex | 913 | 23.2 | 18.9 | 5.0 | 3.9 | 18.2 | 13.0 |
| Kidnapping | | 150 | 96.5 | 81.5 | 8.2 | 7.3 | 88.3 | 70.6 |
| Property Crimes | | 17,884 | 20.5 | 14.3 | 4.0 | 2.5 | 16.5 | 11.4 |
| Burglary | | 5,308 | 25.7 | 16.0 | 4.5 | 2.9 | 21.2 | 12.4 |
| | Burglary 1st | 1,779 | 38.0 | 25.1 | 5.8 | 3.9 | 32.2 | 18.6 |
| | Burglary 2nd | 3,529 | 19.5 | 14.2 | 3.9 | 2.5 | 15.7 | 11.1 |
| Theft | | 7,163 | 18.6 | 13.7 | 3.7 | 2.3 | 14.9 | 10.8 |
| | Grand Theft | 1,818 | 18.5 | 14.1 | 4.4 | 3.0 | 14.1 | 10.4 |
| | Petty Theft With Prior | 3,310 | 19.6 | 13.9 | 3.3 | 1.9 | 16.3 | 11.6 |
| | Receiving Stolen Property | 2,035 | 17.3 | 13.4 | 3.7 | 2.6 | 13.5 | 10.0 |
| Other | | 5,413 | 17.8 | 13.9 | 3.8 | 2.4 | 14.0 | 10.8 |
| | Vehicle Theft | 2,969 | 18.1 | 14.0 | 3.7 | 2.3 | 14.4 | 11.2 |
| | Forgery/Fraud | 2,007 | 17.6 | 13.8 | 3.9 | 2.5 | 13.7 | 10.7 |
| | Other Property | 437 | 17.1 | 13.5 | 4.4 | 2.8 | 12.7 | 9.3 |

* First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the courts
  and paroled for the first time following the new offense.
NOTE: The median time served in CDCR and prior to CDCR may not add to the total median time served because the medians were
calculated separately.

**TABLE 47A**
**TOTAL FELONS**
**FIRST RELEASES TO PAROLE***
**BY OFFENSE AND TIME SERVED ON PRISON SENTENCE**
**CALENDAR YEAR 2004**

| Commitment Offense Groups | | Total Paroled | Total Months Served | | Jail Months Served | | CDC Months Served | |
|---|---|---|---|---|---|---|---|---|
| Groups | Sub-groups | | Mean | Median | Mean | Median | Mean | Median |
| Grand Total | | 60,553 | 24.8 | 15.6 | 4.8 | 3.3 | 20.0 | 12.0 |
| | | | | | | | | |
| Crimes Against Persons | | 13,630 | 40.3 | 25.6 | 6.2 | 4.7 | 34.1 | 19.6 |
| | Homicide | 553 | 91.3 | 72.1 | 10.4 | 8.1 | 80.9 | 61.2 |
| | Murder 1st (Pre 11-8-78) | 7 | 342.5 | 336.6 | 12.9 | 7.0 | 329.6 | 329.0 |
| | Murder 1st | 8 | 284.7 | 286.4 | 15.0 | 17.2 | 269.7 | 271.4 |
| | Murder 2nd (Pre 11-8-78) | 2 | 73.1 | 73.1 | 6.6 | 6.6 | 66.5 | 66.5 |
| | Murder 2nd | 49 | 248.3 | 257.5 | 9.9 | 8.7 | 238.4 | 244.0 |
| | Manslaughter | 321 | 86.7 | 91.0 | 13.2 | 10.6 | 73.5 | 72.5 |
| | Vehicular Manslaughter | 166 | 34.1 | 28.7 | 4.9 | 4.2 | 29.3 | 25.1 |
| | | | | | | | | |
| | Robbery | 2,637 | 53.1 | 35.8 | 6.3 | 4.7 | 46.8 | 31.4 |
| | | | | | | | | |
| | Assault | 7,775 | 30.1 | 20.6 | 6.0 | 4.6 | 24.1 | 14.8 |
| | Assault w. Deadly Weapon | 2,842 | 35.9 | 23.9 | 6.6 | 5.2 | 29.4 | 18.0 |
| | Attempted Murder 1st | 7 | 163.3 | 167.6 | 8.2 | 6.6 | 155.1 | 157.0 |
| | Attempted Murder 2nd | 197 | 101.0 | 102.1 | 10.5 | 8.1 | 90.6 | 89.4 |
| | Other Assault/Battery | 4,729 | 23.4 | 18.4 | 5.5 | 4.0 | 17.9 | 12.5 |
| | | | | | | | | |
| | Sex Crimes | 2,543 | 45.1 | 30.8 | 6.0 | 4.7 | 39.1 | 25.7 |
| | Rape | 223 | 82.5 | 62.0 | 8.1 | 6.5 | 74.5 | 58.2 |
| | Lewd Act With Child | 1,093 | 57.0 | 52.7 | 6.3 | 5.2 | 50.7 | 46.0 |
| | Oral Copulation | 106 | 58.5 | 33.3 | 7.1 | 5.0 | 51.4 | 28.7 |
| | Sodomy | 31 | 84.5 | 61.4 | 7.6 | 5.0 | 76.9 | 52.9 |
| | Penetration With Object | 61 | 45.3 | 33.7 | 5.8 | 4.9 | 39.6 | 29.6 |
| | Other Sex | 1,029 | 21.7 | 15.8 | 4.9 | 3.7 | 16.7 | 11.6 |
| | | | | | | | | |
| | Kidnapping | 122 | 89.4 | 63.7 | 7.5 | 6.3 | 81.9 | 59.5 |
| | | | | | | | | |
| Property Crimes | | 20,897 | 19.1 | 13.6 | 4.1 | 2.6 | 15.0 | 10.6 |
| | Burglary | 6,012 | 24.2 | 14.8 | 4.5 | 3.0 | 19.7 | 11.7 |
| | Burglary 1st | 1,895 | 37.1 | 22.7 | 5.6 | 3.9 | 31.4 | 17.3 |
| | Burglary 2nd | 4,117 | 18.3 | 13.4 | 4.0 | 2.6 | 14.3 | 10.3 |
| | | | | | | | | |
| | Theft | 8,260 | 17.2 | 13.2 | 3.8 | 2.3 | 13.4 | 9.5 |
| | Grand Theft | 1,982 | 17.0 | 13.4 | 4.4 | 3.1 | 12.6 | 9.1 |
| | Petty Theft With Prior | 3,672 | 18.2 | 13.2 | 3.3 | 2.0 | 14.8 | 10.2 |
| | Receiving Stolen Property | 2,606 | 16.0 | 13.2 | 3.9 | 2.5 | 12.1 | 8.8 |
| | | | | | | | | |
| | Other | 6,625 | 16.9 | 13.5 | 4.1 | 2.6 | 12.8 | 10.3 |
| | Vehicle Theft | 3,829 | 17.0 | 13.4 | 3.9 | 2.4 | 13.1 | 10.6 |
| | Forgery/Fraud | 2,266 | 16.8 | 13.6 | 4.2 | 2.9 | 12.6 | 10.0 |
| | Other Property | 530 | 16.2 | 13.2 | 4.6 | 3.0 | 11.7 | 8.5 |

*First releases to parole include new admissions paroled for the first time and parole violators returned with a new term by the courts and paroled for the first time following the new offense.
NOTE: the median time served in CDCR and prior to CDCR may not add to the total median time served because the medians were calculated separately.

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
January 2006

Table 1: Time Served on Prison Sentence, Felons First Released to Parole
during Calendar Year 2005: Total Admissions

| Commitment Offense Groups | Total Paroled | Total Months Served Mean | Total Months Served Median | Jail Months Served Mean | Jail Months Served Median | CDC Months Served Mean | CDC Months Served Median |
|---|---|---|---|---|---|---|---|
| Grand Total | 64,371 | 24.1 | 15.3 | 4.7 | 3.2 | 19.3 | 11.3 |
| Crimes Against Persons | 14,228 | 39.3 | 25.4 | 6.2 | 4.7 | 33.1 | 19.0 |
| Homicide | 504 | 83.3 | 66.2 | 10.4 | 8.2 | 73.0 | 55.0 |
| Murder 1st (Pre 11-8-78) | 2 | 372.0 | 372.0 | 19.7 | 19.7 | 352.3 | 352.3 |
| Murder 1st | 3 | 290.4 | 306.3 | 9.5 | 8.0 | 280.9 | 299.6 |
| Murder 2nd (Pre 11-8-78) | 1 | 65.7 | 65.7 | 5.1 | 5.1 | 60.6 | 60.6 |
| Murder 2nd | 32 | 272.3 | 285.3 | 8.9 | 9.4 | 263.5 | 278.9 |
| Manslaughter | 301 | 85.8 | 92.1 | 13.2 | 11.4 | 72.6 | 71.6 |
| Vehicular Manslaughter | 165 | 35.0 | 29.7 | 5.5 | 3.6 | 29.6 | 23.9 |
| Robbery | 2,692 | 52.0 | 35.9 | 6.3 | 4.8 | 45.7 | 31.1 |
| Assault | 8,168 | 29.7 | 20.0 | 5.9 | 4.5 | 23.8 | 14.5 |
| Assault w. Deadly Weapon | 3,053 | 35.7 | 24.6 | 6.6 | 5.3 | 29.1 | 17.7 |
| Attempted Murder 1st | 7 | 174.0 | 178.7 | 9.7 | 7.8 | 164.3 | 168.5 |
| Attempted Murder 2nd | 187 | 106.6 | 110.0 | 9.7 | 8.0 | 96.9 | 99.5 |
| Other Assault/Battery | 4,921 | 22.8 | 18.4 | 5.3 | 3.8 | 17.5 | 11.8 |
| Sex Crimes | 2,721 | 44.6 | 30.8 | 6.2 | 4.9 | 38.4 | 25.2 |
| Rape | 213 | 78.5 | 61.4 | 8.3 | 6.6 | 70.2 | 54.7 |
| Lewd Act With Child | 1,178 | 58.2 | 57.5 | 6.4 | 5.1 | 51.7 | 47.3 |
| Oral Copulation | 100 | 60.3 | 30.9 | 7.4 | 5.3 | 52.9 | 27.2 |
| Sodomy | 26 | 67.9 | 35.1 | 8.3 | 7.4 | 59.7 | 30.1 |
| Penetration With Object | 60 | 53.8 | 40.0 | 5.3 | 4.0 | 48.5 | 34.5 |
| Other Sex | 1,144 | 21.9 | 17.1 | 5.3 | 4.1 | 16.5 | 11.1 |
| Kidnapping | 143 | 93.7 | 66.5 | 8.7 | 8.0 | 84.9 | 58.7 |
| Property Crimes | 22,176 | 18.8 | 12.9 | 4.0 | 2.5 | 14.8 | 10.1 |
| Burglary | 6,260 | 23.7 | 14.3 | 4.5 | 2.9 | 19.3 | 11.0 |
| Burglary 1st | 1,928 | 37.0 | 24.2 | 5.8 | 4.2 | 31.2 | 17.7 |
| Burglary 2nd | 4,332 | 17.8 | 12.7 | 3.9 | 2.5 | 13.9 | 9.7 |
| Theft | 8,545 | 17.1 | 12.5 | 3.7 | 2.4 | 13.4 | 9.3 |
| Grand Theft | 1,982 | 17.3 | 12.9 | 4.4 | 3.0 | 13.0 | 9.2 |
| Petty Theft With Prior | 3,744 | 18.3 | 12.5 | 3.3 | 2.0 | 15.0 | 10.2 |
| Receiving Stolen Property | 2,819 | 15.4 | 12.3 | 3.9 | 2.5 | 11.5 | 8.0 |
| Other | 7,371 | 16.6 | 12.8 | 4.0 | 2.5 | 12.6 | 9.9 |
| Vehicle Theft | 4,402 | 16.7 | 12.8 | 3.8 | 2.3 | 12.9 | 10.4 |
| Forgery/Fraud | 2,370 | 16.8 | 12.9 | 4.3 | 2.8 | 12.5 | 9.8 |
| Other Property | 599 | 15.2 | 12.4 | 4.6 | 3.3 | 10.6 | 7.5 |
| Drug Crimes | 20,524 | 21.2 | 15.5 | 4.6 | 3.2 | 16.7 | 11.3 |
| Sales Related | 10,192 | 25.4 | 19.8 | 4.9 | 3.4 | 20.5 | 15.8 |
| CS Possession For Sale | 6,568 | 23.1 | 19.0 | 4.5 | 3.1 | 18.6 | 14.4 |
| CS Sales | 1,867 | 34.1 | 25.5 | 6.3 | 4.5 | 27.8 | 18.7 |
| CS Manufacturing | 830 | 32.7 | 28.7 | 5.8 | 4.1 | 26.8 | 22.9 |
| Marij. Possess For Sale | 678 | 15.1 | 12.1 | 3.7 | 2.4 | 11.5 | 7.6 |
| Marijuana Sale | 249 | 23.3 | 14.6 | 5.0 | 3.7 | 18.3 | 11.3 |
| Possession | 10,332 | 17.1 | 12.5 | 4.2 | 2.9 | 12.9 | 7.9 |
| CS Possession | 9,829 | 16.9 | 12.4 | 4.2 | 2.9 | 12.7 | 7.8 |
| CS Other | 395 | 23.9 | 15.7 | 4.3 | 3.1 | 19.6 | 12.1 |
| Hashish Possession | 25 | 12.3 | 12.3 | 4.6 | 3.6 | 7.7 | 6.4 |
| Marijuana Other | 83 | 15.8 | 12.6 | 4.6 | 2.9 | 11.3 | 7.3 |
| Other Crimes | 7,443 | 18.4 | 13.2 | 4.4 | 2.9 | 14.0 | 9.9 |
| Escape | 69 | 21.0 | 10.0 | 4.3 | 2.3 | 16.7 | 7.2 |
| Driving Under Influence | 1,558 | 17.2 | 12.7 | 3.8 | 2.5 | 13.4 | 9.9 |
| Arson | 182 | 29.1 | 20.7 | 7.2 | 6.0 | 21.9 | 11.7 |
| Possession Weapon | 3,421 | 17.4 | 12.7 | 3.9 | 2.5 | 13.5 | 9.8 |
| Other Offenses | 2,213 | 19.7 | 14.3 | 5.4 | 4.1 | 14.3 | 9.9 |

Time-6, CR.DAU.MTHLY.PGMS(TS).

**Page 2**

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services

Department of Corrections and Rehabilitation
State of California
February 2007

Table 1: Time Served on Prison Sentence, Felons First Released to Parole
during Calendar Year 2006: Total Admissions

| Commitment Offense Groups | | Total Months Served | | Jail Months Served | | CDC Months Served | |
|---|---|---|---|---|---|---|---|
| Groups          Sub-groups | Total Paroled | Mean | Median | Mean | Median | Mean | Median |
| Grand Total | 67,278 | 23.6 | 14.6 | 4.7 | 3.2 | 18.9 | 11.1 |
| Crimes Against Persons | 14,424 | 39.8 | 25.2 | 6.3 | 4.8 | 33.5 | 19.2 |
| Homicide | 529 | 79.9 | 62.8 | 11.2 | 8.9 | 68.7 | 52.2 |
| Murder 1st (Pre 11-8-78) | 1 | 521.9 | 521.9 | 0.0 | 0.0 | 521.9 | 521.9 |
| Murder 1st | 3 | 310.8 | 315.8 | 8.1 | 6.8 | 302.8 | 309.0 |
| Murder 2nd (Pre 11-8-78) | 2 | 41.3 | 41.3 | 1.7 | 1.7 | 39.6 | 39.6 |
| Murder 2nd | 27 | 268.4 | 277.2 | 11.3 | 9.7 | 257.1 | 266.4 |
| Manslaughter | 306 | 84.3 | 78.6 | 14.4 | 11.9 | 69.9 | 68.5 |
| Vehicular Manslaughter | 190 | 40.5 | 33.5 | 6.3 | 4.7 | 34.2 | 27.7 |
| Robbery | 2,791 | 53.0 | 40.9 | 6.6 | 5.1 | 46.4 | 32.6 |
| Assault | 8,263 | 30.4 | 19.5 | 5.9 | 4.5 | 24.5 | 13.9 |
| Assault w. Deadly Weapon | 3,183 | 36.1 | 24.4 | 6.7 | 5.5 | 29.4 | 17.2 |
| Attempted Murder 1st | 14 | 191.7 | 195.8 | 6.9 | 7.1 | 184.8 | 188.3 |
| Attempted Murder 2nd | 199 | 113.1 | 112.6 | 9.1 | 7.8 | 104.0 | 104.7 |
| Other Assault/Battery | 4,867 | 22.8 | 16.9 | 5.3 | 3.8 | 17.5 | 11.5 |
| Sex Crimes | 2,705 | 44.7 | 30.8 | 6.1 | 4.7 | 38.6 | 25.2 |
| Rape | 231 | 71.3 | 59.5 | 8.0 | 6.0 | 63.3 | 47.3 |
| Lewd Act With Child | 1,197 | 59.6 | 59.9 | 6.5 | 5.2 | 53.1 | 48.1 |
| Oral Copulation | 117 | 56.2 | 30.8 | 6.6 | 4.9 | 49.7 | 25.5 |
| Sodomy | 23 | 60.6 | 38.9 | 6.4 | 5.9 | 54.2 | 33.5 |
| Penetration With Object | 60 | 53.4 | 38.9 | 7.7 | 6.1 | 45.7 | 34.8 |
| Other Sex | 1,077 | 20.4 | 14.2 | 5.2 | 3.8 | 15.3 | 10.0 |
| Kidnapping | 136 | 89.5 | 58.2 | 8.4 | 7.6 | 81.2 | 50.7 |
| Property Crimes | 23,067 | 18.4 | 12.9 | 4.0 | 2.6 | 14.4 | 10.1 |
| Burglary | 6,285 | 23.0 | 14.1 | 4.5 | 3.0 | 18.5 | 10.8 |
| Burglary 1st | 1,966 | 36.1 | 23.0 | 5.7 | 4.1 | 30.3 | 17.1 |
| Burglary 2nd | 4,319 | 17.1 | 12.6 | 3.9 | 2.5 | 13.2 | 9.2 |
| Theft | 8,999 | 16.8 | 12.5 | 3.8 | 2.3 | 13.0 | 9.1 |
| Grand Theft | 2,147 | 17.0 | 12.8 | 4.3 | 2.9 | 12.7 | 8.7 |
| Petty Theft With Prior | 3,734 | 17.7 | 12.5 | 3.4 | 2.0 | 14.3 | 9.6 |
| Receiving Stolen Property | 3,118 | 15.6 | 12.5 | 3.9 | 2.5 | 11.7 | 8.8 |
| Other | 7,783 | 16.6 | 12.9 | 3.9 | 2.6 | 12.7 | 10.1 |
| Vehicle Theft | 4,847 | 16.6 | 12.9 | 3.7 | 2.4 | 12.8 | 10.4 |
| Forgery/Fraud | 2,297 | 16.7 | 12.9 | 4.1 | 2.8 | 12.5 | 9.8 |
| Other Property | 639 | 16.6 | 12.7 | 4.8 | 3.5 | 11.8 | 7.9 |
| Drug Crimes | 22,014 | 20.4 | 14.2 | 4.4 | 3.0 | 15.9 | 10.8 |
| Sales Related | 10,461 | 25.2 | 19.4 | 4.8 | 3.3 | 20.4 | 15.5 |
| CS Possession For Sale | 6,774 | 22.7 | 18.5 | 4.4 | 3.0 | 18.4 | 13.9 |
| CS Sales | 2,023 | 33.9 | 24.7 | 6.1 | 4.4 | 27.8 | 18.6 |
| CS Manufacturing | 664 | 37.4 | 31.7 | 6.3 | 4.3 | 31.1 | 26.1 |
| Marij. Possess For Sale | 701 | 14.1 | 11.4 | 3.6 | 2.5 | 10.5 | 7.5 |
| Marijuana Sale | 299 | 21.5 | 15.4 | 5.2 | 3.6 | 16.3 | 11.3 |
| Possession | 11,553 | 15.9 | 12.3 | 4.1 | 2.8 | 11.9 | 7.6 |
| CS Possession | 11,035 | 15.7 | 12.2 | 4.1 | 2.8 | 11.6 | 7.5 |
| CS Other | 403 | 22.4 | 16.6 | 4.5 | 2.7 | 17.9 | 11.4 |
| Hashish Possession | 32 | 14.2 | 12.8 | 4.0 | 2.9 | 10.2 | 7.5 |
| Marijuana Other | 83 | 18.3 | 13.3 | 5.3 | 4.2 | 13.0 | 9.4 |
| Other Crimes | 7,773 | 18.2 | 12.9 | 4.3 | 2.9 | 13.9 | 9.5 |
| Escape | 93 | 19.6 | 12.1 | 3.5 | 2.1 | 16.0 | 9.4 |
| Driving Under Influence | 1,823 | 16.5 | 12.4 | 3.6 | 2.4 | 12.9 | 8.6 |
| Arson | 131 | 31.1 | 23.0 | 7.4 | 5.8 | 23.7 | 15.1 |
| Possession Weapon | 3,642 | 17.7 | 12.7 | 4.0 | 2.5 | 13.7 | 9.8 |
| Other Offenses | 2,084 | 19.7 | 14.0 | 5.4 | 4.2 | 14.4 | 9.3 |

Time-6, CR.DAU.MTHLY.PGMS(TS).

# EXHIBIT S

# EXHIBIT S

| ATTORNEY'S NAME (FIRST & LAST) | | TYPE |
|---|---|---|
| ADDRESS | | |
| PHONE = | | |

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES
### JUVENILE COURT

| DEPT. | DATE | APP./NONAPP. |
|---|---|---|
| 203 | 8-8-91 | APP. |

# IN THE MATTER OF:

| CASE NAME: (LAST, FIRST, MIDDLE) |
|---|
| PARTIDA, DANIEL |

**COURT NO:** FJ02002

**JAIN:** 1002834

| PDJ = | USUALLY LIVES WITH | AREA | DPO |
|---|---|---|---|
| 0881615 | MOTHER | FIR | 704 |

**PROBATION OFFICER'S REPORT**

| CURRENT STATUS | CURRENT WHEREABOUTS |
|---|---|
| NEW | JUVENILE HALL |

**MAX CONFINEMENT TIME:** _____

| D.P.O. RECOMMENDATION | CODE |
|---|---|
| UNFIT | 27 |

## PERSONAL & FAMILY DATA:

**TIME SERVED:** _____

| SCHOOL DATA | | |
|---|---|---|
| SCHOOL | | |
| CENTRAL H.S. | | |

| SEX | AGE | VERIFIED BIRTHDATE | ETHNIC ORIGIN | RELIGION | LEGAL CUSTODY | NATURAL PARENTS MARITAL STATUS | GRADE | ATTENDANCE | STATUS |
|---|---|---|---|---|---|---|---|---|---|
| M | 17 | 11-8-73 | HISPANIC | CATHOLIC | GRANDMOTHER | DECEASED | 10 | SAT. | FULL |

| FATHER - LAST, FIRST, MIDDLE I. | ADDRESS, ZIP CODE | PHONE | SOCIAL SECURITY # | AGE |
|---|---|---|---|---|
| PARTIDA, LINO | DECEASED | | | |

| MOTHER | | | | |
|---|---|---|---|---|

| STEP-PARENT OR GUARDIAN | | | | |
|---|---|---|---|---|

| STEP-PARENT OR GUARDIAN   GRANDMOTHER | | | | |
|---|---|---|---|---|
| SALAS, MODESTA | 424 E. 29TH STREET LOS ANGELES, CA | 747-8469 | | 62 |

| EMPLOYER'S ADDRESS | | | | |
|---|---|---|---|---|
| FATHER | | | | |
| MOTHER | | | | |

## REFERRAL INFORMATION & RECENT COURT ACTION:

| AGENCY CODE NO. | REQUESTING AGENCY CASE IDENTIFICATION |
|---|---|
| 0113 | 91-1304281 |

| REFERRED BY | DATE REFERRED | DATE DET. FILED | ALLEGATIONS: |
|---|---|---|---|
| LAPD | 2-13-91 | 1-14-91 2-21-91 | |

| DET.HEARING DATE | DETAINED | CAL. DAYS DET. | |
|---|---|---|---|
| 7-24-91 | YES | 15 | |

CT I: 187 PC (MURDER) - PET. DATED 2-21-91
CT. I: 12031(A) PC - PET. DATED 1-14-91
CT. II: 12101 (B) PC

| ADA HEARING DATE | HEARD BY | SUSTAINED BY | COURT ACTION |
|---|---|---|---|
| | | | ☐ CON'T. |

76M 155E PROB. 22 (REV. 8/87)

1

**ALLEGATIONS CONTINUED:**

**REASON FOR HEARING:**

☐ DISPOSITION   ☒ FITNESS   ☐ 654 SUITABILITY   ☐ OTHER _____

**PRESENT OFFENSE:**

SOURCES OF INFORMATION

☒ Referral Document   ☐ Minor   ☐ Victims   ☐ Witnesses

| ☐ COMPANION(S) NAME | ALLEGATIONS | COURT NO. | DISPOSITION |
|---|---|---|---|
| NONE | | | |

**ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:**

PETITION DATED JANUARY 14, 1991:    ALLEGEDLY, MINOR WAS FOUND IN POSSESSION OF A SIX MILLIMETER SEMI-AUTOMATIC HANDGUN.

WHILE ON ROUTINE PATROL, OFFICERS OF THE LOS ANGELES POLICE DEPARTMENT OBSERVED A 1987 RED HYUNDAI THAT WAS DOUBLE PARKED, IN VIOLATION OF THE VEHICLE CODE.    OFFICERS CONDUCTED A TRAFFIC STOP, WHEREUPON MINOR AND THE WITNESS EXITED THE VIOLATION VEHICLE.    MINOR WAS ASKED IF HE COULD PROVIDE HIS LICENSE AND A REGISTRATION OF THE VEHICLE.    MINOR WAS UNABLE TO PROVIDE A DRIVER'S LICENSE TO THE OFFICERS AND INDICATED TO THE OFFICERS THAT THE VEHICLE REGISTRATION WAS LOCATED IN THE GLOVE

-2- (PARTIDA)

1  BOX OF THE VEHICLE. AS THE OFFICER REACHED INSIDE THE VEHICLE TO
2  OPEN THE GLOVE COMPARTMENT BOX, HE OBSERVED A SMALL GUN CASE
3  UNDER THE DRIVER'S SEAT. HE REMOVED THE GUN CASE, OPENED IT AND
4  DISCOVERED A LOADED, SIX MILLIMETER, SEMI-AUTOMATIC HANDGUN
5  INSIDE. . THE SERIAL NUMBER OF THE HANDGUN WAS SCRATCHED OFF, A
6  VIOLATION OF 12090 PENAL CODE. MINOR INDICATED AT THAT TIME THAT
7  HE HAD PURCHASED THE GUN FOR $80 FROM AN UNKNOWN MALE HISPANIC AT
8  THE CORNER OF 29TH STREET AND MAPLE AVENUE. THE MINOR WAS
9  ARRESTED AND CHARGED AS ALLEGED.
10          PETITION DATED FEBRUARY 21, 1991: ALLEGEDLY, IN A
11 DRIVE-BY SHOOTING, MINOR SHOT THE VICTIM, GABRIEL SOTELO,
12 MORTALLY WOUNDING THE VICTIM.
13          DURING AN INVESTIGATION BY THE LOS ANGELES POLICE
14 DEPARTMENT, NEWTON STREET DIVISION, ON JANUARY 9, 1991, IT WAS
15 REVEALED THAT THE VICTIM WAS STANDING OUTSIDE OF HIS RESIDENCE AT
16 3101 SOUTH GRAND AVENUE, WHEN A LATE MODEL FOUR-DOOR HYUNDAI
17 VEHICLE CONTAINING FOUR MALE HISPANICS APPROACHED AND STOPPED.
18 MINOR WAS OBSERVED TO POINT A NINE MILLIMETER, SEMI-AUTOMATIC
19 HANDGUN IN THE VICTIM'S DIRECTION AND FIRE SEVERAL TIMES. THE
20 VICTIM WAS STRUCK WITH A SINGLE BULLET IN THE BACK OF HIS HEAD
21 AND FELL TO THE PAVEMENT. PARAMEDICS RESPONDED TO THE SCENE AND
22 TRANSPORTED THE VICTIM TO CALIFORNIA HOSPITAL, WHERE HE WAS
23 PRONOUNCED DEAD, SHORTLY THEREAFTER.

   -3- (PARTIDA)

76C692G – PROB. 5A

COORDINATED POLICE INVESTIGATION REVEALED THAT THE LOCATION OF THE AFOREMENTIONED INCIDENT IS KNOWN AS 39TH STREET GANG TERRITORY AND 39TH STREET GANG WAS PRESENTLY AT WAR WITH 36TH STREET GANG.    INVESTIGATING POLICE OFFICERS INTERVIEWED SEVERAL GANG MEMBERS REGARDING THE AFOREMENTIONED INCIDENT, INCLUDING THE WITNESS AND IT WAS REVEALED THAT THE WITNESS AND ANOTHER UNKNOWN MALE HISPANIC ACCOMPANIED MINOR TO THE 39TH STREET TERRITORY IN MINOR'S RED VEHICLE AND ORDERED TO DO A DRIVE-BY SHOOTING.    THE WITNESS ADVISED POLICE OFFICER THAT MINOR HAD APPROACHED HIM IN REGARD TO THE DRIVE-BY SHOOTING ON 39TH STREET.    THE WITNESS STATED THAT HE, MINOR AND AN UNKNOWN MALE HISPANIC DROVE BY 39TH STREET TERRITORY; THE UNKNOWN MALE HISPANIC, WHO WAS SEATED IN THE FRONT WITH THE MINOR, DREW WHAT IS BELIEVED TO HAVE BEEN AN UZI HANDGUN AND SHOT AT A GROUP OF PEOPLE WHO WERE STANDING IN FRONT OF THE AFOREMENTIONED LOCATION. THE WITNESS POSITIVELY IDENTIFIED MINOR AS THE DRIVER OF A RED HYUNDAI AND AS THE ONE WHO WAS IN POSSESSION OF THE UZI-TYPE WEAPON AND AS THE ONE WHO HAD STATED THAT HE WAS GOING TO DO A DRIVE-BY SHOOTING ON 39TH STREET GANG MEMBERS ON THE NIGHT OF JANUARY 9, 1991.    OFFICERS IDENTIFIED MINOR VIA DEPARTMENT RESOURCES AND RESPONDED TO MINOR'S ADDRESS WHERE OFFICERS OBSERVED A RED HYUNDAI PARKED IN THE FRONT YARD.    IT WAS ALSO LEARNED FROM THE WITNESS THAT ON THE DAY FOLLOWING THE INCIDENT,

-4- (PARTIDA)

76C692G — PROB. 5A

1  MINOR HAD BRAGGED ABOUT THE DRIVE-BY SHOOTING.    A WARRANT WAS

2  REQUESTED BY THE DISTRICT ATTORNEY'S OFFICE ON FEBRUARY 21, 1991

3  AND WAS SERVED ON THE MINOR JULY 24, 1991.    THUS, MINOR WAS

4  CHARGED AS ALLEGED.

-5- (PARTIDA)

76C692G — PROB. 5A

**VICTIM:**

SOURCES OF INFORMATION (this page)

REFERRAL DOCUMENT

NAME

GABRIEL SOTELO

SUSTAINED ALLEGATIONS (COUNT(S))

INJURY; PROPERTY LOSS (TYPE / COST / ETC.)

DEATH FROM BULLET WOUND IN THE BACK OF THE HEAD.

INSURANCE COVERAGE

UNKNOWN

LOSS: ☐ YES ☐ NO | ESTIMATED LOSS | RESTITUTION ALREADY MADE | APPLIED FOR VICTIM RESTITUTION FUND ☐ UNK ☐ YES ☐ NO

VICTIM STATEMENT:   (If unable to contact, state reason(s) in this section.)

PROBATION OFFICER WAS UNABLE TO ESTABLISH CONTACT WITH SURVIVORS OF THE ABOVE-NAMED VICTIM.  SHOULD CONTACT BE MADE PRIOR TO COURT DATE, INFORMATION WILL BE FORWARDED TO THE COURT FORTH WITH.

RESTITUTION SUMMARY | TOTAL NUMBER OF VICTIMS | ESTIMATED LOSS TO ALL VICTIMS

IS THERE INSURANCE TO COVER RESTITUTION: ☐ YES ☐ NO | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO.

PAYMENT PLAN

VICTIM LIST CONTINUES NEXT PAGE

-6- (PARTIDA)

76J969—Prob. 1264— (Rev. 4/84)

PRIOR RECORD:

| SOURCES OF INFORMATION | | |
|---|---|---|
| ☐ Juvenile Court Records | ☒ Minor | ☒ JAI |
| ☐ Other (Specify) | ☐ Police | ☒ Probation Records |

AKA'S:

     "LOVER BOY"

AGE 16          3-21-90 - LAPD/NEWTON STREET - 594(A)(2) PC
                (VANDALISM). NON-DETAINED PETITION, CLOSED.

        (MINOR STATED THAT HE WAS STANDING WITH THREE OF HIS
        FRIENDS WATCHING SMALLER KIDS THROW ROCKS AT A VEHICLE THAT
        HAD AN ALARM IN IT. MINOR STATED THAT THE SMALLER KIDS
        WERE THROWING THE ROCKS AT THE VEHICLE IN ORDER TO ACTIVATE
        THE ALARM, WHEN ONE OF THE ROCKS HIT THE WINDOW, BREAKING
        IT. MINOR STATED THAT HE AND HIS FRIENDS STARTED LAUGHING,
        THE OWNER BECAME ANGRY AND CALLED POLICE OFFICERS. MINOR
        STATED THAT THE OWNER PICKED HIM OUT OF THE CROWD BECAUSE
        HE WAS LAUGHING THE HARDEST. MINOR DENIES BREAKING THE
        WINDOW.)

AGE 17          11-28-90 - LASD/LYNWOOD - 626.8(A) PC (PERSON/SEX
                OFFENDER DISRUPT SCHOOL ACT). COUNSELED AND
                RELEASED.

        (MINOR STATED THAT HE AND A FRIEND WALKED THROUGH THE GATE
        TO THE INSIDE OF LYNWOOD HIGH SCHOOL WITHOUT AUTHORIZATION
        IN ORDER TO SEE HIS FRIEND'S GIRLFRIEND. MINOR STATED THAT
        HE WAS DITCHING SCHOOL THAT DAY AND WAS CAUGHT BY THE
        SECURITY GUARDS, WHO CALLED THE POLICE. MINOR STATED THAT
        HE WAS ARRESTED AND SUBSEQUENTLY RELEASED TO HIS
        GRANDMOTHER.)

AGE 17          12-6-90 - LAPD/NEWTON STREET - 12101(B) PC
                (POSSESS LIVE AMMO WITHOUT PARENTAL PERMISSION),
                12031(A) PC (CARRY LOADED FIREARM IN PUBLIC PLACE)
                AND 12090 PC (TAMPER WITH ID MARKS ON FIREARMS).
                NON-DETAINED PETITION DATED 1-14-91.

        (THE ABOVE PETITION IS ADDRESSED IN THE PRESENT MATTER.)

AGE 17          1-9-91 - LAPD/NEWTON STREET - 187 PC (MURDER) AND
                187(A) PC (ATTEMPTED MURDER). PETITION DATED
                2-21-91, FILED BY THE D.A.

        (THIS REFERS TO ONE OF THE PETITIONS IN THE PRESENT
        MATTER.)

AGE 17          1-31-91 - LAPD/NEWTON STREET - 187(A) PC
                (ATTEMPTED MURDER).


     -7- (PARTIDA)

(THE ABOVE MATTER APPEARS TO BE A REFILING OF THE ARREST OF JANUARY 9, 1991.)

AGE 17        6-15-91 - LAPD/NEWTON STREET - 211 PC (ARMED ROBBERY).  NON-DETAINED PETITION SUBMITTED TO THE DISTRICT ATTORNEY.

(CIRCUMSTANCES OF THE ABOVE MATTER ARE UNAVAILABLE AT TIME OF THIS WRITING.)

AGE 17        7-22-91 - LAPD/NEWTON STREET - 187(A) PC (MURDER) DETAINED PETITION.

(THE ABOVE MATTER APPEARS TO BE A REFILING OF THE PRESENT MATTERS.)

-8- (PARTIDA)

76C692G — PROB. 5A

PERSONAL HISTORY:

| SOURCES OF INFORMATION (this page) |
|---|
| MINOR, REFERRAL DOCUMENT |

| RESIDENCE | TYPE RESIDENCE | LENGTH OF OCCUPANCY | MORTGAGE/RENT |
|---|---|---|---|
| | HOUSE | 16 YEARS | UNKNOWN |

OCCUPANTS OF THE HOME

MINOR, GRANDMOTHER, STEPMOTHER, SIBLINGS

| EMPLOYMENT STATUS | Father: ☐ EMPLOYED ☐ UNEMPLOYED | OCCUPATION DECEASED | GROSS MONTHLY WAGE |
|---|---|---|---|
| | Mother: ☐ EMPLOYED ☐ UNEMPLOYED | OCCUPATION DECEASED | GROSS MONTHLY WAGE |
| | Minor: ☐ EMPLOYED ☒ UNEMPLOYED | OCCUPATION | GROSS MONTHLY WAGE |

| MINOR'S PRESENT/LAST EMPLOYER / ADDRESS | OTHER FAMILY INCOME SOURCE / AMOUNT |
|---|---|
| | |

Additional information    BOTH OF MINOR'S PARENTS ARE DECEASED.    ALTHOUGH

MINOR DOES NOT KNOW THE CAUSE OF HIS MOTHER'S DEATH, HIS MOTHER

(CONTINUED PAGE 10)

PHYSICAL / MENTAL / EMOTIONAL HEALTH:

HEALTH: ☒ GOOD ☐ FAIR ☐ POOR

_____ No indication or claim of significant mental/emotional health problem.

_____ See below:    Indication / claim of significant physical/mental/emotional health problem.

Additional information (Duration / Frequency / Severity of problem)

MINOR IS FIVE-FEET TEN-INCHES IN HEIGHT AND WEIGHS

170 POUNDS.    HE HAS BROWN EYES AND BLACK HAIR.    MINOR HAS ONE

TATTOO ON HIS UPPER BACK, "DANNY".    ACCORDING TO THE MINOR, HE

SUFFERS NO MALADIES OR ABNORMALITIES AT THIS TIME.

SUBSTANCE ABUSE:

_____ No record, indication, or admission of alcohol or controlled substance abuse.

__X__ Occasional or experimental use of __BEER__                                    acknowledged.

_____ See below:    Indication / admission of significant substance abuse problem.

Additional information    MINOR ADMITS TO THE OCCASIONAL USE OF BEER, BUT

DENIES THE CONSUMPTION OF OTHER ALCOHOLIC BEVERAGES OR USE OF

ILLICIT DRUGS.

-9- (PARTIDA)

76J969—Prob. 1264—( Rev. 4/84)

<u>RESIDENCE/EMPLOYMENT HISTORY</u>: (CONTINUED)

DIED IN 1979; HIS FATHER DIED OF GUNSHOT WOUNDS IN 1987.  MINOR HAS RESIDED WITH THE GRANDMOTHER, HIS GUARDIAN, FOR THE PAST 16 YEARS.

MINOR STATED THAT PRIOR TO HIS DETENTION, HE WAS EMPLOYED ON A PART-TIME BASIS AT HIS UNCLE'S AUTO SALES BUSINESS AND EARNED $150 PER WEEK.

-10- (PARTIDA)

76C692G — PROB. 5A

PERSONAL HISTORY:
(CONTINUED)

SOURCES OF INFORMATION (this page)

MINOR, REFERRAL DOCUMENT

| GANG ACTIVITY | ☐ YES<br>☒ NO | Name of Gang |
|---|---|---|

Additional information

ALTHOUGH MINOR DENIES ANY GANG MEMBERSHIP, ACCORDING TO LAW ENFORCEMENT GANG CRASH UNIT, MINOR IS AN ACTIVE GANG MEMBER WITH EITHER 36TH STREET OR STREET SAINTS.

| BEHAVIOR IN SCHOOL | ☐ Good   ☐ Fair   ☒ Poor |  |
|---|---|---|
| SUSPENSION(S)<br>☐ YES   ☐ NO | DATE(S) | LENGTH(S) |
| REASON | | |

Additional information

MINOR STATED THAT HE ENROLLED AT CENTRAL HIGH SCHOOL THE FIRST SEMESTER OF THE LAST SCHOOL YEAR, IN THE 10TH GRADE. HE STATED THAT HIS GRADES WERE AS FOLLOWS: MATH - C; SCIENCE - F; ENGLISH - C; PHYSICAL EDUCATION - A; HEALTH - C. HE STATED THAT IN FEBRUARY, 1991, HE LEFT TO ACCOMPANY HIS GRANDMOTHER TO MEXICO TO VISIT AN AILING GRANDAUNT. MINOR HAS NOT ATTENDED SCHOOL SINCE THAT TIME.

-11- (PARTIDA)

1 | MINOR'S STATEMENT:

2      IN THE PRESENCE OF MINOR'S ATTORNEY, MINOR WAS

3 ADVISED OF HIS CONSTITUTIONAL RIGHTS AND THAT THE CIRCUMSTANCES

4 OF THE PRESENT MATTERS COULD NOT AND WOULD NOT BE DISCUSSED UPON

5 THE ADVICE OF HIS ATTORNEY.

6      IN REFERENCE TO SCHOOL, MINOR HAD NO REASON FOR

7 HIS FAILURE TO ATTEND THE LAST SEMESTER OF SCHOOL.  HE INDICATED

8 THAT HE DOES PLAN TO ENROLL IN REGULAR SCHOOL SHOULD HE BE

9 RELEASED BACK INTO THE COMMUNITY.

10      MINOR   DENIES   ANY   GANG   AFFILLIATION   DESPITE

11 REFERENCES OF LAW ENFORCEMENT AGENICES.

12      AS   TO   HIS   FEELINGS   REGARDING   HIS   PRESENT

13 SITUATION, MINOR INDICATED THAT HE WOULD LIKE TO BE RELEASED TO

14 THE CUSTODY OF HIS GRANDMOTHER.  HE STATED THAT HE IS AFRAID AS

15 HE DOES NOT KNOW WHAT WILL HAPPEN TO HIM AT THE PRESENT TIME.  HE

16 INDICATED, HOWEVER, THAT HE WOULD "HAVE TO DEAL WITH IT."  MINOR

17 ADDS THAT "I DIDN'T DO IT."

18 | PARENT'S STATEMENT:

19      PROBATION OFFICER SPOKE WITH MINOR'S GRANDMOTHER

20 THROUGH THE ASSISTANCE OF A SPANISH INTERPRETER.  THE GRANDMOTHER

21 STATED THAT SHE WOULD LIKE FOR HER GRANDSON TO RETURN HOME.  SHE

22 STATES THAT HER GRANDSON PRESENTED NO PROBLEMS TO HER IN THE

23 HOME.  SHE ADDED THAT THERE WERE TIMES WHEN MINOR KEPT LATE HOURS

-12- (PARTIDA)

BUT THAT IT WAS NOT PROBLEMATIC.

THE GRANDMOTHER INDICATED THAT MINOR ACCOMPANIED HER TO MEXICO TO VISIT HER ILL SISTER AND WAS UNABLE TO ATTEND THE SECOND SEMESTER OF SCHOOL. THE GRANDMOTHER STATES THAT SHOULD MINOR BE RELEASED, SHE WILL ENSURE HIS SCHOOL ENROLLMENT AND PERFORMANCE.

AS TO HIS GANG AFFILIATIONS, THE GRANDMOTHER STATED THAT MINOR "HAS FRIENDS WHO ARE A BAD INFLUENCE ON HIM." SHE STATES THAT MINOR'S FRIENDS ARE NOT ALLOWED IN HER HOME BECAUSE SHE DOES NOT APROVE OF THEM, ESPECIALLY THEIR ATTITUDE AND "THE WAY THEY DRESS" (GANG ATTIRE).

<u>INTERESTED PARTIES:</u>

ACCORDING TO DETENTION STAFF, MINOR HAS PRESENTED NO BEHAVIORAL PROBLEM ON THE LIVING UNIT. MINOR HAS NO DIFFICULTY IN FOLLOWING THE INSTRUCTIONS OF THE DETENTION STAFF.

<u>BEHAVIORAL EVALUATION:</u>

A DETERMINATION AS TO WHETHER THIS YOUNG MAN WILL ANSWER TO CHARGES IN ADULT OR JUVENILE COURT WILL BE DETERMINED UNDER THE FOLLOWING CRITERIA:

1. <u>CRIMINAL SOPHISTICATION:</u>

MINOR INITIATED AND ORCHESTRATED THE DRIVE-BY SHOOTING. INVESTIGATION REVEALS THAT IT WAS MINOR'S IDEA AND/OR SUGGESTION TO DRIVE BY AND SHOOT AND THE VICTIM, THEREBY INDICATING A PRE-PLANNED ATTACK. THUS, THE ATTACK WAS

-13- (PARTIDA)

76C692G — PROB. 5A

PREMEDITATED AND, AS PREVIOUSLY INDICATED, CAREFULLY ORCHESTRATED BY THIS MINOR, SUGGESTING MORE THAN NOVICE SOPHISTICATION. MINOR DOES NOT APPEAR AMENABLE UNDER THIS CRITERION.

2. PREVIOUS ATTEMPTS TO REHABILITATE MINOR:

MINOR HAS NEVER BEEN ON FORMAL PROBATION SUPERVISION AT THE PRESENT LEVEL. HE APPEARS AMENABLE UNDER THIS CRITERION.

3. PREVIOUS DELINQUENT BEHAVIOR:

MINOR HAS TWO PRIOR POLICE CONTACTS FOR WHAT APPEARS TO HAVE BEEN FOR MALICIOUS MISCHIEF. ONE MATTER WAS CLOSED AND IN THE OTHER MATTER, MINOR WAS COUNSELED AND RELEASED. MINOR APPEARS AMENABLE UNDER THIS CRITERION.

4. CIRCUMSTANCES AND GRAVITY OF THE OFFENSE:

THE VICTIM LOST HIS LIFE AS A RESULT OF RECEIVING A GUNSHOT WOUND IN THE BACK OF HIS HEAD. THUS, THE GRAVITY AND MAGNITUDE OF THE OFFENSE IS INCOMPARABLE. ADDITIONALLY, THE VICTIM LOST HIS LIFE AS A RESULT OF A DRIVE-BY SHOOTING WHICH GROSSLY ENDANGERED THE LIVES OF INNOCENT BYSTANDERS. MINOR IS THEREFORE NOT AMENABLE UNDER THIS CRITERION.

5. EXPIRATION OF THE COURT'S JURISDICTION:

MINOR IS PRESENTLY 17 YEARS OLD AND WILL REACH THE AGE OF MAJORITY IN APPROXIMATELY THREE MONTHS. THUS, THERE DOES NOT APPEAR TO BE ENOUGH TIME AVAILABLE FOR MINOR'S REHABILITATION AT THE PRESENT LEVEL. THE MINOR IS THEREFORE SEEN AS NOT AMENABLE UNDER THIS CRITERION.

PLACE OF DETENTION:

THE MINOR'S BEHAVIOR IN JUVENILE HALL IS

-14- (PARTIDA)

76C692G — PROB. 5A

ACCEPTABLE FOR DETENTION IN JUVENILE HALL.

RECOMMENDATION:

        IT IS RECOMMENDED THAT MINOR BE FOUND NOT A FIT SUBJECT FOR CONSIDERATION UNDER THE PROVISIONS OF THE JUVENILE COURT LAW; THAT THE COURT DIRECT THE PROSECUTING ATTORNEY TO FILE AN ACCUSATORY PLEADING AGAINST THE MINOR IN A COURT OF CRIMINAL JURISDICTION.  THAT MINOR REMAIN DETAINED AT JUVENILE HALL; THAT THE ORDER FOR DETENTION REFLECT THAT MINOR IS TO BE RELEASED TO THE CUSTODY OF LAW ENFORCEMENT PERSONNEL FOR TRANSPORTATION TO AND FROM ADULT PROCEEDINGS; THAT THE PETITION BE DISMISSED WITHOUT PREJUDICE; THAT THE CASE BE CONTINUED THREE MONTHS TO THE

-15- (PARTIDA)

76C692G — PROB. 5A

1    NON-APPEARANCE CALENDAR FOR FURTHER REPORT.

2    RESPECTFULLY SUBMITTED,

3    BARRY J. NIDORF
     PROBATION OFFICER

4

5
     BY _____
6        RUBY HURD, DEPUTY FOR 202/FIRESTONE
         FIRESTONE AREA OFFICE
7        (213) 586-6425

8
     READ AND APPROVED:
9

10
     _____
11   BOGUS MILLER, SDPO
     (213) 586-6425
12

13   (SUBMITTED 8-7-91)
     (TYPED 8-7-91)
14   RH:TXRX:TL (7)

15

16

17

18

19

20

21

22

23

        -16- (PARTIDA)

76C692G – PROB. 5A

# EXHIBIT T

# BPH Statistics re: Initial Parole Hearing Decisions

# EXHIBIT T

Morton v. Mendoza-Powers
CV-06-0873 OWW LJO

INFO: T. RAMY, LEGAL COUNSEL, BOARD OF PAROLE HEARINGS*    (Tel) 916-324-1983
DATE: MAY 26, 2007

| NUMBER | NAME | EVENT | DATE of GRANTS | STATUS |
|---|---|---|---|---|
| D-19576 | SANDOVAL | July 2006 grant Effective. Approved by the Gov with modification; release date set for 2009. In ill health. | Initial Hrng Grant: 1/13/2002<br>2nd Grant Hrng: 10/19/2004<br>3rd Grant Hrng: 07/06/2004 | In custody. |
| H-93389 | WARTH | Jan 2007 grant Approved by DRU and pending before Gov's Review | Initial Hrng Grant: 3/21/2002<br>2nd Grant Hrng: 3/19/2003<br>3rd Grant Hrng: 12/9/2004<br>4th Grant Hrng: 12/8/2007<br>5th Grant Hrng: 1/25/2007 | In custody. |
| H-14131 | OLDRIGHT | Dec 2006 grant Approved by DRU but reversed by Governor week of May 21, 2007. | Initial Hrng Grant: 4/15/2002<br>1st Subsequent Hrng: 4/5/2004 – DENY<br>2nd Subsequent Hrng: 11/8/2005 – DENY<br>3rd Subsequent Hrng: 12/19/2006 - GRANT | In custody. |
| W43602 | CENICEROS | Dec 2005 grant Effective, Governor approved. | Initial Hrng Grant: 12/7/2005<br>2nd Grant Hrng: 12/29/2004<br>3rd Grant Hrng: 6/1/2004<br>4th Grant Hrng: 12/–/2005 | Release date 2012 |
| H-06552 | WASHINGTON | Last parole Affirmed on en banc review. | Initial Hrng Grant: 7/7/2004<br>En Banc Review: 8/18/2005 | Released June 2005 (appears to be conflict in dates) |
|  |  |  |  |  |
|  |  |  |  |  |

| D-85573 | RAMIREZ | Grant reversed by Governor August 2004. Two subsequent hearings BPH denied parole both times. | Initial Hrng Grant: 8/4/2004<br>1st Subsequent Hrng: 1/26/2006 – DENY<br>2nd Subsequent Hrng: 1/31/2007 - DENY | In custody. |
| H-77738 | CONRAD | June 2006 grant, DRU approved. (Not a murder) | Initial Hrng Grant: 6/21/2006<br>DRU Approved | In custody pending release date. |

* This information was requested by Carl McQuillion, paralegal for Joseph V. Camarata, attorney of record, from Tom Ramy, Staff Counsel at the Board of Parole Hearings. Mr. Ramy called Mr. McQuillion on May 26, 2007, at approximately 1:15 PM, and provided the above information on each inmate. The transcription of this information to this chart is certified as true and correct by Mr. McQuillion, *infra*.

REVIEWED AND APPROVED:

/s/ *Joseph V. Camarata*
Joseph V. Camarata, Attorney for Petitioner Ron Morton

Date: May 27, 2007

## DECLARATION OF CARL D MCQUILLION, PARALEGAL

I, Carl D. McQuillion, declare that:

1.    I am a freelance paralegal contractually employed by Joseph V. Camarata of Pendergast & Camarata Law Offices in Vallejo, California, and am assigned to the case of *Morton v. Mendoza-Powers*.

2.    On May 24th, 2007, I called the office of the Board of Parole Hearings requesting follow-up information with regards to the information provided by Respondent (Board) regarding the discovery motion filed in this case. My duty was to check the status of each of the 7 inmates on the list provided by respondent. I was directed to Mr. Tom Ramy, Staff Counsel for the Board of Parole Hearings. I left a message on his voicemail.

3.    On May 25th, 2007, Mr. Ramy returned my called and we discussed the information being requested. He took the names of the 7 inmates and said he would research it and call me back.

4.    On May 26th, 2007, Mr. Ramy returned by call at approximately 1:15 PM, and related the updated information above.

UNDER PENALTY OF PERJURY, by the laws of California, I swear that the above is a true and correct recordation of the information Mr. Ramy provided me, and would so testify to this in a court of law, if requested.

Dated: May 26, 2007.

/s/ *Carl D McQuillion*
Carl D. McQuillion, declarant

| Post-it® Fax Note | 7671 | Date 3/28 | # of pages ▶ |
|---|---|---|---|
| To Bob Cross | | From Teresa Arcure | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # 322-9424 | |
| Fax # 322-8288 | | Fax # see attached! | |

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RON MORTON, JR.,<br><br>            Petitioner,<br><br>    v.<br><br>KATHY MENDOZA-POWERS, Warden,<br><br>            Respondent. | 1:06-CV-00873 OWW NEW (DLB) HC<br><br>ORDER DIRECTING RESPONDENT<br>TO REPLY TO PETITIONER'S MOTION<br><br>[Doc. #13] |

Petitioner is a state prisoner proceeding with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented in this action by Joseph V. Camarata, Esq.

Pending before the Court is Petitioner's January 31, 2007, Motion for Discovery. Petitioner requests discovery of "[a]ll statistical documents, and/or all parole decision summary sheets, of all initial parole consideration hearings, conducted for all indeterminately-sentenced prisoners for the past five (5) years." Petitioner's Motion at 1-2. Respondent has not filed a reply to said motion.

Discovery is available at the Court's discretion and upon a showing of good cause. McDaniel v. United States Dist. Court (Jones), 127 F.3d 886, 888 (9th Cir. 1997); Jones v. Wood, 114 F.3d 1002, 1009 (9th Cir. 1997); Rule 6(a) of the Rules Governing Section 2254 Cases. However, unlike other civil litigation, a habeas corpus petitioner is not entitled to broad discovery. Bracy v. Gramley, 520 U.S. 899, 904 (1997); Harris v. Nelson, 394 U.S. 286, 295 (1969).

1    Before the Court can make an informed decision on the motion, more information is needed.

2    Respondent is directed to respond and address the subject matter of said motion. The Court requires

3    information on whether such documentation exists, and if so, the amount of documentation, whether

4    the documentation is readily available to Respondent, the amount of time Respondent would need to

5    compile the documentation, and the overall burden that would be placed on Respondent in order to

6    comply with Petitioner's request.

7    Accordingly, Respondent is HEREBY DIRECTED to reply to Petitioner's motion within

8    twenty (20) days of the date of service of this order.

9    IT IS SO ORDERED.

10   Dated:    **March 9, 2007**          /s/ **Dennis L. Beck**
     3b142a                         UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Created by: Laverne Low - Nakashima*

RUN DATE:  MARCH 19, 2007 - LAVERNE

LIST OF LIFER OFFENDERS WHO HAD A "INITIAL" HEARING
THAT WAS "GRANTED" A PAROLE DATE FOR THE LAST 5 YEARS -
JANUARY 1, 2002 TO DECEMBER 31, 2006 - (8 RECORDS)


SET PAGES 100
SET LINES 100
SELECT H.CDC_NUMBER, SUBSTR(B.NAME,1,25), B.OFFENSE_CD, H.HRG_DT,
H.HRG_TYPE, H.ACTION_CD, H.PANELIST1, H.PANELIST2, H.PANELIST3,
H.BPT_PAROLE_DT, H.PBR_PAROLE_DT,H.POSTPONED_FLG,STIP
FROM LIFER.HEARING H, BPT.OFFENDER B
WHERE H.ACTION_CD='GRANT' AND
H.HRG_TYPE = 'I' AND
HRG_DT BETWEEN
TO_DATE('01/01/2002','MM/DD/YYYY') AND
TO_DATE('12/31/2006','MM/DD/YYYY') AND
H.CDC_NUMBER = B.CDC_NUMBER
ORDER BY H.HRG_DT ;
ORDER BY H.HRG_DT ;

| CDC_NU | SUBSTR(B.NAME,1,25) | OFFENSE_CD | HRG_DT | HRG | ACTIO | PAN | PAN | PAN | BPT_PAROL | PBR_PAROL | P | S |
|--------|---------------------|------------|--------|-----|-------|-----|-----|-----|-----------|-----------|---|---|
| D19576 | SANDOVAL,JUAN,GARCIA | P187 | 23-JAN-02 | I | GRANT | 042 | ACA | | | | | |
| H93389 | WARTH,BRIAN | P187 2ND | 21-MAR-02 | I | GRANT | 039 | WJK | | 11-FEB-08 | | | |
| H14131 | OLDRIGHT,WILLIAM,GEORGE,J | P187 2ND | 15-APR-02 | I | GRANT | 040 | GMG | | 29-NOV-07 | | | |
| W43602 | CENICEROS,EMILIA | P187 2ND | 01-JUN-04 | I | GRANT | 039 | GMG | 047 | | | | |
| H06552 | WASHINGTON,REGINALD,VINCE | P187(664) | 07-JUL-04 | I | GRANT | 046 | CJB | | | | | |
| D85573 | RAMIREZ,MARTIN | P187 | 04-AUG-04 | I | GRANT | 045 | KDL | | 18-AUG-05 | | | |
| W43602 | CENICEROS,EMILIA | P187 2ND | 29-DEC-04 | I | GRANT | 039 | DAL | | | | | |
| H77738 | CONARD,PATRICK,MARTIN | P209(B) | 21-JUN-06 | I | GRANT | 050 | HRM | | | | | |

8 rows selected.

PROGRAM: LLN L/PRNT/LIF_ALLINITAL_GRANT_JAN02DEC06.DOC

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **CDC** | **Name** | | | **Req** | **Inst** | **Status** | | |
| 019376 | SANDOVAL,JUAN,GARCIA | | | | NKPRC | | | |

| Hearing Date | Time | Location | S Type | Panel P1 | P2 P3 | Decision | Post Stip spons | Con | New Parole Months BPT | Diff Stip PBR | Waiver Reason For No Decision |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/08/2006 | 12:00 | KVSP | S02 | 053 | | BJM | GRANT | | | | |
| 10/19/2004 | 13:00 | ISP | S01 | 046 | | LAC | GRANT | | | | |
| 02/17/2004 | 15:30 | ISP | S01 | 012 | | HRM | | Y | | | BPT INVESTIGATIO |
| 03/24/2003 | 15:30 | CAL | S01 | 037 | | CJB | | | Y | | |
| 01/23/2002 | 09:45 | CAL | I | 042 | | ACA | GRANT | | | | |

Query    Exit



| Hearing Date | Time | Location | Panel Type P1 P2 P3 | Deci-sion | Post-pone | Stip | Con | Months | News Parole BPT Date | Waiver PBD | Reason for No. Decision |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/25/2007 | 10:30 | CVSP | S04 034 | ACA GRANT | | | | | | | | |
| 12/08/2005 | 08:30 | CVSP | S03 049 | CYW GRANT | | | | | | | | |
| 12/09/2004 | 08:30 | CVSP | S02 040 | ACA GRANT | | | | | | | | |
| 09/01/2004 | 08:45 | CVSP | S02 040 | ACA | | Y | | | | | | NEED UPDATED PS |
| 03/19/2003 | 11:00 | CVSP | S01 039 | VLT GRANT | | | | | | | | |
| 03/21/2002 | 08:30 | CVSP | I 039 | WJK GRANT | | | | | | 02/11/2008 | | |



Hearing History Information

| CDC | Name | Reg | Inst. | Status |
|---|---|---|---|---|
| H14181 | OLDRIGHT,WILLIAM,GEORGE,JR | | CTF-C | |

| Hearing Date | Time | Location | Type | Panel P1 | P2 | P3 | Dact sion | Post Stip pond | Cpn | Months | New Parole BPT | Date(s) PBR/s | Waiver Reason for No Decision |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/19/2006 | 13:30 | CTF | | S03 | 058 | WJK | GRANT | | | | | | |
| 11/08/2005 | 09:45 | CTF | | S02 | 046 | RSH | DENY | | | 12 | | | |
| 04/05/2004 | 15:30 | CTF | | S01 | 043 | RSH | DENY | | | 12 | | | |
| 04/15/2002 | 14:15 | CTF | | I | 040 | GMG | GRANT | | | | | 11/29/2007 | |

Query    Exit



## Hearing History Information

CDC: W43502    Name: CENICEROS, EMILIA    Reg:    Inst:    Status:

| Hearing Date | Time | Locations | Type | Panel P1 | P2 | P3 | Deci sion | Post pond. | Stip. Con Months | New Parole BPT | Date(s) PBR | Waiver Reason For No Decision |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/07/2005 | 13:00 | CCWF | S01 | D52 | | | HRM | GRANT | | 11/28/2012 | | |
| 12/29/2004 | 11:30 | VSPW | I | D39 | | | DAL | GRANT | | | | |
| 06/01/2004 | 13:00 | VSPW | I | D39 | D47 | | GMG | GRANT | | | | |

Query



Hearing History Information

| | CDC | Name | | Rcd | Inst | Status |
|---|---|---|---|---|---|---|
| | JH06552 | WASHINGTON, REGINALD, VINCENT | | | REG4 | |

| Hearing Date | Time | Location | Type | Panel P1 P2 P3 | Deci-sion | Post-pond | Stip Con | New Parole Month | Date of BPT | PBR | Waiver Reason For No Decision |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/07/2004 | 1215 | RJD | I | 048 | CJB GRANT | | | | 08/18/2005 | | |

Query    Exit



AI Hearing History Information

| CDC | Name | | Req | Inst | Status |
|-----|------|--|-----|------|--------|
| D65573 | RAMIREZ, MARTIN | | | SATF | |

| Hearing Date | Time | Location | Type | Panel P1 | P2 | P3 | Decision | Post Slip | Cont. Months | New Parole BPT | Dates PBR | Waiver Reason For No Decision |
|--------------|------|----------|------|----------|----|----|----------|-----------|--------------|----------------|-----------|-------------------------------|
| 01/31/2007 | 10:30 | SATF | | S02 | 061 | | BHR | DENY | | 12 | | | |
| 01/26/2006 | 09:45 | SATF | | S01 | 045 | | RNE | DENY | | 12 | | | |
| 08/03/2005 | 13:30 | SATF | | S01 | 052 | | FDV | | Y | | | | BOARD REPORT L |
| 08/04/2004 | 09:45 | SATF | | I | 045 | | KDL | GRANT | | | | | |

Query     Exit



**Hearing History Information**

CDC: W43602  Name: CENICEROS, EMILIA  Reg:  Inst:  Status:

| Hearing Date | Time | Location | Type | Panel P1 | P2 | P3 | Dec. ision | Post pond. | Stip Con | Months | New Parole BPT | Batch PBRet | Waiver Reason For Not Decision |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/07/2005 | 13:00 | CCWF | S01 | 052 | | HRM | GRANT | | | | 11/28/2012 | | |
| 12/29/2004 | 11:30 | VSPW | I | 039 | | DAL | GRANT | | | | | | |
| 06/01/2004 | 13:00 | VSPW | I | 039 | 047 | GMG | GRANT | | | | | | |

Query    Exit

## Hearing History Information

| CDC | Name | Reg | Inst | Status |
|-----|------|-----|------|--------|
| 177736 | CONARD,PATRICK,MARTIN | | FOL | |

| Hearing Date | Time | Location | Type | Panel P1 | P2 | P3 | Deci sion | Post pond | Stip Con | Mentins | New Parole BPT | Date PBR | Waiver Reason for No Decision |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/21/2006 | 08:30 | FOL | I | 050 | | | HRM | GRANT | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Query    Exit

# EXHIBIT U

# *In re Criscione*
# slip copy

## Santa Clara Superior Court decision

# EXHIBIT U

# Judge slams state parole board, demands changes

**RULING COULD GIVE THOUSANDS OF MURDERERS CHANCE AT FREEDOM**

**By Howard Mintz**
**Mercury News**
**San Jose Mercury News**

Article Launched:09/13/2007 01:33:24 AM PDT

A Santa Clara County judge has ordered the state's parole system to change the way it does business, setting up a major legal clash over the parole board's routine refusal to release convicted murderers.

In an unprecedented 34-page ruling, Superior Court Judge Linda Condron recently called the current parole process "malfunctioning." The parole board's approach to thousands of cases each year is so flawed, she ruled, that it violates the constitutional rights of California's inmates during parole hearings. Her harshly worded opinion, which stemmed from the cases of five local murderers seeking parole, took the extraordinary step of ordering the state agency to revise its procedures and undergo training within 90 days to fix the system.

State lawyers are fighting Condron's order, filing court papers this week saying they are appealing to the 6th District Court of Appeal in San Jose. If upheld, Condron's ruling could entitle thousands of convicted killers to new parole hearings and give them more leeway to argue for release if they have, among other conditions, shown remorse for their crimes and demonstrated they have reformed in prison.

"This system is malfunctioning and must be repaired," Condron, a longtime former prosecutor before joining the bench, wrote in an Aug. 30 order. "The solution must begin with the source of the problem. The Board must make efforts to comply with due process."

Given the broad reach of Condron's decision, lawyers following the case expect the issue to eventually reach the California Supreme Court, which over the past 10 years has dealt with several cases challenging the state's general reluctance to grant parole to murderers.

"I'd say they are going to have to give a level playing field now, which they haven't had," said Jacob Burland, a Del Mar lawyer representing the five inmates. "A lot more will get out because they haven't been treated fairly up to now."

Deputy Attorney General Scott Mather, who is handling the case for the state, did not return phone calls seeking comment. Seth Unger, a spokesman for the prison and parole system, said he could not comment because the issue is being litigated.

Condron's ruling arose from a lengthy evidentiary hearing she conducted earlier this year in which she reviewed statistical evidence from nearly 2,700 board decisions denying parole to murderers. In general, the judge found that the board used boilerplate language regarding the heinous nature of the original crime as justification to deny parole without providing the specific evidence required by the law.

Out of about 3,000 decisions each year, the Board of Parole Hearings grants parole to only about 5 percent of eligible inmates who are serving potential life terms. The board is denying parole with "formulaic decisions" that "do not contain any explanation or thoughtful reasoning," Condron concluded.

In particular, Condron found the board is ignoring a state Supreme Court ruling two years ago that established new guidelines for how the parole board reviews so-called "lifer" cases. Her ruling, legal experts say, provides the Supreme Court with an opportunity to revisit that decision, in which the justices were divided 4-3 over whether a convicted Los Altos Hills businessman serving time for killing his wife was entitled to parole.

The five cases before Condron involved convicted Santa Clara County murderers who have been in prison anywhere from 19 to 28 years. Under the terms of Condron's order, those inmates - Morris Bragg, Viet Ngo, Donnell Jameison, Arthur Criscione and Donnie Lewis - would be entitled to new parole hearings under revised board procedures for reviewing their bids for release.

*Contact Howard Mintz at hmintz@mercurynews.com or (408) 286-0236.*

| Close Window | Send To Printer |



Print - Close Window

**To:**    "CDC-IN" <cdc-in@yahoogroups.com>, "PRUP" <prup@yahoogroups.com>, prisonnewsnetwork@yahoogroups.com, "Politicalinjustice" <politicalinjustice@yahoogroups.com>, "The-convicts-co-op" <the-convicts-co-op@yahoogroups.com>, "Patrickcrusade" <patrickcrusade@yahoogroups.com>, criminaldefenselawforum@yahoogroups.com, "Inmate Family Council files" <inmatefamilycouncil-files-subscribe@yahoogroups.com>

**From:**    "Mary" <marerob_2000@yahoo.com>

**Date:**    Tue, 18 Sep 2007 15:37:21 -0700 (PDT)

**Subject:**    [politicalinjustice] CA - Judge's order about California Parole system stayed

## Judge's order about California Parole system stayed Gives time for state's appeal

By Howard Mintz
Mercury News
Article Launched: 09/18/2007 12:21:25 PM PDT

A state appeals court has at least temporarily put the brakes on a San Jose judge's recent decision ordering California's parole board to change how it handles parole bids by convicted murderers.
In a brief order released this week, the San Jose-based 6th District Court of Appeal agreed to the attorney general's request for a stay of an Aug. 30 ruling that has sent shock waves through the state's parole system. That ruling by Santa Clara County Superior Court Linda Condron found the parole board's approach to parole bids by murderers so flawed that it violates their constitutional rights. Condron ordered the parole board to revise its procedures and institute new training methods for board members within 90 days, but the appeals court's stay puts that decision on hold until the justices can review the state's appeal. Legal experts expect the case, which arose from the appeals of five convicted Santa Clara County murderers denied parole, to wind up in the California Supreme Court.
In court papers filed last week, the attorney general's office urged the 6th District to intervene swiftly, warning that Condron's ruling "is arguably the most sweeping and burdensome ever issued regarding lifer parole determinations. "
The parole board's routine refusal to parole murderers and other so-called "lifer" inmates has triggered a number of legal challenges in recent years, but Condron's order is the most far-reaching denunciation of the parole system's approach to those cases. In her order, the judge said, "This system is malfunctioning and must be repaired."
The ruling stemmed from the judge's review of statistical evidence from nearly 2,700 board decisions denying parole to murderers. In general, the judge found that the board used boilerplate language regarding the heinous nature of the original crime as justification

### Visit Your Group

**Yahoo! News**
Odd News
You won't believe it, but it's true

**Yahoo! Groups**
Endurance Zone
A Yahoo! Group
for better endurance.

**Health & Fitness**
on Yahoo! Groups
Useful info for the
health conscious.

to deny parole without providing the specific evidence required by the law.

There is no timetable for the appeals court to decide the case, but the justices ordered both sides to file briefs by mid-October.

*Contact Howard Mintz at hmintz@mercurynews. com or (408) 286-0236.*

*http://www.mercurynews.com/ci_6928455?source= rss&nclick_check=1*

—·—·—

Messages in this topic (1)        **Reply** (via web post) | **Start a new topic**


Messages | Files | Photos | Database | Polls | Calendar

**YAHOO!** GROUPS
Change settings via the Web (Yahoo! ID required)
Change settings via email: Switch delivery to Daily Digest | Switch format to Traditional
Visit Your Group | Yahoo! Groups Terms of Use | Unsubscribe

—·—·—



(ENDORSED)
**FILED**

AUG 3 0 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of California County of Santa Clara
BRET MORROW
_____ DEPUTY



SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

In re

ARTHUR CRISCIONE,

On Habeas Corpus

No.: 71614

ORDER

## INTRODUCTION

Petitioner alleges that he has been denied due process of law because the Board has used standards and criteria which are unconstitutionally vague in order to find him unsuitable for parole. Alternatively, he argues that those standards, even if constitutionally sound, are nonetheless being applied in an arbitrary and meaningless fashion by the Board.  He relies upon evidence that in one hundred percent of 2690 randomly chosen cases, the Board found the commitment offense to be "especially heinous, atrocious or cruel", a factor tending to show unsuitability under Title 15 §2402(c)(1).

## Are the Board Criteria Unconstitutionally Vague?

Our courts have long recognized that both state and federal due process requirements dictate that the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

1

Cal.4th 1061 at p. 1096, footnote 16.). Those standards are found in

15 CCR §2402(c) (Dannenberg, supra, 34 Cal.4th at p. 1080,) and do

include detailed criteria to be applied by the Board when considering

the commitment offense:

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

In response to Petitioners claim that the regulations are impermissibly vague, Respondent argues that while "especially heinous, atrocious or cruel" might be vague in the abstract it is limited by factors (A)-(E) of §2402(c)(1), and thus provides a 'principled basis' for distinguishing between those cases which are contemplated in that section and those which are not. An examination of cases involving vagueness challenges to death penalty statutes is instructive here and shows that Respondent's position has merit:

"Our precedents make clear that a State's capital sentencing

2

scheme also must genuinely narrow the class of persons eligible for the death penalty. When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." [Arave v. Creech (1993) 507 U.S. 463, 474, citing Maynard v. Cartwright (1988) 496 U.S. 356, 364: "invalidating aggravating circumstance that 'an ordinary person could honestly believe' described every murder," and, Godfrey v. Georgia (1980) 446 U.S. 420, 428-429: "A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'"]

It cannot fairly be said that 'every murder' could be categorized as "especially heinous, atrocious or cruel" under the Board regulations, since the defining factors contained in subdivisions (A)-(E) clearly narrow the group of cases to which it applies. Although Petitioner also argues that the "vague statutory language is not rendered more precise by defining it in terms or synonyms of equal or greater uncertainty" (People v. Superior Court (Engert) (1982) 31 Cal.3d 797, 803, Pryor v. Municipal Court (1979) 25 Cal.3d 238, 249. See also Walton v. Arizona (1990) 497 U.S. 639, 654), the factors in those subdivisions are not themselves vague or uncertain. The mere fact that there may be some subjective component (such as "exceptionally callous" disregard for human suffering) does not render that factor unconstitutionally vague. The proper degree of definition of such factors is not susceptible of mathematical precision, but will be constitutionally sufficient if it gives meaningful guidance to the Board.

A law is void for vagueness if it "fails to provide adequate notice to those who must observe its strictures and impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and

3

1   discriminatory application." (People v. Rubalcava (2000) 23
    Cal.4th 322, 332, quoting People ex rel. Gallo v. Acuna (1997)
2   14 Cal. 4th 1090, 1116, quoting Grayned v. City of Rockford
    (1972) 408 U.S. 104, 108-109.)

3   A review of cases expressing approval of definitions to limit the

4   application of otherwise vague terms in death penalty statutes leads

5   inextricably to the conclusion that the limiting factors in §2402(c)

6   easily pass constitutional muster.  An Arizona statute was upheld

7   that provided a crime is committed in an 'especially cruel manner'

8   when the perpetrator inflicts mental anguish or physical abuse before

9   the victim's death," and that "mental anguish includes a victim's

10  uncertainty as to his ultimate fate." (Walton v. Arizona (1990) 497

11  U.S. 639, 654.)  Similarly, the court in Maynard v. Cartwright, 486

12  U.S. at 364-365, approved a definition that would limit Oklahoma's

13  "especially heinous, atrocious, or cruel" aggravating circumstance to

14  murders involving "some kind of torture or physical abuse.  In

15  Florida, the statute authorizing the death penalty if the crime is

16  "especially heinous, atrocious, or cruel," satisfied due process

17  concerns where it was further defined as "the conscienceless or

18  pitiless crime which is unnecessarily torturous to the victim."

19  State v. Dixon (1973) 283 So. 2d 1 at p. 9.

20      Here, the factors in subdivisions (A)-(E) provide equally clear

21  limiting construction to the term "especially heinous, atrocious, or

22  cruel" in §2402(c).

23  Has the Board Engaged in a Pattern of Arbitrary Application of the
    Criteria?
24

25      As previously noted, 15 CCR §2402 provides detailed criteria for

26  determining whether a crime is "exceptionally heinous, atrocious or

27  cruel" such that it tends to indicate unsuitability for parole.  Our

28

                                    4

1    courts have held that to fit within those criteria and thus serve as

2    a basis for a finding of unsuitability, the circumstances of the

3    crime must be more aggravated or violent than the minimum necessary

4    to sustain a conviction for that offense.  (*In re Rosenkrantz* (2002)

5    29 Cal.4th 616, 682-683.)  Where that is the case, the nature of the

6    prisoner's offense, *alone*, can constitute a sufficient basis for

7    denying parole.  (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

8         Petitioner claims that those criteria, even if constitutionally

9    sound, have been applied by the Board in an arbitrary and capricious

10   manner rendering them devoid of any meaning whatever.  The role of

11   the reviewing court under these circumstances has been addressed

12   previously in the specific context of Parole Board actions:

13        "[Courts have] an obligation, however, to look beyond the facial
          validity of a statute that is subject to possible
14        unconstitutional administration since a law though fair on its
          face and impartial in appearance may be open to serious abuses
15        in administration and courts may be imposed upon if the
          substantial rights of the persons charged are not adequately
16        safeguarded at every stage of the proceedings.  We have
          recognized that this court's obligation to oversee the execution
17        of the penal laws of California extends not only to judicial
          proceedings, but also to the administration of the Indeterminate
18        Sentence Law."  (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
          quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)

19

20        Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21   closest on point to the present situation, the California Supreme

22   Court stated: "This court has traditionally accepted its

23   responsibility to prevent an authority vested with discretion from

24   implementing a policy which would defeat the legislative motive for

25   enacting a system of laws."  Where, as here, the question is whether

26   determinations are being made in a manner that is arbitrary and

27   capricious, judicial oversight "must be extensive enough to protect

28

-5-

1  limited right of parole applicants 'to be free from an arbitrary

2  parole decision... and to something more than mere pro-forma

3  consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,

4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"

6  void for vagueness challenge.

7

8                    The Evidence Presented

9      A similar claim to those raised here, involving allegations of

10  abuse of discretion by the Board in making parole decisions, was

11  presented to the Court of Appeal in *In re Ramirez, supra*. The court

12  there observed that such a "serious claim of abuse of discretion"

13  must be "adequately supported with evidence" which should be

14  "comprehensive." (*Ramirez, supra*, 94 Cal.App.4th at p. 564, fn. 5.)

15  The claim was rejected in that case because there was not "a

16  sufficient record to evaluate." (*Ibid.*) In these cases, however,

17  there is comprehensive evidence offered in support of Petitioner's

18  claims.

19      Discovery orders were issued in five different cases involving

20  life term inmates (Petitioners) who all presented identical claims.[1]

21

22  [1] This Court takes judicial notice of the several other cases currently
    pending (Lewis #68038, Jameison #71194, Bragg #108543, Ngo #127611.) which

23  raise this same issue and in which proof was presented on this same point.
    (Evidence Code § 452(d). See specifically, in the habeas corpus context,

24  *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which judicial
    notice was taken of the evidence in four other cases and in which the court

25  noted: "Facts from other cases may assist petitioner in establishing a
    pattern." See generally *McKell v. Washington Mutual, Inc.* (2006) 142

26  Cal.App.4th 1457, 1491: "trial and appellate courts ... may properly take
    judicial notice of ... established facts from both the same case and other

27  cases." And see *AB Group v. Wartin* (1997) 59 Cal.App.4th 1022, 1036:
    Judicial notice taken of other cases when matters are "just as relevant to

    the present [case] as they are to the others.")

28

6

1   The purpose of the discovery was to bring before the Court a
2   comprehensive compilation and examination of Board decisions in a
3   statistically significant number of cases.  The Board decisions under
4   examination consisted of final decisions of the Board for life-term
5   inmates convicted of first or second degree murder and presently
6   eligible for parole.  Included were all such decisions issued in
7   certain months, chosen by virtue of their proximity in time to the
8   parole denials challenged in the pending petitions.  All Board
9   decisions in the months of August, September and October of 2002,
10  July, August, September, October, November, and December of 2003,
11  January and February of 2004, February of 2005, and January of 2006
12  were compiled.  This resulted in a review of 2690 cases decided in a
13  total of 13 months.

14      The purpose of the review was to determine how many inmates had
15  actually been denied parole based in whole or in part on the Board's
16  finding that their commitment offense fits the criteria set forth in
17  Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18  member of the research team conducting the review, Karen Rega,
19  testified that in its decisions the Board does not actually cite CCR
20  rule §2402(c), but consistently uses the specific words or phrases
21  ("verbiage from code") contained therein, so that it could easily be
22  determined when that criteria was being applied.  (For example,
23  finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24  "dispassionate" "calculated" or "execution style" invokes
25  §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26  invokes §2402(c)(1)(C); a crime that is "exceptionally callous" or
27  demonstrated a "disregard for human suffering" fits criteria

28

7

1  §2402(c)(1)(D); and finding the motive for the crime "inexplicable"

2  or "trivial" invokes §2402(c)(1)(E).)

3  Petitioners provided charts, summaries, declarations, and the

4  raw data establishing the above in the cases of Lewis #68038,

5  Jameison #71194, Bragg #108543, and Ngo #127611.  In this case

6  (Criscione #71614) the evidence was presented somewhat differently.

7  Both to spread the burden of the exhaustive examination, and to

8  provide a check on Petitioners' methods, this Court ordered

9  Respondent to undertake an examination of two randomly chosen months

10  in the same manner as Petitioner had been doing.  Respondent complied

11  and provided periodic updates in which they continued to report that

12  at all "the relevant hearings the Board relied on the commitment

13  offense as a basis for denying parole."  (See "Respondent's Final

14  Discovery Update" filed April 5, 2007.)  At the evidentiary hearing

15  on this matter counsel for Respondents stipulated that "in all of

16  those cases examined [by Respondent pursuant to the Criscione

17  discovery orders] the Board relied on the commitment offense as a

18  basis for denying parole."  (See pages 34-35 of the June 1, 2007,

19  evidentiary hearing transcript.)

20  The result of the initial examination was that in over 90

21  percent of cases the Board had found the commitment offense to be

22  "especially heinous, atrocious or cruel" as set forth in Title 15

23  §2402(c)(1).  In the remaining 10% of cases either parole had been

24  granted, or it was unclear whether §2402(c)(1) was a reason for the

25  parole denial.  For all such cases, the decisions in the prior

26  hearing for the inmate were obtained and examined.  In every case,

27  the Board had determined at some point in time that every inmates

28

8

1   crime was "especially heinous, atrocious or cruel" under Title 15

2   §2402(c)(1).

3        Thus, it was shown that 100% of commitment offenses reviewed by

4   the Board during the 13 months under examination were found to be

5   "especially heinous, atrocious or cruel" under Title 15 §2402(c)(1).

6        A further statistic of significance in this case is that there

7   are only 9,750 inmates total who are eligible for, and who are

8   currently receiving, parole consideration hearings as life term

9   inmates. (See "Respondent's Evidentiary Hearing Brief," at p. 4,

10  filed April 16, 2007.)

11

12                          USE OF STATISTICS

13       In *International Brotherhood of Teamsters v. United States*

14  (1977) 431 U.S. 324, 338-340, the United States Supreme Court

15  reaffirmed that statistical evidence, of sufficient "proportions,"

16  can be sound and compelling proof. As noted by the court in *Everett*

17  *v. Superior Court* (2002) 104 Cal.App.4th 388, 393, and the cases cited

18  therein, "courts regularly have employed statistics to support an

19  inference of intentional discrimination."

20       More recently, the United States Supreme Court, in *Miller-El v.*

21  *Cockrell* (2003) 537 U.S. 322, 154 L.Ed.2d 931, when examining a habeas

22  petitioner's allegations that the prosecutor was illegally using his

23  peremptory challenges to exclude African-Americans from the

24  petitioner's jury, noted that "the statistical evidence alone" was

25  compelling. The high court analyzed the numbers and concluded:

26  "Happenstance is unlikely to produce this disparity." (See also

27  *People v. Hofsheier* (2004) 117 Cal.App.4th 438 in which "statistical

28

                                   9

1   evidence" was noted as possibly being dispositive. And see *People v.*
2   *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3   analysis, combined into an "actuarial instrument" was substantial
4   proof.)
5       A statistical compilation and examination such as has been
6   presented in these cases is entirely appropriate and sufficient
7   evidence from which to draw sound conclusions about the Board's
8   overall methods and practices.

9

10                        THE EXPERT'S TESTIMONY
11       Petitioners provided expert testimony from Professor Mohammad
12  Kafai regarding the statistics and the conclusions that necessarily
13  follow from them.  Professor Kafai is the director of the statistics
14  program at San Francisco State University, he personally teaches
15  statistics and probabilities, and it was undisputed that he was
16  qualified to give the expert testimony that he did.  No evidence was
17  presented that conflicts or contradicts the testimony and conclusions
18  of Professor Kafai.  By stipulation of the parties, Professor Kafai's
19  testimony was to be admissible and considered in the cases of all
20  five petitioners.  (See page 35 of the June 1, 2007, evidentiary
21  hearing transcript.)
22       Professor Kafai testified that the samples in each case, which
23  consisted of two or three months of Board decisions, are
24  statistically sufficient to draw conclusions about the entire
25  population of life term inmates currently facing parole eligibility
26  hearings.  Given that every inmate within the statistically
27  significant samples had his or her crime labeled "'particularly
28

                                10

1  egregious'" or "especially heincus, atrocious or cruel" under Title
2  15 §2402(c)(1), it can be mathematically concluded that the same
3  finding has been made for every inmate in the entire population of
4  9,750.  Although he testified that statisticians never like to state
5  unequivocally that something is proven to a 100% certainty, (because
6  unforeseen anomalies are always theoretically possible,) he did
7  indicate the evidence he had thus far examined came as close to that
8  conclusion as could be allowed.  Not surprisingly, Professor Kafai
9  also testified that "more than 50% can't by definition constitute an
10 exception."

11      Having found the data provided to the expert to be sound this
12 Court also finds the expert's conclusions to be sound.  In each of
13 the five cases before the Court over 400 inmates were randomly chosen
14 for examination.  That number was statistically significant and was
15 enough for the expert to draw conclusions about the entire population
16 of 9,750 parole eligible inmates.  The fact that the approximately
17 2000 inmates examined in the other cases also had their parole denied
18 based entirely or in part on the crime itself (§2402(c)(1)), both
19 corroborates and validates the expert's conclusion in each individual
20 case and also provides an overwhelming and irrefutable sample size
21 from which even a non expert can confidently draw conclusions.

22
23                          DISCUSSION

24      Although the evidence establishes that the Board frequently says
25 parole is denied "first," "foremost," "primarily," or "mainly,"
26 because of the commitment offense, this statement of primacy or
27 weight is not relevant to the question now before the Court.

28

                              11

1   Petitioners acknowledge that the Board generally also cites other

2   reasons for its decision.  The question before this Court, however,

3   is not whether the commitment offense is the primary or sole reason

4   why parole is denied -- the question is whether the commitment

5   offense is labeled "'particularly egregious'" and thus <u>could</u> be used,

6   under *Dannenberg*, primarily or exclusively to deny parole.

7       The evidence proves that in a relevant and statistically

8   significant period where the Board has considered life term offenses

9   in the context of a parole suitability determination, every such

10  offense has been found to be "particularly egregious" or "especially

11  heinous, atrocious or cruel."[2]  This evidence conclusively

12  demonstrates that the Board completely disregards the detailed

13  standards and criteria of §2402(c).  "Especially" means particularly,

14  or "to a distinctly greater extent or degree than is common."[3]  (EC §

15  451(e).)  By simple definition the term "especially" as contained in

16  section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17  is precisely how it has been applied by the Board.  As pointed out by

18  the Second District Court of Appeal, not every murder can be found to

19  be "atrocious, heinous, or callous" or the equivalent without "doing

20  _____
    [2] In a single case out of the 2690 that were examined Petitioner has conceded that
21  the Board did not invoke §2402(c)(1).  This Court finds that concession to be
    improvidently made and the result of over caution.  When announcing the decision at
22  the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
    by stating "I don't believe this offense is particularly aggravated..."  However
23  the commissioner proceeds to describe the crime as a drug deal to which Fletcher
    brought a gun so "we could say there was some measure of calculation in that."  The
    commissioner continued by observing that the reason someone would bring a gun to a
24  drug transaction was to make sure things went according to their plan "so I guess
    we can say that that represents calculation and perhaps it's aggravated to that
25  extent."  As is the Board's standard practice, by using the word 'calculated' from
    §2402(c)(1)(b) the Board was invoking that regulation.  Certainly if Mr. Fletcher
26  had brought a habeas petition Respondent's position would be that there is 'some
    evidence' supporting this.  The ambiguity created by the commissioner's initial
    statement was cleared up several pages later when he announces that "based upon the
27  crime coupled with ..." parole was denied for four years.  (See *In re Burns* (2006)
    136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
28  year denial.)

                                        12

1   violence" to the requirements of due process.  (*In re Lawrence* (2007)
2   150 Cal.App.4th 1511, 1557.)  This is precisely what has occurred
3   here, where the evidence shows that the determinations of the Board
4   in this regard are made not on the basis of detailed guidelines and
5   individualized consideration, but rather through the use of all
6   encompassing catch phrases gleaned from the regulations.

7
8                    THE BOARD'S METHODS

9       Because it makes no effort to distinguish the applicability of
10  the criteria between one case and another, the Board is able to force
11  every case of murder into one or more of the categories contained in
12  §2402(c).

13      For example, if the inmate's actions result in an instant death
14  the Board finds that it was done in a "dispassionate and calculated
15  manner, such as an execution-style murder."  At the same time the
16  Board finds that a murder not resulting in near instant death shows a
17  "callous disregard for human suffering" without any further analysis
18  or articulation of facts which justify that conclusion.  If a knife
19  or blunt object was used, the victim was "abused, defiled, or
20  mutilated."  If a gun was used the murder was performed in a
21  "dispassionate and calculated manner, such as an execution-style
22  murder."  If bare hands were used to extinguish another human life
23  then the crime is "particularly heinous and atrocious."

24      Similarly, if several acts, spanning some amount of time, were
25  necessary for the murder the Board may deny parole because the inmate
26  had "opportunities to stop" but did not.  However if the murder was

27  ————————————————————————————————————————
    [3] Princeton University World Net Dictionary (2006).
28

                              13

1  accomplished quickly parole will be denied because it was done in a
2  dispassionate and calculated manner and the victim never had a chance
3  to defend themselves or flee.  If the crime occurred in public, or
4  with other people in the vicinity, it has been said that the inmate
5  "showed a callous disregard" or "lack of respect" for the
6  "community."  However if the crime occurs when the victim is found
7  alone it could be said that the inmate's actions were aggravated
8  because the victim was isolated and more vulnerable.

9      In this manner, under the Board's cursory approach, every murder
10 has been found to fit within the unsuitability criteria.  What this
11 reduces to is nothing less than a denial of parole for the very
12 reason the inmates are present before the Board - i.e. they committed
13 murder.  It is circular reasoning, or in fact no reasoning at all,
14 for the Board to begin each hearing by stating the inmate is before
15 them for parole consideration, having passed the minimum eligible
16 parole date based on a murder conviction, and for the Board to then
17 conclude that parole will be denied because the inmate committed acts
18 that amount to nothing more than the minimum necessary to convict
19 them of that crime.  As stated quite plainly by the Sixth District:
20 "A conviction for murder does not automatically render one unsuitable
21 for parole." (*Smith, supra,* 114 Cal.App.4th at p. 366, citing
22 *Rosenkrantz, supra,* 29 Cal.4th at p. 683.)

23     In summary, when every single inmate is denied parole because
24 his or her crime qualifies as a §2402(c)(1) exception to the rule
25 that a parole date shall normally be set, then the exception has
26 clearly swallowed the rule and the rule is being illegally
27 interpreted and applied.  When every single life crime that the Board
28

14

1  examines is "particularly egregious" and "especially heinous,

2  atrocious or cruel" it is obvious that the Board is operating without

3  any limits and with unfettered discretion.

4      Other examples of the failure to 'connect up' the facts of the

5  individual case with the criteria and the ultimate findings abound in

6  the decisions of the reviewing courts.  Some of the state cases to

7  have reversed Parole Board or Governor abuses of discretion in

8  denying parole include *In re Roderick*, *In re Cooper*, *In re Lawrence*,

9  *In re Barker*, *In re Gray*, *In re Lee*, *In re Elkins*, *In re Weider*, *In*

10 *re Scott*, *In re Deluna*, *In re Ernest Smith*, *In re Mark Smith*, and *In*

11 *re Capistran*.

12     When "the record provides no reasonable grounds to reject, or

13 even challenge, the findings and conclusions of the psychologist and

14 counselor concerning [the inmate's] dangerousness" the Board may not

15 do so.  (*In re Smith* (2003) 114 Cal.App.4th 343, 369.)

16     When an inmate, although only convicted of a second degree

17 murder, has been incarcerated for such time that, with custody

18 credits, he would have reached his MEPD if he had been convicted of a

19 first, the Board must point to evidence that his crime was aggravated

20 or exceptional even for a first degree murder if they are going to

21 use the crime as a basis for denying parole.  (*In re Weider* (2006)

22 145 Cal.App.4th 570, 582-583.)[4]

23

24 [4]  This rule, rooted in Justice Moreno's concurrence in *Rosenkrantz*, *supra*, is
particularly applicable in this case.  Petitioner was convicted of second degree,
but acquitted of first degree, murder over 25 years ago.  (*People v. Criscione*
25 (1981) 125 Cal.App.3d 275.)  With his custody credits he is beyond the matrix even
had he been convicted of a first.  In a currently pending habeas petition in which
26 he challenges his 2007 parole denial the first reason the Board gave was the crime
itself and the presiding commissioner explained; "His actions go well beyond the
minimum necessary for a conviction of murder in the second degree."  (Decision page
27 2 of 4/2/07 transcript.)  For the Board to penalize the Petitioner for the fact
that he was acquitted of first degree is further proof of their willfulness and

28

15

1   A "petitioner's young age at the time of the offense" must be

2   considered.  (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting

3   *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,

4   1085: "The reliability of the facts of the crime as a predictor for

5   his dangerousness was diminished further by his young age of 18, just

6   barely an adult. 'The susceptibility of juveniles to immature and

7   irresponsible behavior means their irresponsible conduct is not as

8   morally reprehensible as that of an adult.'")[5]

9   The Board's formulaic practice of stating §2402(c)(1) phrased in

10  a conclusory fashion, and then stating "this is derived from the

11  facts" without ever linking the two together, is insufficient.  (*In

12  re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the

13  Board is responsible for articulating the grounds for its findings

14  and for citing to evidence supporting those grounds." (See also *In

15  re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving

16  "conclusorily" announced findings.)

17  After two decades, mundane "crimes have little, if any,

18  predictive value for future criminality.  Simply from the passing of

19  time, [an inmate's] crimes almost 20 years ago have lost much of

20  their usefulness in foreseeing the likelihood of future offenses than

21  if he had committed them five or ten years ago." (*In re Lee* (2006)

22  143 Cal.App.4th 1400, 1412.)  It should be noted that this rule

23  bias.  The jury had a reasonable doubt that Petitioner committed first degree

24  murder but under the Board's 'reasoning' and 'analysis' this puts him in a worse
    position than if they had not.  Had the jury convicted him of the greater offense

25  Petitioner has served so much time that he would already be having subsequent
    parole hearings on a first and the Board would not have been able to use the 'some

26  evidence' of first degree behavior against him.  As observed previously, the
    Board's position in this regard is "so ridiculous that simply to state it is to

27  refute it." (*Weider, supra,* 145 Cal.App.4th at p. 583.)
    [5] This point is particularly significant in the case of Mike Ngo.  Mr. Ngo was only
    18 at the time of his crime.  The impetus behind the shooting was youth group or

28

1  applies with even more force when the Board is relying on any
2  criminality that occurred before the crime.  In that situation, just
3  as with the crime itself, the Board must explain why such old events
4  have any relevance and especially when the inmate has spent a decade
5  as a model prisoner.

6      Murders situationally related to intimate relationships are
7  unfortunately commonplace because emotions are strongest in such
8  domestic settings.  When a murder occurs because of "stress unlikely
9  to be reproduced in the future" this is a factor that affirmatively
10  points towards suitability.  (*In re Lawrence* (2007) 150 Cal.App.4th
11  1511 and cases cited therein.)

12      "The evidence must substantiate the ultimate conclusion that the
13  prisoner's release currently poses an unreasonable risk of danger to
14  the public.  It violates a prisoner's right to due process when the
15  Board or Governor attaches significance to evidence that forewarns no
16  danger to the public."  (*In re Tripp* (2007) 150 Cal.App.4th 306,
17  313.)

18      The Board "cannot rely on the fact that the killing could have
19  been avoided to show the killing was especially brutal."  (*In re*
20  *Cooper* (2007) 153 Cal.App.4th 1043, 1064.)

21      The Board's focus must be upon how the inmate "actually
22  committed his crimes" not the "incorporeal realm of legal
23  constructs."  (*Lee, supra*, 143 Cal.App.4th at p. 1413.)  This is
24  especially significant when the murder conviction is based on the
25  felony murder rule, provocative act doctrine, or accomplice liability
26  such that the inmate did not intend to kill or may not have even been

27  ──────────────────────────────────────────────
   gang rivalries, posturing, and threats which mature adults would not have been

28

1 | the actual killer.

2 |     The Board has ample guidance before it in the decisions of the

3 | various reviewing courts to constrain its abuse, but has failed to

4 | avail itself of the opportunity to do so.

5 |

6 | <center>SEPARATION OF POWERS DOCTRINE</center>

7 |     The evidence presented, as discussed above, has established a

8 | void for vagueness "as applied" due process violation. That same

9 | evidence also proves a separate but related Constitutional violation

10 | -- an as applied separation of powers violation.

11 |     The separation of powers doctrine provides "that the legislative

12 | power is the power to enact statutes, the executive power is the

13 | power to execute or enforce statutes, and the judicial power is the

14 | power to interpret statutes and to determine their

15 | constitutionality." (*Lockyer v. City and County of San Francisco*

16 | (2004) 33 Cal.4th 1055, 1068.) Because the evidence has proven the

17 | Board is not executing/enforcing the legislature's statutes as

18 | intended it is this Court's duty to intervene. The question here is

19 | whether the Board is violating the separation of powers doctrine by

20 | appropriating to itself absolute power over parole matters and

21 | disregarding the limits and guidelines placed by the statute.[6]

22 |     "Government Code section 11342.2 provides: 'Whenever by the

23 |

24 | caught up in.
[6] "It is settled that Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of

25 | administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government. Nor is the motivation

26 | of the agency relevant. It is fundamental that an administrative agency may not usurp the legislative function, no matter how altruistic its motives are."

27 | (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16 Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28 |

<center>18</center>

1   express or implied terms of any statute a state agency has authority

2   to adopt regulations to implement, interpret, make specific or

3   otherwise carry out the provisions of the statute, no regulation

4   adopted is valid or effective unless consistent and not in conflict

5   with the statute and reasonably necessary to effectuate the purpose

6   of the statute.'  Administrative regulations that alter or amend the

7   statute or enlarge or impair its scope are void and courts not only

8   may, but it is their obligation to strike down such regulations."

9   (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

10   Cal.App.4th 1315, 1341, citations omitted.)

11     The vice of overbroad and vague regulations such as are at issue

12   here is that they can be manipulated, or 'interpreted,' by executive

13   agencies as a source of unfettered discretion to apply the law

14   without regard to the intend of the people as expressed by the

15   legislature's enabling statutes.  In short, agencies usurp unlimited

16   authority from vague regulations and become super-legislatures that

17   are unaccountable to the people.  As it has sometimes been framed and

18   addressed in the case law, a vague or all encompassing standard runs

19   the risk of "violat[ing] the separation of powers doctrine by

20   'transforming every [executive decisionmaker] into a "mini-

21   legislature" with the power to determine on an ad hoc basis what

22   types of behavior [satisfy their jurisdiction].'" (*People v. Ellison*

23   (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

24   *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25     "It is concern about 'encroachment and aggrandizement,' the

26   [United States Supreme Court] reiterated, that has animated its

27   separation of powers jurisprudence.  'Accordingly, we have not

28

1   hesitated to strike down provisions of law that either accrete to a

2   single Branch powers more appropriately diffused among separate

3   Branches or that undermine the authority and independence of one or

4   another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

5   472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

6   382.)  This articulation of the principle speaks directly to the

7   situation at hand.  The Board, by its enactment and interpretation of

8   Title 15, §2402, has appropriated to itself absolute power over

9   'lifer' matters.  Overreaching beyond the letter and spirit of the

10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by

11  the Board to supply the power to declare every crime enough to deny

12  parole forever.  The fact that Title 15, §2402, has been invoked in

13  every case, but then sometime later not invoked, tends to show either

14  completely arbitrary and capricious behavior or that unwritten

15  standards are what really determine outcomes.  In either event, all

16  pretenses of taking guidance from, or being limited by, the

17  legislature's statutes have been abandoned.  "[I]t is an elementary

18  proposition that statutes control administrative interpretations."

19  (*Ohio Casualty Ins. Co. v. Garamendi* (2006) 137 Cal.App.4th 64, 78.)

20  Title 15 §2402 as applied, however, has no controls or limitations.

21      The PC § 3041(b) exception to the rule can only be invoked when

22  the "gravity of the current convicted offense or offenses, or the

23  timing and gravity of current or past convicted offense or offenses,

24  is such that consideration of the public safety requires a more

25  lengthy period of incarceration for this individual."  The word

26  "gravity" *is a* directive for comparison just as "more lengthy"

27  indicates a deviation from the norm.  While *Dannenberg* held there

28

1   does not need to be intra case comparison for the purposes of term

2   uniformity or proportionality, there necessarily has to be some sort

3   of comparison for the purposes of adhering to the legislative mandate

4   that parole is available.  The Board employs no meaningful yardstick

5   in measuring parole suitability.  This is a violation of the

6   separation of powers doctrine.  (*People v. Wright* (1982) 30 Cal.3d

7   705; 712-713.  And see *Terhune v. Superior Court* (1998) 65

8   Cal.App.4th 864, 872-873.  Compare *Whitman v. Am. Trucking Ass'ns*

9   (2001) 531 U.S. 457, 472, describing a delegation challenge as

10  existing when the legislature fails to lay down "an intelligible

11  principle to which the person or body authorized to act is directed

12  to conform.")

13

14                          RESPONDENT'S POSITION

15      The Attorney General has suggested, without pointing to any

16  concrete examples, that it is possible that the Board, when invoking

17  the crime as a reason to deny parole, is not placing it within

18  §2402(c)(1) but instead using is as some sort of 'lesser factor'

19  which, only when combined with other unsuitability criteria, can

20  contribute to a valid parole denial.  The two problems with this

21  position are, first, there is no evidentiary support for this

22  assertion, and second, it would have no impact on the constitutional

23  infirmities outlined and proven above.

24      Even if Respondent had produced evidence that the Board was

25  utilizing the crime as a 'lesser factor' which needs others to fully

26  support a parole denial, the Board would then be admitting it was

27  denying parole, in part, for the very reason that the person is

28

1  before the panel and eligible for parole in the first place — the
2  commitment offense.  Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole.  Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context.  This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10 egregious," or one where "no circumstances of the offense reasonably
11 could be considered more aggravated or violent than the minimum
12 necessary to sustain a conviction for that offense." (*Dannenberg*,
13 *supra*, 34 Cal.4th at pp. 1094-1095.)  These are the only two choices.
14 If a crime consists of only the bare elements then it is not
15 aggravated and it cannot, in and of itself, serve as a basis for
16 parole denials once the inmate becomes eligible for parole.  It is
17 the reason an inmate may be incarcerated initially for the equivalent
18 of 15 or 25 years, and then examined to determination rehabilitation
19 efforts when they come before the Board, but a crime that is no more
20 than the bare minimum cannot be factored into the equation pursuant
21 to PC § 3041(b) or any of the case law interpreting it.

22     In oral argument Respondent suggested a second way the
23 commitment offense can be used outside of §2402(c)(1).  If for
24 example a crime had its roots in gang allegiances or rivalries and
25 the inmate continued to associate with gangs while incarcerated, then
26 an aspect of the crime, even if the crime otherwise consisted of no
27 more than the minimum elements, could be combined with other behavior
28

22

1  to support a parole denial.  Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated.  A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability.  It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10 thus, his present dangerousness.

11     Respondent has not demonstrated any flaws in Petitioner's
12 methodology or analysis, nor provided any actual evidence of the
13 crime being invoked *other* than pursuant to §2402(c)(1).  Drawing
14 conclusions from the Board's direct statements, or its precise
15 recitations of the §2402(c)(1) language, logically indicates an
16 invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17 insupportable.

18
19             THE QUESTION OF BIAS
20     Because the issue has been squarely presented, and strenuously
21 argued by Petitioners, this Court is obligated to rule on the charge
22 that the Board's actions prove an overriding bias and deliberate
23 corruption of their lawful duties.
24     In the discrimination and bias case of *USPS Bd. of Governors v.*
25 *Aikens* (1983) 460 U.S. 711, the United States Supreme Court
26 acknowledged "there will seldom be 'eyewitness' testimony as to the
27 [] mental processes" of the allegedly biased decisionmaker.  Instead,
28

23

1    an examination of other cases for trends or patterns can provide the

2    necessary circumstantial evidence.  (See *Aikens, supra,* at footnote

3    2.)  Reaffirming that such circumstantial evidence will be sufficient

4    the Court stated: "The law often obliges finders of fact to inquire

5    into a person's state of mind.  As Lord Justice Bowen said in

6    treating this problem in an action for misrepresentation nearly a

7    century ago, 'The state of a man's mind is as much a fact as the

8    state of his digestion.  It is true that it is very difficult to

9    prove what the state of a man's mind at a particular time is, but if

10   it can be ascertained it is as much a fact as anything else.'"

11   (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29

12   Ch. Div. 459, 483.)[7]

13       The discovery in these cases was granted in part due to the

14   Petitioners' prima facie showing of bias and the necessity that it be

15   "adequately supported with evidence" if such evidence is available.

16   (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.  See also *Nasha v.*

17   *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking

18   to show bias or prejudice on the part of an administrative decision

19   maker is required to prove the same 'with concrete facts.'"  And see

20   *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,

21   841: "The challenge to the fairness of the adjudicator must set forth

22   concrete facts demonstrating bias or prejudice."  See also *Hobson v.*

23

24   [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court,
     Respondent should have provided direct evidence from the decisionmakers.  While the

25   fact that a *Defendant* does not explain his or her actions cannot be held against
     him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.

26   610,) it is appropriate to give some weight to the consideration that the Board has
     failed to offer any direct evidence or explanation on its own behalf.  While the

27   case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
     proposition that Petitioner may not inquire into the Board members mental
     processes, Respondent is not precluded from offering such direct evidence if they

28   were able to testify as to their good faith and conscientious efforts.

24

1  *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.

2  school desegregation case in which the court determined from a

3  statistical and factual analysis that racial bias was influencing

4  policy.)

5       In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,

6  a similar claim of biased decision making was asserted and it was

7  rejected because, although the defendant clearly articulated it, "he

8  has not demonstrated it.  Therefore, he has failed to bear his burden

9  of showing a constitutional violation as a demonstrable reality, not

10  mere speculation."  In the present cases Petitioners have provided

11  overwhelming concrete evidence.  It is difficult to believe that the

12  Board's universal application of §2402(c)(1) has been an inadvertent

13  mistake or oversight on their part.  It is hard to credit the Board's

14  position that it does not know its own patterns and practices reveal

15  a complete lack of standards or constraints on their power.

16  Respondent's protestations ring hollow, and it seems a statistical

17  impossibility, that the Board's use of "detailed" criteria in such a

18  fashion that they are rendered meaningless is a result of good faith

19  efforts on their part.  That <u>every</u> murder is "especially heinous,

20  atrocious or cruel," and can therefore be an exception to the rule

21  that a parole date should be set, does not seem to be an accident on

22  their part.

23       Although no court has thus far agreed with the accusation that

24  the Board approaches its duties with a predetermination and a bias,

25  no court has previously been presented the comprehensive evidence

26  outlined herein.  While this Court does not turn a blind eye to the

27  reasonable conclusion that the Board's unconstitutional practices are

28

willful, there is another possibility. The pattern of errors
demonstrated by the discovery in this case, and the continuously
growing body of Court of Appeal opinions finding consistent and
persistent abuse of discretion, may instead be caused by the fact
that the Board is simply overworked and substantively untrained. The
impossibility of the blanket applicability of §2402(c)(1) may be only
the result of sloppy preparation and inadvertent carelessness.

The Board must first be given an opportunity to comply with the
necessary remedy provided by this court before it is possible to
enter a finding of conscious bias and illegal sub rosa policy. To do
otherwise would ignore the complexities and magnitude of the largely
discretionary duties with which that Board is vested.

## CONCLUSION

The conclusive nature of the proof in this case, and the
suggestion of institutional bias do not preclude formulation of an
remedy which will guarantee adequate restrictions on, and guidance
for, the Board's exercise of discretion in making parole suitability
determinations. The Board can be made to lawfully perform its duties
if given explicit instructions.

As noted supra, a reason the proof in this case irrefutably
establishes constitutional violations is because the Board does not,
in actual fact, operate within the limiting construction of the
regulations. The Board's expansive interpretation allows it to
operate without any true standards. Although numerous rulings of
both state and federal courts of appeal have invalidated the Board's
application of the §2402(c) criteria to particular facts, the Board

1   does not take guidance from these binding precedents and ignores them
2   for all other purposes.  In the most recent of these cases, In re
3   Roderick, (2007) ___ Cal.App.4th ___ (A113370) the First District
4   held four of five §2402 factors "found" by the Board to be
5   unsupported by any evidence.  At footnote 14 the court took the time
6   to criticize the Board for its repeated use of a "stock phrase"
7   "generically across the state."  The court also clarified that "at
8   minimum, the Board is responsible for articulating the grounds for
9   its findings and for citing to evidence supporting those grounds."
10          There is nothing in the evidence presented that would allow any
11   conclusion but that, without intervention of the Courts, the Board
12   will ignore the lessons of these rulings in the future and continue
13   to employ its formulaic approach of citing a criteria from
14   §2402(c)(1), repeating the facts of the crime, but never
15   demonstrating a logical connection between the two.   This is the
16   core problem with the Board's methodology -- they provide no
17   explanation or rationale for the findings regarding the crime itself.
18   This practice results in violence to the requirements of due
19   process and individualized consideration which are paramount to the
20   appropriate exercise of its broad discretion.
21          The only solution is one that compels the Board to identify the
22   logical connection between the facts upon which it relies and the
23   specific criteria found to apply in the individual case.   For
24   example, the Board often finds that an inmate's motive is "trivial"
25   without ever suggesting why, on these facts, that motive is not just
26   as trivial as the motive behind any other murder.  What motive is not
27   trivial?   By any definition "trivial" is a word of comparison and
28

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (In

4  re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10 instances of murder would not fit the Board's amorphous application

11 of the §2402 criteria.  Citing Dannenberg, Respondent insists such

12 comparative analysis is unnecessary.  Respondent fundamentally

13 misunderstands the Dannenberg holding.

14     The PC § 3041(b) exception to the rule can only be invoked when

15 the "gravity of the current convicted offense or offenses, or the

16 timing and gravity of current or past convicted offense or offenses,

17 is such that consideration of the public safety requires a more

18 lengthy period of incarceration for this individual."  The word

19 "gravity" is a directive for comparison just as "more lengthy"

20 indicates a deviation from the norm.  While Dannenberg held there

21 does not need to be intra case comparison for the purposes of term

22 uniformity or proportionality, there necessarily has to be some sort

23 of comparison for the purposes of adhering to the legislative mandate

24 that parole is available.  This is implicit in §2402 because the

25 qualifier "especially," in "especially heinous atrocious or cruel,"

26 requires that some form of comparison be made.  While the original

27 drafters of §2402 seemed to have recognized this fact, the ongoing

28

1    conduct of the Board has completely ignored it, and this is the

2    essence of the due process violation Petitioners have asserted.

3        As noted in his dissent in the recent case of *In re Roderick,*

4    *supra,* Justice Sepulveda would have deferred to the Board's

5    'exercise' of discretion because "Board members have both training

6    and vast experience in this field. They conduct literally thousands

7    of parole suitability hearings each year. The Board therefore has

8    the opportunity to evaluate the egregiousness of the facts of a great

9    number of commitment offenses. ... The Board's training and

10    experience in evaluating these circumstances far exceeds that of

11    most, if not all, judges." The evidence in this case, however,

12    suggests a flaw in granting such deference. Since the Board

13    continues to place every murder in the category of offenses "tending

14    to show unsuitability," something is certainly wrong. Since the

15    Board's vast experience is undeniable, the problem must be in the

16    Board's training and understanding of the distinguishing features of

17    the guidelines and criteria. Although Justice Sepulveda presumes

18    that Board members receive substantive training, there is no evidence

19    before this court to suggest that it does, and substantial

20    circumstantial evidence to suggest that it does not.

21        In the vast numbers of Santa Clara County cases reviewed by this

22    Court, the Board's formulaic decisions regarding the commitment

23    offense do not contain any explanation or thoughtful reasoning.

24    Instead, the Board's conclusionary invocation of words from

25    §2402(c)(1) is linked to a repetition of the facts from the Board

26    report by the stock phrase: "These conclusions are drawn from the

27    statement of facts wherein ..." Thereafter the inmate files a habeas

28

29

1   corpus petition and Respondent, after requesting an extension of
2   time, files a boilerplate reply asserting the Board's power is
3   "great" and "almost unlimited" and thus any "modicum" of evidence
4   suffices.  Respondent does not cite or distinguish the expanding body
5   of case law that is often directly on point as to specific findings
6   made.  Thereafter, if the writ is granted, the Board is directed to
7   conduct a new hearing "in compliance with due process" and that order
8   is appealed by Respondent.  On appeal the order is usually upheld
9   with modifications and in the end, after countless hours of attorney
10  and judicial time, the Board conducts a new two hour hearing at which
11  they abuse their discretion and violate due process in some different
12  way.

13      This system is malfunctioning and must be repaired.  The
14  solution must begin with the source of the problem.  The Board must
15  make efforts to comply with due process in the first instance.  The
16  case law published over the last five years provides ample and
17  sufficient guidelines and must be followed.  Although the Board
18  methods suggest it believes this to be optional, it is not.

19

20                          THE REMEDY

21      Thus, it is the order of this Court that the Board develop,
22  submit for approval, and then institute a training policy for its
23  members based on the current and expanding body of published state,
24  and federal, case law reviewing parole suitability decisions, and
25  specifically the application of $2402 criteria.  In addition to
26  developing guidelines and further criteria for the substantive
27  application of $2402 the Board must develop rules, policies and
28

1   procedures to ensure that the substantive guidelines are followed.

2       This Court finds its authority to impose this remedy to flow

3   from the fundamental principles of judicial review announced over two

4   centuries ago in *Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137.

5   Citing that landmark case, the California Supreme Court has

6   recognized "Under time-honored principles of the common law, these

7   incidents of the parole applicant's right to 'due consideration'

8   cannot exist in any practical sense unless there also exists a remedy

9   against their abrogation." (*In re Sturm* (1974) 11 Cal.3d 258, 268.)

10      In *Strum* the court directed that the Board modify its rules and

11  procedures so that thereafter "The Authority will be required [,]

12  commencing with the finality of this opinion, to support all its

13  denials of parole with a written, definitive statement of its reasons

14  therefor and to communicate such statement to the inmate concerned."

15  (*Sturm* at p. 273.)

16      Similarly, in the case of *Minnis, supra*, the California Supreme

17  Court held the Board's policy of categorically denying parole to drug

18  dealers was illegal.  Based on its analysis the court there was

19  clearly prepared to order that Board to modify its rules and

20  procedures however such was unnecessary because the Board

21  "voluntarily rescinded" the illegal policy.  While the remedy in this

22  case is of greater scope than that necessary in either *Strum* or

23  *Minnis, supra*, so too has been the showing of a systematic abuse of

24  discretion and distortion of process.

25      The most recent case to address the court's roles and duties in

26  overseeing the parole suitability process has been *In re Rosenkrantz,*

27  *supra*, 29 Cal.4th 616.  In that case the court explained that

28

31

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum*,
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation." (*Rosankrantz* at p. 664.)

9       The *Rosenkrantz* court also put forth what it believed was an
10 extreme example but which, unfortunately, has been shown to exist in
11 this case.  The court stated: "In the present context, for example,
12 judicial review could prevent a Governor from usurping the
13 legislative power, in the event a Governor failed to observe the
14 constitutionally specified limitations upon the parole review
15 authority imposed by the voters and the Legislature."  This is
16 exactly what the evidence in this case has proven.  As noted above
17 the Board has arrogated to itself absolute authority, despite
18 legislative limitations and presumptions, through the mechanism of a
19 vague and all inclusive, and thus truly meaningless, application of
20 standards.  The remedy this Court is imposing is narrowly tailored to
21 redress this constitutional violation.

22      The consequence of the Board's actions (of giving § 2402(c)(1)
23 such a broadly all encompassing and universal application) is that
24 they have unwittingly invalidated the basis of the California Supreme
25 Court's holding in *Dannenberg*.  The reason the four justice majority
26 in *Dannenberg* upheld the Board's standard operating procedures in the
27 face of the Court of Appeal and dissent position is because "the

28

1  Board must apply detailed standards when evaluating whether an

2  individual inmate is unsuitable for parole on public safety grounds."

3  (Dannenberg at p. 1096, footnote 16.  See also page 1080: "the

4  regulations do set detailed standards and criteria for determining

5  whether a murderer with an indeterminate life sentence is suitable

6  for parole.")  However, Petitioners in these cases have proven that

7  there are no "detailed standards" at all.  Instead the Board has

8  systematically reduced the "detailed standards" to empty words.  The

9  remedy this Court orders, that there truly be "detailed standards,"

10 requires the promulgation of further rules and procedures to

11 constrain and guide the Board's powers.  This remedy differs in

12 specifics, but not in kind, from what courts have previously imposed

13 and have always had the power to impose.

14      The Board must fashion a training program and further rules,

15 standards and regulations based on the opinions and decisions of the

16 state and federal court cases which provide a limiting construction

17 to the criteria which are applied.[8]  The Board must also make

18 provisions for the continuing education of its commissioners as new

19 case law is published and becomes binding authority.  This Court will

20 not, at this point, outline the requirements and lessons to be taken

21 from the above cases.  It is the Board's duty, in the first instance

22 to undertake this task.  The training program, and associated rules

23 and regulations, shall be served and submitted to this Court, in

24 _____
[8]While the showing and analysis in this case was limited to § 2402(c)(1), the

25 conclusions that the evidence compelled, that the Board has been carelessly
distorting and misapplying the regulations, is not so limited.  Accordingly, the

26 training program that is necessary for the Board can not reasonably be limited to
just § 2402(c)(1).  Thus, to the extent case law recognizes, clarifies and

27 establishes remedies for other due process violations they must also be
incorporated into the necessary rules and training the Board is required to abide

28 by.

33

1  writing, within 90 days. Counsel for Petitioners, and any other
2  interested parties, may submit briefs or comments within 30 days
3  thereafter. After receipt and review of the materials this Court
4  will finalize the training program, and associated rules, and the
5  Petitioners in these cases shall receive a new hearing before a Board
6  that does not operate with the unfettered discretion and caprice
7  demonstrated by the evidence here presented.

8                              <u>ORDER</u>

9       For the above reasons the habeas corpus petition is granted and
10  it is hereby ordered that Petitioner be provide a new hearing which
11  shall comply with due process as outlined above. Respondent shall
12  provide weekly updates to this Court on the progress of its
13  development of the new rules and regulations outlined above.

14

15

16

17  DATED: _Aug 30_, 2007

18                              LINDA R. CONDRON
                               JUDGE OF THE SUPERIOR
19

20  cc: Petitioner's Attorney (Jacob Burland)
        Attorney General (Denise Yates, Scott Mather)
21

22

23

24

25

26

27

28

                              34